UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:17-cv-256

SHIRLEY TETER,                          )
                                        )
      Plaintiff,                       )
                                        )
      vs.                              )
                                        )                    **COMPLAINT**
PROJECT VERITAS ACTION FUND,            )
PROJECT VERITAS,  and                   )
JAMES E. O'KEEFE, III,                  )
                                        )
      Defendants.                      )


      NOW COMES Plaintiff, Shirley Teter, by and through her undersigned counsel, and

alleges as follows:

      1.      This case arises from the assault of a 69-year-old disabled woman outside a

political rally a block from her Asheville home.  Defendants, radical political provocateurs with a

record of duping the public, created multiple YouTube videos falsely stating that the woman,

Ms. Teter, was a paid partisan activist recruited to foment chaos.  Defendants' videos (later

discredited by the Wisconsin Attorney General) tricked thousands of people, many of whom

themselves then disparaged Ms. Teter.  Some, in direct response to Defendants' defamatory

statements, publicly threatened her life:  "Fucking cut this human garbage's oxygen already";

"execute this lying slut for treason"; "kill that idiotic woman."

      2.      Ms. Teter brings this lawsuit to clear her name and ensure that this never happens

to another North Carolinian.

## JURISDICTION

3.    Ms. Teter is a resident of Asheville, North Carolina, and was so at all times related to the events described in this Complaint.

4.    Defendant Project Veritas Action Fund ("PVAF") is a Virginia nonstock, nonprofit corporation with its principal place of business in Mamaroneck, New York.  PVAF claims exemption from federal taxation as a social welfare organization under section 501(c)(4) of the Internal Revenue Code of 1986 as amended.

5.    Defendant Project Veritas ("PV") is a Virginia nonstock, nonprofit corporation with its principal place of business in Mamaroneck, New York. PV is an organization recognized as exempt from federal taxation as a charitable and educational organization under section 501(c)(3) of the Internal Revenue Code of 1986 as amended.

6.    Defendant James E. O'Keefe, III ("O'Keefe"), a convicted criminal, is the President and founder of both PVAF and PV. He is a citizen of New York, residing and domiciled in Mamaroneck, New York.

7.    This Court has subject matter jurisdiction of this action under 28 U.S.C. § 1332 because the action arises between citizens of different states and the amount in controversy exceeds $75,000.00.

8.    This Court has personal jurisdiction over each Defendant under the North Carolina long-arm statute because Defendants each caused tortious injury in North Carolina by acts, individually or through authorized agents or employees, that were directed at Plaintiff, a North Carolina resident.  Furthermore, Defendants regularly and systematically availed themselves of the privileges of doing business in North Carolina before, during and after the events described in this Complaint.

2

9.     Venue in this district is established by 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to the claims asserted herein occurred in the Western District of North Carolina, and Plaintiff resides in this judicial district.

## FACTUAL ALLEGATIONS

**The Parties**

10.     Ms. Teter is a 69-year-old grandmother, who lives in a high rise apartment building in downtown Asheville that caters to senior citizens.  Although she uses supplementary oxygen as a result of Chronic Obstructive Pulmonary Disease, she is able to walk to restaurants and stores within several blocks of her home.  When outside, Ms. Teter breathes from a portable oxygen tank she carries in a backpack.

11.     Mr. O'Keefe is a convicted fraudster.  In January 2010, he "masterminded" the illegal entry of the office of Senator Mary Landrieu by accomplices disguised as telephone repairmen.  He was charged with feloniously entering federal property under false pretenses with the intent of committing a felony, but pleaded guilty to a misdemeanor of entering a federal building under false pretenses.  At his sentencing, United States Magistrate Judge Daniel Knowles, III explained his decision to be stricter with Mr. O'Keefe than his confederates: "Your record concerns me."  Vargas, Ramon Antonio  "James O'Keefe remains defiant despite pleading guilty in failed Mary Landrieu office caper," *The Times-Picayune* (May 26, 2010) --

http://www.nola.com/crime/index.ssf/2010/05/okeefe-and-co-guilty.html

12.     The record to which Judge Knowles alluded includes numerous instances of producing undercover video and audio "sting" operations aimed at progressive organizations, governmental agencies, and academic institutions.  Mr. O'Keefe's productions are hyped and released to generate maximum publicity – and are successful at doing so.  However, Mr. O'Keefe's escapades are often ultimately discredited.  "O'Keefe has previously spliced videos

3

together to imply its subjects were saying things they were not." Elliott, Philip "Everything We Know About the Latest James O'Keefe Video Sting," *Time* (October 18, 2016)

 http://time.com/4536212/james-okeefe-project-veritas-video-democrats/

13.     For example, the California Attorney General concluded in 2010, after granting Mr. O'Keefe immunity from prosecution, that Mr. O'Keefe's video recordings of himself purportedly in pimp garb discussing human trafficking with the Association of Community Organizations for Reform Now ("ACORN") had been "severely edited." The California Attorney General's Report noted that Mr. O'Keefe "stated that he was out to make a point and to damage ACORN, and therefore did not act as a journalist objectively reporting a story." California Dept of Justice "Report of the Attorney General on the Activities of ACORN in California," p. 23 (April 1, 2010)

http://ag.ca.gov/cms_attachments/press/pdfs/n1888_acorn_report.pdf  The *New York Times* concluded: "The videos were heavily edited. The sequence of some conversations was changed." Hoyt, Clark "THE PUBLIC EDITOR: The Acorn Sting Revisited," *The New York Times* (March 20, 2010)  http://www.nytimes.com/2010/03/21/opinion/21pubed.html

14.     An undercover video ruse Mr. O'Keefe perpetrated upon National Public Radio in 2011 similarly could not withstand scrutiny.  "O'Keefe did not merely leave a false impression; he manufactured an elaborate, alluring lie." Gerson, Michael "The NPR video and political dirty tricks," *The Washington Post* (March 24, 2011)

https://www.washingtonpost.com/opinions/the-npr-video-and-political-dirty-tricks/2011/03/17/ABbyMym_story.html?utm_term=.9b41677cbab9

15.     PVAF and PV are related entities through which Mr. O'Keefe and his agents and employees carry out what they call "guerilla journalism."  Employing false identifications and disguises, Defendants use concealed cameras and microphones to record representatives of the

4

object of their sting operations. Defendants then edit the video and audio to present to others to view. The end product will be referred to as a "video journal" in this Complaint.

16.     PVAF and / or PV have a channel on YouTube®. PVAF and PV post and have posted their video journals on YouTube at https://www.youtube.com/channel/UCEE8w-v6Gg4j3ze3oX-urEw where PVAF and PV intend for them to be viewed by the public. PVAF and PV also distribute their video journals in other media outlets, with the intent for them to be displayed and viewed by the public, including local and national television and internet news organizations.

**The Assault Outside the Trump Rally**

17.     On the evening of September 12, 2016, Ms. Teter joined a crowd gathered outside the U.S. Cellular Center, an auditorium one block from her home. Those present were protesting a political rally in the Center for Donald Trump, the Republican Nominee for President (the "Trump Rally"). Ms. Teter never entered the Center.

18.     Ms. Teter and the other protestors remained near the Center when the Trump Rally ended. As the Trump supporters walked by, Ms. Teter suggested to one that he had better learn to speak Russian. He suddenly turned, swung and struck her in the face, knocking her to the sidewalk. She landed on her oxygen tank, sustaining injuries to her jaw, ribs, and elbow.

19.     Police soon interviewed Ms. Teter about the assault. The officers, who had not seen the encounter, declined to arrest Ms. Teter's assailant.

20.     Ms. Teter then went to a hospital for her injuries. She was treated, released, and returned home.

21.     The next day, September 13, 2016, the Asheville Police Department issued a warrant for the arrest of Ms. Teter's attacker. He was charged with assault on a female.

5

22. The events of September 12 and September 13, 2016, described above, became national news. These events coincided with national criticism of Mr. Trump for inciting violence during or after his rallies. In fact, a Trump supporter was charged with criminal assault for assaulting a protestor inside the Center during the Trump Rally. This assault, captured on video, was broadcast widely on social media and in internet and television news.

**Defendants' Defamatory Videos**
*Video I*

23. On or about October 17, 2016, through its agents or employees, PVAF and PV published on its YouTube channel and elsewhere a 16:26 minute video journal titled *"Rigging the Election - Video I: Clinton Campaign and DNC Incite Violence at Trump Rallies"* ("Video I")*. Video I can be viewed at https://www.youtube.com/watch?v=5IuJGHuIkzY. According to the YouTube website, Video I has been viewed more than 6,500,000 times. A copy of the video with all of the written comments made by viewers of Video I that were published on the YouTube website is attached as Exhibit 1, and provided to the Court on a separate DVD.

24. On or about October 17, 2016, through its agents or employees, PVAF and PV published on the YouTube website the following written statement, that was intended to describe the content of Video I: "In this explosive new video from Project Veritas Action, a Democratic dirty tricks operative unwittingly provides a dark money trail to the DNC and Clinton campaign. The video documents violence at Trump rallies that is traced to the Clinton campaign and the DNC through a process called birddogging." (Exhibit 1)

25. Video I includes video clips and spoken statements from representatives, agents and/or employees of several organizations that were alleged to be associated with the presidential campaign of Hillary Clinton. One of the organizations was an entity called "**Americans United for Change**."

6

26.     Video I includes statements that representatives, agents and / or employees of Americans United for Change hired mentally ill and/or homeless people to attend or protest outside rallies for presidential candidate Donald Trump.  These statements and the overall content of the video suggest that Ms. Teter is mentally ill and/or homeless.

27.     Video I includes statements that representatives, agents and/or employees of Americans United for Change trained those hired to engage in behavior designed to incite violence by supporters of candidate Donald Trump at the rallies.  These statements and the overall content of the video suggest that Ms. Teter was trained to engage in behavior designed to incite violence.  As such, the statement suggests that Ms. Teter was responsible for her own assault.

28.     Video I includes statements that representatives, agents and/or employees of Americans United for Change describe the attendance at such rallies by these trained people as "birddogging."  (Exhibit 1)

29.     At 12:51 in Video I, an image of Ms. Teter appears.  A narrator asks: "Remember this woman?  Her name is Shirley Teter. . ."  (Exhibit 1)  The narration, with Ms. Teter's image, continues to 13:08.  The narrator discusses what happened to Ms. Teter at the Trump Rally, and the attention it generated in news and internet media.  On information and belief, the narrator on Video I is Defendant O'Keefe.

30.     At 13:08 in Video I, agents or employees of PVAF, PV and Mr. O'Keefe inserted a video and audio clip of a representative of Americans United for Change, who states:  "She was one of our activists."  (Exhibit 1)  There was no question or other statement before 13:08 in Video I to describe or define the object of who "she" is in the statement "she was one of our

7

activists." Instead, agents or employees of PVAF, PV and Mr. O'Keefe clearly intended to convey to the viewing public that "she" is Ms. Teter.

31.     At 13:13 – 13:18 in Video I, agents or employees of PVAF, PV and Mr. O'Keefe falsely and misleadingly imply that Americans United for Change paid Ms. Teter to birddog at the September 12, 2016 Asheville Trump Rally.  (Exhibit 1)

32.     At 13:20 – 13:31 in Video I, agents or employees of PVAF, PV and Mr. O'Keefe falsely and misleadingly imply that Americans United for Change placed Ms. Teter in the "rope line" at the Trump Rally.  (Exhibit 1)

33.     At 13:48 – 13:56 in Video I, agents or employees of PVAF, PV and Mr. O'Keefe falsely and misleadingly imply that Ms. Teter is a mentally ill person, and that Americans United for Change paid her to attend the Trump Rally.  (Exhibit 1)

34.     At 13:56 – 14:26 in Video I, agents or employees of PVAF, PV and Mr. O'Keefe falsely and misleadingly imply that Ms. Teter is a homeless person, and that Americans United for Change paid her to attend the Trump Rally.  (Exhibit 1)

35.     At no time, has Ms. Teter ever been affiliated in any way with Americans United for Change.

36.     At no time, has Ms. Teter ever been trained in any way by any representative, agent, or employee of Americans United for Change.

37.     Ms. Teter did not attend the Trump Rally on behalf of Americans United for Change.

38.     At no time, has Ms. Teter ever been paid by Americans United for Change.

39.     At no time, has Ms. Teter ever been homeless or mentally ill.

8

40.     As one of millions of people who decided to voice their opposition to the candidacy of Donald Trump in the fall of 2016, Ms. Teter did not become a public figure; nor did she become one after involuntarily joining the many victims who suffered violence during Candidate Trump's rallies.

41.     On or about October 19, 2016, a local Asheville television station, WLOS, reported on the appearance of Video I.  In this report, Ms. Teter denied being recruited to protest outside the Trump Rally.   She also told WLOS that it is possible that her assailant could have struck her with his backhand.  A copy of the internet version of the October 19, 2016 WLOS story is attached as Exhibit 2.

*Video II*

42.     On October 21, 2016, PVAF, PV and Mr. O'Keefe published a 1:39 minute video journal entitled *"Shirley Teter Changes Her Story After Release of Project Veritas Action Videos".* ("Video II").  Video II can be viewed at https://www.youtube.com/watch?v=QNR9FUN98Qg.  According to the YouTube website, Video II has been viewed more than 58,000 times. In addition to these 58,000 views, the YouTube website reports that more than 380 comments were made by viewers of Video II, many of them expressing belief in the truth of the content of Video II, and expressing contempt and ridicule for Ms. Teter.  A copy of the video with all of the written comments made by viewers of Video II that were published on the YouTube website is attached as Exhibit 3, and supplied to the court on a separate DVD.

43.     On October 21, 2016, through its agents or employees, PVAF and PV published on the YouTube website the following written statement, that was intended to describe the content of Video II:  "Shirley Teter, the woman who accused a Donald Trump supporter of

punching her outside a Trump rally in North Carolina is changing her story after Project Veritas Action released videos that caught Democrat operatives on camera claiming she was a trained 'birddogging' activist." (Exhibit 3) At no point did Video II or Defendants' description of Video II suggest how any purported change in Ms. Teter's story was related to Defendants' earlier videos.

44. Like Video I, Video II included video clips and spoken statements from representatives, agents and / or employees of Americans United for Change.

45. Video II began with an image of Ms. Teter with these words superimposed across her face for 13 seconds: "Shirley Teter is in the news yet again. The 69-year-old made headlines in September after getting 'cold-cocked' at a Trump rally." (Exhibit 3)

46. At 0:13 until 0:17 in Video II, these words are superimposed across Ms. Teter's face: "This week, Project Veritas Action revealed a different side of the story." (Exhibit 3)

47. At 0:17 in Video II, agents or employees of PVAF, PV and Mr. O'Keefe again inserted a video and audio clip of a representative of Americans United for Change who states "she was one of our activists." (Exhibit 3) There was no question or other statement before 0:17 in Video II to describe or define the object of who "she" was in the statement "she was one of our activists." Instead, agents or employees of PVAF, PV and Mr. O'Keefe intended to convey to the viewing public that the "she" in the statement is Ms. Teter. This falsely and misleadingly implies that Ms. Teter is affiliated with Americans United for Change.

48. At 0:20 – 0:58 in Video II, agents or employees of PVAF, PV and Mr. O'Keefe falsely and misleadingly imply that Americans United for Change trained – and paid -- Ms. Teter to birddog at the Trump Rally. (Exhibit 3) At no time did Video II reveal that Ms. Teter had

10

flatly denied – in the very same WLOS story sourced in Video II – that she ever had anything to do with Americans United for Change.  (*See* Exhibit 3)

49.     Numerous viewers of Video II were apparently convinced by Defendants' misstatements about Ms. Teter's supposed relationship with the activists.  These viewers commented:

persiamotorman
That birddogging Grandma probably has done a lot of other things if a private investigator ever did some "digging".

*        *        *

Whitewolf Wendi Brown
Yeah POOR OLD LADY - she was PAID WELL, they start at $1500.00 USD

*        *        *

lansing street blues

granny probably needed the $1500. The was no social security cost of living increase again this year. She's setting a great example for her grandkids . (sarcasm) What a piece of work.

*        *        *

Iliek Tehbut
TheSonic9876 Too damn bad for her she got paid off to lie and will never be able to live that down.

*        *        *

Michael Hennesy
Her thirty pieces of silver .....to betray her own Country and try and help elect a criminal woman President .

*        *        *

11


**Pluffpluff**

The old women I can forgive, she's sick and most likely needed the money. She
most likely signed a contract, so telling the truth is not an option.

*       *       *


**ispin4u2**

haha...old bitch did it for the cash...we all know it.

*       *       *


**Mein Fuhrerh**

How disgusting of those liberals brainwashing a poor old lady.

*       *       *

**David A. Moore**

~ Not JUST A LIAR, but a DNC-PAID &SUPPORTED LIAR..!!!!**

*       *       *

**Steve Jensen**

She's an old druggy living of the taxpayers, while being paid by DNC to lie.

(Exhibit 3)

50.     At 0:58 in Video II, agents or employees of PVAF, PV and Mr. O'Keefe then
superimposed on the video these words:  "After that bombshell, Teter seemed to change her
tune."  (Exhibit 3)  "Bombshell" is defined by the American Heritage Dictionary as "a shocking
event."  The only shocking events are the false and misleading statements made in both Video I
and Video II that Ms. Teter was a homeless, mentally ill, paid, trained activist associated with
Americans United for Change who was placed at the Trump Rally to incite violence.

51.     At 1:05 in Video II through the end of Video II, agents or employees PVAF, PV
and Mr. O'Keefe then imply that Ms. Teter Ms. is not to be believed because of her supposed
"change in tune."  (Exhibit 3)  Specifically, the implication was because Ms. Teter responded to

12

an Asheville, North Carolina television reporter's question that it was "possible" that the assailant at the Trump Rally struck her with his backhand, she should not be believed that she was hit with such force that it caused her to fall to the ground. (*See* Exhibit 2) At no time did Video II state how the acknowledgment of a possible variant of how she was struck was in any way related to Video I.

52. Numerous viewers of Defendants' Video II became persuaded that Ms. Teter is a liar:

MP USMC SRT

So she straight up lied.

            *      *      *

Madea Simmons

 liar

            *      *      *

The Chosen One

What a lying bitch

            *      *      *



annebeck58

I hate what she did, and at this point, I question her entire story. Was she hit by anyone? Would anyone hit a woman of this age, wearing an O2 mask, or is this just a sham? I don't know; I hardly think it would happen. What, about her, looked different then? Is the oxygen mask a lie?

            *      *      *

2eelShmeal

You lying fucking CUNT.

            *      *      *

SemperAugustusBubble

This LYING whore is an example of ALL it takes to DESTROY our GREAT COUNTRY. Trump 2016!

            *      *      *

fairfeatherfiend

The worst kind of whore is a lying whore.

13

\*        \*        \*

999 9

She went from a poor lady to a no good lying bitch.

\*        \*        \*

Ryan Freeman

What a scumbag lying piece sh\*t!

\*        \*        \*

This beastly conniver should be tossed in jail for her lies and wrongful persecution of that feeble, legally blind old man she knock off balance which started the incident.

(Exhibit 3)

53.    In addition, several viewers of Video II obtained the impression that Ms. Teter is

mentally ill:

 Shlomohammed Ibn Al-Israeli

[U]nderstand that many of these people being exploited by the "Democrats" are either severely mentally-ill or homeless as Veritas revealed. . . .

\*        \*        \*

 craxd1

Look at the mentally ill that they were picking up from their cardboard box homes in the cities alleys. They took them to a hotel, gave them a bath and clean clothes, then gave them some cash, and sent them off to the Trump rallies to instigate trouble. That is worse than using old women. Nothing is beneath a Democrat.

Antonio Fletcher

 annebeck58

It sounds like they (the Dems) went specifically at disabled people as their, "do-ers". Hilarity seems to think abusing poor people is fine.

\*        \*        \*

 zeptomole

14

can anyone verify the background of this lady? possibly homeless or destitute?
possibly a bit mentally simple and easily duped. not difficult to understand how
she might have been enticed and recruited by the evil sociopath Scott Foval. have
seen many like him who eventually literally rot from within.

\* \* \*

Mein Fuhrerh
I meant I feel bad that she was plucked out of the community by the terrible liberals

\* \* \*

Mel Gibson
Creeper Gaming Youre probably right. There is no doubt Democrats prey on the weak
and feeble minded. "We have mentally ill people who will do shit . .

\* \* \*

Confusius

Sick, using sick, old, and autistic people, along will elderly to push your crooked
agenda through. Only "progressives" aka crooks can go that low.

(Exhibit 3)

54.    Many commenters to Video II expressly threatened Ms. Teter with physical harm

or death:

johnlocke445
This animal doesn't deserve to have the oxygen she's breathing through her tube. Tie the
tube into a knot and let her squirm!

\* \* \*

TheSquidPro
Fucking cut this human garbage's oxygen already.

\* \* \*

Matej Fele
Pull out the plug on that b*tch.

\* \* \*

Mikey Wall
Cut her oxygen tank off..let the bitch die Fuckin weasels

15

&ast;  &ast;  &ast;

Nathan unknown

Strangle that bitch with her oxygen line then use said oxygen line to drag her behind the Mutineer Hijacked DNC Buss that was dumping liberal shit in the street.

&ast;  &ast;  &ast;

bigrig0625

Why I oughtta kink her airhose for committing such atrocities! Pisses me off!

&ast;  &ast;  &ast;

2eelShmeal

I bet she doesn't even have COPD.... I'd like to yank that fake ass tube off her face and beat her with her oxygen tank.

&ast;  &ast;  &ast;

Matthew Rider

Hope someone cold cocks her with a hammer.

&ast;  &ast;  &ast;



Hey Behappy

She should be cold cocked now and pay the irs for the money she didn't pay taxes on.

&ast;  &ast;  &ast;

Constant Chinner

Lying fucking cunts like her should be in the ground.

&ast;  &ast;  &ast;

Rurouni Kenshin

DIE YOU SCUM!

(Exhibit 3)

55. In addition to deceiving those who commented, Defendants' videos misled numerous publications, broadcasters, media outlets, and internet sites. Hoodwinked by Defendants' false statements that Ms. Teter was a paid activist associated with the Democratic Party, they publicized Defendants' misrepresentations even more widely.

56. In April 2017, the Buncombe County District Attorney dismissed charges against all people charged with assault at the Trump Rally, including Ms. Teter's assailant.

16

57.     That same month, the Wisconsin Attorney General determined that Defendants' tapes described above did not show any violation of law by Democratic activists.   "'Based on all the available facts I do not believe there is any basis to conclude that the videos demonstrate or suggest violations of Wisconsin criminal laws,' Assistant Attorney General Roy Korte wrote in a Jan. 31 memo ending the investigation."  Marley, Patrick (April 25, 2017)  "Wisconsin DOJ:  James O'Keefe's Project Veritas tape did not show election law violations" *Milwaukee Journal Sentinel* http://www.jsonline.com/story/news/politics/2017/04/25/wisconsin-doj-james-okeefes-project-veritas-tape-did-not-show-election-law-violations/100885192/

### NOTICE UNDER N.C.G.S. § 99-1

58.     On August 21 and 29, 2017, Plaintiff's counsel sent a letter pursuant to N.C.G.S. § 99-1 to each Defendant requesting a full retraction of all false and defamatory statements. Defendants declined to do so.  The videos, including comments, remain posted on YouTube as of the date of this filing.

### INJURY

59.     Ms. Teter has suffered emotional distress, fear for her personal safety and the safety of her family, mental anguish, humiliation, embarrassment, injury to moral character, and injury to reputation as a direct and proximate result of Defendants' publication of these video journals.

60.     Ms. Teter has endured insults from strangers in online posts as well as online threats from strangers to harm her physically.



Darth Vader

Kill that idiotic woman.

                                    *       *       *

17



Villz

execute this lying slut for treason

*       *       *



Bryan Miles

Anyone have her address to post online?

(Exhibit 3)  Ms. Teter fears for her personal safety.

61.     Plaintiff has incurred and will incur out of pocket expenses and other damages as a result of the wrongful actions of Defendants. Ms. Teter has not been able to return to the level of comfort and security she had prior to the Defendants' wrongful actions.  She continues to live in fear for her safety.

62.     Defendant's actions described in this Complaint were extreme and outrageous, exceeded all bounds of decency tolerated by society, caused mental distress of a very serious nature, were committed intentionally, with a reckless disregard for Plaintiff's rights or with a reckless indifference that they would cause Plaintiff severe emotional distress, and with actual malice.  Plaintiff is entitled to an award of punitive damages.

## COUNT I:
### Defamation, Libel and Slander

63.     Plaintiff incorporates by reference Paragraphs 1 – 62 of this Complaint.

64.     Defendants made false, misleading, and defamatory written and verbal statements of or concerning Ms. Teter in Video I and Video II which were published to third persons, causing injury to Ms. Teter's reputation.  Defendants knew that Video I and Video II would be disseminated by means of public communication.

18

65.     Defendants' statements are false and misleading by their suggestion that Ms. Teter is homeless and suffers from mental illness.

66.     Defendants' statements are false and misleading by their suggestion that Ms. Teter was a paid political activist sent to provoke violence.

67.     Ms. Teter is not a public figure.

68.     Defendants' statements have subjected Ms. Teter to shame and ridicule.

69.     At the time Defendants published Video I and Video II, they knew the content of Video I and Video II was false as it pertained to Ms. Teter, or Defendants recklessly undertook no effort to determine the accuracy or truthfulness of the content as it related to Ms. Teter.

70.     At the time Defendants published Video I and Video II, Defendants held no privilege to make the written and verbal statements as those statements related to Ms. Teter.

71.     The written and verbal statements relating to Ms. Teter in Video I and Video II were made with actual malice.

72.     The written and verbal statements relating to Ms. Teter in Video I and Video II have caused mental suffering and injury to the reputation of Ms. Teter.

73.     The statements are defamation per se because the statements alone subjected Ms. Teter to ridicule, contempt, and/or disgrace.

74.     In the alternative, the statements are defamation per quod because when considered with the innuendo, colloquium, and circumstances surrounding the publication, the defamatory meaning is clear.  Defendants intended a defamatory meaning and the audience understood the statements to be defamatory.

## COUNT II:
## Violation of N.C.G.S. §75-1.1

75.     Plaintiff incorporates by reference Paragraphs 1 – 74 of this Complaint as if fully set forth herein.

76.     For the reasons described above, the statements about Ms. Teter in Videos I and II constitute libel per se.

77.     Statements that constitute libel per se also constitute unfair and/or deceptive conduct under N.C. Gen. Stat. § 75-1.1.

78.     Defendants' statements about Ms. Teter were deceptive.  They not only had the capacity to deceive, but in fact deceived numerous individuals, bloggers, media outlets, and others.

79.     Defendants' actions described above were immoral, unethical, oppressive, and/or unscrupulous and, therefore, unfair under N.C. Gen. Stat. § 75-1.1.

80.     Videos I and II, available at www.youtube.com, are in or affecting commerce.

81.     Defendants placed Videos I and II, available at www.youtube.com, on a publicly-available website.

82.     Defendants' statements are the actual and proximate cause of injuries to Ms. Teter's reputation.

83.     As an actual and proximate cause of Defendants' conduct, Ms. Teter has sustained harm, including damages exceeding $75,000.

## PUNITIVE DAMAGES

84.     Plaintiff incorporates by reference Paragraphs 1 – 83 of this Complaint as if fully set forth herein.

85.     Defendants' statements were made with full knowledge that they were false.

86. Defendants acted with actual malice in making the statements described above.

87. Defendants acted willfully and/or wantonly in making the statements described above.

88. Pursuant to N.C. Gen. Stat. § 1D-1, Ms. Teter is entitled to punitive damages for Defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shirley Teter demands judgment against Defendants as follows:

1. That Plaintiff recover compensatory damages in the amount that will be proved at trial;

2. That Plaintiff recover punitive damages pursuant to Chapter 1D of the North Carolina General Statutes;

3. That Plaintiff recover treble damages pursuant to Chapter 75 of the North Carolina General Statutes;

4. That Plaintiff recover reasonable attorneys' fees pursuant to Chapter 75 of the North Carolina General Statutes, and any other applicable law;

5. That Defendants be held jointly and severally liable for all damages awarded against them;

6. That Plaintiff recover pre and post judgment interest as provided by law;

7. That the costs of this action be taxed against Defendants;

8. That Defendants be ordered to issue a public retraction, apology, and removal of the false statements contained herein and others since October 17, 2016;

9. That the Court grant a trial by jury on all issues; and,

10. For such other and further relief as may be deemed appropriate by the Court.

This 14th day of September, 2017.

Respectfully submitted,

**ELLIS & WINTERS, LLC**


By: /s/Jonathan D. Sasser

   Jonathan D. Sasser
   N.C. State Bar No. 10028
   Jeremy M. Falcone
   N.C. State Bar No. 36182
   Sean W. Fernandes
   N.C. State Bar No. 50699
   4131 Parklake Ave., Suite 400
   Raleigh, NC 27612
   Phone: 919-865-7002
   Fax: 919-865-7010
   Email: jon.sasser@elliswinters.com
*Counsel for Defendant Shirley Teter*


**CRITCHFIELD, CRITCHFIELD & JOHNSTON, LTD.**


By:  /s/ Ralph Streza

   Ralph Streza (OH S. Ct. #0017694)
   4996 Foote Road
   Medina, Ohio 44256
   Phone: 330-723-6404
   Fax: 330-721-7644
   Email: streza@ccj.com
   *Of-Counsel for Defendant Shirley Teter*
   *Pro-hac-vice admission application*
   *to be filed*