# EXHIBIT 2

```
          IN THE UNITED STATES DISTRICT COURT
      FOR THE WESTERN DISTRICT OF NORTH CAROLINA
                    ASHEVILLE DIVISION


RICHARD L. CAMPBELL,           )
                               )
          Plaintiff,           )
                               ) Case No.
     vs.                       ) 1:17-cv-00129-MR-DLH
                               )
SHIRLEY TETER and SINCLAIR     )
COMMUNICATIONS, INC.,          )
                               )
          Defendants.          )
------------------------------ )
                               )
SHIRLEY TETER,                 )
                               )
          Plaintiff,           )
                               ) Case No.
     vs.                       ) 1:17-cv-00256-MR-DLH
                               )
PROJECT VERITAS ACTION FUND,   )
et al.,                        )
                               )
          Defendants.          )
------------------------------ )
```

         *  *  *ATTORNEYS' EYES ONLY*  *  *

    VIDEOTAPED DEPOSITION OF JAMES E. O'KEEFE, III

        (Taken by Attorneys for Shirley Teter)

            Winston-Salem, North Carolina

            Wednesday, November 28, 2018



               Reported in Stenotype by
                    Jana F. Collins
    Transcript produced by computer-aided transcription

CaseWorks
court reporting | videography | HD video conferencing

1    Q    Did you come to North Carolina in 2014?

2    **A    Yes.**

3    Q    What was that for?

4    **A    The press conference about an investigation we**

5    **did.**

6    Q    And what was that investigation?

7    **A    It was regarding potential noncitizens being**

8    **encouraged to vote in the midterm elections.**

9    Q    Encouraged to or allowed to?

10   **A    Encouraged or allowed.  It was the subject of**

11   **the investigation.**

12   Q    And did you come during the investigation

13   itself?

14   **A    I don't remember exactly.  I'd have to go back**

15   **and check.**

16   Q    Did you speak to any elections officials

17   during that investigation?

18   **A    I believe I did.  I believe now that my memory**

19   **is refreshed, I did, yes.**

20   Q    And what was the nature of your conversations

21   with them?

22   **A    Well, I talked about ballots and voting and**

23   **issues of that nature.**

24   Q    Did you ever present yourself to an elections

25   official in North Carolina and give them a name other

1  than your own?

2     **A    Yes.**

3     Q    Was it your understanding that those people

4  thought that you were the person whose name you gave

5  them?

6     **A    Repeat the question.**

7     Q    Was it your understanding that the person you

8  spoke to thought that you were the person whose name

9  you gave?

10    **A    In some cases, yes.**

11    Q    In other words, it was your intention to

12 convince the North Carolina elections official that

13 you were somebody other than James O'Keefe; is that

14 right?

15    **A    I suppose.**

16    Q    And you denied being James O'Keefe in North

17 Carolina?

18    **A    I don't remember.**

19    Q    You don't remember someone saying, are you

20 James O'Keefe and you denying it?

21          MR. DEAN:  Objection.  Asked and answered.

22    You can answer again.

23    **A    I do remember something happening with a, with**

24 **a citizen to that regard now, yes.**

25    Q    So why did you deny being James O'Keefe?

1

2    Q    Do you have any obligation to find out whether

3  people are telling you the truth?

4    **A    Not necessarily.  The extent of our ethical**

5  **obligation is to report accurately what people say to**

6  **us.  That's, that's the extent.**

7    Q    Was Miss Teter trained by Mr. Foval's

8  organization?

9    **A    I can only report what Scott Foval said about**

10 **Miss Teter and I would really like to refer to a**

11 **transcript of that so that I can accurately answer**

12 **your questions.**

13   Q    Have you seen a transcript of that recently?

14   **A    Yes.**

15   Q    When -- how recently?

16   **A    Yesterday.**

17   Q    Was Shirley Teter paid to disrupt Trump

18 rallies?

19   **A    I can only report accurately what Scott Foval**

20 **said about Miss Teter.**

21   Q    All you know about Miss Teter is what you've

22 heard from Mr. Foval?

23   **A    That's my job as a journalist is to report**

24 **what people tell me.**

25   Q    All you know about Miss Teter is what Mr.

1   Foval said?

2    **A**   **That's what the video is about, yes.**

3    Q   So your answer is yes?

4    **A**   **The answer is that what is contained in the**

5   **video that we did about Scott Foval is the extent to,**

6   **to what I know about, about the matter.**

7    Q   And to the extent what you know about Miss

8   Teter?

9    **A**   **Yes.**

10    Q   You mentioned your MO.   What is your MO?

11    **A**   **We use investigative journalism and undercover**

12   **techniques to expose the truth, tell the truth to the**

13   **people.   It's our mission to expose waste, fraud,**

14   **abuse, corruption, dishonesty in order to make society**

15   **more ethical and transparent.**

16    Q   Are you journalists?

17    **A**   **Yes.**

18    Q   Anything other than journalists?

19    **A**   **Journalism is a broad term so we, that -- I**

20   **think that captures who we are.**

21    Q   Has anyone outside of Project Veritas

22   considered Project Veritas to be journalists?

23    **A**   **Yes.**

24    Q   Who?

25    **A**   **Oh, I, I'm struggling to come up with names**

1  check.

2  Q   He wasn't with you back during the project,

3  the Acorn project?

4  **A   I knew him then, yes.**

5  Q   And he did some work for Project Veritas then?

6  **A   Not as a employee, no.**

7  Q   As what?

8  **A   As a independent contractor.**

9  Q   How many people have worked at Project Veritas

10  since its inception?

11  **A   I don't have an exact number.  I am, I would**

12  **have -- if I had to give you a best answer, it**

13  **probably be somewhere over a hundred people.**

14  Q   How many working there now?

15  **A   I don't have the exact number, but we have**

16  **both employees and independent contractors.  So in --**

17  **over 30 people.**

18  Q   How many employees did you have during the

19  summer of 2016?

20  **A   I would say over a dozen.**

21  Q   As many as 22?

22  **A   Yes, that's possible.**

23  Q   What is Project Veritas Action Fund?

24  **A   It is a 501 C3 corporation.**

25  Q   What's its relationship with Project Veritas?

1     A    They are related entities.

2     Q    Was Project Veritas Action Fund created at the

3  same time as Project Veritas?

4     A    No.

5     Q    When was it created?

6     A    In the latter part of 2014.

7     Q    Why was Project Veritas Action Fund created?

8     A    To investigate and expose waste, fraud, abuse

9  corruption and dishonesty in order to make a more

10 transparent and ethical society.

11    Q    That sounds like why Project Veritas was

12 created?

13    A    Yes.

14    Q    So why did you have to have two?

15    A    Because the IRS mandates that if you're

16 exposing these sorts of things within say 90 days of

17 an election, it has to be done under a different

18 corporation.

19    Q    Even if the target is not a public official?

20    A    I believe so, but I'm not sure.

21    Q    Are you aware of people outside of Project

22 Veritas saying you're not a journalist?

23    A    Yes.

24    Q    Who's done that?

25    A    Many people in the mainstream media.

1  Q  Can you give me some examples?

2  **A  Specific names?**

3  Q  Yes.

4  **A  Honestly, it's difficult for me to extract**

5  **those from my memory right at this moment.  I don't --**

6  **I'm struggling to come up with one particular --**

7  Q  Not even one name?

8  **A  -- name.**

9  Q  Okay.

10  **A  A lot of people on MSNBC.**

11  Q  Let me show you a short video, if I'm capable.

12      (Video Plays)

13  Q  Who is that?

14  **A  That's Dean Baquet.**

15  Q  And what's his job?

16  **A  He is the New York Times executive editor.**

17  Q  And does he have a position with any

18  journalistic, journalism societies or organizations?

19  **A  I'm sure he does.**

20  Q  Is he chair of the Society of Professional

21  Journalists?

22  **A  I don't know.**

23  Q  Were you aware of this opinion that Mr. Baquet

24  has of what you do?

25  **A  Yes.**

1    A    The truth.

2    Q    Aren't you trying to get people to say things?

3    A    Not necessarily.

4    Q    Can you name an investigation you've had where

5 it didn't involve somebody saying something on camera?

6    A    I'm sorry.  Could you repeat the question?

7         (QUESTION WAS READ BACK BY COURT REPORTER)

8    A    Where it didn't involve somebody saying what?

9    Q    Let me try that again.  Have you ever reported

10 a successful investigation that did not involve

11 someone saying something on camera?

12    A    I'm struggling to understand your question.

13    Q    All right.  Let me put it this way.  Have you

14 ever had a successful investigation where you didn't

15 entrap someone into saying something stupid on camera?

16         MR. DEAN:  Object to form.  You can answer.

17         THE WITNESS:  Answer?

18         MR. DEAN:  Yeah.

19    A    Well, I'm still struggling to understand the

20 question, but I'll attempt to answer it.  We have done

21 investigations that didn't involve the use of hidden

22 cameras.

23    Q    How many times?

24    A    Oh, dozens, I suppose.

25    Q    What percentage of your investigations don't

1   involve hidden cameras?

**2   A   I'd say a substantial minority of them.**

3   Q   Less than 10 percent?

**4   A   It could be 10 to 25 percent, I suppose.**

5   Q   Are there other words you use to describe your

6   projects instead of investigations?

**7   A   That I've used?**

8   Q   Yes.

**9   A   Or that I use currently?**

10   Q   Let's go with have you ever used?

**11   A   I believe there have been other words.**

12   Q   What are they?

**13   A   I think I've referred to them as stings on**

**14   occasion.**

15   Q   Have you referred to them as pranks?

**16   A   I don't, I don't know if I've done that.**

17   Q   Other people have though, haven't they?

**18   A   Yes.**

19   Q   You ever refer to them as capers?

**20   A   I don't know if I've done that.**

21   Q   Other people have referred to them as that,

22   haven't they?

**23   A   I don't know.**

24   Q   Okay. When you have a sting, do you by

25   definition have a target?

1 information.  I will do so willingly, but I do believe

2 that it is a violation of a journalistic ethic.

3     Q   Mr. Foval was a source, wasn't he?

4     A   I'm sorry?

5     Q   Mr. Foval, he was a source, wasn't he?

6     A   He was the subject.

7     Q   Are you calling the sources your own

8 reporters, your own journalists?

9     A   In some cases, yes.

10     Q   And you object to revealing the names of your

11 own journalists?

12     A   The names of the sources.

13     Q   I'm familiar with journalism involving sources

14 who talk to journalists.  Explain to me exactly what

15 your terminology is there.

16     A   Well, there is some confusion about this, but

17 we try to avoid disclosing the identities and the

18 names of our undercover journalists because that could

19 compromise the work that we continue to do as

20 investigative journalists.  And there is a story

21 tradition of protecting sources and methods inside

22 investigative journalism.

23     Q   That refers to confidential sources though,

24 doesn't it?

25     A   Yes.

1    Q    Not to your own hired investigators?

2    **A    Well, in our case, it might compromise our**

3    **ability to do the work that we do.  In some cases, it**

4    **would compromise our ability to do our journalistic**

5    **work to disclose the identities of our sources.**

6    Q    So after you conducted the -- after you

7    conducted the Democracy Partners investigation, you

8    released a video?

9    **A    Yes.**

10   Q    And it was called what, Rigging the Election?

11   **A    Yes.**

12   Q    Let me show you a part of that.

13                (Video Plays)

14   Q    So the fellow talking with the red and white

15   shirt, who is that?

16   **A    May I see the first minute and 12 seconds**

17   **again?**

18   Q    Sure.

19                (Video Plays)

20   **A    Pause.  That is Scott Foval.**

21   Q    All right.  And the person who says Hillary is

22   aware of that, who is that?

23   **A    Bob Creamer.**

24   Q    No.  The person who said Hillary is aware of

25   that?  Just play it from right there.

1      **A**    Because I believe journalism is an activity,

2   not an identity, and we should evaluate the media or

3   journalism entity by the fruits of what they do.

4      Q    Did Sinclair end up having the opportunity to

5   be the first to break the story?

6      **A    I believe they did.**

7      Q    And did they take that opportunity?

8      **A    They did not.**

9      Q    What was the expression you used?  Did they,

10  they cut you loose or whatever?  What was the -- do

11  you remember what you said?

12     **A    I'm sorry?**

13     Q    What, what was it that Sinclair did?

14     **A    They chose not to launch the story.**

15     Q    Let me show you.

16                   (Video Plays)

17     Q    Spiked.  That's you talking about Sinclair?

18     **A    Yes.**

19     Q    What do you mean by they spiked the story?

20     **A    Spiked means to cancel a story or to choose**

21  **not to publish a story oftentimes right before that,**

22  **that was supposed to happen.**

23     Q    Why did they do that?

24     **A    Well, let me think.  I'm not certain.  I was**

25  **never able to ascertain with certainty why they did**

1  it.

2     Q   Did anybody ever tell you why they did it?

3     **A   I did have a conversation with someone there**

4  **and he made some statements.**

5     Q   Who was that?

6     **A   His name was John Solomon.**

7     Q   And what did Mr. Solomon say?

8     **A   I don't -- I'm assuming you have the exhibit.**

9  **If I can look at it, otherwise, I'll have to just**

10 **paraphrase.**

11    Q   Okay.

12    **A   It was him saying he had Bob Creamer in his**

13 **offices right now.  This is when he spoke to me.  And**

14 **he said sometimes these decisions are made, I believe**

15 **he said something to the effect of at a higher up**

16 **level and it was circumstances not in his control,**

17 **something to that effect.**

18    Q   What was Mr. Solomon's position at Sinclair

19 Media?

20    **A   I believe he was the C, chief operations**

21 **officer of Circa which is an arm of Sinclair.**

22    Q   What do they do?

23    **A   They're investigative journalists.**

24    Q   At the same time that you were having trouble

25 with Sinclair spiking the story, were you also having

1  trouble with Fox News using it?

2     A   Trouble.  I don't, I don't believe there was

3  any trouble at that same time, no.

4     Q   Fox News was not refusing to run the video at

5  the same time that you were having the issues with

6  Sinclair Media spiking the story?

7     A   There, there was, there was a few days, this

8  happened over the course of a few days.  So there was

9  a, quite a few events that occurred between when I

10  received the call from Solomon and when the story did

11  ultimately appear on Fox News.

12     Q   Did the Fox News initially decline to run with

13  the video?

14     A   I don't remember if there was some, an

15  official declining.  I wouldn't characterize it.

16     Q   Was there some sort of unofficial declining?

17     A   Well, there were statements made by executives

18  and anchors of the network to the effect that they're

19  looking into this.

20     Q   Did you get the impression that for some

21  unstated reason they didn't want to use your video?

22     A   I wrote about this in my book American Pravda

23  extensively.  But I believe that due to the nature of

24  hidden camera, journalism television executives are

25  oftentimes reticent to air the tapes for various

 1  reasons.

 2      Q   Do you think it had anything to do with you

 3  personally?

 4      A   I don't know.

 5      Q   Nobody ever told you you had been banned from

 6  Fox News?

 7      A   No one's ever told me that.

 8      Q   Okay.  We're looking at another video.

 9               (Video Plays)

10      Q   That was you, right?

11      A   Yes.

12      Q   What were you talking about?

13      A   I was talking about what someone told me about

14  us and Fox News.

15      Q   And that was at a time when you were trying to

16  get some traction with the Rigging the Election video?

17      A   Yes.

18          MR. SASSER:  Let's mark this as the next

19      exhibit.  Jamie, for the record, that's PVDEF

20      0000467.

21          MR. DEAN:  Thank you.

22          (EXHIBIT 7 WAS MARKED FOR IDENTIFICATION)

23      Q   Have you seen Exhibit 7 before?

24      A   I may have seen this before.

25      Q   When is the last time you saw it?

1  them.  Again, standard journalistic practice across

2  the industry and at news networks and certainly with

3  reporters on background, it's -- you don't have to

4  refer to someone to, by name to refer to them.  Scott

5  Foval clearly indicates that she was one of the

6  activists who had been trained to birddog and we

7  reported accurately what Scott Foval said in this

8  instance.

9      Q    All right.  Third line up from the bottom of

10  page 47 -- 471 Foval says, "No, no, no, no, it was not

11  preplanned but she was one of our activists."  You,

12  you didn't include the it was not preplanned in your

13  video, Rigging the Election, did you?

14      A    We did not include that in this release, no.

15      Q    Are you aware that Scott Foval has said

16  whenever you see trouble at a Trump rally, that's us?

17      A    I'd have to refer to all the materials.  It

18  sounds vaguely familiar.

19      Q    Do you have the impression that Scott Foval

20  was taking a lot of credit for what happened at Trump

21  rallies?

22      A    He appears to do that in some cases, yes.

23          MR. SASSER:  Let's mark this as the next

24      exhibit.  Jamie, this is Exhibit 8.  PVDEF

25      0007106.

1  there's an e-mail that, that you send that doesn't

2  have a To line?

3  **A    Oftentimes, it might mean that I'm sending it**

4  **to the staff blind carbon copied.**

5  Q    I see.   That's September 29, 2016?

6  **A    Yes.**

7  Q    And the Subject is Target Foval/Creamer

8  Release Date, right?

9  **A    Yes.**

10  Q    And you say, "Set your calendars for launching

11  March -- Monday, October 17th on first installment of

12  that story.  Debate is 19th.  Sources tell me strong

13  chance material may be used in that debate."  Who are

14  are those sources?

15  **A    I don't recall.**

16  Q    "That means operations must get any necessary

17  material by 6:00 a.m. Monday, October the 17th.  You

18  have 20 days to get a smoking gun."  What did you mean

19  by that?

20  **A    I mean, they have, our journalists have that**

21  **much time to complete substance of their**

22  **investigation.**

23  Q    Do you remember offering a bonus to your

24  employees?

25  **A    Yes.**

1    Q    Why did you do that?

2    **A    We often try to provide incentives and rewards**

3 **for a job well done.**

4    Q    Did you have some criteria for establishing a

5 bonus for Rigging the Election?

6    **A    I believe I did.**

7    Q    What were the criteria?

8    **A    I don't remember exactly.**

9    Q    Did a reference to the video in a presidential

10 debate count as, as bonus material?

11    **A    I believe there was some reference to that.**

12    Q    Was getting a, an article in the New York

13 Times a basis for a potential bonus?

14    **A    I believe it may have been.**

15    Q    Did you pay out bonuses for the video, Rigging

16 the Election?

17    **A    I believe I did.**

18    Q    How much got paid out?

19    **A    I'd have to check with my accountant.**

20    Q    Would it have been tens of thousands of

21 dollars?

22    **A    Maybe not that much.**

23    Q    How successful was the Rigging the Election,

24 Part 1 video?

25    **A    How do you define success?**

1      Q    However you would define it.

2      **A    Well, I think it exposed and accurately**

3   **captured some significant newsworthy events in our**

4   **political system, raised serious questions and was**

5   **covered by a lot of mainstream media organizations**

6   **that took the tapes very seriously including CNN, the**

7   **New York Times, A section.  I think it was a very**

8   **serious and significant piece of journalism.**

9      Q    Was Rigging the Election, Part 1 the most

10  watched of all Project Veritas videos at the time?

11     **A    Most watched in our organization's history?**

12     Q    Yes.

13     **A    I believe it was.**

14     Q    And it smashed the record, didn't it?

15     **A    It was watched on You Tube well over in**

16  **advance of what was in previous and many other forums,**

17  **social media as well.**

18     Q    At one point, you said it smashed the record

19  by going from 1.2 million to 7 million.  Do you recall

20  that?

21     **A    That's the You Tube view count.**

22     Q    Do you recall saying that Rigging the

23  Election, Part 1 was the most watched video in the

24  world in the 24 hours leading up to the presidential

25  debate?

1    A    That sounds like something I may have said.

2    Q    Is that accurate?

3    A    I believe it, I believe it is and was.

4    Q    As a result of the Rigging the Election video,

5    were you invited to the third presidential debate in

6    Las Vegas?

7    A    I was.

8    Q    The Trump campaign invited you?

9    A    A man named Charlie Kirk invited me.

10   Q    Was he affiliated with the Trump campaign?

11   A    I don't know.

12                  (Video Plays)

13   Q    Was that Charlie Kirk you're referring to?

14   A    I believe it was.  Charlie Kirk was the, is

15   the head of Turning Points which is a nonprofit

16   organization.  I'm not exactly sure his, his role or

17   relationship was with the campaign at the time.

18   Q    So when you were telling your staff that you

19   got a call from one of his people, surrogates, were

20   you referring to Charlie Kirk?

21                  MR. DEAN:  Object to the form.  It's vague.

22   A    I, I believe I was referring to Charlie Kirk.

23                  (Video Plays)

24   Q    That was leading up to the presidential

25   debate?

1    Q    Who mentioned it?

2    **A    The President.**

3    Q    What did he say?

4    **A    Well, let me think about exactly.  He said**

5    **something to the effect of -- let me just try to**

6    **remember.  She -- he referencing Hillary Clinton said**

7    **that she was the one that caused the violence and he**

8    **referenced the clips and what he saw on the tapes that**

9    **were released in that week about the incitement of**

10   **violence at these Trump rallies including his rally**

11   **and he specifically mentioned in Chicago in an**

12   **exchange with Hillary Clinton at that presidential**

13   **debate.**

14                    (Video Plays)

15   Q    Was that true at the time you said it?

16   **A    Yes.**

17   Q    Still true?

18   **A    Well, let me think for a minute.  I'm not**

19   **sure.  That's a tough, that's a tough, tough question**

20   **because these things are oftentimes not yes or no**

21   **questions.**

22   Q    But at the time, it was the biggest story

23   you'd ever done?

24   **A    Yes.**

25   Q    Is now a good time to take a break?

1      THE VIDEOGRAPHER:  We're going off the

2   record.  The time on the video monitor is 3:13

3   p.m.

4           (RECESS TAKEN)

5      THE VIDEOGRAPHER:  This is the beginning of

6   media unit number 3 in the videotaped deposition

7   of James E. O'Keefe, the Third.  November the

8   28th, 2018.  It is now 3:34 p.m.  Please continue.

9 BY MR. SASSER:

10   Q   Mr. O'Keefe, did you read the New York Times

11 article about Rigging the Election?

12   **A   Yes.**

13   Q   It had a reference to Shirley Teter in it?

14   **A   I don't recall a Shirley Teter reference.**

15      MR. SASSER:  Let's mark this as the next

16   exhibit.

17           (EXHIBIT 23 WAS MARKED FOR IDENTIFICATION)

18   Q   Exhibit 23 is newsreports 000017.

19   **A   Okay.**

20   Q   You see the reference to Miss Teter?

21   **A   Yes.**

22   Q   On the bottom of page 3 of 4, 000019, it says,

23 "In a phone interview Thursday, the woman, Shirley

24 Teter said she had attended the rally which was near

25 her home on her own accord and had not received any

1  protest training."  You see that?

2      A    Yes.

3      Q    And you read that shortly after it was

4  published on October the 20th, 2016?

5      A    **This article, yes.**

6           MR. SASSER:  Let's mark this as the next

7      exhibit.

8           (EXHIBIT 24 WAS MARKED FOR IDENTIFICATION)

9      Q    I'm showing you what's been stamped as PVDEF

10  0014029.

11     A    **Uh-huh.**

12     Q    Exhibit 24.  That's an e-mail from you to a

13  number of people; is that right?

14     A    Yes.

15     Q    And it's dated October 21, 2016?

16     A    Yes.

17     Q    And it includes that New York Times article of

18  Exhibit 23?

19     A    Yes.

20     Q    Who is John Richards?

21     A    **He's an advisor to me.**

22     Q    A financial advisor?

23     A    **No.**

24     Q    What kind of an advisor?

25     A    **Advisor to my work at Project Veritas.**

1    A    That would, that, that -- we make

2  determinations about what is newsworthy and, and as

3  evidenced by this New York Times story, it's fairly

4  newsworthy what these people were saying and doing and

5  claiming.  It was very, it was so newsworthy that it

6  made CNN.  The other, the other parts of the material

7  rose to that standard.  So our ethical obligation

8  extends to reporting accurately what we see and what

9  we hear and that rises well far above and beyond the

10  ethical obligations of traditional journalists do not

11  disclose their sources.  They don't even disclose raw

12  transcripts of their interviews with sources.  So

13  we're being held to a standard that is well above and

14  beyond the standard that is expected of any

15  award-winning journalist.

16    Q    By October the 21st, you knew that Shirley

17  Teter denied being a birddogger, didn't you?

18    A    I don't recall.

19    Q    Well, if you look at this e-mail you sent

20  around to your counselors, you see that Shirley Teter

21  denied to the New York Times that she had any protest

22  training.  You see that?

23    A    Okay.

24    Q    I mean, you read it before you sent it around

25  to your counselors, didn't you?

1    A    **Most likely.**

2    Q    And then you decided to do a video devoted

3 solely to Shirley Teter?

4    **A    I'd have to check about how and why that**

5 **decision was made, but there was a video released,**

6 **yes.**

7    Q    Who made that decision?

8    **A    I don't remember.**

9        MR. SASSER: Let's mark this as the next

10    exhibit.

11        (EXHIBIT 25 WAS MARKED FOR IDENTIFICATION)

12        MR. SASSER: Jamie, Exhibit 25 is PVDEF

13    0011651 except the version that I've given to Mr.

14    O'Keefe seems to be cut off at the bottom.

15        MR. DEAN: Okay.

16        MR. SASSER: That Bates stamp and the word

17    Confidential don't appear on that copy.

18        MR. DEAN: Okay.

19 BY MR. SASSER:

20    Q    What is Exhibit 25?

21    **A    I don't know.**

22    Q    Are you familiar with a program known as

23 Slack?

24    **A    Yes.**

25    Q    You used that for what purpose at Project

1    A    No, that's not the reason.

2    Q    Okay.  Without looking at a full sentence, is

3  it possible for a snippet to be misleading?

4    **A    It's possible for journalists, media folks and**

5  **attorneys to be misleading, but we were not misleading**

6  **and we 100 percent stand by our reporting, period.  We**

7  **stand by the context and the color of what we**

8  **presented.**

9    Q    How many times has Project Veritas been

10  accused of deceptive editing?

11    **A    Many times.**

12    Q    Pretty much every day, isn't it?

13    **A    Not every day, no.**

14    Q    Did the California Attorney General find that

15  you'd engaged in deceptive editing?

16    **A    I'd have to look at that report to properly**

17  **characterize exactly what he found.**

18    Q    So when you settled with the Star Ledger, you

19  had an attorney, right?

20    **A    Yes.**

21    Q    Did any of your discussions over whether to

22  drop this minute and a half video on Shirley Teter

23  involve her ability to fight back?

24        MR. DEAN:  Object to form, vague.

25    **A    You have to repeat the question, please.**

1     Q    Did you ever use video one, Rigging the

2   Election to solicit donations?

3     **A    I don't think there were any solicitations in**

4   **the video.**

5     Q    Did you refer to the video in solicitation

6   letters?

7     **A    I may have.  We do that probably all of the**

8   **time.**

9     Q    Every time you release a video, you ask for

10   collections, donations?

11     **A    I suppose in the same way NPR or PBS does.**

12   **You could say that we're funded by viewers like you**

13   **except we don't get government funding, of course.  So**

14   **we oftentimes do have to ask for money.  We're a**

15   **nonprofit organization.  We don't have advertisers.**

16   **So we often solicit, even sometimes on a daily basis.**

17     Q    And you traded on the popularity of video one

18   to solicit donations, didn't you?

19     **A    I would say so, probably.**

20     Q    You boasted about how successful the Rigging

21   the Election video was?

22     **A    I don't know what you're referring to, but I**

23   **certainly have done that.**

24     Q    Did donations increase after the Rigging the

25   Elections video?

1      A    I'd have to check our financial records.

2      Q    You don't know off the, off the top of your

3    head whether the donations went up or down?

4      A    I don't know off the top of my head, no.

5      Q    Okay.  The Washington Post has reported that

6    you brought in $4.8 million in 2016.  You have any

7    reason to disagree with that?

8              MR. DEAN:  Objection.  You said you, vague.

9      Q    Okay.  The charity brought in $4.8 million in

10   2016?

11     A    Yes.  I believe that they probably received

12   that information from our 990 tax return.  So I have

13   no reason to dispute that.

14     Q    Someone else says, reported that Project

15   Veritas doesn't seem to be having money problems.  Its

16   budget has nearly doubled every year.  According to

17   financial filings, O'Keefe said it raised more than $7

18   million in 2017.  Is that accurate?

19     A    Is the statement made by that person accurate?

20     Q    Yes.

21     A    We did raise more than $7 million in 2017,

22   yes.

23     Q    How much did you raise in 2017?

24     A    I'd have to go back and check our tax return

25   on the exact number.

1    **A    It is extraordinarily difficult to comply with**

2    **the litany of Attorney General and State issues that**

3    **our organization is faced with.**

4    Q    Your organization knows who the officers are,

5    right?

6    **A    Yes.**

7    Q    And your organization should know whether any

8    of the officers have any criminal convictions,

9    correct?

10   **A    It was a unintentional filing error as far as**

11   **I understand and I would object to any**

12   **characterization beyond that.**

13   Q    Your criminal conviction, did it involve a

14   dishonest act?

15              MR. DEAN:  Object to form.

16   **A    I don't believe so.**

17   Q    Did your criminal conviction involve a false

18   statement?

19              MR. DEAN:  Same objection.

20   **A    I don't believe so.**

21   Q    What precisely was the crime to which you

22   pleaded guilty?

23   **A    Entry by false pretense, a class B**

24   **misdemeanor.**

25   Q    False pretense would seem to include a false

1    **A    Right.**

2    Q    It's our team doing it?

3    **A    Yes.**

4         MR. SASSER:  Okay.  Hit play.

5             (Video Plays)

6    Q    What, what is the Raleigh thing?  Do you

7    understand that?

8    **A    I don't.**

9         MR. SASSER:  Okay.  Play.

10            (Video Plays)

11        MR. SASSER:  Stop.

12   Q    What are you doing?

13   **A    I am coaching the journalist on the question**

14   **that I think the journalist ought to ask, ought to ask**

15   **Scott Foval in this moment.**

16   Q    Would you say you're being active in doing so?

17   **A    Yes.**

18        MR. SASSER:  Go ahead.  Play some more.

19            (Video Plays)

20   Q    Now what are you doing?  What was that?

21   **A    I'm sorry?**

22   Q    What were you doing just then in the video?

23   **A    I'm trying to help our journalist ask the**

24   **right question of the source, Scott Foval.**

25   Q    You were pointing at the screen, right?

1    A    Yes.

2    Q    With both hands?

3    A    Yes.

4    Q    And what kind of look are you giving the

5  journalist?

6    A    A look of urgency.

7              MR. SASSER:  Okay.  Play.

8                   (Video Plays)

9    Q    Now what are you doing?

10   A    I'm pointing to the question that he ought to

11  ask Scott Foval.

12   Q    You were actually tapping the computer screen

13  with your finger, weren't you?

14   A    Yes.

15             MR. SASSER:  All right.  Play.

16                  (Video Plays)

17   Q    So he finally asked the question you were

18  wanting him to ask?

19   A    Yes.

20   Q    The question about the violence?

21   A    Yes.

22   Q    You described something very similar to this

23  in American Pravda, don't you?

24   A    Yes.

25   Q    About trying to get Christian to get

```
 1     Q    In 2016 -- I'm sorry.  In 2012, you published

 2  a video stating that William Romero had committed

 3  voter fraud, didn't you?

 4     A    I'd have to refresh my memory on that

 5  incident.

 6              MR. SASSER:  All right.  Can you play?

 7                   (Video Plays)

 8              MR. SASSER:  Stop.

 9     Q    Who's the person talking?  Who is the

10  investigator you're using there?

11     A    Spencer Meads.

12              MR. SASSER:  Okay, continue.

13                   (Video Plays)

14     Q    Is that you talking?

15     A    Yes.

16     Q    And you just said that William Romero is not a

17  United States citizen, correct?

18     A    Yes.

19     Q    Do you need to see anymore of that?

20     A    Depends upon what you're going to ask me.

21     Q    Were you wrong about Mr. Romero being a United

22  States citizen?

23     A    Well, I would certainly have to see this whole

24  video.

25                   (Video Plays)
```

1    Q    Who is the person talking to the North

2   Carolina elections officials?

3    **A    That was a journalist with Project Veritas.**

4    Q    What was his name?

5    **A**    ████████████████

6    Q    You refer to him in your book as John Buckley?

7    **A    Yes.**

8    Q    Do you know whether or not Mr. Romero is

9   actually a United States citizen?

10   **A    Can you play the first part of the video**

11  **again, please?**

12   Q    Yeah.

13                  (Video Plays)

14   **A    Okay.  I, I do recall having to print a**

15  **correction or an apology about this portion of the**

16  **video after publishing the video.  So we may have**

17  **indeed had to correct this portion.**

18   Q    So you made a false statement about Mr. Romero

19  illegally voting in North Carolina?

20   **A    I, I'd have to check the whole facts**

21  **surrounding the investigation, but I believe this was**

22  **one of the only instances in the history of our**

23  **organization where we had to correct something that we**

24  **reported, yes.**

25   Q    Turn --

1    A    Well below industry standard.

2    Q    Mr. Romero was, in fact, a North Carolina

3 citizen?

4    A    I believe so.

5    Q    And you falsely said that he was not?

6         MR. DEAN:  Objection.  Asked and answered.

7    A    Again the, we, I believe we corrected, I

8 believe there was an apology for this portion of the

9 video.  And like I said, well, well below industry

10 standard for journalists in terms of the corrections

11 that we've published.

12   Q    Didn't you say earlier today that Project

13 Veritas has not done apologies or retractions?

14        MR. DEAN:  Objection.  Misstates his

15   testimony.

16   A    I don't believe I characterized it that way.

17 But again, in the spirit of what it means to be a

18 journalist, we don't make many mistakes at Project

19 Veritas.  We make far fewer than industry standard and

20 that's self-evident.

21   Q    In 2012, you also published a video saying

22 that Zbigniew Gorzkowski had committed voter fraud?

23   A    I'd have to refresh the facts of that case.

24   Q    Okay.

25              (Video Plays)

1    Q   So you said that Mr. Gorzkowski is not a

2    United States citizen, correct?

3    **A   According to the refusal form that I'm seeing**

4    **here.**

5         MR. SASSER:  Continue to play that.

6              (Video Plays)

7    **A   But like I stated earlier in my testimony,**

8    **this, this two or series of stories, we did have, we**

9    **did have to correct or however you want to**

10   **characterize it, apologize.**

11   Q   Were you wrong about Zbigniew Gorzkowski?

12   **A   I'd have to go back and check exactly.**

13        MR. SASSER:  Let's mark this as the next

14   exhibit.

15           (EXHIBIT 32 WAS MARKED FOR IDENTIFICATION)

16   Q   Mr. O'Keefe, I'm showing you Exhibit 32.  An

17   article from the News and Observer of Raleigh, North

18   Carolina?

19   **A   Yes.**

20   Q   Its title is Coming to America, Bringing

21   Foreign Fare.  It's dated March 8, 2008?

22   **A   Yes.**

23   Q   Can you read aloud the second paragraph?

24   **A   "Customers flocked through the red door of**

25   **Ziggy and wife Gorzkowski's European grocery and**

1  proudest things that we've done is to compel reform.

2  That's the job of investigative journalism is to

3  compel reform and society's institutions which is

4  what, which is what these videos help do.

5      Q    You're proud of this?

6      A    Absolutely.

7              MR. SASSER:  Hit play.

8                  (Video Plays)

9              MR. SASSER:  Stop.

10     Q    When she says is Romero your last name and he

11  gives the name William de Jesus Romero, are you saying

12  that that's not being deceitful?

13             MR. DEAN:  Objection.  Misstates the video.

14     A    The name is William de Jesus Romero is what he

15  says and, and indeed I believe that the intent of this

16  investigation, as I previously stated, is to expose

17  the vulnerabilities in the system.  And this, these

18  videos and those like it have led to reforms in state

19  legislatures across the country which is the job of

20  investigative journalism.

21     Q    Can you describe what Mr. Houting is wearing

22  there?

23     A    He's wearing glasses.  He's wearing a shirt.

24  He's wearing lederhosen.

25     Q    And what's he carrying?

1    A    I'm sorry?

2    Q    What is he carrying?

3    A    I, I can't tell.

4    Q    What, what kind of a hat is he wearing?

5    A    I can't tell from the image right here.

6             MR. SASSER:  Okay.  Run it back a little

7    bit.

8                    (Video Plays)

9    Q    What kind of hat is he wearing?

10   A    I don't know what to call the --

11   Q    Okay.

12   A    I don't, I can't characterize the hat.  It's a

13   cap of some type.

14   Q    Who's in charge of ethics at Project Veritas?

15   A    Well, ultimately I'm responsible.  I'm

16   responsible as the leader, but I do authorize the

17   people that work for me to help assist.

18   Q    Like, who?

19   A    Like, Joe Halderman.

20   Q    Do you consult him about journalism ethics?

21   A    I do.

22   Q    Does Mr. Halderman have any journalism awards?

23   A    He does.

24   Q    What?

25   A    Various Emmy awards.

1    record at 6:09 p.m.  Please continue.

2  BY MR. SASSER:

3    Q    Mr. O'Keefe, Project Veritas corrected an

4  inaccurate statement it made about two North Carolina

5  residents, correct?

6    **A    I believe so.**

7    Q    And Project Veritas' source for the inaccurate

8  statements was voter registration records?

9    **A    I believe that was one of the items, yes.**

10   Q    So Project Veritas corrected a false statement

11 made in reliance on a third-party?

12   **A    Well, the difference in that case was we**

13 **didn't have people on making a claim.  So we, we try**

14 **to hold ourselves to a higher standard than we did**

15 **back in 2000 -- back when we did that.  We, we try to**

16 **keep to catching people or getting claims from the**

17 **people in the tapes.**

18   Q    I'm sorry.  Can you explain that?

19   **A    Yes.  We, we oftentimes, we don't report**

20 **anything unless you can see and hear it coming out of**

21 **the subject's mouth.  And in this particular case, we**

22 **deviated from that standard and we had to, we had to**

23 **correct or apologize or how you wish to characterize**

24 **it.**

25   Q    The two North Carolina citizens were, were