# EXHIBIT 5

# REPORT OF THE ATTORNEY GENERAL
# ON THE ACTIVITIES OF ACORN IN CALIFORNIA

## APRIL 1, 2010



CALIFORNIA DEPARTMENT OF JUSTICE

OFFICE OF THE ATTORNEY GENERAL

# TABLE OF CONTENTS

**Page**

Origin and Scope of the Attorney General's Investigation ............................................................ 1

Summary of Investigative Findings and Conclusions ................................................................. 2

A Brief History of ACORN .............................................................................................................. 3

Publication of the O'Keefe and Giles Recordings and its Aftermath .......................................... 5

The Covert Recordings Made By O'Keefe and Giles at ACORN's Offices ................................. 8

Disposal of Documents at the San Diego ACORN Office ............................................................ 18

Allegations of ACORN Voter Registration Fraud ........................................................................ 19

ACORN Compliance and Governance and California Funds ....................................................... 21

     A. ACORN Was Delinquent in its Corporate Filings and Tax
        Reporting ............................................................................................................. 21

     B. ACORN Failed to Properly Account for Charitable Assets ................... 22

     C. Diversion of Charitable Funds for Prohibited Purposes ......................... 22

Conclusion ....................................................................................................................................... 23

Case 1:17-cv-00256-MR   Document 43-6   Filed 01/22/19   Page 3 of 29

From 1970 until 2009, the Association of Community Organizations for Reform Now (ACORN) operated as a collection of community organizations in the United States. ACORN's primary mission was to advocate for low- and moderate-income families by working on neighborhood safety, voter registration, affordable housing, and other social issues. ACORN's priorities have included better housing and wages for the poor, more community development investment from banks and governments, better public schools, and other social justice issues. ACORN pursued these goals through demonstration, negotiation, lobbying, and voter participation. ACORN through its Project Vote campaign participated in voter registration drives and collected approximately 450,000 new voter registrations nationwide for the 2008 election. Over the years, ACORN branched into providing services for its members and community residents, including housing and mortgage advice, and tax preparation.

Between July 24 and August 14, 2009, James O'Keefe III, a political filmmaker, and Hannah Giles, a Florida college student, secretly recorded audio and video at various ACORN offices across the country while posing as a law student and a prostitute, respectively. The recordings were edited by O'Keefe and released on the internet between September 10 and September 17, 2009. The edited footage showed ACORN employees engaging in conversations with the couple regarding prostitution, human trafficking in underage girls, and reporting false information on tax returns and loan applications. The recordings engendered widespread media attention and touched off a rash of government reactions and investigations.

On September 16, 2009, Governor Schwarzenegger wrote to Attorney General Brown and requested that he investigate ACORN's activities in California. On September 25, 2009, this Office informed the Governor that it had opened an investigation into ACORN's activities in California, as well as the circumstances surrounding the covert recordings.

As the investigation into the videos began, additional concerns about ACORN surfaced. The Attorney General expanded his investigation to include the following issues and allegations related to ACORN and its affiliates:

- criminality under California law for the conduct portrayed in the Los Angeles, San Diego and San Bernardino videos
- disposal of documents containing personal data at the ACORN San Diego office,
- violations of the California Political Reform Act arising from voter registration drives ACORN conducted on behalf of the California Teachers Association,
- complaints that ACORN workers in California engaged in voter registration fraud,
- accounting and use of charitable donations collected for California purposes,
- proper reporting of State grant funds received by ACORN,
- compliance with State reporting requirements for charitable entities and corporations, and
- payment and reporting of State taxes by ACORN.

This investigation has involved attorneys from all three legal divisions – Criminal Law, Public Rights, and Civil Law – as well as Special Agents from the Department's Bureau of Investigation and Intelligence. We obtained records, police reports and information from various

California state departments and offices, as well as local prosecution and law enforcement agencies. We reviewed the unedited recordings made by O'Keefe and Giles. We contacted and exchanged information with prosecutors and investigators in the Louisiana Attorney General's Office, the Brooklyn District Attorney's Office and the United States Attorney's Office for the District of Columbia. We spoke with the Attorney General's offices of several other states on a confidential basis. We reviewed and consulted numerous published reports and news articles concerning ACORN and its operations. We spoke with ACORN executives and members in California and with New York counsel for ACORN. Additional sources of information and investigative activities are more fully described in the relevant portions of this report.

Since we began this investigation, ACORN's California chapter broke away from the national organization and formed a new entity called the Alliance of Californians for Community Empowerment (ACCE). ACORN's general counsel advised us that the national ACORN umbrella entity will no longer operate in California. ACORN publicly announced that it is closing its operations throughout the country on April 1, 2010. At least one ACORN affiliate, Acorn Housing, continues to operate in California, though under a different name.

SUMMARY OF INVESTIGATIVE FINDINGS AND CONCLUSIONS

- ACORN consisted of a tangle of separate affiliate organizations whose activities and management were confusingly entertwined. ACORN in California was disorganized and very poorly managed. It failed to recruit, train and monitor its employees to ensure compliance with California law.

- The recordings establish ACORN employees across the country were willing to discuss with O'Keefe and Giles their plan to conduct a prostitution business, and a few even made suggestions for disguising profits and avoiding detection by law enforcement agencies. The most offensive conversations occurred outside California.

- Although highly inappropriate, the evidence does not show that the ACORN employees in California violated state criminal laws in connection with their conversations with O'Keefe and Giles.

- O'Keefe and Giles received immunity from prosecution in exchange for providing the full, unedited videotapes. As a result, we did not determine if they violated California's Invasion of Privacy Act when they recorded the ACORN employees. If the circumstances meet the requirements of the Act, the ACORN employees may be able to bring a private suit against O'Keefe and Giles for recording a confidential conversation without consent.

- The San Diego ACORN office most likely violated state civil laws designed to protect personal information, when it disposed of documents with confidential information about its employees, members, and individuals in the community it served. These violations may result in private litigation by the victims if they were injured by the disclosures.

- The California Secretary of State discovered four instances of possible voter registration fraud in San Diego in connection with the 2008 election. These cases have been examined by the Secretary of State's Office and referred to the local district attorney. The district attorney's office investigated and has filed no criminal charges. We found no allegations or evidence of actual fraudulent votes being cast.

- At the inception of our investigation, ACORN and 18 affiliates were delinquent in registering or filing reports with the Attorney General's Registry of Charitable Trusts. In response to notices from the Registry, all 19 of those entities have now either cured the delinquencies or forfeited their corporate status in California.

- ACORN solicited contributions for charitable purposes for victims of Southern California wildfires. ACORN did not properly account for these charitable funds and was unable to tell us if it raised any restricted funds or how the funds were used. We determined that ACORN spent more than it likely raised for the fire victims and therefore further action into this issue is not a wise use of the State's resources.

- ACORN did not file its 2007 tax form with the Franchise Tax Board. The Board will take appropriate action.

- Although ACORN's successor organization in California, ACCE, emphasizes that it is no longer part of ACORN, it is run by the same people, raising concerns about its ability to cure the defects in the organization. ACCE is organized as a California nonprofit public benefit corporation. As a result, its operations will be subject to more oversight by this Office and we will scrutinize its future activities.

- ACORN failed to implement internal controls and procedures sufficient to account for and protect charitable assets held in California as required by California law. This lack of appropriate infrastructure raises concerns about ACORN's use of its charitable funds and grants. However, we found no complaints from any California agency or private foundation that ACORN had misused funds granted and supervised by the agency or foundation. The Lousiana Attorney General and the IRS are investigating ACORN's finances and use of charitable and grant funds. We will continue to closely monitor those investigations for evidence of illegal activity in California

A BRIEF HISTORY OF ACORN

ACORN was founded in 1970 by Wade Rathke, Gary Delgado, and George Wiley in Little Rock, Arkansas. ACORN's first campaign was to help welfare recipients obtain basic assistance, which began a movement that grew to become the Arkansas Community Organizations for Reform Now, the beginnings of ACORN. By 1984, ACORN had expanded into twenty-seven states. When the video scandal erupted, ACORN had over 400,000 members and more than 1,200 neighborhood chapters in over 100 cities across the United States. It maintained 70 offices nationwide and had over 1,300 employees in 2008. In California, ACORN maintained 13 offices and had approximately 40,000 members.

3

At its peak, ACORN comprised a complex web of legally distinct entities that were all controlled by ACORN's management team. Nationwide, Rathke and ACORN management set up 160 entities, though it is not clear how many are active today. Several affiliates seem to have been established for specific programs or purposes, the largest of which may be ACORN Housing Corporation, an entity that provided services and advocacy related to housing issues. All or most ACORN entities were established as nonprofits, though not all have tax exempt status under sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code[1]. None of these entities was organized in California. At the outset of this investigation, there were more than twenty different ACORN-related entities which had at one time or another operated in California.

Prior to the videos, ACORN had an annual national budget of approximately $25 million, with approximately 10% of those funds coming from federal sources, a smaller share from state sources, and the rest coming from supporters (including foundations) and members. The California chapter stated its annual budget was $3.5 million. Acorn Housing has a separate budget, which was $11 million nationally in 2008.

On July 9, 2008, the *New York Times* reported that Dale Rathke, the brother of ACORN's founder Wade Rathke, embezzled close to $1 million from ACORN in 1999-2000. ACORN executives handled it quietly and internally, and did not inform most board members or law enforcement. Instead, they signed an enforceable restitution agreement with the Rathke family to repay the money that was embezzled. Meanwhile, Dale Rathke continued to work at ACORN, and Wade Rathke continued to run it until 2008, when the embezzlement became public. Thereafter, Dale left ACORN and Wade stepped down as ACORN's chief organizer.[2]

In September 2008, following revelations of Dale Rathke's embezzlement, two members of ACORN's national board of directors filed a lawsuit seeking to obtain financial documents and to force the organization to sever all ties with Wade Rathke. ACORN's executive committee voted unanimously to remove the two directors "because their actions – such as releasing a confidential legal memo to the press – were damaging the organization." The following year, Wade Rathke left ACORN, and signed an agreement under which he retained "control" of twenty-two ACORN affiliates.

Operating funds and all expenses for the various ACORN entities were centralized and funneled through a Louisiana based entity called Citizens Consulting, Inc. (CCI). CCI, which had no offices in California, provides accounting and payroll services to the ACORN entities and other non-profits in New Orleans. CCI was controlled by Dale Rathke until he left in 2008. After the Rathkes left, ACORN began a process of reorganization. CCI likewise reorganized to be more independent and instituted fiscal controls to protect against embezzlement.

Over the years, businesses, conservatives, and Republican groups have criticized ACORN's efforts to pursue agendas for the poor, such as anti-predatory lending regulations, and to register

---

[1] See page 26 for a discussion of tax exempt status.

[2] In October 2009, the Louisiana Attorney General issued a subpoena stating that ACORN's board of directors found that a larger amount – $5 million – had been embezzled from the organization. Bertha Lewis, ACORN's CEO, has denied the allegation. On November 6, Louisiana Attorney General investigators served a search warrant at the ACORN headquarters in New Orleans. That investigation is ongoing.

low-income and minority voters who are more likely to vote Democratic. Beginning in the 2006 lead up to the Presidential election, Republican supporters accused ACORN of being involved in political and economic wrongdoing, particularly voter registration fraud and the promotion of loans to low-income home buyers, including high risk, subprime mortgages. In the 2008 presidential election, ACORN's political arm endorsed Barack Obama who, along with several other attorneys, had served as local counsel for ACORN in a 1995 voting rights lawsuit. The U.S. Justice Department and the League of Women Voters sided with ACORN in the lawsuit.

In early 2009, a few GOP officials and conservative commentators charged that the Democratic Congress intended to funnel billions in economic stimulus funds to ACORN. In July 2009, Representative Darrell Issa, ranking minority Republican member on the House Oversight and Government Reform Committee, released a report entitled "*Is ACORN Intentionally Structured as a Criminal Enterprise*?" which catalogued allegations made against ACORN during the campaign and in the years before. Representative Issa's report claimed that ACORN was engaged in criminal money laundering to manipulate the American electorate. Representative Issa claimed that ACORN received $53 million in federal funds in fifteen years.

Over the past several years, several states investigated ACORN contractors or employees for submitting fraudulent voter registration forms.[3] To date, formal charges against ACORN canvassers for voter registration violations have been brought in Washington, Las Vegas, Pittsburgh and Wisconsin. In addition, in August 2009, law enforcement in Miami arrested several ACORN canvassers for voter registration fraud based on a tip from ACORN itself.[4] News media reported investigations into voter registration fraud in Colorado, Connecticut, Indiana, Michigan, Missouri, and North Carolina. The allegations of voter registration fraud led to an FBI investigation, which was initiated a year ago, the status of which has not been made public.

In the last few years, the IRS, Louisiana and other states filed substantial tax liens against ACORN entities for underpayment taxes, primarily employee withholding.

PUBLICATION OF THE O'KEEFE AND GILES RECORDINGS AND ITS AFTERMATH

On September 10, 2009, conservative commentator and publisher Andrew Breitbart launched a website called BigGovernment.com. The website premiered with a piece featuring covert video recordings made by 25 year old James O'Keefe and 20 year old Hannah Giles. O'Keefe had received some notoriety a few years earlier by posing as a racist donor to a Planned Parenthood office who supported abortions for African Americans. Those recordings led to Planned Parenthood grants and employees being terminated or suspended.

The September 10 posting documented a July 24, 2009 visit to the ACORN office in Baltimore, Maryland, with O'Keefe pretending to be a law student with political ambitions and Giles a prostitute. The couple claimed to be seeking tax and housing advice, mentioned using underage girls from Central America as prostitutes, and asked how to obtain legal documentation and

---

[3] http://www.nytimes.com/2008/10/24/us/politics/24acorn.html

[4] http://www.miamiherald.com/460/story/1225950.html

voting privileges for them. The video shows two ACORN employees giving advice on filing tax returns to disguise profits from the illegal trade and avoiding law enforcement scrutiny. Within 24 hours of the story's release, ACORN terminated the two employees. The day the piece was released, Fox News devoted extensive coverage to the story, including exclusive in-depth interviews with O'Keefe and Giles.

On the same day that the Baltimore video premiered, O'Keefe posted a statement on the Big Government website entitled "*Chaos for Glory*: *My Time* with ACORN," in which he says that he targeted ACORN because it controls elections and receives massive government funds:

> ACORN has ascended. They elect our politicians and receive billions in tax money. Their world is a revolutionary, socialistic, atheistic world, where all means are justifiable. And they create chaos, again, for it's [sic] own sake. It is time for us to be studying and applying their tactics, many of which are ideologically neutral. It is time, as Hannah said as we walked out of the ACORN facility, for conservative activists to "create chaos for glory."[5]

Between September 10 and September 17, 2009, four more stories were posted on BigGovernment.com based on covert recordings made by O'Keefe and Giles at ACORN offices in Washington D.C., Brooklyn, New York, San Bernardino, and San Diego. Each piece was edited and narrated by O'Keefe and said to display criminal conduct by ACORN employees.

The media interest in the recordings intensified and government reaction was swift. On September 11, 2009, the Census Bureau terminated its relationship with ACORN.[6] ACORN had been one of approximately 30,000 groups signed on to assist with the 2010 Census.[7] On September 14, 2009, the Senate voted to exclude ACORN from federal funds. The House of Representatives followed suit on September 17, and again in another budget extension vote on September 25. A federal court later ruled that the funding cut off was unconstitutional.[8]

On September 20, 2009, President Obama said during an interview that the video content was "certainly inappropriate and deserves to be investigated." On September 23, the IRS removed ACORN from a volunteer tax program which offered free tax advice to low and moderate income tax filers.[9] The IRS also announced a probe into ACORN's tax-exempt status.[10] The IRS has not released publicly the results of its investigation.

---

[5] http://biggovernment.com/2009/09/10/chaos-for-glory/#more-274

[6] http://www.nytimes.com/2009/09/12/us/politics/12acorn.html?_r=1&scp=14&sq=acorn&st=cse

[7] http://www.factcheck.org/2009/06/acorn-and-the-census/

[8] Preliminary injunction issued on December 11, 2009. *ACORN v. United States* (E.D.N.Y. 2009) 662 F.Supp.2d 285, 299. The injunction was made permanent on March 10, 2010.

[9] http://www.salon.com/wires/ap/2009/09/23/D9AT9CEO0_us_acorn_irs/

[10] ACORN, the parent company, does not have tax-exempt status, though a few of its affiliated entities do.

On September 14, 2009, the New York City Council suspended all ACORN grants while the Brooklyn district attorney conducted an investigation. The New York Attorney General announced an investigation into ACORN's use of state grant funds on September 16.  Both the Louisiana Attorney General and the United States Attorney's Office in Washington, D.C. opened investigations during this time.  The Inspectors General of the United States Departments of Justice, Housing & Urban Development, and Treasury also have opened internal inquiries into ACORN and its relationship with those departments. On December 17, the Government Accounting Office announced that it will investigate ACORN's use of federal funds.

On December 7, 2009, former Massachusetts Attorney General Scott Harshbarger of the Proskauer law firm, released his report, commissioned by ACORN.  The report found ACORN suffered from poor management and inadequate internal training, employee supervision and lacked appropriate standards of governance and accountability.  Harshbarger concluded, however, that no ACORN employee committed any crime in connection with the videos.

The House Judiciary Committee commissioned a review by the non-partisan Congressional Research Service (CRS). On December 23, the CRS issued its report finding no publicly reported violations of any laws by ACORN in connection with the videos.  The report also found that O'Keefe and Giles may have violated state laws in California and Maryland prohibiting covert recordings.

Because of the negative publicity, ACORN lost most of its funding from private foundations. On January 13, 2010, Amy Schur, the head of ACORN in California announced that the California chapter had broken away from ACORN and formed a new entity called the Alliance of Californians for Community Empowerment (ACCE).  Ms. Schur stated that ACCE had "no legal, financial or structural ties to ACORN."[11]  The *L.A. Times* reported that Ms. Schur said ACCE would be staffed by many of the same employees,[12] have the same members and be funded by most of the same donors as ACORN.  Ms. Schur advised us that ACORN had ceased operating in California.  When we asked for information regarding ACORN, Ms. Schur, who was the head organizer of ACORN California for eleven years, provided little information about ACORN's activities in California, and what information she did provide she sometimes contradicted in later discussions or in interviews with the press.  Once she formed ACCE, Ms. Schur asserted that she should not be involved in our investigation as ACCE was a new and separate organization and no longer associated with ACORN.

Counsel for ACORN advised us that chapters in nineteen other states have or are incorporating as separate entities and that ACORN is winding down its operations across the country with the possible intent to dissolve.  ACORN publicly announced that it will cease all operations on April 1, 2010.  Acorn Housing continues to operate in California, but changed its name to Affordable Housing Centers of America.

We had difficulty obtaining information from ACORN regarding its operations and finances. ACORN counsel and management were not responsive or cooperative and gathering information

---

[11] "Statement from Amy Schur Executive Director" January 13, 2010. PR Newswire.com.

[12] "California ACORN Breaking Off into New Group" *L.A. Times*, January 13, 2010.

was made much more difficult as ACORN reduced its operations. We ultimately obtained documents from the Louisiana Attorney General's Office produced by the ACORN accounting entity, CCI.

On January 25, 2010, James O'Keefe was arrested by the FBI and charged with entering a federal building with the intent to commit a felony. The arresting affidavit alleged that O'Keefe and three other men plotted to wiretap the phones of U.S. Senator Mary Landrieu's office in New Orleans, Louisiana. O'Keefe issued a statement claiming his intent was to investigate whether Senator Landrieu's phones were broken. Senator Landrieu, a Democrat, supported the federal healthcare reform bill and opponents of the bill complained that their calls to her office were met with busy signals. In an interview, the Senator had apologized and stated that the volume of calls had overloaded her staff and voice mail. An attorney for one of the other men said the men did not intend to interfere with her phones, but rather intended to make a film embarrassing the Senator because of her support for the healthcare bill. On March 28, 2010, the US Attorney announced reduced charges against the four men. The press reported that the attorney for one of O'Keefe's co-defendants said they reached a deal to plead guilty to a misdemeanor.

On February 18, 2010, Rep. Issa released a second report, "*Follow the Money: ACORN, SEIU and their Political Allies*." That report claims that many of ACORN's social campaigns constitute crimes, such as ACORN demonstrating against banks to pressure the banks to change their lending and foreclosure practices for low income people. The second Issa report also contends that ACORN was a significant cause of the financial crises because it worked with other groups to support the passage of the Federal Housing Enterprises Financial Safety and Soundness Act which was signed into law by President Bush in 1992. The report alleges that ACORN uses charitable funds collected by its tax exempt entities for political purposes, which is illegal under US and state tax law.

On March 1, 2010, the Kings County, New York, District Attorney's office announced that it had completed an investigation into the video made at the ACORN office in Brooklyn and found no criminal conduct.

THE COVERT RECORDINGS MADE BY O'KEEFE AND GILES AT ACORN'S OFFICES

The recordings occurred in eight ACORN and ACORN Housing locations around the country: Philadelphia, Baltimore, Washington, D.C., Brooklyn, Miami, Los Angeles, San Diego and San Bernardino. Our investigation concerned the three California locations, specifically whether the ACORN employees in the videos committed a crime under California law. As part of our investigation, we reviewed the edited video segments released on the internet as well as the complete and unedited recordings. A timeline detailing the O'Keefe-Giles covert recording of ACORN employees is included as an attachment to this Report as well as a description of the unedited videos from offices outside of California.

In each of ACORN offices they visited together, Giles posed as a prostitute fleeing an abusive pimp, and O'Keefe posed as her boyfriend, trying to help her, and, in some instances, attempting to benefit from the proceeds of the prostitution trade. Although O'Keefe is dressed in stereotypical 1970s pimp garb in the opening and closing scenes of the videos released on the internet, when O'Keefe visited each of the ACORN offices, ACORN employees reported that he

Case 1:17-cv-00256-MR   Document 43-6   Filed 01/22/19   Page 11 of 29

was actually dressed in a shirt and tie.[13]  Also, contrary to the suggestion in the edited videos, O'Keefe never stated he was a pimp.  Although their story morphed over time, the couple requested advice from ACORN employees related to Giles' prostitution business, including obtaining a mortgage, reporting income and taxes from the illicit business, avoiding law enforcement scrutiny, smuggling young girls into the country to serve as prostitutes, and obtaining documentation and voting privileges for them.  Woven into the narrative and conversations were tales of Giles' flight from an abusive pimp and how the girls could be kept safe from the pimp, albeit employed as prostitutes.  O'Keefe wore a hidden camera and secretly recorded audio and video of the conversations.

With regard to the San Bernardino recording, we attempted to interview ACORN employee Tresa Kaelke, but she declined our requests.  We did, however, obtain a copy of the affidavit she gave to ACORN on September 15, 2009, as well as reports taken by the San Bernardino Police Department.  We also visited the San Bernardino ACORN office and spoke to employees who oversee that office.  With regard to the San Diego recording, we interviewed ACORN employees Juan Carlos Vera and office head David Lagstein, as well as National City Police Department Detectives Alejandro Hernandez and Steve Villariasa.  We visited the ACORN office in National City.  We also obtained phone records from ACORN, Vera, and Detectives Hernandez and Villariasa.

Summary of Recordings Made In California.

Los Angeles:  Recorded 08/17/09; Released 11/17/09.

On August 17, 2009, O'Keefe and Giles visited the ACORN and ACORN Housing offices in Los Angeles.  O'Keefe wore a hidden camera to secretly record audio and video of the visits.  (Unedited Los Angeles ACORN video.)

When the couple first visited ACORN's office and inquired about the first time home buyer's program, ACORN employee Lavelle Stewart directed them to ACORN Housing.  The ACORN Housing offices were located in a separate building.  O'Keefe and Giles drove to the ACORN Housing offices and asked to speak with someone regarding qualifying for a first time buyer home loan.  Felix Harris agreed to speak with the couple briefly and explained that he was in the middle of a meeting with clients.  Harris spoke with the couple in the reception area of the office, in front of the receptionist, other ACORN employees, and ACORN clients.  (Unedited Los Angeles ACORN video.)

O'Keefe and Giles told Harris that Giles was a prostitute and they wanted to buy a home in which she and other girls could work.  They were unable to tell their full story, however, because Harris repeatedly cut them off and rushed them out of the office.  Harris explained that anyone could attend his seminars where he gave general information about applying for a home loan as a first time buyer.  Giles' occupation as a prostitute would not prevent them from attending the seminar.  Harris explained that ACORN Housing does not provide loans directly to individuals.

---

[13] Photos of O'Keefe and Giles are attached.  Because O'Keefe was holding the camera during filming, there is no photographic record of his appearance during the interviews.

The organization merely teaches people how to fill out the application paperwork. He told them they would need to prove income and a record of filing taxes. However, Harris said no bank would fund the couple based on an illegitimate prostitution business and ACORN would not get involved with an illegitimate prostitution business. (Unedited Los Angeles ACORN video.)

O'Keefe and Giles returned to the ACORN offices and spoke with Stewart again. The conversation began at Stewart's desk, which was inside a cubicle open to the remainder of the office. This time, Giles told Stewart a lengthy story about her tragic life as a prostitute. Giles said she was sold by a pimp in Miami to a pimp in Los Angeles, and that she was not dealing well with the transition across the country, in part because the Los Angeles pimp was "extremely abusive" and had pushed her down some stairs. She said she left the pimp to work on her own, but the pimp began following her and she was afraid. O'Keefe claimed to be Giles' boyfriend, a law student who planned to run for political office. (Unedited Los Angeles ACORN video.)

Stewart walked O'Keefe and Giles out of the ACORN offices and down a hall to a door marked "Program for Torture Victims."[14] Stewart opened the door and told Giles she should speak with the people working there. She explained the program assists various types of victims and can help abused people obtain housing and get their lives on track. O'Keefe said they would rather speak to ACORN and continued the conversation with Stewart in the hallway outside the Program for Torture Victim's offices. (Unedited Los Angeles ACORN video.)

Giles told Stewart that the pimp planned to have twelve El Salvadoran girls aged 12 to 15 work for him as prostitutes. Giles said she wanted to shield the girls from the pimp and wanted a home to take them to. Although the girls would continue to work as prostitutes, she would protect them. Stewart again suggested the couple consult the Program for Victims of Torture. She explained that ACORN would not be able to help with their situation and did not provide any services that the couple was looking for. (Unedited Los Angeles ACORN video.)

O'Keefe and Giles asked for advice on how to avoid getting caught for running a brothel. Stewart suggested they look for housing in an area where people would not mind the presence of prostitutes. O'Keefe stated that they would be running an "international sex business" and he planned to use the money from the business to finance a future political campaign. When asked her thoughts on that situation, Stewart told O'Keefe the couple needed to hook up with someone "on the international sex business level" and that "ACORN doesn't deal with that." Giles mentioned that she was thinking about setting up a "classy" prostitution business with a front of a spa. Stewart said the couple needed to speak with people who work in the sex business, not ACORN. Giles claimed that although she was a prostitute and wanted to carry on as a prostitute, she was afraid to speak to others in the sex business. (Unedited Los Angeles ACORN video.)

Giles continued to portray herself as an abused prostitute desperate for help and pushed for any advice. She said she wanted to save the El Salvadoran girls from being preyed upon and raped. She claimed the pimp put a hit out on her and injured her by pushing her down the stairs.

---

[14] The Program for Torture Victims (PTV) is a non-profit organization located in Los Angeles. Its website states, "PTV is a non-profit organization whose mission is to alleviate the suffering and health consequences of torture through psychological, medical, and case management services to victims of state-sponsored torture." (http://www.ptvla.org/.)

Case 1:17-cv-00256-MR   Document 43-6   Filed 01/22/19   Page 13 of 29

Stewart, expressing sympathy for Giles, offered to do Giles a personal favor. She said she would see if anyone she knew could provide advice on setting up and running the business, including local pornography magnate Larry Flynt. O'Keefe asked if Stewart was going to judge them for prostituting underage girls. Stewart explained that she would not judge them because underage girls had been trafficked overseas for years, she was not involved in it, she could not control it, and Giles said that she wanted to help the girls. Stewart was very complementary of Giles for having the courage to try to escape her oppressor and help the El Salvadoran girls. She asked the couple to contact her later that week for the results of her research. Toward the very end of the conversation, O'Keefe asked if the conversation was "confidential" and Stewart responded that it was. (Unedited Los Angeles ACORN video.)

On November 16, 2009, O'Keefe released an edited videotape of his conversation with Harris.[15] On November 19, 2009, O'Keefe released an edited videotape of his conversation with Stewart.[16] The released recordings did not include all Giles' statements regarding the abusive pimp, her tragic life, and fear for the underage girls, or Stewart's statements that ACORN could not help.

<u>San Bernardino</u>: Recorded 08/17/09; Released 09/15/09.

Later on August 17, 2009, O'Keefe, Giles, and a third person named Ryan[17] visited the ACORN offices in San Bernardino, California and spoke with Tresa Kaelke. O'Keefe was wearing a hidden camera and recorded audio and some video of the conversation. Our investigation disclosed that Kaelke was the receptionist at ACORN and was alone in the office at the time of the visit. O'Keefe and Giles were seated just inside the office's exterior door and Kaelke got up from her desk at the end of the short hallway leading from the door to the interior office spaces, and positioned herself so that the couple did not come into the office proper. (Unedited San Bernardino video.)

O'Keefe and Giles told Kaelke that Giles was a prostitute from Miami and O'Keefe was her boyfriend and a law student with political ambitions. Giles told Kaelke that she had an abusive pimp and was trying to get away from him and set up her own prostitution business in California. She said she knew of 12 El Salvadoran girls aged 12 to 15 that were shipped in for prostitution. Although Giles reported that she planned to have the underage girls engage in prostitution for her, she attempted to engender sympathy by explaining that she was saving them from a far worse fate. Giles claimed the young girls were currently not paid or fed and were raped by the pimp. She intended to ensure they were safe, not beaten, and received an education. To that end, she and O'Keefe wanted to set up a prostitution business in San Bernardino with a front business of a spa and were looking to buy a home for that purpose. They solicited advice on running a prostitution business without being caught. O'Keefe claimed that he would eventually

[15] "The LA Story, Part III: ACORN Employee of the Year, Felix D. Harris", at http://biggovernment.com/2009/11/16/acornthe-la-story-part-iii-acorn-employee-of-the-year-felix-d-harris/.

[16] ("The LA Story, Part IV: Program for Torture Victims", at http://biggovernment.com/2009/11/19/the-la-story-part-iv-program-for-torture-victims/.

[17] During the undercover taping, Ryan went by the name Jeff. However, the transcript reflects that his true name is Ryan. His full name is unknown.

use the money from the prostitution scheme to run for Congress. (San Bernardino Tr. 2-15, 23-24, 30-31; Unedited San Bernardino video.)

Kaelke told police investigators that she realized that this was a scam and decided to play along. (San Bernardino Police Report, Detective Baumgartner, dated September 15, 2009, at p. 1.) Kaelke told O'Keefe and Giles that ACORN would not approve of their business or of her giving them advice, but that she personally supported legalizing prostitution. (San Bernardino Tr. 2-3, 5, 14-15, 37.) She claimed Heidi Fleiss was a personal hero. She told them that she used to be a prostitute and gave them tips on keeping the business a secret. She suggested they set up the business as a massage parlor and sell vitamins as a cover. (San Bernardino Tr. at pp. 17-23.) When they expressed concern that neighbors might notice the underage El Salvadoran girls, she suggested they call the place a "group home." (San Bernardino Tr. at p. 35.) When the group was discussing the abusive nature of pimps, Kaelke said she had killed her abusive ex-husband. She told a story about how she set up a self-defense claim by going to battered women shelters before the murder. (San Bernardino Tr. 26-27.)

Kaelke has stated that none of her claims were true and she was playing along with what she perceived as a joke. (San Bernardino Police Report, Detective Baumgartner, at p. 1.) At one point during the conversation she said, "if I didn't know better and I don't but I would think this is a total set up." (San Bernardino Tr. 33.) Both of Kaelke's former husbands are alive and have reported to law enforcement that Kaelke never attempted to harm either of them. There is no evidence that she ever engaged in prostitution. (San Bernardino Police Report, Detective Baumgartner, at pp. 2-3; San Bernardino Police Report, Detective Carr, dated September 30, 2009, at p. 1-2.)

According to Kaelke, to continue the joke, Kaelke referred O'Keefe and Giles to her friend and neighbor Jim Miller. She claimed the group should talk to him because he might have some good ideas about their prostitution business. Kaelke thought Miller might find the group amusing and explained the situation to him before introducing them. She led the group out of ACORN's offices and across the street to Miller's home. (San Bernardino Tr. 36-37.) Miller is not affiliated with ACORN.

Miller's friend Kathleen was at the house. Kathleen is also not affiliated with ACORN. While standing in front of Miller's home, O'Keefe, Giles, Ryan, Kaelke, Miller, and Kathleen discussed the possibility of a prostitution business in San Bernardino. Miller appeared to play along with the joke and suggested the couple set up the business somewhere besides San Bernardino because the city was not thriving economically. Kathleen told the couple they should engage in a legal profession and return the young girls to their families. (San Bernardino Tr. 43-58.) The conversation broke up and the group left Miller's home.

Kaelke said she needed to return to work. She said goodbye to the couple outside the door to the ACORN office building. O'Keefe and Giles never went back inside ACORN's office. Our investigation revealed that Kaelke locked the door to the office as she left for Miller's. While standing outside the office, Kaelke continued to joke around with the couple. She repeatedly told them they were both sexy and told O'Keefe he resembled Princess Diana. When the couple said they were worried Miller and Kathleen might tell someone about their crimes, Kaelke

promised to threaten her neighbor's lives to keep them silent. (San Bernardino Tr. 57-67.) Again, Kaelke has since told authorities she was not serious.

O'Keefe released an edited videotape of the conversations with Kaelke on September 15, 2009.[18] He also released an edited audiotape of the conversation with Miller but did not explain that Miller was not an ACORN employee.

ACORN fired Kaelke shortly after the release of the recording.

San Diego: Recorded 08/18/09; Released 09/17/09.

On August 18, 2009, at approximately 5:00 p.m., O'Keefe and Giles visited the ACORN office in National City, California. Again, O'Keefe was wearing a hidden camera and recorded audio and video of the visit. (Unedited San Diego ACORN Video, August 18, 2009.)

At the office, they spoke with ACORN employee Juan Carlos Vera. We determined that Vera had been employed by ACORN for two to three years as a community organizer. The couple told Vera they wanted information about the first time home buyers program offered by ACORN. They went into Vera's office, sat down, and began a conversation. (Interview with Juan Carlos Vera, November 19, 2009.)

Vera was fiddling with his cell phone during the beginning of the conversation. O'Keefe and Giles, apparently concerned that Vera was photographing or recording them, asked whether the conversation would be kept confidential and Vera agreed.

O'Keefe and Giles gave Vera substantially the same background story that they presented in San Bernardino. They told Vera that Giles was a prostitute and her pimp was bringing over twelve girls aged 12 to 15 from El Salvador. (San Diego Tr. 4.) Giles claimed she wanted to save the girls from the pimp because he was a "huge guy" and might abuse them. She told Vera the pimp was "a really bad guy" who stole money from her. She believed the young girls would be safer and more comfortable with her. (San Diego Tr. 5-6.) O'Keefe said he was Giles' boyfriend and a recent graduate from law school who wanted to pursue criminal defense. He later revealed that he may use some of the money from the prostitute business to finance a political campaign. (San Diego Tr. 7-8, 17, 22.) O'Keefe and Giles claimed they had a friend who had recommended ACORN and they asked for advice regarding immigration and how to pull off their plan. (San Diego Tr. 8-9.)

Vera listened to them tell their tale. (San Diego Tr. 5-8.) He explained that ACORN San Diego would be offering seminars for first time home buyers. He told them they needed to apply for the program in order to participate and that they needed to prove income and a past record of paying taxes. (San Diego Tr. 9, 11-12, 15.) Although O'Keefe and Giles attempted to engage Vera in a conversation about how to file fraudulent tax forms, Vera continued to discuss the first time home buyers program and informed the couple that they had lawyers who would work with them in the program. (San Diego Tr. 12-15.) Vera attempted to focus the conversation on the

---

[18] "ACORN Prostitution Scandal: California Here We Come!", at http://biggovernment.com/2009/09/15/acorn-prostitution-scandal-california-here-we-come/.

first time housing program, but O'Keefe and Giles pushed for advice on how to smuggle underage prostitutes. (San Diego Tr. 19.)

Our investigation revealed that Vera speaks limited English. The language barrier, combined with the couple's peculiar story, left him confused over whether the couple was serious about running a prostitution business and smuggling young girls into San Diego. He felt the couple's story was constantly changing and made little sense. At first Vera understood there was another pimp running the business and Giles needed help. Then the story evolved in such a way that Vera understood O'Keefe was actually the pimp. Vera felt something strange was going on and was not sure if the situation was legitimate. (Vera Interview.)

Vera went along with the conversation in hopes of getting information from the couple that he could provide to law enforcement in the event they were telling the truth. (Vera Interview.) He asked when and where the girls would be smuggled into the country. (San Diego Tr. 19, 25.) O'Keefe asked for advice about the best place to smuggle the girls in and Vera said Tijuana and that Vera had contacts in Tijuana. Vera stated that he believed O'Keefe was asking whether it was better to bring the girls in through the port in Tijuana or San Diego. He answered just to go along with the conversation and obtain more information from them. He did not give the answer any thought and does not have smuggling contacts. (Vera Interview.)

Vera had Giles write her telephone number and email on a piece of paper. (San Diego Tr. 21, 23.) He also gave them his cell phone number when O'Keefe asked for a contact number. (San Diego Tr. 29.) He told them he would contact them the following day in hopes of getting rid of the couple. (San Diego Tr. 24, 26; Vera Interview.) He took their information in order to provide it to police. (Vera Interview.)

Giles forgot her sunglasses in Vera's office and Vera brought the glasses to the couple in the front stairwell of the office building. (Unedited San Diego ACORN Video.) Vera continued to speak with Giles and O'Keefe and O'Keefe also recorded this portion of the conversation. Vera asked Giles about her business. (Second San Diego Tr. 1-4; Vera Interview.) He told the couple that ACORN was hosting an immigration event that Friday. (Second San Diego Tr. 6-7.) Vera again told them that he would contact them the next day. He reassured them that they could trust him and that he would not tell anyone about the substance of the conversation. Giles and O'Keefe left a second time. (Second San Diego Tr. 4-7.)

Immediately after the couple left, Vera telephoned his cousin, Detective Alejandro Hernandez, at the National City Police Department. He left a voicemail message for Detective Hernandez stating that some "crazy people" were in his office providing information. Vera did not explain the substance of the conversation and did not make reference to prostitution or human smuggling on the message. He asked his cousin to call him back. (Interview with Vera; Vera Phone Records, at p. 4 [reflecting a 2-minute call to Detective Hernandez's cell phone at 6:40 p.m.]; Detective Hernandez Phone Records, at p. 132 [reflecting a call to voicemail at 6:45 p.m.].)

Later that day, Vera also reported the incident to fellow ACORN employee Cruz Acosta. Acosta had been away from the office while the couple was present. Vera explained to him what happened. Vera also reported the incident, either the same day or shortly thereafter, to Mar

14

Murrillon, an ACORN board member. Vera told Murrillon that he had reported the incident to the police. (Vera Interview.)

Vera eventually spoke with Detective Hernandez on August 27, 2009. He told Detective Hernandez that a self-admitted prostitute had been to the office and was discussing human smuggling. He did not know the exact location where the smuggling would take place. Detective Hernandez said he would contact someone in law enforcement who dealt with that area and get back to Vera. (Interview with Detective Alejandro Hernandez, October 8, 2009; Detective Hernandez Phone Records, at p. 115 [reflecting 12-minute call between Vera and Detective Hernandez on August 27, 2009 at 5:07 p.m.].) The next day, Detective Hernandez and his partner, Detective Steve Villariasa, contacted Detective Mark Haas at the San Diego Police Department. Detective Haas works with cases involving human smuggling. He said he would need more information in order to work the case. (Detective Hernandez Interview; Interview with Detective Steve Villariasa, October 8, 2009; Detective Villariasa Phone Records, at p. 86 [reflecting 4-minute call between Detectives Villariasa and Haas on August 28, 2009 at 7:44 a.m.].) Detective Hernandez called Vera and left a message stating that he had information for him that might help. (Detective Hernandez Phone Records, at p. 115 [reflecting 1-minute call between Detective Hernandez and Vera on August 28, 2009 at 10:48 a.m.].)

Vera attempted to acquire more information as Detective Hernandez had requested. He sent O'Keefe and Giles an email at the address Giles had given him. The email asked them to call him. A short time later, O'Keefe called Vera's cell phone. O'Keefe said the girls would be crossing in Tijuana, but did not give any other details. Vera told O'Keefe he would call him back and hung up. Vera called Detective Hernandez in order to give him the information. (Vera Interview.)

Several days passed and Vera played phone tag with Detective Hernandez. The first videos of ACORN employees began to surface and Vera realized that O'Keefe and Giles had been acting. He contacted Detective Hernandez on approximately September 11, 2009 and told him the whole thing was a set up and to disregard it. (Vera Interview; Detective Hernandez Interview; Detective Hernandez Phone Records, at p. 120 [reflecting a 12-minute call between Vera and Detective Hernandez on September 11, 2009 at 6:28 p.m.].)

On September 17, 2009, O'Keefe released an edited videotape of his conversation with Vera.[19]

ACORN fired Vera the same day. (Lagstein Interview.)

The O'Keefe and Giles Recordings Reveal that Some ACORN Employees Acted Inappropriately, But Not Illegally.

The complete and unedited recordings made by O'Keefe and Giles establish that the four California ACORN employees discussed with the couple their plan to conduct a prostitution business, which they described to three of the employees as using captive underage girls who were illegal immigrants. Despite the criminality of the hypothetical conduct discussed, none of

---

[19] ACORN Video: Prostitution Scandal in San Diego, CA at http://biggovernment.com/2009/09/17/acorn-video-prostitution-scandal-in-san-diego-ca/

the California ACORN employees committed, solicited or conspired to commit any criminal acts. Based on all the evidence now known, none of these employees said or did anything that was, in light of all the circumstances, illegal. Because O'Keefe and Giles's criminal plans were themselves a ruse, one cannot be criminally complicit in those plans. In order to be liable as an aider and abettor, the perpetrators (in this case, O'Keefe and Giles) must have actually committed the planned or underlying crime. (See CALCRIM No. 401; *People v. Perez* (2005) 35 Cal.4th 1219, 1225.) Similarly, conspiracy culpability would require a finding that not only the ACORN employee, but also O'Keefe and Giles (the coconspirators), intended to enter into an agreement and intended to commit the target crime of that agreement. (CALCRIM No. 415; *People v. Vargas* (2001) 91 Cal.App.4th 506, 551.)

Even if O'Keefe and Giles had truly intended to break the law, there is no evidence that any of the ACORN employees had the intent to aid and abet such criminal conduct or agreed to join in that illegal conduct. Aiding and abetting liability requires the aider and abettor (1) to know the perpetrator intends to commit the crime and (2) to intend to aid and abet the perpetrator in committing the crime. (*People v. Perez, supra*, 35 Cal.4th at p.1225.) Likewise, conspiracy liability requires both the specific intent to agree and the specific intent to commit the elements of the offense which is the object of the conspiracy. (*People v. Vargas, supra*, 91 Cal.App.4th at p. 551.) It is this lack of intent which obviates any possible criminal liability. Additionally, there is no evidence that any of the California ACORN employees did any act to further or promote any of the criminal activity discussed with O'Keefe and Giles. (*See People v. Campbell* (1994) 250 Cal.App.3d 402, 409 [mere knowledge that a crime is being committed and failure to prevent it is not sufficient to prove aiding and abetting]; *People v. Vargas, supra*, at pp. 551-552 [conspiracy liability requires one or more of the participants in the conspiracy commit an overt act in furtherance of the conspiracy].) ACORN employees did not commit any crime in advising O'Keefe and Giles to report and pay taxes on income earned from criminal activity because income taxes apply to both legal and illegal activities. (*James v. United States* (1961) 366 U.S. 213.)

The San Bernardino ACORN employee, Kaelke, has stated that she knew or believed O'Keefe and Giles' story was a ruse, and there are objective facts which support her claim. Vera has stated he intended to, and did in fact, contact law enforcement immediately after his conversation with the couple. In Los Angeles, Felix Harris told O'Keefe and Giles that ACORN would not get involved in a prostitution business but they were free to come to his workshop on loan applications. The other Los Angeles employee, Stewart, also stated that ACORN could not help them with their situation and walked them to a victim's rights organization. Exhibiting sympathy for Giles' expressed fear of her abusive pimp, Stewart promised to try to contact Larry Flynt or someone else in the "sex trade" to speak to O'Keefe and Giles. None of these conversations constitute an overt act or intent to commit a crime. ACORN could determine that the conduct of its employees in California was inappropriate, but that is an employment matter, which does not rise to the level of a law enforcement or governmental concern.

Employees outside California made suggestions for disguising profits from the illegal enterprise and for avoiding detection by law enforcement authorities. Clearly, the worst behavior was exhibited by the Baltimore employees who advised on how to falsely report the profits of their sex business and report underage prostitutes as "dependants." To a somewhat lesser degree the

Washington, D.C. employees provided inappropriate advice, as did the employees in the Brooklyn office.

Liability Under California Law for Making Covert Recording of Confidential Conversation

California law generally prohibits the recording of confidential communications without the consent of all participants where there is an objectively reasonable expectation that the conversation is not being overheard or recorded. To meet the Governor's request to investigate ACORN, this Office needed the complete, unedited video and audio recordings made by O'Keefe and Giles, who are not in California. O'Keefe and Giles agreed to produce the full recordings if the Attorney General agreed not to prosecute them for violations of California's privacy laws. This Office determined that the fastest and most efficient means to comply with the Governor's request was to agree not to prosecute.

In light of this limited grant of immunity, we did not focus on the circumstances surrounding the conversations to determine if the recordings themselves violated California law. Nevertheless, we take this opportunity to note the legal principles governing clandestine recording of conversations in California. Whether a recording of a conversation is unlawful depends on the circumstances of the conversation and the expectations of the parties. In 1967, the California Legislature adopted the Invasion of Privacy Act, codified at Penal Code sections 630 through 638. The Act is designed to protect the right of privacy by requiring the consent of all parties before a confidential conversation is recorded. (*Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 768-769 (*Flanagan*).) The eavesdropping and recording provision, section 632, provides that any person who intentionally and without consent of all parties to a confidential communication records such conversation is guilty of an alternate felony/misdemeanor. (Penal Code, § 632(a).) A private cause of action also exists for any person injured by a violation of the Act.[20] (*Id*., § 637.2.) Section 632 defines confidential communication to include "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." (*Id.*, § 632(c).) A communication made in a public place or "in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded" does not qualify as a confidential communication under the statute. (*Id.*) Confidentiality "appears to require nothing more than the existence of a reasonable expectation by one of the parties that no one is 'listening in' or overhearing the conversation." (*Flanagan*, 27 Cal. 4th at pp. 772-773.) The fact that the subject matter of the conversation might later be discussed with a third party has no bearing on a finding of confidentiality under the statute. (*Coulter v. Bank of America* (1994) 28 Cal.App.4th 923, 929.) Although the Act contains exemptions for particular individuals or circumstances, no exemption exists for filmmakers, the media, or journalists.

An application of these principles to the facts presented here strongly suggests that O'Keefe and Giles's violated state privacy laws and provides fair warning to them and others that this type of activity can be prosecuted in California.

---

[20] Aggrieved parties are authorized by statute to bring a civil action for $5,000 or three times the amount of actual damages. (Penal Code, § 632.7) We express no opinion as to whether ACORN or the videotaped employees may have a private right of action against O'Keefe and Giles under § 637.2.

DISPOSAL OF DOCUMENTS AT THE SAN DIEGO ACORN OFFICE

On November 22, 2009, Andrew Breitbart hosted a three-hour show on Los Angeles's KFI radio, the largest radio station in the country, and had Derrick Roach as a guest. Roach is a licensed private investigator in San Diego who ran unsuccessfully for the Republican nomination in the California 79th Assembly District in 2008. In that interview, and in postings on Breitbart's website, Roach said that he had staked out ACORN's National City office. On the evening of October 9, 2009, Roach noticed ACORN employees discarding a large amount of documents in the outside dumpster. Roach returned after dark, found the trash bin unlocked and removed nearly 20,000 pages of documents. Roach and Breitbart characterized the documents as highly sensitive and political. They stated that ACORN had disposed of the documents a few days after the Attorney General's announcement of his investigation of ACORN, suggesting that the documents had been dumped in an effort to thwart that investigation.

On November 24, Roach held a press conference with the chairman of the Republican Party of San Diego to announce the recovery of the documents, to condemn ACORN for its involvement in a "massive data breach," and to again suggest that the documents were dumped in an effort to thwart the Attorney General's investigation. ACORN's California head organizer, Amy Schur, explained that the documents had been disposed of as part of a clean-up of the San Diego office to accommodate the installation of a phone bank. While acknowledging that some of the documents contained sensitive private and personal information, Schur denied that there was any connection between the dumping of the documents and the Attorney General's investigation. Our investigators had scheduled a site visit at the National City ACORN office on October 7, 2009 and visited that office on October 15. The Attorney General had not sought any documents from ACORN before that time and did not plan to obtain any documents during the October 15 site visit.

On November 24, 2009, we interviewed Roach in our San Diego office. He was accompanied by counsel and the Chairman of the San Diego Republican Party. Roach said that he returned to the ACORN office on six to seven additional occasions between October 9 and November 20, 2009, and retrieved ACORN documents from the dumpster on three other occasions. Roach advised that he had turned over documents to the San Diego District Attorney's Office and Representative Darrell Issa. The District Attorney's Office advised us that they had no interest in pursuing the matter. We obtained from Roach a digital copy of the documents he recovered. Roach claimed that the documents showed an "illicit relationship" between ACORN and Citibank. When pressed to explain, Roach stated that the dumping of the documents with the mortgagor's personal information was the "illicit" aspect to which he was referring. Roach also claimed that the documents showed a possible Political Reform Act violation related to the California Teachers Association (CTA). CTA paid ACORN to conduct voter registration in 2009 in connection Proposition 1B, but Roach claimed the documents suggested that ACORN in fact conducted issue and measure advocacy on behalf of the CTA.

We reviewed the digital copy of the documents provided to us by Roach. We found approximately 500 pages of documents which contained employee-related information, including personal information related to twenty-two employees, such as I-9, W-4 and other IRS records and tax returns, Social Security numbers and card copies, driver's licenses, and copies of pay roll stubs. The documents also included Citibank originated customer lists with addresses and

contact information, some with land parcel and tax numbers. Among the documents were hundreds of pages of ACORN membership information, including names, telephone numbers, and e-mails addresses and direct deposit information. Some twenty-seven food stamp applications and related information, such as Social Security numbers and other personal financial information was also found among the documents. There were a number of documents which related directly to the covert recordings made by O'Keefe and Giles and ACORN's response to the release of the recordings, but we determined that none of these documents was relevant to this investigation.

The disposal by ACORN of documents containing sensitive personal information, without any effort to protect this information, such as shredding, is probably a civil violation of California's "personal information" privacy provisions (Civ. Code, § 1798.80, et seq.) Under those laws, the victims could sue for money damages if they were injured. The privacy laws do not provide for criminal prosecution. We have given a copy of the documents to ACORN to notify the individuals that their information has been compromised.

We also referred to the Fair Political Practices Commission the matter raised by Roach concerning the payment and reporting by CTA regarding the April 2009 ACORN voter registration/Proposition 1B effort. On December 30, 2009, the FPPC reported to the Attorney General that it had reviewed the matter and determined that there is no evidence of a Political Reform Act violation.

ALLEGATIONS OF ACORN VOTER REGISTRATION FRAUD

Voter Fraud Versus Voter Registration Fraud.

The difference between individual voter fraud and voter *registration* fraud is important. Actual individual voter fraud is rare because of the lopsided risk to reward ratio: there is almost no benefit for an individual to risk a felony conviction, prison time, and a large fine just to cast one vote among millions.[21] The New York University School of Law has done an extensive study regarding voter fraud, and found that allegations of voter fraud are almost always overstated, and end up working as an impetus to new voter registration restrictions, which, in turn, end up disenfranchising voters.[22] "Overall, the disfranchisement of voters through antiquated voting systems, errors, mismanagement of registration bases, and intimidation or harassment is a far bigger problem today than traditional forms of election fraud."[23]

---

[21] http://truthaboutfraud.org/pdf/TruthAboutVoterFraud.pdf, at p. 7 ("Fraud by individual voters is a singularly foolish and ineffective way to attempt to win an election [since] [e]ach act of voter fraud in connection with a federal election risks five years in prison and a $10,000 fine, in addition to any state penalties [which] in return . . . yields at most one incremental vote. That single extra vote is simply not worth the price").

[22] TruthAboutVoterFraud.pdf at p. 6 (citing interview of previous Republican political director for the state of Texas who admitted that "requiring photo IDs could cause enough of a drop off in legitimate Democratic voting to add 3 percent to the Republican vote").

[23] http://www.demos.org/pubs/Analysis.pdf at p. 2. In its analysis, Demos, a non-partisan public policy research and advocacy organization, examined perhaps the most contested case of voter fraud in recent times: the Sanchez-Dornan California congressional election in 1996. The final result showed Sanchez winning by just over 900 votes. Dornan vigorously opposed the results, claiming a well-known Latino rights group had signed up illegal voters in an effort, he argued, that may have led to "the first case in history where a congressional election was decided by non-citizens." (*Id.*, at p. 12.) He brought a formal congressional challenge to the results. Ultimately, however, the

Voter registration fraud, on the other hand, occurs where false voter registration forms are submitted to local registrars.[24]  Generally, voter registration fraud is caused by non-professional canvassers who are motivated by some financial incentive to create fraudulent registration cards for monetary gain, rather than to influence the outcome of an election.[25]  In 2009, Nevada instituted a case against ACORN based on allegations that it offered financial incentives to canvassers to turn in as many registration forms as possible, a violation of Nevada law.  In contrast, California has no law against offering financial incentives for the registration of new voters.

Allegations of ACORN Voter Registration Fraud in California

We spoke to Mark Loren, chief investigator for the Election Fraud Investigation Unit of the California Secretary of State's office (SOS).  Mr. Loren's unit is charged with investigating alleged voter and election fraud cases that are generally referred by county registrars.  The current system filters fraudulent registrations by cross-checking the information on each card with several other databases maintained by other agencies like the Department of Motor Vehicles and the Social Security Administration.  When fraud is suspected, it is referred to a law enforcement agency.

Allegations of voter registration fraud against were raised in 2008 in San Diego County. The San Diego County Registrar submitted to the SOS 62 registration cards turned in by ACORN and Young Political Majors (YPM).  The Registrar believed these cards were suspicious or possibly fraudulent in some way.[26]  YPM is not affiliated with ACORN and was hired by the California Republican Party to solicit voter registration and Republican Party membership.  At the time the ACORN recordings were made public, the SOS had opened cases on some of the cards submitted by San Diego County, but for a multitude of reasons, had not focused its limited resources to fully resolving the cases.  Of the 62 suspicious cards submitted, 31 related to multiple re-registrations not found to be fraudulent, and 24 were juvenile registrants that were too young to vote.  Of the remaining cards, three were submitted by YPM, leaving four fraudulent cards collected by four different canvassers hired by ACORN.  Due primarily to resource restrictions, these types of cases would not normally warrant a significant amount of investigation time. The SOS advised us of no other complaints of ACORN-related problems from the 2008 election.

California Secretary of State (at the time, a Republican) determined that the voters who were investigated (and whose ballots were apparently rejected) had "registered in error and not from criminal intent."  (*Ibid.*)

[24] http://truthaboutfraud.org/pdf/TruthAboutVoterFraud.pdf, at p. 20 ("it is extraordinarily difficult to find reported cases in which individuals have submitted registration forms in someone else's name in order to impersonate them at the polls . . . [i]ndeed, we are aware of no recent substantiated case in which registration fraud has resulted in fraudulent votes being cast").

[25] TruthAboutVoterFraud.pdf at p. 20 (most registration fraud is based on canvassers seeking monetary reward, and fake registration forms "actually defraud the voter registration drives, which compensate workers on the expectation that their time will be spent registering new and eligible citizens; the worker herself is interested not in defrauding the government, but in getting credit for work she didn't do . . . [t]here are no reports that we have discovered of votes actually cast in the names of such registrants").

[26] http://www.signonsandiego.com/news/metro/20081016-1250-bn16acorn.html.

Once the ACORN recordings were made public, the SOS received requests from both the state Republican Party and Assemblyman Martin Garrick regarding the status of the investigation. Mr. Loren explained that the SOS was working with the San Diego District Attorney's office to refer the seven possibly fraudulent registrations for further investigation or prosecution. After investigation, the District Attorney declined to prosecute.

According to the SOS, ACORN's voter registration efforts are less disciplined and have more quality control issues than other groups, resulting in substantially higher registration rejection rates compared to other voter registration organizations. While only a small percentage of rejected cards are actually judged fraudulent, the amount is still higher than for other groups. ACORN acknowledged that in 2008 almost one-third of the 1.3 million new registration forms turned in nationwide by ACORN were rejected "for a variety of reasons, including duplicate registrations, incomplete forms and fraudulent submissions from low-paid field workers trying to please their supervisors" and another third were address changes.

As noted, the investigation revealed four possibly fraudulent registration cards from ACORN in California. There is no indication in any of the allegations against ACORN that fraudulent registrations have led to any actual fraudulent votes, and, as discussed above, such fraudulent votes would be unlikely.

## ACORN COMPLIANCE AND GOVERNANCE AND CALIFORNIA FUNDS

### A.    ACORN Was Delinquent in its Corporate Filings and Tax Reporting

The Attorney General has jurisdiction over charitable trustees doing business in California and over funds raised for charitable purposes in California. All trustees, including charitable corporations incorporated in, and foreign corporations doing business in California are required to register and file annual reports with the Attorney General's Registry of Charitable Trusts. (Government Code §12580 et seq.)

We searched the Registry database for ACORN and each of the over 160 entities we identified as affiliates of ACORN. A total of nineteen entities were identified as operating in California, only five of which were registered with the Registry. Of those five, only one was current in reporting at the inception of our inquiry. Staff then searched the California Secretary of State database to determine if any of the remaining fourteen entities were incorporated in, or registered to do business in California. Of those fourteen, three were exempt from registration with the Attorney General, one has since registered, and eight have surrendered corporate status in California or are in the process of dissolution. Two entities, Wal-Mart Alliance for Reform Now, and Wal-Mart Worker's Association, remain unregistered in spite of delinquency notices, although we believe these entities are controlled by Wayne Rathke and are no longer affiliated with ACORN. A chart of these organizations and the status of each is attached to this report.

We contacted the California Franchise Tax Board regarding ACORN and whether it was current in its tax filings and payments. The FTB advised us that ACORN had not filed its 2007 tax return. The FTB is taking appropriate action.

**B.    ACORN Failed to Properly Account for Charitable Assets**

Funds solicited for a specific purpose are restricted for use for the purpose stated in the solicitation.  (Business and Professions Code §17510.85.)  In addition to addressing the compliance issues discussed above, we sought information regarding ACORN, and the nineteen entities identified as affiliates, to ascertain the scope of their activities in California.  We examined the nature and extent of policies and procedures in place to address board oversight and governance, fiscal controls, and legal compliance, as well as training materials for staff and volunteers.  We also looked at whether any of the ACORN entities held assets in California in trust for charitable purposes.

We discovered that ACORN solicited donations for victims of Southern California fires on its national website.[27]  Any donations received in response to that solicitation would be restricted for the stated purpose and ACORN is required to account for those funds.  ACORN could not tell us if any money was collected, how much was collected or how it was spent.  The ACORN representatives we contacted did not appear to understand that funds are restricted for the specific purpose solicited.  ACORN's policies and procedures were inadequate to track the collection and use of charitable funds.  This Office reviewed information regarding funds collected by ACORN during the relevant period as well as ACORN's activities to aid the fire victims.  We received no complaints from donors to the wildfire solicitation.  ACORN  stated that it raised little money and spent more than it raised.  Documents obtained from ACORN did not show substantial funds raised.  Under these circumstances, further action is not a wise use of the state's limited resources.

**C.    Diversion of Charitable Funds for Prohibited Purposes**

Organizations exempt from taxation under IRC §501(c)(3) cannot engage in political activities and donations are fully deductible to the donor.  Those exempt under IRC §501(c)(4) may engage in substantial lobbying, but cannot receive government grants and charitable contribution deductions are not available to donors.  An entity can incorporate as a nonprofit and choose not to apply for an exemption under 501(c)(3) or (4).  For non-exempt entities, donations are not tax deductible for the donor, but there are no restrictions on the entities ability to engage in political activities.  A 501(c)(3) can pay a non-exempt entity for goods or services provided to the 501(c)(3).  The tax codes prohibit use of tax exempt charitable funds for political purposes, but do not prohibit a 501(c)(3) from being under common control with an entity that engages in political activity.  The tax codes do not prohibit a 501(c)(3) organization from contracting with a non-exempt corporation for services, if the services are not political. A common structure for charitable organizations is one entity organized as a tax exempt 501(c)(3) and another organized as a 501(c)(4).  It is also common for charities to "outsource" their accounting functions to a nonprofit accounting company in order to lower their administration costs.

The Governor did not ask the Attorney General to investigate whether government or private grants made to tax exempt ACORN entities were used for political activities in violation of federal and state tax codes.  The confusing structure of the ACORN entities and the lack of appropriate internal policies and controls raise serious concerns about whether ACORN is

---

[27] See webpage from ACORN's website on September 25, 2009, attached to this report.

misusing funds. In general, state agencies and private foundations that provide grants to nonprofit entities audit the entities to ensure the funds are used in accordance with the purpose of the grant. No California state agency has advised this Office of any suspected misuse of funds by ACORN. Nor have we received complaints from any private foundation. We did not find any evidence of misuse of funds in our investigation, but we did not conduct an audit of the ACORN entities. The IRS and the Louisiana Attorney General's Office are both investigating ACORN's finances. Devoting the significant resources needed for a duplicate investigation into financial activities that are mostly out of state would not be a wise use of the state's limited resources, especially without allegations of financial misconduct by the agencies and foundations supervising the use of their funds. We will continue to closely monitor the Louisiana and IRS investigations for any evidence of violations of California law.

Representatives of ACCE, the newly formed entity that is replacing California ACORN, advised us that the new organization will be structured as two separate entities. One is a nonprofit public benefit corporation that is exempt from taxation under IRC §501(c)(3), and able to accept charitable contributions. The second will be a nonprofit mutual benefit corporation that is exempt under IRC §501(3)(4) and that may engage in political activities. ACCE also advised us that it has engaged independent law firms, accountants and management consultants in California to help it organize and has established an independent advisory council of community leaders from throughout the state. Because they will be organized under California law, the ACCE entities will be required to register and file annual reports with the Registry and be subject to more oversight by this Office than an out of state entity such as ACORN.

Conclusion

The video recordings evidence a serious and glaring deficit in management, governance and accountability within the ACORN organization. It is both disturbing and offensive that ACORN employees in different and far-flung offices were willing to engage in such conversations. ACORN's conduct suggests an organizational ethos at odds with the norms of American society. Empowering and serving low- and moderate-income families cannot be squared with counseling and encouraging illegal activities. This is particularly so given that ACORN received government grant funds and the support of major charitable foundations and thousands of members.

The edited O'Keefe videos released on the BigGovernment.com website portrayed ACORN as an organization infested with employees committing crimes. However, the impression of rampant illegal conduct created by the recordings at the various ACORN offices around the country is not supported by the evidence related to the videos in California. Our investigation revealed facts which were not reflected in the recordings. The San Diego employee's answers were influenced by his limited English and intent to contact the police. The San Bernardino ACORN receptionist knew it to be a prank and made outrageous and false statements.

O'Keefe stated he was out to make a point and to damage ACORN and therefore did not act as a journalist objectively reporting a story. The video releases were heavily edited to feature only the worst or most inappropriate statements of the various ACORN employees and to omit some of the most salient statements by O'Keefe and Giles. Each of the ACORN employees recorded in California was a low level employee whose job was to help the needy individuals who walked

in the door seeking assistance. Giles and O'Keefe lied to engender compassion, but then edited their statements from the released videos. Would it have been best had each ACORN employee simply refused to deal with the couple and shown them the door when their story came out? Of course.

ACORN was not the criminal enterprise described by O'Keefe in his "Chaos for Glory" statement – it did not receive billions in federal funds and did not control elections. ACORN is, however, disorganized and its operations were far from transparent, leaving it vulnerable to allegations of illegal activity and misuse of funds. Many of the ACORN employees lacked appropriate training and ACORN did not comply with its own internal policies and procedures. Unfortunately for ACORN, ACORN itself had undermined public confidence in the organization before O'Keefe and Giles walked into the first ACORN office. By covering up Dale Rathke's embezzlement, keeping him as an employee and going after board members who sought to rectify the situation, ACORN's management damaged the organization.

The California chapter has broken away from ACORN and reorganized in California. A charity operating in this state cannot avoid the law by changing its name. Criminal and civil liability attach to the people who illegally manage a charity. At this time, however, we find no evidence that would justify legal action against ACORN employees. The new ACCE will now be subject to supervision by this Office and we will scrutinize its activities going forward to ensure compliance with California law. This Office will continue to monitor the investigations in other states and at the federal level for any further allegations related to ACORN's activities in California.

**ACKNOWLEDGEMENTS**

Attorney General Brown acknowledges the substantial contributions of the following attorneys and Special Agent to this investigation, and to this report:

Belinda Johns
Senior Assistant Attorney General
Charitable Trusts Sections

Gary W. Schons
Senior Assistant Attorney General
Criminal Law Division

Catherine Ysrael
Supervising Deputy Attorney General
Consumer Law Section

Peter Williams
Deputy Attorney General
Government Law Section

Emily Hanks
Deputy Attorney General
Criminal Law Division

Barbara Shakowski
Special Agent
Special Investigations Team, Bureau of Investigation and Intelligence

1

**ATTACHMENTS**

**A.** Letter from Governor Schwarzenegger requesting investigation dated September 16, 2009.

**B.** Letter from Chief Deputy Attorney General James M. Humes to Governor Schwarzenegger dated September 25, 2009.

**C.** Timeline of Events Related to O'Keefe and Giles' Covert Recording of Acorn Employees.

**D.** Summary of Recordings Made Outside of California

**E.** Photo of James O'Keefe.

**F.** Photo of Hannah Giles.

**G.** Chart of ACORN entities identified as doing business in California and registration status with the Attorney General's Registry or Charitable Trusts.

**H.** Webpage from ACORN's website on 9/25/2009 showing solicitation for victims of Southern California Wildfires.

**I.** San Bernardino Police Report by Detective Baumgartner dated 9/15/2009.

**J.** Affidavit of Trisha Kaelke dated September 15, 2009.

**K.** Articles of Incorporation and Bylaws of Alliance of Californians for Community Empowerment ("ACCE").