

EXHIBIT 40

Attorneys Eyes Only

```
 1          IN THE UNITED STATES DISTRICT COURT
       FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                 ASHEVILLE DIVISION

 3

 4  RICHARD L. CAMPBELL,          )
                                  )
 5          Plaintiff,            )
                                  ) Case No.
 6     vs.                        ) 1:17-cv-00129-MR-DLH
                                  )
 7  SHIRLEY TETER and SINCLAIR    )
    COMMUNICATIONS, INC.,         )
 8                                )
            Defendants.           )
 9  ------------------------------
                                  )
10  SHIRLEY TETER,                )
                                  )
11          Plaintiff,            )
                                  ) Case No.
12     vs.                        ) 1:17-cv-00256-MR-DLH
                                  )
13  PROJECT VERITAS ACTION FUND,  )
    et al.,                       )
14                                )
            Defendants.           )
15  ------------------------------

16

17

18       *  *  *ATTORNEYS' EYES ONLY*  *  *

19    VIDEOTAPED DEPOSITION OF JAMES E. O'KEEFE, III

20       (Taken by Attorneys for Shirley Teter)

21         Winston-Salem, North Carolina

22         Wednesday, November 28, 2018

23

24             Reported in Stenotype by
                  Jana F. Collins
25   Transcript produced by computer-aided transcription
```

```
 1                      APPEARANCES

 2   ON BEHALF OF RICHARD L. CAMPBELL:

 3        VIRGINIA WOOTEN, Esquire (Via Telephone)
          Cranfill, Sumner and Hartzog
 4        2907 Providence Road, Suite 200
          Charlotte, North Carolina 28211
 5        (704) 940-3401

 6   ON BEHALF OF SHIRLEY TETER:

 7        JONATHAN D. SASSER, Esquire
          PREETHA SURESH RINI, Esquire
 8        JEREMY FALCONE, Esquire
          Ellis and Winters, LLP
 9        4131 Parklake Avenue, Suite 400
          Raleigh, North Carolina 27612
10        (919) 865-7000

11        RALPH STREZA, Esquire
          Critchfield, Critchfield and Johnson, Ltd.
12        4996 Foote Road
          Medina, Ohio 44256
13        (330) 723-6404

14   ON BEHALF OF PROJECT VERITAS, PROJECT VERITAS ACTION
     FUND and JAMES E. O'KEEFE, III:
15
          JAMES A. DEAN, Esquire
16        MICHAEL MONTECALVO, Esquire (Via Telephone)
          Womble Bond Dickinson, LLP
17        One West Fourth Street
          Winston-Salem, North Carolina 27101
18        (336) 721-3632

19
     ALSO PRESENT:  BRAD CARTNER, Videographer
20

21

22

23

24

25
```

 1    Q    Use a different name every time?

 2    A    **Not necessarily.**

 3    Q    Have you used as many as 200 fictitious names?

 4    A    **Possibly.**

 5    Q    Has anybody referred to you as a provocateur?

 6    A    **Yes.**

 7    Q    What do you understand that to mean?

 8    A    **Someone who provokes.**

 9    Q    Do you do that?

10    A    **The work often does provoke reactions.**

11    Q    Do you deliberately provoke people?

12    A    **I wouldn't characterize it as that, no.**

13    Q    How would you characterize it?

14    A    **We accurately report what people say and do in**

15 **order to expose reality and give truth to the masses.**

16    Q    And in getting people to do that generally,

17 Project Veritas lies to them; is that right?

18    A    **Not necessarily.  In some case, we use an**

19 **alias.**

20    Q    In some case, you directly lie to the person

21 you're trying to provoke a statement from; is that

22 right?

23         MR. DEAN:  Object.  Misstates his prior

24    testimony.

25    A    **Repeat the question.**

1          MR. SASSER: Can you read that back?

2          (QUESTION WAS READ BACK BY COURT REPORTER)

3    **A    I wouldn't characterize it as lying.**

4    Q    How would you characterize it?

5    **A    I suppose guerrilla theater in order to elicit**

6 **truthful statements so that we can tell the truth to**

7 **the public because we believe that the truth is**

8 **paramount. And oftentimes, the only way to get to the**

9 **truth is to dig deep, the way that investigative**

10 **reporters have done for a hundred years.**

11    Q    Are you saying that the only way to get to the

12 truth sometimes is to lie?

13    **A    I'm saying that Pulitzer price winning**

14 **reporters for the last 100 years have made statements**

15 **to that effect.**

16    Q    Who?

17    **A    Okay. Give me a minute to think. Veteran**

18 **journalist Ken Auletta made that, a statement to that**

19 **effect. William Gaines won the Pulitzer prize.**

20    Q    What did William Gaines --

21          MR. DEAN: Hold on.

22    Q    -- win a prize for?

23          MR. DEAN: Let him finish his answer,

24    please.

25          MR. SASSER: Okay.

1    A    William Gaines won the Pulitzer prize for

2  posing as a janitor for the Chicago Sun Times being

3  asked to assist with surgery.  And there have been

4  countless others throughout the 20th century.  Upton

5  Sinclair is considered a legend for misrepresenting

6  himself.

7    Q    Who's doing that now other than Project

8  Veritas?

9    A    Very few people.

10   Q    Did Upton Sinclair dress up like a pimp?

11   A    I don't believe so.

12   Q    But you've done that, haven't you?

13   A    Yes.

14   Q    Did Mr. Gaines wear lederhosen?

15   A    I can't remember what he wore.

16   Q    But you've sent people on projects wearing

17  lederhosen, haven't you?

18   A    Yes.

19   Q    So it's more theater than reporting, isn't it?

20   A    No.

21   Q    Do you refer to your projects as

22  investigations?

23   A    Yes.

24   Q    What are you trying to find out in your

25  investigations?

1    A    Sometimes.

2    Q    In the sting involving Shirley Teter, who was

3  the target?

4    **A    I object to the characterization of what that**

5  **was.  The investigation involved Democracy Partners.**

6    Q    And were they the target?

7    **A    They were the subject of the investigation.**

8    Q    What's the difference between subject and

9  target with regard to what Project Veritas does?

10   **A    Nomenclature.**

11   Q    Which one is accurate?

12   **A    They're, I suppose they're used**

13  **interchangeably in, in investigative journalism.**

14   Q    Are they used interchangeably at Project

15  Veritas?

16   **A    Occasionally.**

17   Q    Is Project Veritas a news organization?

18   **A    Yes.**

19   Q    Does Project Veritas put its reporting in

20  context?

21   **A    Yes.**

22   Q    And you expect other organizations to add

23  context to their sources?

24   **A    I don't know what you mean.**

25   Q    You expect other news organizations to do

1    Q    It's a issue of opinion as to whether or not
2    you're a journalist?
3    **A    It's not a matter of opinion.  It's a fact**
4    **that we are.**
5    Q    What is it that Project Veritas does that
6    makes its people journalists?
7    **A    Well, we believe that journalism is an**
8    **activity, not an identity.  Journalism is something**
9    **that you do and the purest form of journalism is to**
10   **report people in their own words and to report that**
11   **accurately to the masses.  So therefore, we believe**
12   **that what we do is the purest form of journalism.**
13   Q    And you're aware that the vast majority of
14   journalists does not lie to people in order to get
15   quotes from them?
16   **A    Well, I would say the vast majority of the**
17   **people that you may be referring to are not themselves**
18   **journalists.**
19   Q    You're saying a reporter who is able to tell a
20   story without lying to his sources is not really a
21   journalist?
22   **A    No, that's not what I'm saying.**
23   Q    What are you saying?
24   **A    I'm saying that many of the people in the**
25   **media may be pundits or commentators or aggregators.**

Case 1:17-cv-00256-MR   Document 54-3   Filed 02/05/19   Page 7 of 21

1  Q   So it's not really fair to say whether
2  somebody's a journalist or not?
3  **A   I'm doing my best, but I would prefer to, to,**
4  **to clarify that the question of whether or not you are**
5  **a journalist depends upon what it is that you do, not**
6  **who you are.**
7  Q   What you're doing at a particular moment?
8  **A   What you're doing in a particular reporting**
9  **assignment or investigation.**
10  Q   So of all the people you've listed as
11  journalists, do you know of any of them ever using a
12  fictitious name?
13  **A   Yes.**
14  Q   Who?
15  **A   Well, Gunter Wallraff has done that.**
16  Q   All right.  Anyone else?
17  **A   Yes.**
18  Q   Who?
19  **A   I'm trying to remember the specific instances.**
20  **ABC News has done that.**
21  Q   Who at ABC News has done that?
22  **A   There was a show called Primetime Live.  Diane**
23  **Sawyer was the, the anchor of the program.**
24  Q   So who used a fictitious name?
25  **A   I don't remember the names of the reporters on**

Case 1:17-cv-00256-MR   Document 54-3   Filed 02/05/19   Page 8 of 21

1   the assignment, on that particular assignment.

2      Q   All right.  Other than that, out of all the

3   journalists you've named, who has used a fictitious

4   name?

5      A   The Chicago Sun Times in the 1970s conducted a

6   number of newspaper investigations.  I believe it was

7   a, a bar called the Mirage that they owned and

8   operated.

9      Q   Did those people use fictitious names?

10     A   In, in various circumstances, yes.

11     Q   Of the people you've named as journalists,

12  which of them have worn disguises?

13     A   Well, the most famous example of that would be

14  Gunter Wallraff who's considered by almost everyone to

15  be a journalist.

16     Q   Has Ronan Farrow ever, ever worn a disguise on

17  a story?

18     A   I don't know.

19     Q   What about Jane Mayer?

20     A   I don't know.

21     Q   What about Mr. Rosen?

22     A   I don't know.

23     Q   What about Joel Pollak?

24     A   I don't know.

25     Q   What fictitious names have you used?

1  me.  I believe he worked for People for the American

2  Way.  I, I'd have to double check what the name of the

3  entity was.

4    Q   Have you heard of an organization called

5  Americans United for Change?

6    A   American United for Change, that was the one,

7  yes.  My mistake.

8    Q   Is that some sort of offshoot of People for

9  the American Way?

10   A   No, I don't, I don't think they're connected.

11  I'd, I'd forgotten the name of the entity until you

12  just said it.

13   Q   Okay.  Do you know who's in charge of

14  Americans United for Change?

15   A   I did know that.  I don't remember that here

16  right now.

17   Q   It wasn't Mr. Foval though?

18   A   I don't believe so.  I believe he had a

19  position of authority there of some type.

20   Q   What was the relationship between Americans

21  United for Change and Democracy Partners?

22   A   Well, I recall Foval saying something to the

23  effect of wear the white hat and Bob Creamer is the

24  dark hat, descriptions made by Mr. Foval about his

25  relationship with Bob Creamer.

1      Q    That was in the April 2016 interview?

2      **A    Yes.**

3      Q    Do you know what relationship, if any,

4  Democracy Partners had with the Hillary Clinton

5  campaign in 2016?

6      **A    I, I, I've learned, I've learned that they did**

7  **indeed have a relationship.**

8      Q    What was that?

9      **A    Well, I -- it would be great if I could refer**

10 **to the transcript of Foval.  In the video, he**

11 **references how the Hillary Clinton campaign, the DNC**

12 **or there's some relationship between the Hillary**

13 **Clinton campaign, the DNC, Democracy Partners.**

14 **There's a, there's a connection there, funding**

15 **connection that helps implement activities.**

16     Q    Recall some language about Hillary knows about

17 it through the chain of command?

18     **A    Yes.**

19     Q    And who said that?

20     **A    That was Bob Creamer, the head of Democracy**

21 **Partners.**

22     Q    So that was later, that was not the original

23 Foval interview?

24     **A    Correct.  There was multiple series of**

25 **meetings that occurred.**

1  that sometimes our journalists have sources and I
2  don't know the extent of everyone that they talk to.
3  But to repeat, we don't report anything unless you can
4  see and hear the people on tape saying it.  That's my
5  responsibility to ensure that we accurately report the
6  content and the context of the people that we interact
7  with.  So ultimately, I would be ultimately
8  unconcerned if I did learn of those surprises.
9      Q    It's easier for you to supervise people at
10 headquarters than it is the journalists on the field,
11 isn't it?
12     A    Not necessarily.
13     Q    If you were to try to find out who the eighth
14 person imbedded as you told Mr. Hannity was, who would
15 you, what records would you need to consult?
16     A    I would have to take a look at old e-mails.
17 I'd have to consult our chief compliance officer about
18 whether or not these records still even exist.  I
19 would also say that I think it's unethical for me to
20 disclose -- it's -- I, I, I will do so, but I
21 personally and my conscience objects to having to
22 disclose the identity of our sources.  If this was
23 done in any other context, any investigative
24 journalist worth their soul would object to having to
25 identify some of the sources they used to obtain the

1    A    Oh, excuse me, excuse me.  I understand.  The,
2  that would be Allison Maass.
3    Q    Talking to Bob Creamer?
4    A    That is correct.
5    Q    All right.  And Bob Creamer is the guy with
6  the suspenders that we're looking at now?
7    A    Yes.
8    Q    All right.
9                    (Video Plays)
10   Q    Who's talking?
11   A    That's me.
12   Q    All right.  And who wrote what you're saying
13 there?
14   A    Joe Halderman.
15   Q    All right.  Continue.
16                   (Video Plays)
17   Q    Now you made a cut from -- you were talking
18 about Shirley Teter to that's Mr. Foval?
19   A    Yes.
20   Q    Saying she was one of our activists?
21   A    Yes.
22   Q    How did you know he was talking about her?
23   A    May I see the transcript of the surrounding
24 minutes associated with this video so that I may
25 properly and accurately answer your question?

1    **A    I believe I've seen it but not for a long**
2  **time.**

3    Q    Did you mention earlier that you've seen a
4  transcript yesterday?

5    **A    Yes.**

6    Q    And that's something other than this?

7    **A    Yeah, it wasn't identical to this.  It may**
8  **have been a consolidated version.**

9    Q    Okay.

10   **A    I just need to read these sheets of paper here**
11 **that are relevant to this video.  Okay.  Can you ask**
12 **me your question again?  I'll do my best to --**

13           MR. SASSER:  Can you read back the
14      question?

15           (QUESTION WAS READ BACK BY COURT REPORTER)

16   **A    Well, based upon the interactions between the**
17 **journalist, our journalist and Scott Foval, he was**
18 **clearly referring to her in the -- while he didn't**
19 **mention her by name based upon the conversations that**
20 **they have, Scott Foval was referring to Miss Teter.**

21   Q    The transcript in front of you has no
22 reference to Shirley Teter, does it?

23   **A    It does.**

24   Q    You see the name Shirley Teter?  Can you show
25 me the line?

1    A    Oh, no, I don't see the name.

2    Q    Okay.

3    A    I do see references to, to the, to, to Miss

4  Teter.

5    Q    Okay.  Tell me where the reference is.

6    A    Yes.  The, the -- on page 42 of the transcript

7  of the conversation between Christian Hartsock and

8  Scott Foval, it says from the lady who got

9  cold-cocked, cold-cocked.  That was you guys, I'm

10  reading the transcript.  That's the kind of shit,

11  that's the kind of shit that he and I tickles him.

12  Scott Foval confirms that the incident in question was

13  the stuff that they do.  On page 80, they refer to

14  what do you do to punch an old lady.  Elderly, old

15  lady confirms that it's an elderly individual later in

16  life.  This meeting occurred three days, I'm sorry,

17  three days within the incident in question at the

18  rally.  So it was in the news and the journalists and

19  Scott Foval are clearly referencing that situation

20  that happened days previous.  And Scott Foval

21  references on page 83 of the transcript, this is where

22  he says, pardon me one second as I find it.  That this

23  person, she, North Carolina was one of our activists

24  who had been quote, "trained up to birddog."

25    Q    I'm sorry.  We're on page 83?

1     A     83.

2     Q     Where's it say North Carolina?

3     A     **North Carolina is on page 42.**

4     Q     How do you know they're talking about the same

5  person?

6     A     **It says cold-cocked.  That was you guys.**

7     Q     Does that say North Carolina?

8     A     **It says in the conversation between the**

9  **journalist and the subject in the same -- this is from**

10  **this, this interaction between the journalists and**

11  **Scott Foval.  They're clearly referring to someone in**

12  **North Carolina in the same meeting that occurred for,**

13  **I don't know how long it was.  I suppose a couple of**

14  **hours, maybe less.  They're referring to people that**

15  **Scott Foval says that he trained.  It's unclear**

16  **whether they were paid or not, but again Scott Foval**

17  **is making these claims about somebody in North**

18  **Carolina.**

19     Q     Do you see anything on page 83 about North

20  Carolina?

21     A     **Not on page 83, no.**

22     Q     And you referred to an elderly lady on page

23  80?

24     A     **Yes.**

25     Q     You see there at the bottom of the page, can

1    A    Because I believe journalism is an activity,

2  not an identity, and we should evaluate the media or

3  journalism entity by the fruits of what they do.

4    Q    Did Sinclair end up having the opportunity to

5  be the first to break the story?

6    A    I believe they did.

7    Q    And did they take that opportunity?

8    A    They did not.

9    Q    What was the expression you used?  Did they,

10  they cut you loose or whatever?  What was the -- do

11  you remember what you said?

12    A    I'm sorry?

13    Q    What, what was it that Sinclair did?

14    A    They chose not to launch the story.

15    Q    Let me show you.

16                    (Video Plays)

17    Q    Spiked.  That's you talking about Sinclair?

18    A    Yes.

19    Q    What do you mean by they spiked the story?

20    A    Spiked means to cancel a story or to choose

21  not to publish a story oftentimes right before that,

22  that was supposed to happen.

23    Q    Why did they do that?

24    A    Well, let me think.  I'm not certain.  I was

25  never able to ascertain with certainty why they did

1   it.

2   Q   Did anybody ever tell you why they did it?

3   **A   I did have a conversation with someone there**

4   **and he made some statements.**

5   Q   Who was that?

6   **A   His name was John Solomon.**

7   Q   And what did Mr. Solomon say?

8   **A   I don't -- I'm assuming you have the exhibit.**

9   **If I can look at it, otherwise, I'll have to just**

10   **paraphrase.**

11   Q   Okay.

12   **A   It was him saying he had Bob Creamer in his**

13   **offices right now. This is when he spoke to me. And**

14   **he said sometimes these decisions are made, I believe**

15   **he said something to the effect of at a higher up**

16   **level and it was circumstances not in his control,**

17   **something to that effect.**

18   Q   What was Mr. Solomon's position at Sinclair

19   Media?

20   **A   I believe he was the C, chief operations**

21   **officer of Circa which is an arm of Sinclair.**

22   Q   What do they do?

23   **A   They're investigative journalists.**

24   Q   At the same time that you were having trouble

25   with Sinclair spiking the story, were you also having

1    Q    And as a result, they did not run the story,

2  right?

**3    A    I don't know what that resulted from.**

4    Q    You were aware that Mr. Creamer was in Mr.

5  Solomon's office, right?

**6    A    Yes.**

7    Q    Are you familiar with a practice of

8  journalists giving a subject of one of their stories

9  the opportunity to respond?

**10   A    Yes.**

11   Q    And you don't adhere to that?

**12   A    Well, the extent to our ethical obligation is**

**13 to report accurately what we hear and see coming out**

**14 of the subject's own mouth.  That is their, that often**

**15 is their response.**

16   Q    And if they say something about a third-party,

17 you don't have any obligation to investigate that?

**18   A    Not in the discipline of what we do, no.**

19   Q    No matter how innocent that person may be?

**20   A    In this case, the story is about Scott Foval**

**21 and claims that he made.  That's what the story is**

**22 about.**

23   Q    And if Scott Foval had said Shirley Teter is

24 one of our prostitutes, you have no obligation to

25 follow-up on that?

1    A    That would, that, that -- we make

2  determinations about what is newsworthy and, and as

3  evidenced by this New York Times story, it's fairly

4  newsworthy what these people were saying and doing and

5  claiming.  It was very, it was so newsworthy that it

6  made CNN.  The other, the other parts of the material

7  rose to that standard.  So our ethical obligation

8  extends to reporting accurately what we see and what

9  we hear and that rises well far above and beyond the

10 ethical obligations of traditional journalists do not

11 disclose their sources.  They don't even disclose raw

12 transcripts of their interviews with sources.  So

13 we're being held to a standard that is well above and

14 beyond the standard that is expected of any

15 award-winning journalist.

16    Q    By October the 21st, you knew that Shirley

17 Teter denied being a birddogger, didn't you?

18    A    I don't recall.

19    Q    Well, if you look at this e-mail you sent

20 around to your counselors, you see that Shirley Teter

21 denied to the New York Times that she had any protest

22 training.  You see that?

23    A    Okay.

24    Q    I mean, you read it before you sent it around

25 to your counselors, didn't you?

1    STATE OF NORTH CAROLINA

2    COUNTY OF FORSYTH

3                   REPORTER'S CERTIFICATE

4         I, Jana Collins, a Notary Public in and for

5    the State of North Carolina, do hereby certify that

6    there came before me on Wednesday, the 28th day of

7    November, 2018, the person hereinbefore named, who was

8    by me duly sworn to testify to the truth and nothing

9    but the truth of his knowledge concerning the matters

10   in controversy in this cause; that the witness was

11   thereupon examined under oath, the examination reduced

12   to typewriting under my direction, and the deposition

13   is a true record of the testimony given by the

14   witness.

15        I further certify that I am neither attorney

16   or counsel for, nor related to or employed by, any

17   attorney or counsel employed by the parties hereto or

18   financially interested in the action.

19        IN WITNESS WHEREOF, I have hereto set my hand,

20   this the 11th day of December, 2018.

21

22                       _Jana Collins_

23        _____

24             Jana Collins, Notary Public

25             Notary Number: 200733100028