IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Case No. 1:17-cv-00256-MR-DLH

| | |
|---|---|
| SHIRLEY TETER, | |
| Plaintiff, | |
| vs. | **TRIAL BRIEF** |
| PROJECT VERITAS ACTION FUND et al., | |
| Defendants. | |

Plaintiff Shirley Teter asserts alternative claims for defamation *per se* and defamation *per quod* against Defendants Project Veritas Action Fund ("PV Action"), Project Veritas, and James O'Keefe, III based on as-of-yet unspecified statements[1] contained in two videos that PV Action published during October 2016.[2] The Court's ruling on several threshold legal questions will determine

---

[1] Plaintiff has not identified the specific statements within the videos that she contends are defamatory. Instead, Plaintiff's counsel advised Defendants' counsel that Plaintiff intends to treat the entirety of Videos I and II as the defamatory statements. Defendants believe Plaintiff should be required to identify specific statements and to do so in advance of trial.

[2] Plaintiff also sued Defendants for unfair and deceptive trade practices under N.C. Gen. Stat. § 75-1 et seq., but the Court indicated that Defendants' motion for summary judgment as to that claim would be granted.

which of Plaintiff's alternative claims may potentially be submitted to the jury as well as what evidence will be relevant at trial. These questions include:

1.     Whether Plaintiff was a public figure (voluntary or involuntary) when PV Action published so-called Videos I and II?

2.     Whether the statements in the PV Action videos constitute defamation *per se*? This requires answering:

     a.     Whether the PV Action videos are subject to only one interpretation, and

     b.     If the videos are subject to one interpretation, whether that interpretation is defamatory?

3.     As to Video II, whether statements concerning Plaintiff's varying accounts of her altercation with Richard Campbell constitute actionable facts or non-actionable opinions?

## ARGUMENT

## I.    PLAINTIFF IS A PUBLIC FIGURE WHO MUST PROVE ACTUAL MALICE.

Whether Plaintiff was a public figure when the PV Action videos were published is a pivotal question of law. The Fourth Circuit recognizes three varieties of public figure:

> (1) "involuntary public figures," who become public figures through no purposeful action of their own; (2) "all-purpose public figures," who achieve such pervasive fame or notoriety that they

2

become public figures for all purposes and in all contexts; and (3) "limited-purpose public figures," who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues.

*Wells v. Liddy, 186 F.3d 505, 532* (4th Cir. 1991) *(citation omitted).* Plaintiff qualifies as a limited purpose or involuntary public figure. Consequently, she must prove by clear and convincing evidence that PV Action published the videos with actual malice. *Hatfill v. The New York Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008).

## A.   Limited Purpose Public Figure

When "an individual voluntarily injects [her]self or is drawn into a particular public controversy," she "becomes a public figure for a limited range of issues." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974). "Whether a person has achieved the status of a limited-purpose public figure is a question of law," which depends on (1) "whether a public controversy gave rise to the defamatory statement" and (2) "whether the plaintiff's participation in that controversy sufficed to establish [her] as a public figure within the context of that public controversy." *Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir. 2001).

### i.   PV Action's Videos Address Multiple Public Controversies.

"Public controversy" is a legal term of art that "encompasses a dispute that in fact has received public attention because its ramifications will be felt by persons who are not direct participants." *Carr*, 259 F.3d at 279 (quotation and

3

citation omitted); *see also Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1554 (4th Cir. 1994). In analyzing whether a publication concerns a public controversy, courts "should look to the scope of the message conveyed in the [challenged publication]," rather than considering only the portion of the publication relating to the plaintiff. *Hatfill*, 532 F.3d at 322.

PV Action's videos relate broadly to the qualifications of the candidates seeking election to the U.S. Presidency in the fall of 2016. The videos challenge the narrative that Trump was unfit for office because he incited his followers to violence and present evidence that violence was orchestrated by Democrat operatives with the blessing of the Clinton campaign. "There is little doubt that public discussion of the qualifications of a candidate for elective office presents what is probably the strongest possible case for application of the [public figure] rule." *Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686-87 (1989. The videos also addressed public controversies including (1) whether Trump or others incited violence at campaign rallies and (2) whether Clinton was justified in referring to "half of Trump's supporters" as "deplorables." These are issues of substantial importance to the general public.

### ii. Plaintiff Injected Herself Into the Public Controversies.

To determine whether a plaintiff injected herself into a particular public controversy, courts consider whether

4

> (1) the plaintiff has access to channels of effective communication, (2) the plaintiff voluntarily assumed a role of special prominence in the controversy, (3) the plaintiff sought to influence the resolution of the controversy, (4) the controversy existed prior to the publication of the defamatory statements, and (5) the plaintiff retained public figure status at the time of the alleged defamation.

*Carr*, 259 F.3d at 280 (citation omitted). The second and third factors are the "heart" of this test and are "sometimes combined into the question of "whether the plaintiff has voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy." *Id.*

### (a) Plaintiff had access to effective channels of communication.

On September 13, the day after the rally, Plaintiff gave interviews to WLOS and *The Asheville Citizen-Times*. WLOS ran TV and print stories and *The Citizen-Times* published an article. Those stories received worldwide press. When statements and video were released later that week challenging Plaintiff's story, Plaintiff again spoke with and appeared on/in WLOS and *The Citizen-Times*.

Plaintiff also communicated her message through political activists. She gave an interview to *Letters from the Left*, a progressive blog run by a local Asheville freelance reporter and to MoveOn Political Action, a political action committee with millions of members. On September 15, *Letters from the Left* published a piece about Plaintiff. On September 16, MoveOn sent an email and

video concerning Plaintiff to 4,549,221 of its members and to the world via social media.

Following publication of Video I, Plaintiff appeared on WLOS a third time and responded to the video. Plaintiff was also interviewed by *The New York Times*, which published her response to the video in a Section A story. Clearly, Plaintiff had access to effective channels of communication before and after the videos were published.

### (b) Plaintiff voluntarily assumed a role of special prominence in and tried to affect the outcome of the public controversies.

Plaintiff inserted herself into the controversies swirling around Trump, Clinton, and the election by making many public statements through the television and print news as well as activist organizations. While voluntary discussion of events with the press does not automatically make one a public figure in all circumstances, *Wells*, 186 F.3d at 537, press participation is significant to the public figure analysis. *See, e.g., Gertz*, 418 U.S. at 352.

> When an individual has had contact with the press, the proper questions are whether he has attempted to influence the merits of a controversy, or has drawn attention to himself in order to invite public comment, or invited that degree of public attention and comment essential to meet the public figure level.

*Wells*, 186 F.3d at 537. Plaintiff "attempted to influence the merits of a controversy" when she accused Trump of inciting violence at his rallies. She

6

"[drew] attention to [her]self in order to invite public comment" when she called the first WLOS reporter who interviewed her to insist that WLOS ask "if people find a Trump supporter punching her in the face deplorable." These advocacy efforts distinguish Plaintiff from someone who merely relays facts in response to media questions.

Plaintiff further inserted herself into the public controversies surrounding Trump's fitness for office and campaign rally violence by disseminating her message through publications by individuals she knew to be political activists. Through a blog post article, an email distributed to more than 4.5 million people, and a video published via email, Facebook, Twitter, and YouTube, Plaintiff reiterated her theory that Trump incites his supporters to be violent.

In short, Plaintiff acted as an advocate who utilized both the mainstream press and political activists to influence the outcome of ongoing controversies.

> **(c)** **The public controversies existed before the PV Action videos.**

The media coverage of Plaintiff's altercation and Plaintiff's own public statements show that the public controversy surrounding violence at Trump's campaign rallies and Clinton's "deplorables" comment existed at the time of her altercation, weeks before PV Action's videos were published.

7

### (d) Plaintiff was still a public figure when the videos were published.

Plaintiff was still a public figure when the PV Action videos were published, as evidenced by the fact that both WLOS and *The New York Times* quickly reached out to Plaintiff after Video I's publication. Moreover, local television and print Media followed the criminal case against Plaintiff's alleged attacker, often repeating Plaintiff's claims, for months, also demonstrating that Plaintiff remained a public figure. *See Carr*, 259 F.3d at 282. Local media even continue to cover this case, printing front page stories as recently as March 2019.

To summarize, the evidence clearly demonstrates that Plaintiff was and is a limited purpose public figure before, during, and even after publication of the PV Action videos.

### B. Involuntary Public Figure

If the Court decides Plaintiff's extensive advocacy through the media and activist organizations was not enough to make her a limited purpose public figure, that does not end the public figure inquiry. "[E]ven 'involuntary' participants can be public figures when they choose a course of conduct which invites public attention." *Reuber v. Food Chemical News, Inc.*, 925 F.2d 703, 709 (4th Cir. 1991) (citations omitted). To determine whether a plaintiff is an involuntary public figure, courts consider whether (1) the plaintiff pursued a course of conduct from which it was reasonably foreseeable, at the time of the conduct, that public interest

would arise, (2) a public controversy actually arose that is related, although not necessarily causally linked, to the action, (3) the plaintiff is recognized as a central figure during debate over that matter, (4) the controversy existed prior to the publication of the defamatory statement, and (5) the plaintiff retained public-figure status at the time of the alleged defamation. *Wells*, 186 F.3d at 539-40.

Plaintiff attended a public protest outside a widely-publicized presidential rally. She engaged attendees and was ultimately involved in an altercation with one who she heckled, followed, and grabbed. She used that altercation to advocate against Trump in the media and with activist organizations. If this was not enough to make Plaintiff a limited purpose public figure, it was at least a course of conduct from which it was reasonably foreseeable that public interest would arise which, of course, it did. The altercation and Plaintiff's claims about it related to controversies concerning violence at Trump rallies and whether Trump incited his supporters to be violent. Plaintiff became a central figure in the debate over those controversies when her claims drew local, national, and international attention. Local interest in and coverage of Plaintiff's story persists even to this day. As discussed above, those controversies predated and still existed at the time of the PV Action videos, as did Plaintiff's public-figure status. Consequently, if Plaintiff was not a limited purpose public figure, she was certainly an involuntary public figure. In either event, the result is the same. She must prove actual malice.

## II.   **PLAINTIFF MUST PROVE ACTUAL MALICE.**

Showing actual malice requires proving that PV Action published the videos with knowledge that they were false or with reckless disregard for their falsity. *Hatfill*, 532 F.3d at 317. Despite the misleading nomenclature, "reckless disregard" is not akin to a negligence standard. *Horne v. WTVR, LLC*, 893 F.3d 201, 211 ( 4th Cir. 2018) ("The Supreme Court has made clear that reckless conduct is not measured by whether a reasonably prudent person would have published or spoken, or would have investigated before publishing or speaking."); *Hatfill*, 532 F.3d at 325 ("Constitutional malice requires "much more than a failure to exercise ordinary care") (citations omitted). Rather, "reckless disregard" means that the defendant acted with a high subjective awareness of the publication's probable falsity. *Hatfill*, 532 F.3d at 317; *Carr*, 259 F.3d at 282 (citation omitted). Put another way, a plaintiff must show that the defendant "in fact entertained serious doubts as to the truth of his publication." *Carr*, 259 F.3d at 283 (citation omitted).

PV Action harbored no doubts whatsoever that Foval's "she was one of our activists" claim referred to Plaintiff or, for that matter, that the claim was true. Nor did it have any reason to doubt, based on the content and context of Foval's claim:

- The relevant meeting between the journalists and Foval occurred only three days after the Asheville Trump rally and while Plaintiff was still in the national news;

- During their meeting, both the journalists and Foval made references that pointed to Plaintiff, including referring to a woman in North Carolina who had been "cold-cocked;" and

- Foval had not presented the journalists with any reasons to doubt his claims but, in fact, had proven himself a reliable source of information.

Unsurprisingly, Foval now claims that his comments did not refer to Plaintiff, after all. But, even crediting Foval's after the fact testimony as truthful, this does not lead to the conclusion that Defendants acted with actual malice. The factors cited above, in addition to Foval's words and actions at the September 15, 2016 meeting, made it rational for PV Action to interpret Foval's comment as referring to Plaintiff. Adopting one of multiple rational interpretations of a source's statements does not create a jury issue on actual malice. *CACI Premier Technology, Inc. v. Rhodes*, 536 F.3d 280, 296 (4th Cir. 2008).

Even assuming that Foval's claim did not refer to Plaintiff or was false, there simply is no evidence that PV Action knew or had a high degree of subjective awareness of either fact. For that reason, Plaintiff cannot show clear and convincing evidence of actual malice.

## A. Actual Malice Depends on PV Action's Subjective Mental State.

The Supreme Court and Fourth Circuit have consistently rebuffed Plaintiff's efforts to transform the actual malice standard into something closer to a

negligence inquiry. In *Reuber*, the Fourth Circuit reviewed and rejected numerous such efforts and, in the process, confirmed that the following types of evidence, all of which Plaintiff relies upon to one degree or another, do not show actual malice:

- Insensitivity to the plaintiff's reputation or career

- Ill-will towards the plaintiff

- The publication's profit motive, political orientation, desire to promote a candidate, or partisanship

- A publication's decision not to inquire into the truth of a source's assertion (in absence of obvious reasons to doubt the source's veracity)

- Falsity of the statement

*Reuber*, 925 F.2d at 715-18. Thus, evidence in these categories is not relevant to the actual malice inquiry. The evidence should be excluded from the trial (other than evidence of falsity), as any slight probative value is heavily outweighed by the risks of misleading the jury, confusing the issues, and unfairly prejudicing Defendants. To prove actual malice, Plaintiff must prove PV Action's mental state, not argue based on evidence the Fourth Circuit has already held improper.

## III.   <u>PLAINTIFF'S DEFAMATION CLAIM SHOULD NOT REACH THE JURY.</u>

North Carolina recognizes three types of defamation: (1) defamation *per se* (statements that are defamatory on their face as a matter of law), (2) statements that are reasonably susceptible to two meanings, one defamatory and one not, and (3)

defamation *per quod* (statements that are not defamatory on their face but become so in light of innuendo, colloquium, or surrounding circumstances). *Renwick v. News and Observer Pub. Co.*, 310 N.C. 312, 316, 312 S.E.2d 405, 408 (1984). Plaintiff alleges alternative theories of defamation *per se* and *per quod*. (Doc. 1 ¶¶ 73-74.) The evidence supports neither.

### A. Plaintiff's Alleged Defamatory Statements Misconstrue PV Actions Videos.

The bedrock for any defamation claim is an untrue statement. Here, Plaintiff misconstrues the videos in an effort to get around this requirement by claiming that the videos include PV Action's own factual assertions about her. Actually, the fact reported in Video I and II is that Scott Foval claimed that Plaintiff was one of his activists. Given Foval's positions with prominent political organizations Democracy Partners and Americans United for Change, this claim was newsworthy on its own merit. In this lawsuit, Foval has testified that he was not, in fact, referring to Plaintiff. But his responses to Project Veritas's under cover journalists and his own words, accurately recorded by those journalists, undermine Foval's attempt to revise what he actually said during the meeting.

Because PV Action accurately reported Foval's claim, Plaintiff's defamation claim fails whether considered *per se* or *per quod*.

**B. As a Matter of Law, Statements in PV Action's Videos Are Not Defamation *Per Se*.**

As explained by the North Carolina Supreme Court:

> [T]o be libelous *per se* [words] must be susceptible of but one meaning and of such nature that the court can presume as a matter of law that they tend to disgrace and degrade the party or hold him up to public hatred, contempt or ridicule, or cause him to be shunned and avoided.

*Renwick*, 310 N.C. at 317-18, 312 S.E.2d at 409 (citation omitted). It follows that there are two threshold legal questions that the Court must answer before a defamation *per se* claim may go to the jury.

1. "The initial question for the court in reviewing a claim for libel *per se* is whether the publication is such as to be subject to only one interpretation." *Id.* at 318, 312 S.E.2d at 409 (citation omitted).

2. "If the court determines that the publication is subject to only one interpretation, it then is for the court to say whether that signification is defamatory." *Id.* (citation omitted).

Importantly, "It is only after the court has decided that the answer to both of these questions is affirmative that such cases should be submitted to the jury on a theory of libel *per se*." *Id.* (citation omitted).

As to the first question, to be defamatory *per se*, a publication must be reasonably susceptible of only one meaning.

> When a publication is susceptible of two interpretations, one defamatory and the other not, it will not support an action for a libel of the first class-a libel based upon a publication obviously defamatory which is libel *per se*.

14

*Id.* at 320, 312 S.E. at 410 (citation omitted).

As to the second question, if the Court concludes that the Videos are subject to only one interpretation, it must then determine whether that interpretation is defamatory.

> a libel *per se* is a publication . . . which, when considered alone without innuendo, colloquium or explanatory circumstances: (1) charges that a person has committed an infamous crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace.

*Id.* at 317, 312 S.E.2d at 408-409 (citation omitted).

The PV Action videos comprise the only evidence relevant to the Court's analysis of the foregoing questions. *See Id.* at 318, 312 S.E.2d at 409. And the videos must be construed within their four corners, "stripped of all insinuations, innuendo, colloquium and explanatory circumstances." *Id.*

### i. The statements contained in Video I are not defamatory *per se*.

Before determining whether particular statements in Video I are defamatory *per se*, the Court must first determine that the only way to interpret the video is as asserting those statements. As an example, Plaintiff has previously argued that the video accuses her of being mentally ill and homeless. But an alternative and more logical interpretation based on the words used in the video is simply that Foval claimed that Plaintiff was trained to "birddog," which Foval explained means to

arrive early at a political rally and place one's self along the rope line to ask questions of the candidate, and that his comments concerning using mentally ill and homeless people refer to some of his general exploits. There is nothing defamatory in this interpretation. In any event, under *Renwick's* clear teaching, the existence of multiple interpretations removes the video from the narrow universe of defamation *per se*.

> ii.    **The statements contained in Video II are not defamatory *per se*.**

Video II repeats Foval's claim that Plaintiff was a trained birddogger. As Plaintiff conceded during the parties' summary judgment arguments, there is nothing defamatory in such an assertion:

> THE COURT: What I'm trying to do is take that a piece at a time so we can zero in on what it is you are asserting is defamatory in nature. So, if I understand you correctly, the assertion of the plaintiff's affiliation with AUC and having been paid and trained by AUC, those are not defamatory statements. But then the next step in what you assert, or what you claim is defamatory, is the assertion by the defendants that the plaintiff was paid and trained by AUC in order to "bird dog" the Trump rally. First of all, what does that mean?
>
> MR. SASSER: It was defined by Scott Fogel (sic) in video one, which says to bird dog is when you train people two weeks in advance to go to the rally, get there early, get in the rope line, and ask the candidate questions.
>
> THE COURT: What's defamatory about that?
>
> MR. SASSER: Nothing. There's nothing defamatory about that, Your Honor.

16

(Transcript of March 19, 2019 Hearing, pp. 14:20-15:12.)

The remainder of Video II addresses two statements Plaintiff made to the media about her altercation with Richard Campbell outside the September 12, 2016 Donald Trump rally. The first, that she was "cold-cocked," was made on September 13, the day after the rally. The second, a concession that Campbell might have hit her with the back of his hand, was made in October when the local reporter confronted Plaintiff with Video I. Assuming for the sake of argument that Video II's statements concerning Plaintiff's two accounts amount to an accusation that Plaintiff changed her story, such an assertion is not defamatory for two reasons:

First, under North Carolina law, accusing someone of being a liar does not constitute defamation *per se*. *Kling v. Harris Teeter Inc.*, 338 F. Supp. 2d 667, 673 (W.D.N.C. 2002) ("Under North Carolina law, calling a person, in effect, a liar, without linking the statement to their trade or business, cannot constitute slander *per se*." (citation omitted); *Wolfe Fin. Inc. v. Rodgers*, No. 1:17cv896, 2018 WL 1870464, at *13 (M.D.N.C. Apr. 17, 2018) "North Carolina courts have consistently held that alleged false statements calling a plaintiff dishonest or charging that a plaintiff was untruthful are not actionable *per se*.") (citations

omitted). Thus, Video II is not defamatory *per se* even under the interpretation most favorable to Plaintiff's claim.

Second, Video II's statements concerning Plaintiff's changed story clearly qualify as opinions. "If a statement cannot reasonably be interpreted as stating actual facts about an individual it cannot be the subject of a defamation suit." *Daniels v. Metro Magazine Holding Co.*, 179 N.C. App. 533, 539, 634 S.E.2d 586, 590 (2006); *see also Blue Ridge Bank v. Veribanc, Inc.*, 866 F.2d 681, 685 (4th Cir. 1989) ("[i]f the defamatory statement is an expression of opinion rather than a declaration of fact, then it is constitutionally protected under the First Amendment and judgment should be entered for the defendant"). "Rhetorical hyperbole and expressions of opinion not asserting provable facts are protected speech." *Daniels*, 179 N.C. App. at 539, 634 S.E.2d at 590. "Whether a statement can reasonably be interpreted as stating facts about an individual . . .is a question of law." C*ACI Premier Technology, Inc. v. Rhodes*, 536 F.3d 280, 293-4 (4th Cir. 2008).

Plaintiff has not shown that PV Action misquoted or misreported her statements; she simply disagrees with PV Action's characterizations as contradictory. PV Action's interpretations are not "provable facts" and cannot support a defamation claim.[3]

---

[3] This is true whether the statements are considered in the *per se* or *per quod* framework.

### C. Plaintiff's Evidence Does Not Support Her Alternative Claim for Defamation *Per Quod*.

To succeed on a defamation *per quod* theory, Plaintiff must prove: (1) Defendants printed certain statements, (2) Defendants published the statements to third-persons; (3) the statements were false; (4) defendants intended the statements to defame Plaintiff; (5) a third-person understood the statements as defaming Plaintiff; and (6) as a result of the publication, the plaintiff suffered a monetary or economic loss. *See* N.C.P.I. §§ 806.61, 806.62. If the Court finds that Plaintiff was a public figure when the videos were published, before she can seek any damages, Plaintiff must prove by clear and convincing evidence that Defendants published the statements with actual malice. N.C.P.I. § 806.62. Even if the Court finds that Plaintiff was not a public figure, Plaintiff must still prove actual malice before she is entitled to seek punitive damages. *Id.* While Defendants intend to oppose each of the *per quod* elements, a few merit comment here.

#### i. Plaintiff must present third-party testimony on interpretation, not unauthenticated hearsay.

Plaintiff must present sworn testimony from a third-party who saw the videos and interpreted them as defamatory. *Wright v. Commercial Credit Co.*, 212 N.C. 87, 192 S.E. 844, 845 (1938). This cannot be satisfied by testimony from individuals who only saw the videos after the statute of limitations expired. *See Williams v. Rutherford Freight Lines, Inc.*, 10 N.C. App. 384, 391, 179 S.E.2d 319,

324-25 (1971) (explaining that, in order for plaintiff to have a valid defamation *per quod* claim, all elements of claim must exist within statute of limitations). The fact that sworn testimony is required precludes Plaintiff from relying on YouTube comments, newspaper articles, television news reports, or other hearsay evidence, as more fully explained in Defendants' Motion in Limine.

### ii.     There is no evidence of defamatory intent.

Plaintiff must prove that PV Action intended to defame her. *Robinson v. Nationwide Ins. Co.*, 273 N.C. 391, 394, 159 S.E.2d 896, 899 (1968); *Raymond U v. Duke University*, 91 N.C. App. 171, 181, 371 S.E.2d 701, 708 (1988). *See also DaimlerChrysler Corp. v. Kirkhart*, 148 N.C. App. 572, 582, 561 S.E.2d 276, 284 (2002) (holding plaintiff had not shown likelihood of success on merits where attorney's intent in sending alleged defamatory letters was to secure witnesses or generate litigation, not to defame plaintiff). The evidence does not support any such intent. PV Action published the portion of Video I concerning Plaintiff in order to shed light on Foval's claim about a highly-publicized incident. It published Video II to report Plaintiff's apparent change in story concerning the Campbell altercation. PV Action had no intent to defame Plaintiff.

### iii.     Plaintiff has no special damages.

Plaintiff is expected to contend that she incurred special (e.g. monetary) damages in the form of (1) the costs of procuring a new cell phone and (2)

expenses Medicare paid relating to neuro feedback therapy Plaintiff received during 2017. This evidence fails for substantive and procedural reasons.

### (a) Plaintiff's phone purchase was not proximately caused by PV Action's videos.

Plaintiff's phone expense theory is that she was forced to cancel her landline and acquire a new cell phone in response to harassing phone calls. Plaintiff concedes that the calls began after her altercation with Campbell was reported in the news, which occurred a month before PV Action's videos. Even if, in contradiction to her deposition testimony, Plaintiff testifies at trial that she received harassing calls after the PV Action videos were published, she cannot show that any such calls were caused by the PV Action videos rather than by the extensive pre-existing media coverage of the altercation (in which she willingly participated).

### (b) Plaintiff's medical expense claim and evidence were not pled, disclosed, or produced and, as a result, are barred.

Plaintiff's medical expense claim was a new creation for summary judgment. The only special damages articulated in Plaintiff's Complaint are unspecified "out of pocket expenses." (Doc. 1 ¶ 61.) Based on Plaintiff's Rule 26(a) disclosures and answer to Defendants' Interrogatory 1, it is evident that these damages only include the alleged costs Plaintiff incurred to purchase a cell phone. (Docs. 52-02, 52-03, 52-06, 52-07.) Rule 9(g) bars Plaintiff from seeking special

damages at trial that she did not plead.[4] *Carnell Const. Corp. v. Danville Redevelopment & Housing Authority*, 745 F.3d 703, 724-25 (4th Cir. 2014). Similarly, Rule 37(c) bars Plaintiff from using information (i.e. medical expense evidence) that she did not disclose in her initial disclosures or interrogatory response. Fed. R. Civ. P. 37(c) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). The same goes for Medicare records that Plaintiff did not produce until after summary judgment arguments, nearly four months after discovery closed.

### (c) Plaintiff cannot show that her medical expenses were caused by the PV Action videos.

Even if admitted, Plaintiff's medical expense evidence fails to show causation.

First, Plaintiff cannot do an end-around the normal requirements for proving causation of injury. Plaintiff contends that reading comments posted on YouTube in response to PV Action's videos caused her to experience psychological

---

[4] The pled "out of pocket expenses" could not have included any amounts for Plaintiff's medical care, because it is undisputed that Plaintiff did not personally pay for that care. Medicare did. Further, Plaintiff's attorneys have conceded that they were not even aware of the alleged relevance of Plaintiff's medical treatment until the last week of discovery, so that could not have been in their contemplation when drafting the Complaint.

symptoms that necessitated treatment in the form of neuro feedback therapy. "[W]here the exact nature and probable genesis of a particular type of injury involves complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." *Hensley v. Danek Med., Inc.*, 32 F. Supp. 2d 345, 350 (W.D.N.C. 1998) (quoting *Click v. Pilot Freight Carriers, Inc.*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980)). "In North Carolina, a jury award cannot be sustained in the absence of expert medical testimony on the issue of causation." *Hensley*, 32 F. Supp. 2d at 350 (citation omitted).

No lay person is equipped to determine that the psychological issues that caused Plaintiff to seek neuro feedback therapy were caused by the PV Action videos. Plaintiff's neuro feedback therapist diagnosed her with "generalized anxiety disorder." But Plaintiff was already using anxiety medication prior to seeking therapy. Once in therapy, Plaintiff identified numerous sources of stress, but did not mention Defendants or the PV Action videos even once. In these circumstances, it would be rank speculation for any lay person or juror to draw conclusions on causation. Plaintiff has not designated her treating therapist as a witness nor identified any other medical expert, so she cannot prove causation.

Second, Plaintiff is attempting to make Defendants liable for comments posted by unknown individuals over which Defendants had no control. Defendants

did not post, sanction, ratify, or invite the comments. Yet it was the comments, not the contents of the videos, that Plaintiff says caused her to seek therapy. As such, the comments are an independent, intervening cause that breaks the causal link between the videos and Plaintiff's alleged harm. *See Tise v. Yates Const. Co., Inc.*, 345 N.C. 456, 460-61, 480 S.E.2d 677, 680 (1997). Moreover, it was not reasonably foreseeable that publishing political videos in which a Democratic operative claimed that Plaintiff was trained as a bird dog would cause unidentified individuals to post threats concerning the Plaintiff on social media. Permitting the opposite conclusion would make every media entity beholden unto the whims of fringe members of society who choose to use the open forum provided by the internet.

### iv. Plaintiff's Evidence of Emotional Distress Damages Is Insufficient.

Plaintiff has also forecasted her intent to seek actual damages on her defamation per quod claim in the form of unspecified emotional distress damages. However, she has no evidence to merit presenting that issue to the jury. "[B]ecause emotional distress is fraught with vagueness and speculation, it is easily susceptible to fictitious and trivial claims." *Ross v. F.D.I.C.*, 625 F.3d 808, 818 (4th Cir. 2010) (citation and internal quotation marks omitted). As a result, "conclusory statements that the plaintiff suffered emotional distress do not support an award of compensatory damages." *Id.* In *Ross*, for example, the Fourth Circuit

held that a plaintiff could not rely on her own testimony to establish that debt collection practices caused her depression and insomnia. *Id.* The court explained:

> One would expect a person seeking medical treatment for such conditions as depression and insomnia to mention any major sources of stress in her life. But Ross never mentioned WaMu's debt collection efforts to any of her doctors, with the lone of exception of Dr. Bochacki. Even in her first 21 visits with Dr. Bochacki, during which time Ross explained the stress of working in the Charlotte–Mecklenburg school system, she never once mentioned WaMu's debt collection practices. Instead, Ross waited until the day before Dr. Bochacki's deposition to broach the subject with her.
>
> Finding no support in the medical testimony, the only evidence Ross can bring forth are her own conclusory statements concerning emotional distress. . . . Presented only with Ross's conclusory assertions, no reasonable jury could find that WaMu's debt collection practices were the proximate cause of Ross's non-economic injuries.

*Id.* (citations, quotation marks, and alterations omitted). This case mirrors *Ross*. Plaintiff attributes her anxiety disorder and need for neuro feedback therapy to comments she allegedly saw on the YouTube page displaying PV Action's videos. One would expect a person seeking medical treatment for generalized anxiety disorder to "mention any major sources of stress in her life." *Ross*, 625 F.3d at 818. Sure enough, the records from Plaintiff's more than fifty therapy sessions document a wide array of stressors. Problematic for Plaintiff, however, is that not one record mentions Defendants, the PV Action videos, or YouTube comments.

25

Following *Ross's* guidance, Plaintiff's evidence is insufficient to reach the jury on emotional distress.

Respectfully submitted, this the 2nd day of May, 2019.

*/s/ Michael Montecalvo*
Michael Montecalvo
N.C. Bar No. 24943

*/s/ James A. Dean*
James A. Dean
N.C. Bar No. 39623
WOMBLE BOND DICKINSON (US) LLP
One West Fourth Street
Winston-Salem, NC  27101
Telephone: (336) 721-3600
E-Mail:  michael.montecalvo@wbd-us.com
E-Mail:  jamie.dean@wbd-us.com

*Attorneys for Project Veritas Action Fund, Project Veritas, and James E. O'Keefe, III*