IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
Case No. 1:17-CV-00256

SHIRLEY TETER,

                    Plaintiff,

     v.

PROJECT VERITAS ACTION FUND
et al.,

                    Defendants

**SHIRLEY TETER'S TRIAL BRIEF**

## INTRODUCTION

Ms. Teter brings claims for defamation and for punitive damages. This brief gives an overview of the facts, identifies two issues of law that the Court will be asked to decide, and outlines the major evidentiary issues anticipated in this case.

### Shirley Teter's Assault

Shirley Teter is a 71-year-old, disabled woman who lives in the Battery Park senior housing apartment in downtown Asheville. On September 12, 2016, she joined a crowd of protestors outside a rally for candidate Donald Trump at the U.S. Cellular Center, a block from her apartment. (DE 43-2 at 297-98.) As people exited, a man[1] suddenly threw "shadow-box" punches toward her face. (Ex. 2 at 34; DE 43-15 at 17-19.) When she followed him to object, he whirled and punched her in the face, knocking her to the sidewalk. She landed on her oxygen tank, sustaining injuries. (DE 43-2 at 72-73; DE 43-15 at 17-19; Ex. 2 at 49.)

The day after the assault, *The Asheville Citizen Times* and WLOS television approached Ms. Teter for interviews. (DE 43-2 at 118.) A video of the assault emerged, and the assailant's daughter asserted to the press that Ms. Teter was the aggressor. (Ex. 3; Ex. 4 at 3.) Reporters returned to Ms. Teter for her reaction. (DE 43-2 at 118, 269.)

---

[1] The man, Richard Campbell of Edisto Island, South Carolina, was arrested on September 16, 2016. (Ex. 1.)

A local blogger and two Asheville representatives of a political organization, MoveOn, also came to interview Ms. Teter. She did not know the blogger, and had never heard of MoveOn. (DE 43-2 at 124-25, 156, 160, 274.) Ms. Teter told them what she had told the local press. (*Id.*)

Without Ms. Teter's consent, MoveOn composed a fundraising email letter on its website, designed to appear to be from Ms. Teter. (DE 43-18 at 216; DE 43-2 at 275.) MoveOn could not produce a release signed by her. (DE 43-18 at 225; DE 43-2 at 273-74.) This unauthorized letter led to the dismissal of the criminal case against Ms. Teter's assailant. (DE 43-2 at 104-05.)

### The Release of Video I

One month later, Defendant Project Veritas Action Fund[2] released a 16-minute YouTube video entitled *Rigging the Election – Video I: Clinton Campaign and DNC Incite Violence at Trump Rallies* ("Video I"). The video begins with a series of clips of Democratic strategists stating that "it doesn't matter what the . . . legal and ethics people say" and that they are starting "conflict engagement . . . in the lines at Trump rallies." (DE 39-23.) Narrator James O'Keefe then describes the video as "graphic, uncensored, and disturbing" and that there is "strong evidence of criminality." (*Id.*)

---

[2] Project Veritas is a 501(c)(3) organization founded by Mr. O'Keefe. (DE 43-3 at 30-31.) Project Veritas Action Fund ("PVAF") is a closely related 501(c)(4) organization which, for tax reasons, releases his videos during election cycles. (*Id.*)

The video introduces Scott Foval as a "one of the dark operatives of the Clinton campaign," and shows him discussing violence at Trump rallies. At the 10:33 mark, Mr. O'Keefe states that a series of fights that broke out at a Chicago event "was not spontaneous." (*Id.*) Another clip shows a Democratic strategist saying "we also did the Arizona one where we shut the highway down." (*Id.*) Between clips of Mr. Foval, Mr. O'Keefe narrates that "these guys have been doing their dirty tricks for some time, even before Trump won the nomination." (*Id.*) The video then shows of Mr. Foval stating that he had "storyboarded" a "plant" getting "roughed up" at a Scott Walker rally. (*Id.*)

At the 12:50 mark, immediately after discussing the Walker rally plant, a photo of Ms. Teter flashes up, and narrator James O'Keefe states:

> Remember this woman? Her name is Shirley Teter. She is a 69-year-old suffer of COPD. According to numerous news stories at the time, she was "assaulted" at a Trump rally in North Carolina by Trump supporter, Richard Campbell. The media played her story across the country for days.

(DE 43-30 at PVDEF0000425; DE 39-23.) The video abruptly cuts to a man saying "she was one of our activists." (DE 43-30 at PVDEF0000425; DE 39-23.) The video next cuts to the same man speaking in a bar (with no voice-over or title card to distinguish his subject from the topic of Ms. Teter) saying "we have mentally ill people that we pay to do shit" and "I've paid off a few homeless guys to do some crazy stuff . . . ." (DE 43-30 at PVDEF0000425; DE 39-23.)

3

Ms. Teter had never heard of Project Veritas Action Fund,or Mr. O'Keefe. She was stunned by this video. Not only was it untrue, but she had never heard Mr. Foval, whom the video claimed employed her.

### Defendants' History of Sting Operations

Ms. Teter was not Defendants' first victim. Mr. O'Keefe has previously conducted undercover "sting" operations aimed at progressive organizations, governmental agencies, and academic institutions. (*See* DE 43-3 at 37-38; DE 43-4.) Using operatives with false identities, he lures his targets into agreeing to incriminating statements on hidden cameras. (DE 43-4.) He releases such videos in a melodramatic way designed to generate maximum publicity. (*Id.*)

### Defendants' Democracy Partners "Investigation"

In 2016, Defendants targeted two political organizations, Democracy Partners and Americans United for Change with the aim of influencing the 2016 election. Defendants created a narrative that Democrats were recruiting saboteurs to incite violence at Trump events. Two of Defendants' operatives, Christian Hartsock and Brittney Rivera, stalked Mr. Foval for months. (DE 43-19 at 80-81, 101, 103.) Mr. O'Keefe monitored Mr. Hartsock's communications with Mr. Foval and sometimes implored Mr. Hartsock to bait Mr. Foval into discussing "violence." (DE 43-19 at 113-19; DE 43-3 at 187-88, DE 43-20.)

Pretending to work for a wealthy donor, Mr. Hartsock and Ms. Rivera

enticed Mr. Foval into a September 15 discussion in Madison, Wisconsin. (DE 43-19 at 60.) They hoped to record him saying his organization was provoking violence at Trump rallies. (*Id.* at 81.) As part of their strategy, they mentioned "a North Carolina woman." (*Id.* at 82.)

| | |
|---|---|
| Rivera: | So let me ask you in the meantime. This North Carolina woman, does that mean she's going out again? She's going to go do this again. |
| Foval: | I have no idea. We didn't know who she was ahead of time. We just had somebody who connected with her before that rally. And we knew that she was putting herself out there to draw a fire. That's all we knew. |
| Hartsock: | So someone that you guys work with contacted her -- |
| Foval: | That's what we know about it now. |
| Hartsock: | -- put out like a secret casting notice? I don't know how the hell you guys do this. |
| Foval: | No, no, no, no, no, no, no, it was not preplanned. But she was one of our activists. |
| Rivera: | She was one of your activists who? |
| Foval: | Who had been trained up to bird dog. |
| Rivera: | Yes. |
| Foval: | So the term birddogging -- you put people in the line, at the front which means that they have to get there at six o'clock in the morning because they have to get in front, at the rally, so that when Trump comes down the rope line, they're the ones asking him the question in front of the reporter, because they're pre-placed there. To funnel that kind of operation, you have to start back with people two weeks ahead of time and train them how to ask questions. |
| Rivera: | Right. |
| Foval: | You have to train them to birddog. |
| Rivera: | You're putting a very specific kind of person, who's going to get a specific reaction. |
| Foval: | Right. |
| Hartsock: | So she was trained? Or she was not trained. |
| Foval: | She was trained. We've trained a whole group of people |

> in North Carolina, South Carolina, New Hampshire, New
> York, Virginia, here, Iowa, to go and insert themselves
> and try to get into rallies to ask questions. It's a hit or
> miss kind of thing.

(DE 43-21 at 8-9; DE 43-22 at 83-85; DE 39-22.)

Mr. Foval was not talking about Ms. Teter (DE 43-23, ¶ 12; Ex. 5 at 24.),

and Defendants did not confirm the identity of the North Carolina woman he

referenced (DE 43-9 at 105). Mr. Foval also stated to Mr. Hartsock and Ms.

Rivera, "We haven't paid a single person to get beat up at a rally." (Ex. 5 at 31-32,

59, 63-64, 111-15.) This statement was not included in Video I; nor was Mr.

Foval's statement that Ms. Teter's assault "was not preplanned." (DE 39-23.)

### The Release of Video I

Defendants released Video I (DE 39-23) through their own YouTube

channel on October 17, 2016, two days before the third presidential debate. (DE

43-19 at 155-56.) It became the most-watched video on the Internet, with more

than 6.5 million views on YouTube. (DE 43-3 at 138-39.) Mr. Trump mentioned

it during the debate. (DE 43-19 at 155-56.) "Rigging the Election" became "the

biggest story [Mr. O'Keefe had] ever done." (DE 43-3 at 141; DE 43-31.)

### Ms. Teter Confronted with "Rigging the Election" (Video I)

A WLOS reporter showed Video I to Ms. Teter , and she reiterated that she

attended the rally on her own. (DE 43-32.) She also offhandedly mentioned that

the assailant "could have struck her with his backhand." (*Id*.)

6

Citing the WLOS story, Breitbart News published an October 20 article headlined "Woman Backtracks on Assault Claim after O'Keefe Video." (DE 43-33.) Characterizing Ms. Teter's "backhand" remark as "changing her story rather dramatically," Breitbart reported Ms. Teter "vehemently denied being involved in any way with any person, group, or organization, political or otherwise." (*Id*.)

That day, after interviewing Ms. Teter, *The New York Times* covered Ms. Teter's denial: "Shirley Teter said she had attended the rally, which was near her home, on her own accord and had not received any protest training." (DE 43-34.) Mr. O'Keefe read and circulated this article. (DE 43-35; DE 43-3 at 142, 147-48.)

**The Release of Video II**

Despite knowing she had denied being a trained, paid protestor, Defendants published a video on October 21, 2016 entitled "Shirley Teter Changes Her Story After Release of Project Veritas Action Videos" ("Video II"). (DE 39-27.) Video II—devoted only to Ms. Teter—displayed title cards over music:

- Shirley Teter is in the news yet again.
- The 69-year-old made headlines in September after getting "cold-cocked" at a Trump rally.
- This week, Project Veritas Action revealed a different side of the story.

(*Id.*) The video then cut to Mr. Foval's "[s]he was one of our activists," followed by his description of birddogging. Switching back to title cards, the video showed the words: "After the bombshell, Teter seemed to change her tune." The video cut

7

to a portion of the Breitbart article, in enlarged font: "Now, however, Teter is changing her story rather dramatically. She told WLOS on Wednesday that 'it's possible that he could have struck her with his backhand.'" New words flashed up: "A far cry from this . . ." The video then cut to footage of Ms. Teter saying "and he stopped in his tracks and he turned around and just cold-cocked me." (*Id.*)[3]

Video II did not disclose, despite express knowledge derived from *The New York Times*, Breitbart, and WLOS, that Ms. Teter denied any training or attending the protest on behalf of any organization. As with Video I, Defendants made no effort to verify the truth of what they were publishing. (DE 43-9 at 105.) This video also made no reference to the fact that Foval did not identify Shirley Teter by name or that he had stated that the North Carolina woman "was not preplanned."

## ISSUES OF LAW

There are two issues of law. First, whether Ms. Teter's claims are properly brought as libel per se or as libel per quod. Second, whether Ms. Teter was a private figure or a limited purpose public figure when the statements were made.

## I.    DEFENDANTS' VIDEOS CONSTITUTE LIBEL *PER SE*.

As matter of law, Defendants' videos constitute libel *per se*. Libel *per se* is

a publication which, when considered alone without explanatory circumstances: (1) charges that a person has committed an infamous

---

[3] Defendants do not explain how this is a change in Ms. Teter's story or its relationship to Video I.

crime; (2) charges a person with having an infectious disease; (3) tends to impeach a person in that person's trade or profession; or (4) otherwise tends to subject one to ridicule, contempt or disgrace.

*Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 29, 568 S.E.2d 893, 898 (2002)

(quoting *Phillips v. Winston–Salem/Forsyth County Bd. of Educ.*, 117 N.C. App.

274, 277, 450 S.E.2d 753, 756 (1994)).  Defendants' publications tended to subject

Ms. Teter to ridicule, contempt, or disgrace.

*Renwick v. News & Observer Pub. Co.*, 310 N.C. 312, 312 S.E.2d 405

(1984), requires review of the entire publication to determine its "most obvious and

natural meaning." *Id.* at 320, 312 S.E.2d at 410; *see also Boyce*, 153 N.C. App. At

32, 568 S.E.2d at 899 (*per se* test is viewing "through the eyes of an average

person and in the context of the advertisement as a whole").  Video I's message is

unambiguous:  Ms. Teter was an activist trained by Mr. Foval and planted at the

Asheville rally as part of an "operation" to provoke her own assault.  (DE 39-23;

DE 43-41.)  A reasonable, ordinary viewer would also conclude that she was

mentally ill, homeless, and "paid to do sh*t."  (*See* DE 39-23; DE 43-41.)

Mr. O'Keefe's voiceover supports this understanding.  He refers to Ms.

Teter immediately after referring to persons "planted" at rallies to get reaction, and

immediately preceding a clip of Mr. Foval stating that "she was one of her

activists."  He also prefaces Video I by stating that Defendants had discovered

"strong evidence of criminality"—implying that the actions uncovered in Video I,

including those of Ms. Teter, were illegal. (DE 39-23; DE 43-41.)

Video II repeats Video I's messages. It focuses solely on Ms. Teter, adding that she had "changed her tune" after Video I had come out. The most obvious and natural meaning of this video is that Ms. Teter had lied. (DE 39-27.) Such a statement of fact is actionable as defamation. *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) (accusing a person of lying is defamation if the accusation stated as a fact as opposed to being stated as the speaker's opinion).

It is worth noting that to prove libel *per se*, Ms. Teter need not demonstrate that a third person understood the videos to be defamatory or that she suffered special damages. *See Renwick*, 310 N.C. at 316, 312 S.E.2d at 408 ("When an unauthorized publication is libelous *per se*, malice and damage are presumed from the fact of publication and no proof is required as to any resulting injury.").

For these reasons, Videos I and II tended to subject Ms. Teter to ridicule, contempt, or disgrace and is libel *per se*.[4]

_____

[4] Even if the Court determines as a matter of law that the statements are not libel *per se*, Ms. Teter states a claim for libel *per quod*. A *prima facie* case for libel *per quod* requires a showing of (1) a false, (2) defamatory statements, (3) that are of or concerning the plaintiff, (4) published to a third person, (5) causing special damage. *Griffin v. Holden*, 180 N.C. App. 129, 136, 636 S.E.2d 298, 304 (2006). Defendants' publication was false, defamatory, concerned Ms. Teter, was published to a third person, and caused special damages, First, Defendants' accusation that Ms. Teter attended the rally on behalf of Americans United for Change or Democracy Partners is false. (DE 43-2 pp. 297-98, Ex. 5 at 24-26.) Likewise, Ms. Teter was not "mentally ill" or "homeless" and that she was not paid

## II. AT THE TIME THE DEFENDANTS PUBLISHED THEIR VIDEOS, MS. TETER WAS A PRIVATE FIGURE.

The second issue of law for the Court to decide is whether Ms. Teter was a private or public figure at the time the videos were published.

Ms. Teter did not become a public figure by being assaulted a block from her home. The Fourth Circuit has set forth a five-factor test for determining if a party is a public figure: (1) the plaintiff has access to channels of effective communication, (2) the plaintiff voluntarily assumed a role of special prominence in the controversy, (3) the plaintiff sought to influence the resolution of the controversy, (4) the controversy existed prior to the publication of the defamatory statements, and (5) the plaintiff retained public figure status at the time of the

---

to attend the rally. (Ex. 6 at 255.) Second, the most obvious meaning of Videos I and II—that Ms. Teter was planted by Democratic organizations to provoke violence at a Trump rally—is a defamatory accusation. Third, Videos I and II were published to third persons on YouTube and concerned Ms. Teter. (DE 43-3 at 138-39; DE 39-23; DE 39-27.) Fourth, this case—unlike many that have gone to jury verdict—features clear, contemporaneous evidence that the statements were understood by third persons to be defamatory because (1) the YouTube comments show that an average viewer would understand the videos to be defamatory (DE 1 pp. 11-15; DE 43-2 p. 279-280; Ex. 6 at 255.); (2) Ms. Teter's sister provided sworn testimony that she understood the videos to imply that her sister was a birddogger (Ex. 7 at 26-28, 36-38.); (3) Scott Foval testified during his *de bene esse* deposition that he understood the videos to defame Ms. Teter (Ex. 5 at 146-47.); and (4) then-Candidate Trump told the world during a presidential debate that Video I reported that the Clinton Campaign had hired people to "be violent, cause fights, do bad things" (DE 43-43.) Fifth, Ms. Teter has special damages in the form of the cost of her cell phone and the need for neurotherapy. (Ex. 6 at 180-83; DE 43-2 at 42–43, 45, 55-56, 276–277, 279-80; DE 43-37; DE 43-38; DE 43-39; DE 43-44 at 9.)

alleged defamation. *Fitzgerald v. Penthouse Int'l, Ltd.,* 691 F.2d 666, 668 (4th Cir.1982) (reversing summary judgment due to issue of fact as to actual malice). "Typically, we have combined the second and third requirements, to ask 'whether the plaintiff ha[d] voluntarily assumed a role of special prominence in a public controversy by attempting to influence the outcome of the controversy.'" *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994).

### A. Ms. Teter did not have access to the media.

The only media with whom Ms. Teter spoke before the defamation was her hometown newspaper and TV station. She also unwittingly spoke with representatives of a political organization, MoveOn, whom she thought were local activists. (DE 43-2 at 124.) They called her, and she politely answered their questions. (DE 43-2 at 118, 175.) Interest dissipated within a week, and she was not contacted again until after Video I's release. (*See id.* at 121-22.)

### B. Ms. Teter did not voluntarily assume a role of special prominence in a controversy by seeking to influence its outcome.

The Fourth Circuit, applying *Fitzgerald*, has held that mere interviews with news or other media does not transform a plaintiff into a public figure. For example, in *Wells v. Liddy*, 186 F.3d 505 (4th Cir. 1999), *cert. denied*, 528 U.S. 1118 (2000), G. Gordon Liddy, a Watergate conspirator turned media personality, published a conspiracy theory: The break-in was to expose a prostitution ring run by Ms. Wells, a former secretary for the Democratic National Committee. When

12

she sued for defamation, he asserted she was a public figure.  *Id.* at 537.

The court examined Ms. Wells's "media exposures" before the defamation, including a letter she wrote to the editor of the *New York Times* and interviews she gave to *The Washington Post*, the BBC, and historian James Rosen.  *Id*.  The court found that voluntarily speaking with four national (or international) news platforms did not transform Ms. Wells into a public figure.  *Id*.

The court reached the same conclusion in *Foretich*.  The Foretichs had participated in three press conferences, gone on two national television programs including *The Phil Donahue Show*, and been repeatedly interviewed by *The Washington Post*, as well as by *The Washington Times*, the Hampton Roads *Daily Press*, *Glamour* and *Cosmopolitan*.  37 F.3d at 1545-49.  Noting that they "did not reach out to additional media outlets . . . in an effort to expand the circle of persons familiar with the controversy," the Fourth Circuit found their public statements were not enough to make them public figures.  *Id*. at 1563.

By contrast, scientists who publish learned treatises and engage in what they characterize as whistleblowing should reasonably expect forceful response from those whose academic work they have criticized.  They are therefore public figures.  *See, e.g.*, *Hatfill v. The New York Times Co.*, 532 F.3d 312, 324, (4th Cir.), *cert denied*, 555 U.S. 1085 (2008); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 706 (4th Cir. 1991).

Unlike the scientists, Ms. Teter did not publish learned treatises and engage in whistleblowing.  Further, Ms. Teter did not even take some of the actions taken by Ms. Wells and the Foretichs, who were found not to be public figures.  Ms. Teter did not talk to the national media—and certainly did not go on a modern-day equivalent of *The Phil Donahue Show*, such as *Dr. Phil*.  Her "voluntary discussion of events with the press does not per se indicate that [she] has 'thrust herself to the forefront of [a public] controversy.'"  *Wells*, 186 F.3d at 537.  Moreover, Ms. Teter did not reach out to the media—the reporters came to her doorstep.

### 1. Ms. Teter did not have public figure status on October 17 or 21.

Five weeks after the rally, Defendants published Video I.  In the month before its release, the media reported Ms. Teter's name only on lists of those assaulted at Trump rallies.[5]  Video I's first words about Ms. Teter confirm that her story had faded from public memory.  "*Remember this woman*?  Her name is Shirley Teter . . . . According to numerous news stories *at the time* she was assaulted . . . ."  (DE 43-41 at PVDEF0007241 (emphasis added).)  Defendants' prompting their audience to remember her confirms Ms. Teter was no longer publicly recognized.

---

[5] Two weeks after the rally, an online article included a reference to Ms. Teter because it discussed the arrest of seven people at the rally, including her assailant. (DE 39-38.)

Defendants cite the chatter created by Video I as evidence that Ms. Teter was in the news between October 17- 21.  However, Defendants cannot themselves convert her into a public figure.  *See, e.g.*, *Jenoff v. Hearst Corp.*, 644 F.2d 1004, 1007 (4th Cir. 1981) ("'[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.'" (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 113, (1979))).

Accordingly, the Court should find that Ms. Teter was a private figure at the time Defendants published the videos.  Ms. Teter concedes that the subject matter of the videos was a matter of public concern.  *See Connick v. Myers*, 461 U.S. 138, 145 (1983) ("[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." (quoting *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)).

## EVIDENTIARY ISSUES

There are a number of evidentiary issues in this case, as outlined in Ms. Teter's response to the motion *in limine*.  (DE 81.)  However, certain issues warrant further discussion because of their relevance to Ms. Teter's challenge to Defendants' First Amendment defense, her contention that Defendants were negligent, and her claims for punitive damages and for defamation *per quod*.

## III. EVIDENCE OF DEFENDANTS' BUSINESS PRACTICES SHOULD BE ADMISSIBLE.

Defendants seek to exclude the context of Mr. Foval's statements, their

15

previous "investigations," their bonus structure, and the profits and publicity they garnered from Video I. Ms. Teter contends that this evidence is relevant to show actual malice because it shows a pattern and course of conduct that promotes sensationalism and publication of statements with a reckless disregard for the truth. *See Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692 (1989) ("Although failure to investigate will not alone support a finding of actual malice, the purposeful avoidance of the truth is in a different category."). Ms. Teter also contends that the YouTube comments are relevant to establish her claim for defamation *per quod*.

Further, this evidence is admissible to show punitive damages. Under North Carolina law, the jury may consider evidence relating to the following when determining whether to award punitive damages:

a. The reprehensibility of the defendant's motives and conduct.
b. The likelihood, at the relevant time, of serious harm.
c. The degree of the defendant's awareness of the probable consequences of its conduct.
d. The duration of the defendant's conduct.
e. The actual damages suffered by the claimant.
f. Any concealment by the defendant of the facts or consequences of its conduct.
g. The existence and frequency of any similar past conduct by the defendant.
h. Whether the defendant profited from the conduct.
i. The defendant's ability to pay punitive damages, as evidenced by its revenues or net worth.

N.C. Gen. Stat. § 1D-35(2) (2018). As will be discussed, the evidence to which

16

Defendants object is relevant and admissible.

### A. Defendants' Attempts to Discuss "Violence" With Mr. Foval Is Relevant.

Defendants seek to keep out their own attempts to prompt Mr. Foval to discuss violence at Trump rallies. However, the fact that Defendants were driving the narrative in an attempt to get a usable sound bite from Mr. Foval shows both reckless disregard for the truth and factors that the jury could consider in awarding punitive damages. *See* N.C. Gen. Stat. § 1D-35(2)(a) (reprehensibility of defendant's motives and conduct); N.C. Gen. Stat. § 1D-35(2)(c) (degree of the defendant's awareness of the probable consequences of its conduct).

Mr. Foval testified that during the September 15, 2016 meeting with Mr. Hartsock and Ms. Rivera, the two operatives attempted to direct the conversation to violence at Trump rallies, and he tried to reject their narrative. (Ex. 5 at 38-40.) On October 7, 2016, Mr. Hartsock (pretending to be a man named Steve Packard) spoke to Mr. Foval on the phone. Midway through their conversation, Mr. O'Keefe theatrically prompted Mr. Hartsock to discuss violence at Trump rallies with Mr. Foval. (DE 43-19 at 113-19; DE 43-3 at 187-88.) Defendants filmed this interaction. (DE 43-20 at 15:00-19:00.)[6]

_____

[6] At 18:15 of this video, when Mr. Hartsock says the word "violence" to Mr. Foval, Mr. Foval can be heard on the phone telling Mr. Hartsock, "Steve, Steve, don't even get in the woods with him on this . . . ." (DE 43-20.) This shows that Mr.

Capturing Mr. Foval saying certain buzzwords on hidden camera and then splicing those same words out of context constitutes actual malice. *See Fitzgerald v. Penthouse Int'l, Ltd.*, 691 F.2d 666, 670 (4th Cir. 1982) ("[A] publisher cannot feign ignorance or profess good faith when there are clear indications present which bring into question the truth or falsity of defamatory statements."). For these reasons, evidence of Defendants' attempt to discuss violence with Mr. Foval is relevant to show they acted with actual malice and to show Ms. Teter is entitled to punitive damages.

### B. Evidence of Defendants' Prior Videos Is Relevant.

Defendants' business model shows they have a pattern for acting with reckless disregard for the truth, which supports a finding of actual malice. It also shows the existence and frequency of Defendants' similar past conduct, which would support an award of punitive damages. N.C. Gen. Stat. § 1D-35(2)(g) (existence and frequency of any similar past conduct by defendant); *see also* N.C. Gen. Stat. § 1D-35(2)(a) (reprehensibility of defendant's motives and conduct); N.C. Gen. Stat. Ann. § 1D-35(2)(c) (degree of defendant's awareness of the probable consequences of its conduct). Defendants' business model consists of conducting undercover "sting" operations in North Carolina, (*see* DE 43-3 at 37-38; DE 43-4), and publishing the results as YouTube videos:

---

Foval was trying to direct the conversation away from violence. (*See id.*)

- In 2012, Defendants released a video falsely accusing two North Carolinians of voting without being citizens. (DE 43-10; DE 43-3 pp. 206-09.)
- In 2014, Defendants released a YouTube video showing Mr. O'Keefe hoodwinking election officials by providing a false name at various polling places in North Carolina. (DE 43-3 pp. 10-11, 206-09; DE 43-10; DE 43-12.)

Defendants release their YouTube videos in a melodramatic way designed to generate maximum publicity. (DE 43-4.) These tactics show that Defendants are accustomed to a business model that uses deception to produce highly publicized content, without fear of the consequences. These tactics demonstrate reckless disregard for the truth.

### C. Evidence of Defendants' Profit Motive Is Relevant.

Defendants' bonus structure and fundraising provides context for why they acted recklessly. This evidence also supports an award of punitive damages—because Defendants knew they would profit from their reckless conduct. N.C. Gen. Stat. § 1D-35(2)(h) (whether defendant profited from the conduct); N.C. Gen. Stat. § 1D-35(2)(c) (degree of the defendant's awareness of the probable consequences of its conduct).

Leading up to the presidential election, Mr. O'Keefe incentivized the use of any means necessary to generate content. (DE 81-10 at 8.) In September 2016, he told his employees that they had "20 DAYS to get a smoking gun" and that they needed to find any "necessary material" before the third presidential debate. (DE

43-25; DE 43-3 at 136-37.) In early October 2016, he sent his employees emails informing them that they would receive bonuses (1) "IF we get the content we need on Democracy Partners"; or (2) if either presidential candidate mentioned the videos on national television or in a presidential debate. (DE 43-26.)

### D. Evidence of Defendants' Profits and Publicity From Video I Is Relevant.

Defendants' profits from Videos I and II are relevant. N.C. Gen. Stat. § 1D-35(2)(h) (whether defendant profited from the conduct); N.C. Gen. Stat. § 1D-35(2)(i) (defendant's ability to pay punitive damages).

Defendants' employees received the promised bonuses due to the profits and publicity garnered as a result of Video I. (*See* DE 43-3 at 138-39, 141; DE 43-19 at 155-56; DE 43-31.) Defendants used Video I to fundraise from their distribution list. (Ex. 8; Ex. 9) As late as September 2017, they were still attempting to fundraise by invoking Ms. Teter. (Ex. 10.) Defendants' 2016 tax returns show that they received "contributions and grants" in excess of $4.5 million. (DE 43-48 at 2.) This demonstrates both that (1) the use of Ms. Teter's name in Video I was highly profitable to Defendants; and (2) that Defendants have the ability to pay Ms. Teter significant punitive damages.

## IV. NO EXPERT IS REQUIRED TO ESTABLISH NEGLIGENCE.

If the Court determines, as Ms. Teter has asserted, that Ms. Teter is a private figure and that the claim is for libel per se, the jury will be instructed that they are

required to find that Defendants are negligent.  Defendants contend that, in order to

prove negligence, Ms. Teter requires an expert.

"[F]ailure to print a retraction after Plaintiff requested one is sufficient to

satisfy a breach of a legal duty for which 'every person shall be held responsible

for the abuse' of the 'freedom of the press.'" *Araya v. Deep Dive Media, LLC*, 966

F. Supp. 2d 582, 602 (W.D.N.C. 2013) (quoting N.C. Const. art. I, § 14);  *see also*

N.C. Gen. Stat. § 99-1.  Ms. Teter sent Defendants a notification pursuant to the

Good Faith and Retraction statute.  (Ex. 11)  "This notification created a legal duty,

pursuant to North Carolina law, for the Defendant to either confirm the truth of the

article and stand by its validity, or to print an apology and retraction."  *Araya*, 966

F. Supp. 2d at 602.  "By not printing a retraction after Plaintiff's request for the

explicit reasons upon which this lawsuit is based, it is, as a matter of law,

established that Defendant 'should have known the probable consequences of [its]

act,' thus satisfying the standard for "ordinary negligence.'"  *Id.* (quoting *Clayton*

*v. Branson*, 170 N.C. App. 438, 613 S.E.2d 259, 265 (2005)).  At the time the

retraction letter was sent, Defendants could not confirm the truth of the videos. [7]

---

[7] They still cannot confirm the videos' truth: there is no evidence that Ms. Teter
was a birddogger hired by (or even volunteering on behalf of) Mr. Foval,
Democracy Partners, or Americans United for Change.  (*See id.*; DE 43-2 pp. 297,
Ex. 5 at  24-26)  Moreover, there is no evidence that Ms. Teter was paid to attend
the rally; that she was mentally ill or homeless; or that she intentionally provoked
violence.  (Ex. 6 at 255)

(*See* DE 43-23)  Despite being confronted with this information, Defendants refused to retract their videos.  (Ex. 12)  Thus, Ms. Teter does not require an expert to prove negligence.[8]

## V. EVIDENCE OF THE YOUTUBE COMMENTS IS ADMISSIBLE.

Defendants have challenged the admissibility of YouTube comments appended to Videos I and II on Defendants' YouTube channel.  These comments show that third persons understood Defendants' videos to be defamatory—an element of defamation *per quod*.  (*See* DE 81 p. 12.)  They are also relevant to establishing Ms. Teter's punitive damages claim.  *See* N.C. Gen. Stat. § 1D-35(2)(a) (reprehensibility of defendant's conduct); N.C. Gen. Stat. § 1D-35(2)(c) (degree of the defendant's awareness of the probable consequences of its conduct).

---

[8] Even if Ms. Teter cannot prove Defendants failed to retract pursuant to N.C. Gen. Stat. § 99-1 and even if Defendants are professional disseminators of news (which Ms. Teter does not concede that they are), Ms. Teter is still not required to call an expert to establish a duty of care in defamation cases.  *See, e.g.*, *Kassel v. Gannett Co.*, 875 F.2d 935, 943 (1st Cir. 1989) (expert was not necessary because "none of the activities undertaken by defendant or its hirelings were so arcane or complex as to demand explication by a professional"); *Boswell v. Phoenix Newspapers, Inc.*, 730 P.2d 178, 182 (Ariz. Ct. App. 1985), *approved as supplemented*, 730 P.2d 186 (Ariz. 1986) ("[G]iven the facts and circumstances of this case the absence of expert testimony on how a news reporter accurately takes notes of a conversation is not fatal."); *Kohn v. W. Hawaii Today, Inc.*, 656 P.2d 79, 82 (Haw. 1982) (expert was not required to show that defendant deviated from its own standard of care in publishing an article); *Schrottman v. Barnicle*, 437 N.E.2d 205, 215 (Mass. 1982) ("Nor do we believe that expert testimony is necessary to enable triers of fact to apply a standard of ordinary negligence to the methods used by a journalist to record interviews."); *see also* DE 81 at 17-19.

As addressed in the briefing on the Defendants' motion *in limine*, (DE 81 pp. 6-12), the admissibility of these YouTube comments is an evidentiary issue that will need to be addressed by the Court if the matter proceeds as libel *per quod*. A primary difference of libel *per se* and libel *per quod* is that the jury may consider evidence outside the four corners of the statement when evaluating whether a statement is defamation per quod. *See Flake v. Greensboro News Co.*, 212 N.C. 780, 195 S.E. 55, 59 (1938) (libel *per quod* requires consideration of the publication in connection with innuendo, colloquium, and explanatory circumstances).

The YouTube comments to Video II constitute compelling evidence that an average viewer would understand the video to be defamatory:

- Yeah POOR OLD LADY - she was PAID WELL, they start at $1500.00 USD
- Her thirty pieces of silver .....to betray her own Country and try and help elect a criminal woman President.
- So she straight up lied.
- What a lying b*tch.
- It sounds like they (the Dems) went specifically at disabled people as their, "do-ers". Hilarity seems to think abusing poor people is fine..
- Youre probably right. There is no doubt Democrats prey on the weak and feeble minded. "We have mentally ill people who will do sh*t .
- Sick, using sick, old, and autistic people, along will elderly to push your crooked agenda through.
- That birddogging Grandma probably has done a lot of other things if a private investigator ever did some "digging".

(DE 1 pp. 11-15.)

23

## VI. MR. O'KEEFE'S PRIOR CONVICTION IS ADMISSIBLE.

Defendants should be aware of the probable consequence of their conduct. *See* N.C. Gen. Stat. § 1D-35(2)(c) (degree of the defendant's awareness of the probable consequences of its conduct). Mr. O'Keefe knows that tactics he has taken in the past have legal consequences. In 2010, Mr. O'Keefe masterminded the illegal entry of then Senator Mary Landrieu's office. Charged with a felony, he pleaded guilty to the misdemeanor of entering a federal building under false pretenses. (DE 43-3 at 181.)

Moreover, Mr. O'Keefe's treatment of his own past conviction shows that he has previously operated under the assumption that the ends justify the means. He is aware of the probable consequences of his conduct and that his actions are improper. Consistent with their national practice and in violation of North Carolina law, Defendants failed to disclose Mr. O'Keefe's prior criminal conviction to potential North Carolina donors. (DE 43-3 at 22.) The Secretary of State issued a cease and desist letter, fined Project Veritas $3,000, and compelled it to enter into a Consent Order. (DE 43-14 at 5.) Regulators in six other states have similarly investigated, with Florida banning Defendants from fundraising. (*See* DE 43-3 at 178-80; DE 43-13.)

## CONCLUSION

This Court should find that Plaintiffs have stated claims for libel per se and

that Ms. Teter was a private figure. Defendants' videos portray Ms. Teter as a trained activist planted at the Asheville rally as part of an "operation" to provoke her own assault. Defendants are not entitled to the First Amendment protections granted to public figures. When the videos were published, Ms. Teter was a private figure, as the first video itself demonstrated by reminding viewers who she was. Finally, the categories of evidence challenged by Defendants are admissible.

This 2nd day of May, 2019.

Respectfully submitted,

**ELLIS & WINTERS LLP**

By: /s/ Jonathan D. Sasser
Jonathan D. Sasser
N.C. State Bar No. 10028
Preetha Suresh Rini
N.C. State Bar No. 51022
Post Office Box 33550
Raleigh, North Carolina 27636
Phone: 919-865-7000
Fax: 919-865-7010
Email: jon.sasser@elliswinters.com
preetha.sureshrini@elliswinters.com

Dixie T. Wells
N.C. State Bar 26816
Post Office Box 2752
Greensboro, North Carolina 27402
Telephone: (336) 217-4193
Fax: (336) 217-4198
dixie.wells@elliswinters.com

**CRITCHFIELD, CRITCHFIELD & JOHNSTON, LTD.**

25

By: /s/ Ralph Streza
Ralph Streza
4996 Foote Road
Medina, Ohio 44256
Phone: 330-723-6404
Fax: 330-721-7644
Email: streza@ccj.com

*Counsel for Plaintiff Shirley Teter*