```
1                  UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF NORTH CAROLINA
2                        (Asheville Division)

3    ---------------------------x
     SHIRLEY TETER,             :
4             Plaintiff,        :
                                :
5                               :
     vs                         :Civil Action: 1:17-CV-256
6                               :
                                :
7    PROJECT VERITAS ACTION     :
     FUND, ET AL,               :
8             Defendants.       :
     ---------------------------x
9
                                   Friday, May 3, 2019
10                                 Asheville, North Carolina

11        The above-entitled action came on for a Final
     Pretrial Conference Hearing Proceeding before the
12   HONORABLE MARTIN K. REIDINGER, United States District
     Judge, in Courtroom 3, commencing at 8:56 a.m.
13

14        APPEARANCES:
          On behalf of the Plaintiff:
15        JONATHAN DREW SASSER, Esquire
          PREETHA SURESH RINI, Esquire
16        DIXIE WELLS, Esquire
          Ellis & Winters, LLP
17        Post Office Box 33550
          Raleigh, North Carolina  27636
18
          RALPH STREZA, Esquire
19        Critchfield, Critchfield & Johnston, Ltd
          4996 Foote Road
20        Medina, Ohio 44256

21        On behalf of the Defendants:
          JAMES A. DEAN, Esquire
22        MICHAEL MONTECALVO, Esquire
          Womble Bond Dickinson, LLP
23        One West Fourth Street
          Winston-Salem, North Carolina  27101
24
     Tracy Rae Dunlap, RMR, CRR              828.771.7217
25   Official Court Reporter
```

1                          **I N D E X**

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24                                                    <u>Page</u>

25  Reporter's Certificate.......................153

1                    **P R O C E E D I N G S**

2          THE COURT:  Good morning, everyone.  We have one

3    matter that is on the calendar for today and that is

4    Teter versus Project Veritas which is on for a final

5    pretrial conference, as this case is on for the trial

6    calendar for the May term.

7          I recognize most of the attorneys but not quite

8    all.  We have some new characters here today, so I'll

9    allow all the counsel who are participating to announce

10   their presence on the record.

11         MR.  SASSER:  Good morning, Your Honor, Jonathan

12   Sasser from Raleigh, with the firm of Ellis and Winters,

13   representing Ms. Teter.

14         MS.  RINI:  Preetha Rini, also with Ellis and

15   Winters, representing Ms. Teter.

16         MS.  WELLS:  Good morning, Your Honor.  I'm Dixie

17   Wells from Ellis and Winters, as well, representing Ms.

18   Teter.

19         MR.  STREZA:  Good morning, Judge.  I'm Ralph

20   Streza.  I represent Ms.  Teter also.  I'm with the firm

21   Critchfield, Critchfield and Johnston, and I'm here from

22   Ohio.

23         MR.  DEAN:  Good morning, Your Honor.  I'm Jamie

24   Dean and I represent the defendants.

25         MR.  MONTECALVO:  Good morning, Your Honor.  Mike

1   Montecalvo; I also represent the defendants.

2       THE COURT:  As far as -- can you all hear me?

3   Because I'm hearing this echo that is just terrible.  Can

4   you still hear me?

5       MR. SASSER:  Yes, sir.

6       THE COURT:  Okay.  Maybe that's going to be a

7   little bit better.  If there had been a window, I would

8   have jumped out the window before the end of this if I

9   had to put up with that.

10      The entire objective of this proceeding today is

11  to sort of plan out how we're going to try this case.  I

12  want to try to streamline the things that need to be done

13  of an administrative nature because, once we are trying

14  the case, it is my objective to have the jury in the jury

15  box literally eight hours a day until we're done.

16      So, for the first part of this, I want to go

17  through a number of the things that I need for all of you

18  to know about how I expect this case to go so that we can

19  plan accordingly and so that you can plan accordingly.

20  Then we'll move on to some other issues to where we have,

21  hopefully, a common understanding of how this case is

22  going to go forward so that we can all account for that

23  case in the manner it will be tried.

24      Let me start with the simple question to which I

25  never get the simple answer.  And that is, how likely is

1   it that this case is going to try?  Mr.  Sasser, I'll

2   start with you.

3        MR.  SASSER:  Your Honor, based on our discussions

4   this week, it seems very, very likely.

5        THE COURT:  Okay.  Mr.  Dean, Mr.  Montecalvo, do

6   you have any different thoughts?

7        MR.  DEAN:  No, sir.  I think it's a certainty.

8        THE COURT:  Okay.  The next question that I have

9   is, how long do you think it's going to take to try the

10   case?  Before you answer that, let me give you a few

11   parameters to keep in mind.  Because here, unlike in

12   superior court where they have other things going on on

13   the same days, we start every morning at 9 o'clock and we

14   go to 6:00 p.m.  There's a one hour break for lunch.  I

15   literally intend to have the jury in the jury box eight

16   hours a day until we're done.

17        Anything that needs to be done outside of the

18   presence of the jury, it would be my preference and my

19   intention of doing that either before 9 o'clock in the

20   morning, during the lunch break, or after 6:00 p.m.  That

21   comes with the admonition that I give all lawyers who

22   come to try cases here, and that is:  Bring your

23   crackers.  Because I will assure the jury that they will

24   get the opportunity for lunch; I make no promises like

25   that for you.

1        Jurors already feel like you're wasting their

2  time.  And if they feel like you're dragging it out by

3  letting them sit in the jury room for a couple hours and

4  that you do some stuff out of the presence of the jury,

5  and back and forth like that, they get really ticked off.

6  They don't get ticked off at me, they get ticked off at

7  the lawyers.  So that's the schedule that I really don't

8  intend to deviate from if at all possible.

9        Another aspect of this that I want you to keep in

10  mind is you're in the first place on the trial calendar.

11  There's another civil case but they're behind you.  That

12  means that when we start trying this case on Monday, the

13  20th, that Friday is the Friday of Memorial Day weekend.

14  I don't need to explain to you what impact that's going

15  to have on the jurors.

16        All of that having been said, what I'd like from

17  both sides is an estimate of how long is it going to take

18  to try the case, and how many witnesses do you expect you

19  are going to call?  And, of that number of witnesses, how

20  many will be live?  How many will be by deposition?

21        Mr.  Sasser, I'll start with you.

22        MR.  SASSER:  Your Honor, I think we're going to

23  have two live witnesses and five or six videotaped

24  witnesses.

25        THE COURT:  How long do you think the trial will

1    take?

2         MR. SASSER: I was going to say two days. I'm

3    not sure when we will -- the gun will be fired on Monday,

4    after jury selection. I think we will be -- certainly be

5    done by the end of the day Wednesday.

6         THE COURT: With your case?

7         MR. SASSER: Yes, sir, with my case.

8         THE COURT: Do you have an estimate of how long

9    the trial is going to take?

10        MR. SASSER: I don't know for their side of the

11   case how long they're going to take. But I still think,

12   as we said at summary judgment hearing, four to five days

13   for everything.

14        THE COURT: So you have two live witnesses but

15   five on video?

16        MR. SASSER: As many as five, Your Honor. Five

17   or six.

18        THE COURT: Well since you have them, so to speak,

19   "in the can," you should have a real good idea of how

20   long that part of the presentation is going to take.

21        MR. SASSER: I would if I knew the rulings on

22   certain motions in limine and designations of

23   depositions, and that way I could certainly compact them.

24   But some of that's still up in the air. We're not going

25   to be able to cut them until --

1      THE COURT:  I understand that.  But are the

2  potential cuts so great that you don't have an estimate

3  of, you know, a two=hour deposition with the cuts comes

4  to one hour and 50 minutes or comes to ten minutes?

5      MR.  SASSER:  I'm sorry, Your Honor, I do not have

6  that estimate at this point.  I do not intend on putting

7  any one witness on the video for more than two hours, and

8  probably less than that.

9      THE COURT:  I can't say that I've ever had a trial

10  where five out of seven witnesses were by deposition.  I

11  don't think jurors like that very much.  That's a kind of

12  risky way of proceeding, but your case is what your case

13  is.

14      MR.  SASSER:  I understand, Your Honor.

15      THE COURT:  Okay.  Very good.

16      MR.  SASSER:  They're from out of state.

17      THE COURT:  Mr.  Dean, what are your thoughts?

18      MR.  DEAN:  Your Honor, the same as the plaintiff

19  in that some of the number of witnesses depends on the

20  Court's rulings today.  We could have as many as seven, I

21  think, live witnesses.  Many of them will be very short.

22  I think some of them will be less than maybe even an

23  hour.  We will have two witnesses by deposition, and each

24  of those depositions is less than an hour and a half.  I

25  think that the original estimate that -- even including

jury selection is that we can be completed, given the

Court's parameters, by close of business on Thursday with

the presentation, is what we're shooting for, and I

believe that can happen.

THE COURT:  So, roughly, with the idea of getting

the case to the jury maybe on Friday morning?

MR.  SASSER:  Yes, sir.

MR.  DEAN:  Yes, Your Honor.

THE COURT:  Okay.  As I mentioned earlier, you are

on a trial calendar with one other case.  We'll pick both

juries on the morning of the 20th, on that Monday

morning.  Since the other case is second we will pick

their jury first.  Once that jury is picked then I'll

release that jury to the following week, I'll release the

parties in that other case until the following week, and

then we'll pick your jury and go straight from your jury

selection in to the presentation of the evidence.

We'll get to the method of jury selection in a few

minutes.  I would certainly propose to have both juries

selected before we take the lunch break on Monday.

The next broad topic that I want to address is the

manner of presentation.  The first topic there concerns

the presentation of exhibits to the jury.  Well

presentation of exhibits in general, including

presentation to the jury.  Upstairs, I'm sure you noticed

1    at the summary judgment hearing that we have an
2    electronic system for presenting exhibits.  Back in the
3    old days, when I was trying lawsuits, and you had the
4    paper copy, and you asked to approach the witness, and
5    you walked up to the witness stand and hand it to the
6    witness.  You don't do that anymore.  That burns an awful
7    lot of time.
8         There is a system for displaying an exhibit to the
9    Court and witness.  Then if something is admitted and is
10   to be published to the jury there's a means by which it
11   can be published to the jury.  There are very few
12   situations in which anybody needs to be approaching the
13   witness.  This isn't a criminal gun case.  You don't have
14   to take the gun up to the officer or anything like that.
15   Use of the electronic equipment is mandatory -- it's not
16   optional -- because it saves us an awful lot of time.
17        If you need any sort of tutorial on the use of
18   that equipment, please talk to the clerk about arranging
19   a time to get that tutorial, whether it is today or one
20   day next week.  It will need to be either today or next
21   week, because the following week there will probably be
22   no one here from the clerk's office to assist you with
23   that; and then the following Monday is when we start the
24   trial.
25        Please make sure that all electronic equipment

that you are planning to use to connect to the system is
compatible with the system.  I have had it happen before
that the attorney comes for his tutorial, he hooks up a
laptop, and all of the exhibits transfer just fine.  He
shows up for trial with a different laptop, he connects
it, and then when we pushes "play" for the video nothing
happens.  We're not stopping for that.  It's your
responsibility to make sure it's all compatible; to make
sure it all works.  So please keep that in mind.

       The next topic that I want to address with you
pertains to opening statements and closing arguments.  I
believe that all of you are probably experienced enough
to know that jurors completely discount everything you
say.  They want to hear the story from the witnesses.
For that reason, I generally limit, in civil cases, each
side to an opening statement of ten minutes.  Closing
arguments for a case as long as what we're talking about
here?  Maybe 30 minutes to a side.

       Do any of you feel that those parameters are not
realistic in light of the specifics of this lawsuit.

       MR.  SASSER:  No, Your Honor.

       MR.  DEAN:  No, sir, Your Honor.

       THE COURT:  If something does come up to where we
need to revisit that, regarding closing arguments, we can
do that at the charge conference.  But I want you all to

1   understand at the front end that those are generally my
2   expectations.
3       The next thing that I wanted to address regarding
4   the presentation of the case is the issue of
5   stipulations.  I noticed you-all filed some very
6   extensive stipulations, but what you filed left me
7   uncertain as to how you were planning to present this.
8   Because it seemed like an awful lot of what you have in
9   the stipulations is what you're going to be presenting
10  through your witnesses or, at least, what I would have
11  been expecting you would be presenting through your
12  witnesses.
13      So is this just a list of the things that are not
14  in dispute, or is this actually a set of stipulations
15  that the parties are intending for either the Court or
16  one of the attorneys to read to the jury during the
17  course of the trial?
18      MR.  SASSER:  Your Honor, it's my usual experience
19  that the judge would read those in.  I realize some are
20  specific and they will be covered, and I don't want to
21  duplicate anything.  So I think that it may depend on a
22  particular stipulation as to whether we would want the
23  Court to start out reading them in or reading them in at
24  the start of the defense case some of them.
25      THE COURT:  Okay.  The very last thing you said

1   puzzles me.  Because if it's at the start of the defense

2   case that means the plaintiff has rested; you're past the

3   Rule 50 motions.  So are you telling me these

4   stipulations have nothing to do with any element of your

5   case?

6           MR.  SASSER:  No, Your Honor.

7           THE COURT:  Okay.

8           MR.  SASSER:  Just that they may come in at the

9   appropriate time.  Definitely, we want them in before the

10  directed verdict motion.

11          THE COURT:  Okay.  With regard to stipulations

12  though.  First of all, the general rule is that for the

13  presentation of stipulations whatever you-all agree to as

14  to how to present them is fine with me.  If you -- if

15  plaintiff's counsel is going to read them, and you agree

16  to that, that's fine.  If defense counsel is going to

17  read them, and you agree to that, that's fine.

18          The default is that if you don't agree as to how

19  this stipulations will be presented then I will read the

20  stipulations when plaintiff's counsel tells me that other

21  than the stipulations the plaintiff has no further

22  evidence.  In other words, the very last thing before the

23  plaintiff rests is they will be read by me unless you

24  stipulate or agree to something else.

25          Because of what you were just saying a moment ago,

1    Mr. Sasser, about these stipulations and not wanting to

2    duplicate things.  As we go through the plaintiff's case,

3    if you are wanting to winnow down that list of

4    stipulations to where at the end of plaintiff's case you

5    only want me to read stipulations 30 through 38.  So long

6    as you let me know, I'm glad to do that.  But, other than

7    that, I don't have any way of knowing.  I'm not going to

8    go through and check off, well, witness one got items

9    three, four and five in.  And I can't keep up with that

10   and everything else.

11          MR.  SASSER:  We will keep up with that, Your

12   Honor.

13          THE COURT:  Okay.

14          The next issue regards exhibits, stipulations

15   regarding authenticity of exhibits, and exhibit lists,

16   and exhibit notebooks.  So it pertains to stipulations;

17   it also pertains to exhibits in general.  There's a

18   particular format for exhibit lists that's in The Case

19   Management Order.  Please follow that.  And in there,

20   there is a -- one of the columns is with regard to

21   whether there are stipulations or agreements about either

22   authenticity, admissibility, et cetera.

23          The way I do it with exhibits -- because I think

24   it's a waste of time to read to the jury for each

25   exhibit.  There is a stipulation as to authenticity.

There's a stipulation as to admissibility.  The way it
will work is, even if you have stipulated, when
Mr. Sasser has examined the witness about Exhibit 10, it
has been authenticated, and it's -- or there's a
stipulation as to the authenticity, and Mr. Sasser says
the plaintiff will offer Plaintiff's Exhibit 10, I will
still ask if there is any objection.  If there is no
objection, it will be admitted.  It just becomes a nice
little routine for getting in the exhibits.  It becomes
very efficient for doing it that way, notwithstanding
having the stipulation, but any stipulation will not be
read.

         With regard to exhibits that are presented during
video deposition testimony.  How do you propose to do
that?  If you have the witness on the screens for the
jury, how do you propose to display the exhibits to the
witness -- to the jury?

         MR.  SASSER:  Your Honor, I think we'll be able to
do that through a split screen.  If not, we will figure
something out.  The one concern I have is that something
may be Exhibit 14 at the trial; it was the same document
was Exhibit 3 in Mr. O'Keefe's deposition; Exhibit 2 in
somebody else's deposition.  So we're going to have to
figure out a way to make sure that the jury knows we're
talking about the exhibit that's before them and that

that's exactly who the witness is talking about.

THE COURT: Yeah. That presents some real logistical problems. I urge you to try to figure out a way to work that out ahead of time. I have no idea whether you have the expectation that these videos were going to be used at trial. Obviously, if you know ahead of time, the easy way to do that is you have sequential. Numbers. In other words, Exhibits 1 through 5 are the first deposition; 6 through 25 are the second deposition, and so on. But that's water over the dam.

MR. SASSER: Yes, sir.

THE COURT: Some things about exhibit notebooks and exhibit lists that I want to -- it's not really an admonition. There are some things I don't want you to do. And I say that based on what I've had other attorneys do, and it's a pain in the neck. First of all, when you're about to try a case, you have a pretty good idea of what exhibits you're going to use and what exhibits you're not going to use. So if there are these 20 exhibits that you're pretty certain that you're going to use, and that's pretty much your case, please do not give me an exhibit list that has 150 exhibits listed on it. By the same token, if you expect that there are going to be a hundred exhibits that you're going to use, please don't give me an exhibit list that has 20 of them listed.

1    If you need to add two or three exhibits during

2  the course of the trial -- I mean, we've all had that

3  experience that there was some document that you found in

4  discovery that you really didn't think was going to be

5  all that important, and on the second day of trial it

6  suddenly becomes very important.  You can add it to the

7  list.  That's not a problem.  When you start doing that

8  over and over and over again, it's a problem.

9    Please don't do what I had one lawyer do in a

10 trial that we had about three years ago.  He showed up

11 for trial, I kid you not, with 23 bankers' boxes of the

12 exhibits.  He had an exhibit list that went for -- I

13 forget what it was -- 400 exhibits.  During the course of

14 the trial, of those 400 exhibits he used about 40; and he

15 added another 60 to the list during the course of the

16 trial.  By the end of that trial I had no idea what was

17 in evidence and what wasn't.  My document management was

18 out the window.  That becomes impossible to manage.  So

19 please do not do anything like that.

20    Also, do not have a catch-all exhibit.  I've had a

21 lawyer do this before.  He had those 60 exhibits that he

22 thought that he was going to put into evidence, and then

23 Exhibit 61 was, I think, quite literally everything else

24 that had been produced in discovery.  It was a notebook

25 all by itself.  And in the middle of trial he says I

1  would like to offer into evidence Exhibit Number 61, page
2  122, or whatever it was, and he wanted to examine the
3  witness about.  By the time you take a 400- or 500-page
4  exhibit, load it into the system, scroll down to page
5  122, and get it on the screen, the jury's asleep, and
6  you've probably overloaded the system.  I mean it will
7  take forever.  So that just doesn't work.  I'd rather you
8  keep that entire stack in your briefcase.  And when you
9  need page 122 you pull it out, you put an exhibit sticker
10 on it making it new Plaintiff's Exhibit 61, and then you
11 go forward from there.

12       Are there any questions about what I'm talking
13 about regarding the presentation of exhibits.

14       MR.  STREZA:  Judge, may I ask a question?

15       THE COURT:  Please.

16       MR.  STREZA:  In several of the depositions the
17 witnesses have been shown short video clips and have been
18 asked to comment on the content of the video clips.  How
19 would the Court allow us to present those video clips,
20 especially when we're showing the video depositions of
21 those witnesses.

22       THE COURT:  Well I don't see how that's really any
23 different from any other exhibit that you're planning to
24 display to the jury.  Whatever means you are intending to
25 use to display an exhibit to the jury in the middle of a

1  video deposition is what I would suggest that you use for

2  that.  And I've seen it done two different ways.  One is

3  what Mr. Sasser mentioned earlier, a split screen.  And

4  the other one that I've seen is that the exhibit

5  supplants the visage of the deponent for that five

6  seconds, or whatever it is, on the screen, and the video

7  is edited in that manner.  Either of those would be

8  acceptable.

9       MR.  STREZA:  Thank you.

10       THE COURT:  Any other questions about the

11  presentation of exhibits?  Again, this is all for making

12  it an efficient presentation to the jury.

13       One thing I want to note with regard to the

14  exhibit notebooks.  Again, I should have looked before we

15  started today whether you got the old version of the Case

16  Management Order or the new version.  The old version

17  says you have to bring four copies of the exhibit

18  notebooks.  If that's what you got, I'm amending that

19  right now.  You only need to bring two.  One copy of all

20  the exhibits that are on your exhibit list you need to

21  present to the Court before we get started.  That's my

22  copy so that in the event that I need to be referring to

23  an exhibit that you're not displaying on the electronic

24  system that I have a copy of it there at the bench.

25       The second copy, the second notebook, is what I

refer to as your insurance policy.  Because if everything

else breaks down there are document cameras, one on each

counsel table.  We have never run into the problem of

those not working.  So that if you cannot present the

exhibits any other way you can take that hard copy out of

your insurance policy notebook, you can put it on the

tray with the dot cam, and then you can show it to the

witness, you can show it to the Court, and if it's

admitted you can show it to the jury.  So that's all you

need.  You don't need the additional copies.  That's

presuming, of course, that you've exchanged copies of the

exhibits which you're supposed to have done anyway.  I'm

not counting the exchanged copies.  That's your

responsibility to get done.  So any questions about that

issue?  Mr. Sasser.

          MR. SASSER:  Yes, sir.  More as to depositions

than exhibits.  If I have a five-minute video to show of

one particular witness and their cross-examination would

be 45 minutes, how do we work that out?  Do they need to

play theirs in their case, or do they play theirs with

mine?  How does that --

          THE COURT:  Maybe I don't understand your

question.  The rule of completeness is that if you're

presenting a portion of a deposition in lieu of live

testimony then everything regarding that deposition comes

1    in at that time.  Using your example.  If you have a

2    video deposition where you want to put in five minutes

3    but they want to put in an hour.  If you are wanting to

4    put in that five minutes as part of your presentation,

5    then the hour -- I mean the five minutes plus the hour

6    come in at that time, and it comes in in the order that

7    it was done at the deposition.

8            MR.  SASSER:  Thank you, Your Honor.

9            THE COURT:  Anything else with regard to exhibits,

10   exhibit notebooks, exhibit lists, or any of that?  Okay.

11           The next issue that I want to turn to is jury

12   selection.  I can't remember whether this is in your

13   supplemental case management order or whether we emailed

14   it to you, or maybe neither.  I want to make sure that we

15   are of a common understanding as to how jury selection

16   will proceed.  We use the "mandatory strike" method,

17   which I know that the Administrative Office of the

18   federal courts in Washington would like all federal

19   courts to use but I understand that not all do.  If

20   you're in federal court often you're probably familiar

21   with this system.

22           In short, when we call in the jury pool for this

23   case, we will then have 14 people who are selected at

24   random who we'll put in the jury box.  Of those 14, I

25   will conduct a voir dire.  After I conduct a voir dire

1  then plaintiff's counsel will have an opportunity to voir

2  dire the 14 for approximately 20 minutes.  That's not 20

3  minutes per juror; that's 20 minutes for the panel.

4  After that, defense counsel will have the opportunity to

5  voir dire the 14 for approximately 20 minutes.

6         At the end of that period you will have the

7  opportunity to make challenges for cause at the bench.

8  Any jurors who are excluded for cause, or stricken for

9  cause, will be replaced by new people from the jury pool

10 and we'll repeat this process but only as to the new

11 members of the jury pool -- of the jury panel.

12        So, for instance, if we call up 14 at the end of

13 that process and there are two that are stricken for

14 cause we'll call two new jurors into those two seats.  I

15 will then voir dire the two new jurors, the plaintiff's

16 counsel will have an opportunity to voir dire those two

17 new jurors for approximately two minutes each -- so

18 probably four minutes -- defense counsel will get

19 approximately four minutes, and then you'll get an

20 opportunity to challenge for cause those two.  You don't

21 get to go back to the other 12.  I realize that's very

22 different from what you do in superior court but it's

23 much more efficient as well.

24        Once we have 14 people in the box who have not

25 been stricken for cause then both sides have to exercise

1   all of their peremptory challenges.  I will say, for

2   instance:  Mr. Sasser, what says the plaintiff as to the

3   exercise of her first peremptory challenge?  You would

4   say, the plaintiff thanks and excuses Juror 2, Ms. Smith.

5   I'd say, Mr.  Dean, what says the defendants as to the

6   exercise of their first peremptory challenge?  He will

7   say, we excuse Juror 14, Mr.  Jones.

8       Each side has three peremptories; you have to use

9   all three.  Please don't do what I've had other attorneys

10  do after they've used one and they stand up and say

11  plaintiff is satisfied with the jury.  No.  It's called

12  "mandatory strike" because you have to use all three

13  peremptory strikes.  Simple math.  You start with 14,

14  plaintiff strikes three, defendant strikes three; you end

15  up with eight.  The eight are your jury.

16      We don't have alternates because with a civil case

17  they can have a verdict all the way down to six.  So if

18  we lose one juror in the middle of trial we will continue

19  with a jury of seven.  If we lose two jurors in the

20  middle of trial we will continue with a jury of six.  And

21  I've had it happen one time.  If you lose three jurors in

22  the middle of trial we can only continue with a jury of

23  five by the stipulation of the parties.  I never thought

24  that would ever happen but it happened once so I mention

25  it.

1    Any questions about the jury selection method that
2 we're going to use for selecting the jury in this case?
3    MR. DEAN: Your Honor, could I ask a related
4 question about the jury?
5    THE COURT: Yes.
6    MR. DEAN: What, if any, information will we be
7 allowed to glean about the jurors before we arrive to
8 court on May 20th?
9    THE COURT: Well that's a good question. As of
10 right now, I don't have an answer for you. Here's the
11 issue. We have a fairly large number of jurors who have
12 been summoned for this term. In fact, I believe we had
13 something like 500 maybe, or maybe even 600 jury
14 summonses that went out. Some subset of that -- in fact,
15 a relatively small subset of that will be randomly
16 selected on, what is it, Friday, the 17th to come in on
17 Monday, the 20th? So I think that there may be some
18 information available next week about the 500 but not
19 about the ones who will actually be in the jury pool that
20 morning. I don't know if that helps you any.
21    MR. DEAN: As to the subset that's randomly
22 selected. Is that something that we can learn on the
23 17th, or is that only information we can learn on the
24 20th?
25    THE COURT: I think the answer is that it would be

available on the 17th, but I'm not directly involved in
that whole process.  And when I say "available on the
17th," I don't mean at 9 o'clock in the morning.  I mean
quite late in the day.  One of the reasons that I
hesitate is I happen to know that there's not going to be
anybody in the clerk's office on Friday, the 17th,
because that's the day of -- during that week is our
district meeting.  So I don't want to make you any
promises that I can't keep.

I guess the best answer is inquire further and
hopefully I'll know more.  The person to contact would be
my career law clerk, Ms. Ritter, and she can -- she'll
have information for you to update that.

MR. DEAN:  Thank you, sir.

THE COURT:  Anything else with regard to jury
selection?  The next thing -- I mean that covers, kind
of, the issues having to do with how the trial will be
conducted and all of those logistical problems.

From here I wanted to turn more to the things that
are specific to this case.  So if there are any issues
that you want to talk about regarding trial logistics now
would be the time.

MR. SASSER:  Your Honor, what courtroom will we
be in if Your Honor knows at this point.

THE COURT:  Oh.  Well there's really only one

courtroom in this building with a usable jury box and that's the one where we were for the summary judgment hearing.

MR. SASSER: Thank you, Your Honor.

And there's an issue about a witness who has a conflict. I think there was a motion pending on the -- a consent motion pending on that.

THE COURT: Well, yeah, that was something specific to this -- to the trial so -- but we'll get there. That's here on my list.

One thing that I didn't mention, and in light of what you said earlier it's probably irrelevant. But in the event that you somehow settle this case there are a few rules that we have because of the system that we use concerning bringing in jurors and how expensive juries are. If you settle the case, settle the case by noon on the 17th, the Friday before the trial, you have to not only inform the court that you have settled the case but you also have to file with the court -- and you can file it under seal. But you have to file what I refer to as a "term sheet." It is a sufficient description of the terms of your settlement such that, if necessary, the Court can enter a judgment based on that settlement agreement. It has to be signed by the attorneys. Both of you seem certain that you will not settle the case,

but I've heard that before in cases that settled, so I
mention that for what it's worth.

Now does that mean that you are prohibited from
settling the case after noon on the Friday before?
Obviously, the answer is no. It's just that you will get
tagged with the jury costs. Bringing in a jury pool like
that, and the additional portion of the jury pool for a
case like this, you're probably looking at something
like, I don't know, $4,500, $5,000. Juries are not
cheap. And they're less cheap around here because we
have jurors coming from so far and we have to pay their
mileage, and for a lot of them we have to pay their
lodging.

Okay. Anything else that we need to address
before we move on to things that are directly related to
this action?

The next thing that I want to turn to is what the
verdict sheet is going to look like. I was a little bit
puzzled by what had been submitted with all of these
essentially factual interrogatories. As you're probably
aware, the North Carolina Pattern Jury Instructions with
regard to defamation do not propose submitting a
defamation claim on anything like that. In fact, if we
follow the pattern jury instructions approach the verdict
sheet would really consist of three issues.

1      The first one, essentially, is did the defendants

2  defame the plaintiff?  And I'll come back to that issue

3  in a moment.  And then two:  If yes, what amount of

4  compensatory damages, if any, is the plaintiff entitled

5  to recover from the defendants?  Then they fill in the

6  blank.  Three is the same sort of thing with punitives.

7      With regard to the first issue, the defamation

8  issue.  In looking into this more carefully I think that

9  there is a determination as a matter of law that the

10  Court is required -- is called on to make that says, did

11  the defendants defame the plaintiff by the following

12  statement or the following implied statement.  Let me

13  hear your thoughts about proceeding in that manner,

14  whichever side wants to go first.

15      MS.  WELLS:  Your Honor, we generally try to track

16  the pattern jury instructions.  At defendant's request,

17  we separated out actual malice for the person -- for the

18  public figure instructions.  But, certainly, the

19  plaintiffs would have no objection to going back to the

20  pattern jury instructions with -- let me raise one point

21  though.  With the per se -- I believe it was with the per

22  se private figure, the pattern jury instructions have a

23  part one question and a part two question.

24      THE COURT:  All of a sudden the sound system went

25  out and I had trouble hearing you.

1          MS. WELLS:  I'll speak up, Your Honor.  The

2     pattern jury instructions have a part one and a part two,

3     and the parties agree that it just seemed easier to

4     separate those out as questions rather than having one

5     question with different parts.  So I'll let defendant

6     speak as well.

7          THE COURT:  Okay.  Mr. Dean.

8          MR. DEAN:  Yes, sir.  What has been proposed on

9     the verdict sheet are the issues taken from the pattern

10    instructions in terms of, did the defendant defame the

11    plaintiff?  And, then, if so what amount of actual

12    damages and, if appropriate, what amount of punitive

13    damages.  We did propose a separate instruction for

14    actual malice, really, for two reasons.

15         One is because it's subject to a different burden

16    of proof.  It's subject to the clear and convincing

17    standard.  Whereas, the other elements of defamation are

18    subject to a did not know or failed to use ordinary care

19    standard or, I'm sorry, preponderance of the evidence

20    standard.  And, so, Your Honor, we thought that the

21    distinction there between the two burdens of proof made

22    it appropriate to separate out that element from the

23    others.

24         I believe both sides also -- although I haven't

25    had an opportunity to review the plaintiff's proposed

1    jury instructions at this time.  Both sides, I believe,

2    have added to or proposed revisions to what the pattern

3    uses for actual malice to incorporate the Supreme Court

4    and Fourth Circuit jurisprudence on that issue.  So, in

5    terms of the questions, we have tried to track with that

6    one exception.

7         To your question.  We do agree, Your Honor, that

8    the case should be submitted following the pattern

9    instruction.  It says -- asks whether the defendant

10   defamed the plaintiff by asserting specific statements.

11   And we do believe that those specific statements should

12   be articulated for the jury.  And where it is the Court's

13   determination as to whether the statements are per se,

14   the court makes that call.  Obviously, if the Court

15   determines a statement is not defamation per se then it's

16   up to the jury.

17        But we do think it should be on specific

18   statements rather than just simply saying, did video one

19   defame the plaintiff?  Did video two defame the

20   plaintiff?  And we would ask Your Honor that that's

21   something that the parties crystallize -- really, that

22   plaintiff crystallize in advance of trial so we know

23   which statements are at issue.

24        THE COURT:  Let me stop you there for a second.

25   Hasn't the plaintiff already done that by particularly

crystallizing the alleged defamatory elements by the way
it's been alleged in the complaint.

MR. DEAN:  That's what we argued at summary
judgment, Your Honor.  And, certainly, we believed at
summary judgment that the statements were those that were
alleged in the complaint.  There was some disagreement
from the plaintiff about that, and there was extensive
discussions about what the statements were at summary
judgment.

And I believe that some of the statements also --
there were concessions during summary judgment aren't
defamatory.  So the statement alone that Mr. Foval said
Ms. Teter is a trained bird-dogger.  I believe they
conceded that statement on its own was not defamatory,
but they said there was some implied meaning elsewhere.

I agree with Your Honor that it should be limited
to the statements articulated in the complaint, but I
don't think -- I don't believe that's been the consistent
position on the other side.  From our vantage, we would
like to know what the specific statements are in order to
be able to prepare for trial.

THE COURT:  Ms. Wells, I'll hear from you.  I've
already said my understanding is that you are -- you are
whetted to what you've alleged in the complaint.  Maybe
not the precise wording, but certainly in terms of the

1  substance of what you've alleged in the complaint as

2  being the particular express or implied statements that

3  would be submitted to the jury as the alleged defamatory

4  statements.  Do you disagree with that?

5       MS.  WELLS:  I do not disagree with that, Your

6  Honor.  And if you look at our complaint.  In Count One

7  it alleges defamation, libel, and slander.  It says the

8  defendants made false, misleading, and defamatory written

9  and verbal statements of or concerning Ms.  Teter in

10  video one and video two, which were published to third

11  persons, causing injury to Ms.  Teter's reputation.

12       It's our position that we did allege that the

13  entirety of video one and the entirety of video two are

14  the statements that are at issue.  Your Honor, I would

15  further say, it's looking at the entire statement that

16  gives the meaning of those statements rather than picking

17  out parts of those.

18       THE COURT:  Mr.  Dean, do you want to respond to

19  that?

20       MR.  DEAN:  Well, obviously, I disagree, Your

21  Honor.  The pattern instruction says that do we defame by

22  making certain statements?  Video one is a 16-minute

23  video.  I don't know how the jury can be asked to opine

24  if we simply said in the jury instructions, did video one

25  defame the plaintiff?  How are they supposed to ferret

out things like falsity of an accusation when only a
small portion of the video relates to Ms. Teter?  You
can certainly look at the context of the video without
saying that the entirety is a defamatory statement.

     I think the example I would point the Court to is
the *Renwick versus Greensboro News* case that we've talked
about extensively, Your Honor, the North Carolina Supreme
Court case that talks about multiple interpretations.
There the court looked at whether the whole article in
that case made the implied statements that the plaintiff
alleged.  So it's really apples to oranges to say you
have to look at the whole statement, thus the whole
publication and, thus, the whole publication is the
statement.

     I think what is true is you have to identify in
what specific way the publication defames you.  And then
the court, in terms of defamation per se, looks at the
entire publication to see if the entire publication, or
context of the publication within its four corners
actually makes that statement.  So I do believe, again,
Your Honor, that there should be specific statements not
simply asking the jury to opine on whether the entirety
of video one and the entirety of video two is defamatory.

     THE COURT:  With that, Ms. Wells, I want to turn
back to you, because here is why I don't understand your

1    argument at all.  The paragraph that you were referring

2    to in the complaint, paragraph 64, talks -- says the

3    defendants made false, misleading, and defamatory written

4    and verbal statements of or concerning Ms.  Teter in

5    video one and video two.  It doesn't say the videos are

6    defamatory.  It says the defamation is contained in.

7         And then in the very next paragraph you say the

8    defendant's statements are false and misleading by their

9    suggestion that Ms.  Teter is homeless and suffers from

10   mental illness.  And then you give another one with

11   regard to being a paid political activist sent to provoke

12   violence.  That's what you've alleged as the defamatory

13   statements, and that's what I foresee at least being

14   potential items to submit to the jury.

15        I think that there -- the question here in my mind

16   is, is that one allegedly defamatory statement or is it

17   two?  In other words, is it an allegedly defamatory

18   statement that Ms.  Teter is a homeless, mentally ill

19   person who was paid as a political activist to provoke

20   violence?  Or is that two separate statements to be

21   submitted separately, or analyzed separately, as to

22   whether they are defamatory?  Do you disagree with that?

23        MS.  WELLS:  No, Your Honor.  To answer your

24   question, we would take the position that that is two

25   separate statements.

1        THE COURT:  Okay.  But with regard to what you

2    were saying before of the question is whether or not the

3    jury should be submitted the question of, is video one

4    defamatory?  I'm not seeing that.  So are you leaving

5    that idea behind?

6        MS.  WELLS:  Yes, Your Honor, I will leave that

7    idea.  I do think it's important that the jury be given

8    the entire context, even under a per se, because those

9    statements are being pulled out of that video just as the

10   *Renwick* case establishes.

11       THE COURT:  Well and from an evidentiary point of

12   view you get to present your case in context.  So I

13   didn't -- I didn't hear Mr.  Dean arguing anything

14   different about that a moment ago, so I think that's

15   clear.

16       Mr.  Dean, am I understanding correctly you're not

17   objecting to the presentation of the video; but you're

18   just objecting to the idea of the video as a whole being

19   presented to the potentially defamatory statement?

20       MR.  DEAN:  Exactly right, Your Honor.

21       THE COURT:  Okay.  One of the other things that

22   you did in what you presented was it presented separate

23   liability questions for each of the defendants.  Now you-

24   all know this case a whole lot better than I do -- that's

25   the understatement of the week -- but I have always been

1   looking at this from the standpoint that the plaintiff's

2   case rises and falls as to all three defendants equally.

3   This indicates to me that maybe that's a misapprehension

4   on my part.  So either Ms. Wells or Mr. Dean either one

5   of you.

6        Do we need to split it up as to the three

7   defendants with separate questions?

8        MR. DEAN:  Your Honor, from the defendant's

9   perspective, we have not argued these issues before.  We

10  have always preserved them in our documents but there is

11  no dispute that only one of the defendants published

12  video one and video two.  That's Project Veritas Action

13  Fund.  So we do believe that is an element that we want

14  to preserve to ask the jury about for trial, you know, if

15  it should even get that far.  These are Project Veritas

16  Action videos.

17       James O'Keefe is an officer of Project Veritas

18  Action.  Project Veritas is a separate entity who employs

19  the investigators.  But this isn't a case about

20  negligence and, you know, of an employee.  This is a case

21  about defamation.  And one of the elements is that the

22  defendant published the statement.  In this case, you

23  know, video one and video two, undoubtedly, were -- I

24  think we stipulated were published by Project Veritas

25  Action.  So we think that is an issue that requires

1  separation, although we don't believe that all three

2  issues or the issues as to each defendant should reach

3  the jury for that reason.

4       THE COURT:  Okay.  MS. Wells or Mr. Sasser, who

5  wants to respond to that?

6       MR.  SASSER:  Your Honor, while Mr. O'Keefe is

7  indeed an officer of Project Veritas Action Fund, they're

8  all -- he and the other witnesses were all employees of

9  Project Veritas.  So I wouldn't think that their actions

10  should be attributable to Project Veritas.

11       THE COURT:  Well if I understood Mr.  Dean's

12  argument just now he's saying, in essence, the question

13  as to Mr. O'Keefe and as to Project Veritas is likely not

14  to survive the Rule 50 motion because they are not

15  publishers.  That was the thrust of his argument.  And

16  I'm not seeing how what you just said is responsive to

17  that argument.

18       MR.  SASSER:  Mr. O'Keefe is the person in the

19  video making the statements, and he's the person

20  responsible and in charge of the company.  I think that

21  when publishing the statement he's the one saying the

22  statement that goes out to the public.  I think that's

23  publishing it.  You can publish it without being the

24  publisher.

25       THE COURT:  I'm trying to -- I haven't looked at

1  the videos since the summary judgment, and I'm trying to
2  recall the videos, but I thought that the alleged
3  defamation was the manner in which statements made
4  primarily by Mr. Foval were edited such as to cast a
5  certain light upon the plaintiff.
6          MR. SASSER:  Yes, sir.
7          THE COURT:  Now you're saying, no, it's
8  Mr. O'Keefe who is making the statements.  And I'm not
9  remembering what is in those videos that would be -- that
10 would support the statement you just made.  So remind me
11 of what I'm forgetting.
12         MR. SASSER:  Well what he says specifically about
13 Mr. O'Keefe is --
14         THE COURT:  Ms. Teter.
15         MR. SASSER:  I'm sorry.  He's saying I remember
16 this lady, her name is Shirley Teter and she claims she
17 was assaulted at a Trump rally; the media played it for
18 days.  That's probably all he says directly about her.
19 There are other places where he refers to agitators who
20 are trained to come in and do these sorts of things.  So
21 I think that holds him and, by respondeat superior, also
22 holds Project Veritas as well.  He also says at the
23 beginning of the video that what you're going to hear
24 will disturb you; there may be criminal ramifications,
25 according to our lawyer.

1    THE COURT:  Well it seems like that -- that's

2  going to be very fact specific.  In other words, you're

3  going to have to present evidence at trial which, of

4  course, would be in the form of the video that I could

5  look at ahead of time as to whether there is anything

6  that Mr. O'Keefe individually does that constitutes the

7  making of a defamatory assertion and thereby constitutes

8  an element of the publication of that assertion.

9    MR.  SASSER:  We will have evidence that he takes

10  credit for it, Your Honor, and that he has in his book --

11    THE COURT:  Is that even relevant?  Is that not

12  something that is to be determined from the face of the

13  video itself?  Either he did it or he didn't.  You have

14  video evidence that answers that question definitively;

15  right?

16    MR.  SASSER:  Yes, sir, we will present that.

17    THE COURT:  Okay.  Well you say you will present

18  that.  It's just in that video that's the subject of the

19  lawsuit; right?

20    MR.  SASSER:  Yes, sir.

21    THE COURT:  Okay.  I just want to understand your

22  argument.  I don't want to go off on a tangent.  It seems

23  to me -- this is related to the verdict form issue but

24  not something that actually shows up on the verdict form.

25  This whole issue of the plaintiff being a limited purpose

1   public figure because, it seems to me, even though that
2   is a fact based determination, the case law is pretty
3   clear that that is to be -- that determination is to be
4   made as a matter of law by the court.  In fact, I think
5   the Fourth Circuit says that, quite specifically, in
6   *Foretich*.  Does anybody disagree with that?
7           MS.  WELLS:  No, Your Honor.
8           THE COURT:  Mr.  Dean.
9           MR.  DEAN:  No, Your Honor.  Your Honor, I believe
10  the record was essentially fully developed on that point
11  at summary judgment.
12          THE COURT:  Well you say it's fully developed on
13  that.  But I have to make that determination based on
14  what evidence is presented at trial, don't I?  Is it
15  entirely independent on what is presented then?  If there
16  is some elements of limited purpose public figure that
17  were presented for summary judgment that aren't
18  presented, now I have to make the determination based on
19  that new universe of evidence, don't I?
20          MR.  SASSER:  Your Honor, I'm afraid I -- I agree
21  with Mr.  Dean on that.  I think Your Honor may well be
22  able to decide that on the forecast of evidence, since
23  it's a legal issue.
24          THE COURT:  Well how can I do it based on a
25  forecast of evidence where it is then determinative of

1    the case?  In other words, in summary judgment I'm going

2    on a forecast of evidence saying, well, in the light most

3    favorable to the plaintiff, this is a possible outcome

4    and therefore I don't make a factual determination.  I

5    don't make a determination on the facts, I make a

6    determination on what the evidence could tend to show.

7    It may or may not show that at trial.  In fact, I've seen

8    that a lot of times where I deny summary judgment, we get

9    to trial and the plaintiff's case just comes unraveled.

10           It strikes me that this is something that's

11    totally different here.  That especially looking at what

12    the Fourth Circuit says in *Foretich* that it is -- they

13    made a determination at the appellate level based not on

14    forecasts of evidence but based on the evidence that was

15    actually in the record before them.  You know, the hard

16    and fast -- this is what the court has and, therefore,

17    the court makes a determination.  Especially since you

18    and Mr. Dean agree on this I feel like maybe there's

19    something here I'm missing.  Convince me why I'm wrong.

20           MR. DEAN:  I'll take the first stab at it, Your

21    Honor, if that's all right with Mr. Sasser.  I think

22    here one major point is that, regardless of the specific

23    posture, this case is a defamation case.  We agree that

24    the facts are undisputed.  So the facts that the parties

25    are relying on to -- for the Court's determination on the

1   public figure issue aren't disputed.  Whether Ms.  Teter

2   made certain statements to the media and how those

3   statements were broadcast, that's not in dispute between

4   the parties.

5        THE COURT:  Let me stop you for a second because

6   there's another element of this that would seem relevant

7   to this, and that is whether or not Ms.  Teter in fact --

8   the term I keep using is "lit the fuse;" started the

9   entire process.  That's one of the reasons why I left

10  this case consolidated with the Campbell case until it

11  went away.  Because it seemed to me that that

12  determination of what happened in that altercation may

13  not be dispositive but it certainly is a factor in

14  whether or not quote, unquote, Ms.  Teter lit the fuse.

15  And that's a factor in whether or not she injected

16  herself into the situation so as to have volunteered that

17  second *Foretich* element.  Am I misunderstanding

18  something?

19       MR.  DEAN:  Well I think, Your Honor, that from

20  the defendant's perspective, whether Ms.  Teter inserted

21  herself into the debate, when you look at the case law

22  it's generally done in terms of what statements a party

23  has made or what they have said publicly on public

24  controversy.  So there are two types of limited purpose

25  public figure.   There's a limited public figure; there's

1    an involuntary public figure.  I think Ms. Teter's

2    conduct in terms of the altercation is probably

3    involuntary public figure analysis.  But on public figure

4    analysis says the way she behaved afterwards, we believe,

5    was sufficient in terms of calling the news back and

6    asking them to print the question about someone punching

7    -- a Trump supporter punching an old lady is deplorable;

8    participating with the media, and advocates from advocacy

9    groups -- activist groups.  We think all that was

10   sufficient.  I would say Your Honor --

11          THE COURT:  Well regardless of whether you think

12   it's sufficient -- I mean, I realize that's your argument

13   --

14          MR. DEAN:  Right.

15          THE COURT:  -- but I need to make a determination

16   based on all of the facts that are pertinent to the

17   question.  I'm just wondering, how can I do that without

18   having heard what that evidence actually is about the

19   altercation?

20          MR. DEAN:  Right.  And, Your Honor, if Your Honor

21   feels like that is something that's essential to the case

22   -- I agree that's not fully developed in summary

23   judgment, and that's something that would have to be

24   presented at trial.

25          THE COURT:  Well then let me ask the next

1    question.  Is that among the evidence that is going to be

2    presented at trial?  Obviously if you-all aren't going to

3    be presenting evidence on that, maybe I do have the full

4    universe of evidence to decide this case.  I'm certainly

5    not telling anybody how they need to try their lawsuit.

6         MR.  DEAN:  So, Your Honor, this actually gets at

7    what was a motion in limine for us.  The defendant's

8    position is that Ms.  Teter's testimony about what

9    happened at the altercation and in her claims after that

10   are relevant because those obviously were in the public

11   eye, what brought her to the public eye, and were the

12   direct subject of our second video.

13        Our position is that whether or not Mr.  Campbell

14   in fact punched Ms.  Teter in the face, swung

15   reflexively, or didn't touch her at all, isn't relevant

16   to this case because neither one of the videos either

17   affirms or denies that that punch happened.

18        In the first video Mr. O'Keefe states Ms.  Teter

19   claims she was assaulted.  And in the second video it

20   shows Ms.  Teter's claim that Mr.  Campbell cold-cocked

21   her, and then her later claim he might have hit her with

22   a back hand.  Our position is, with a 401 issue, that

23   evidence is not relevant because it doesn't control

24   either defamation issue.

25        We've also argued, Your Honor, that it's

1  prejudicial under Rule 403 because Ms.  Teter had an

2  opportunity to litigate the truth with Mr.  Campbell and

3  elected not to do that.  That case settled.  This is not

4  a case about assault.  I think there's a real possibility

5  that bringing in third parties in to testify about the

6  assault is simply going to encourage a jury to rule on a

7  motion -- to rule on passion but, maybe, more

8  importantly, to rule based on whether or not they think

9  she was punched, and that's not the issue.

10       Whether she was or wasn't punched doesn't control

11  whether our videos were defamatory.  So our position is

12  that that evidence should not be admitted at trial

13  whether or not the parties have it available.

14       THE COURT:  Well we've strayed pretty far afield

15  of where I started with this particular discussion.

16       Mr. Sasser, let me turn back to you.  Is that

17  evidence that you're planning to present at trial that

18  you feel is relevant to the issues here.

19       MR.  SASSER:  Very briefly, Your Honor.  I was

20  hoping to address the issue you're asking him about which

21  is the evidence of public figure or not a public figure.

22  And I think -- I think I agree with him that those are

23  things that really cannot be in dispute.  What's in the

24  newspaper on September 14th or September 15th is kind of

25  undisputed.  Those facts are there, and they're in front

1  of the court, and Your Honor can make that decision
2  without the trial.  I think that would shorten their
3  case, because I think a lot of their case is about
4  whether she's a public figure or not.  And then I'll be
5  glad to address the issue of, you know, whether she got
6  assaulted.
7       But I think if he and I are in agreement that the
8  facts as to whether she's a public figure are undisputed,
9  because there's a number of times she was interviewed and
10 that sort of thing, I think that issue is --
11      THE COURT:  I don't suspect you-all are in
12 agreement as to whether she's a public figure or not.  I
13 get the feeling you-all are in strong disagreement about
14 the issue.
15      MR.  SASSER:  Yes, sir.  That's the issue we
16 raised and briefed and argued on summary judgment.  But
17 the facts -- we think the facts are established because
18 they can't be disputed, and Your Honor can decide that.
19 But --
20      THE COURT:  Let me go back to my other question
21 which is where I started with you a moment ago.  Are you
22 planning to present evidence of the actual altercation
23 between Mr.  Campbell and Ms.  Teter?
24      MR.  SASSER:  Yes, Your Honor.
25      THE COURT:  Well, if you are, then what is the

relevance of that if it is not relevant to the question

of whether or not she, in essence, became a volunteer?

In other words, she stepped into the situation rather

than the situation coming at her.

MR. SASSER: Because the jury is going to want to

know. How did this video come into existence? We've got

to tell them that she was at a rally and something

happened at the rally. Maybe there's a dispute about

what happened at the rally. That's not a major portion

of our case, but we think it's important just to add

context and let the jury know this is what happened. And

then a month later this video comes out.

If we start out just talking about their video

they're going to wonder well is did she get assaulted or

not? They don't need to decide -- I agree with him they

don't need to decide whether she got assaulted, but I

think it's going to be the kind of thing -- it's going to

be the elephant in the room.

THE COURT: Well Mr. Dean.

MR. DEAN: Just quickly, Your Honor. I'd say

that many of the facts surrounding the altercation are

already in the record as well including, you know, from

summary judgment. So we have Ms. Teter's testimony that

she engaged Mr. Campbell, you know, with her statements

about learning to speak Russian; we have her admission

1  that she followed Mr. Campbell; and then there's

2  disputes about what happened next. But what's in the

3  press coverage of that is essentially what the parties, I

4  think, would present at trial.

5      So I think that there is a significant volume of

6  evidence not just in the press but in the testimony that

7  was presented at summary judgment and in the answer to

8  request for admission that shed light on that that

9  essentially would just be repeated at trial.

10     THE COURT: Well it's going to be repeated at

11 trial anyway, isn't it? Because if I make a

12 determination based on what you filed for summary

13 judgment, and then based on that determination you do not

14 present a sufficient evidentiary basis to or foundation

15 to support that finding, when it goes up to the Fourth

16 Circuit, which I expect it will regardless of who wins,

17 they're going to make a new determination not based on

18 what you submitted at summary judgment but what was

19 presented at trial. So, I mean, all you're doing is

20 hanging me out to dry; right?

21     MR. DEAN: Not intentionally.

22     MR. SASSER: I was going to say the same thing

23 you were. I understand the judge -- Your Honor's

24 question. Maybe a summary judgment decision, or a ruling

25 on that, would include the undisputed evidence that the

parties presented at summary judgment. I don't know. If
you want me to go back to the issue of their motion in
limine and the assault I will address a couple of those
issues.

One is that video two says she changed her mind
about whether she was assaulted or not. So I think there
is an issue about the circumstances of the assault. So
that is relevant to the truth of video two. Also, video
one talks about her being out there and acting like a
bird-dogger. So what she was doing and how she was
acting, I think, is also relevant to the truth of video
one, Your Honor.

THE COURT: I didn't follow that last part because
the whole "bird-dogger" part I do not understand as being
something that you have alleged in your complaint as
constituting a defamatory assertion regarding Ms. Teter.
So why is that even relevant?

MR. SASSER: I did make that concession at
summary judgment, Your Honor, because it's a confusion
about a bird-dogger and a trained agitator, and I think
they are lumping all those in together in their video.
Where, normally, if you're talking about a bird-dogger
who stands up and asks questions and is kind of like a
pain to a candidate, that's one thing. But what they're
actually describing in the video was someone who's out

1  there inciting violence.  And there may be some confusion

2  about "bird-dogger" meaning more than what Mr.  Foval

3  described it.  Because the whole context of the video --

4  they're describing what both Mr. O'Keefe and Mr.  Foval

5  called agitators who are trained to provoke violence.

6  THE COURT:  In light of the way you have cabined

7  your allegations in the complaint, why is that relevant

8  other than to present the full context of the statements

9  that do form the basis of your allegations in the

10  complaint?

11  MR.  SASSER:  I think it's relevant to show that

12  she was -- whether she was inciting violence or not,

13  which is, I think, one of the things Your Honor really

14  focused on as being potentially defamatory.

15  THE COURT:  Okay.  Well I -- particularly, in

16  light of the fact that you-all take the view that you do,

17  I'll take another look at that.  But I'm not making any

18  promises that I'm going to make a determination about

19  limited purpose public figure before the close of all the

20  evidence.  Obviously, that determination needs to be made

21  before the case gets submitted to the jury because it

22  dictates how the jury will be instructed.  But I just --

23  I do not see the procedural mechanism by which there is a

24  record that is preserved to support my finding unless it

25  is the record from the trial.  That's where I am right

1    now, but I'll give that some more thought.

2         MR.  SASSER:  I may be getting way out of my skis

3    here, Your Honor, but the stipulations may shed some

4    light on that.  I'm not sure we've stipulated far enough

5    to give Your Honor some of what would be necessary to

6    make that decision but I'm just thinking out loud.

7         THE COURT:  Well and I -- I actually read through

8    the stipulations again this morning, particularly with an

9    eye toward that issue.  Obviously, I did it in something

10   of a hurry.  But my shoot from the hip reaction was there

11   wasn't enough there.  And maybe you-all can have further

12   stipulations to where we can do that before the trial

13   starts.  But I'm sure you have bigger fish to fry between

14   now and the 20th.

15        Is there anything else that you-all want to

16   discuss about the verdict form, the issues to be

17   submitted to the jury, and to the extent that it affects

18   how, ultimately, the jury would be instructed?  Any of

19   those issues that you want to talk about?  Mr.  Dean.

20        MR.  DEAN:  Your Honor, the issue of libel per se

21   versus libel per quod that both sides have highlighted.

22   In that event the only relevant evidence as to libel per

23   se is video one and video two.  So I think both parties

24   -- they'll correct me if I speak out of school -- would

25   be -- you know, in this instance it seems like a ruling

1    whether it's based on -- couched as under the summary

2    judgment or as another type of pretrial ruling on those

3    points could impact the way that the evidence is

4    presented to the jury.  But it could certainly impact how

5    the parties speak about the case in their arguments and

6    how the parties speak about the case between now and the

7    beginning of trial.  So that's the only other issue that

8    we would raise as having a potential impact.  And it is

9    one where the evidence at trial simply won't be relevant,

10   because the mandate from the North Carolina Supreme Court

11   is that only the publications can be considered.

12           THE COURT:  Well, Mr. Sasser, do you want to

13   respond to that?

14           MR.  SASSER:  Your Honor, as much as I hate to aid

15   and abet Mr.  Dean and asking the court to do more work,

16   I kind of agree that Your Honor can look at video one and

17   video two and determine from the entirety, the four

18   corners of those documents, whether it's per se or per

19   quod.

20           THE COURT:  And then are you in agreement with

21   Mr.  Dean that that is going to make a substantial

22   difference as to how the case is presented to the court

23   and to the jury?

24           MR.  SASSER:  I may not be in agreement on that,

25   Your Honor.  I think that we may be presenting in a lot

1   of the same material regardless of that decision.

2           THE COURT:  Well it seems to me that what

3   Mr.  Dean is saying is a lot of that would be

4   inadmissible.  And if -- based on -- say, for instance, I

5   make a ruling that if it's anything it's libel per se.

6   If I'm understanding Mr.  Dean correctly he's saying,

7   well, then under existing case law the only thing that

8   the jury can consider is the document itself, the videos.

9   Do you disagree with that?

10          MR.  SASSER:  Yes, sir, I do disagree with that

11  with regard to a number of issues.

12          THE COURT:  Like what?

13          MR.  SASSER:  Such as damages.  Such as --

14          THE COURT:  Well let me recast my question because

15  I don't think Mr.  Dean is saying you didn't present any

16  other evidence as to any other aspect of the lawsuit.

17  You still have to prove the falsity.  So you have to

18  present some sort of context that shows that the implied

19  statement was in fact not true.  You still -- if you're

20  seeking damages you have to present your evidence of

21  damages.  He's not saying that -- at least I don't

22  understand Mr.  Dean to be saying that you are limited to

23  presenting evidence as to that one element to the

24  exclusion of the other elements of your case.  But as to

25  the element of defamation he's saying that's it; that's

1    all you get to present.

2         MR.  SASSER:  If Your Honor was to decide that it

3    was defamatory per se.

4         THE COURT:  That's what I'm talking about.  I'm

5    not -- I haven't made that ruling.  I'm just saying

6    hypothetically if I make the ruling that it is, if

7    anything, libel per se, how -- does that not limit, or

8    does that limit your evidentiary presentation that you

9    said no?  Why not?

10        MR.  SASSER:  I think whether or not it's an

11   element of the tort is still relevant that certain people

12   saw this and realized it was defamatory.  Even though I

13   don't need to prove that it goes to what happened here.

14   It may not be part of the defamation per se whether it's

15   defamation but it sure goes to the overall presentation

16   of our case.

17        THE COURT:  Well maybe I could cut to the chase by

18   asking Mr.  Dean, more particularly, what is the evidence

19   that you understand that the plaintiff has in her quiver

20   that would not be admissible if I make a determination

21   that the videos, if anything, constitute libel per se?

22        MR.  DEAN:  I think it affects two key pieces of

23   information that are highly in dispute whether admissible

24   under any circumstances.  One of that would be these

25   YouTube comments.  If it is defamation per se the

1  plaintiff doesn't have to prove that a third party heard

2  and interpreted the statement as defamatory because the

3  Court has already made that determination as a matter of

4  law.  And then secondarily if it's defamation per se the

5  plaintiff -- you know, depending on their constitutional

6  analysis of actual malice, the plaintiff is entitled to

7  presume damages and doesn't have to prove pecuniary

8  damages as she would have to for a defamation per quod.

9       Again, in this case, there is -- there's a dispute

10 about whether even if plaintiff proceeds on the per quod

11 theory she can put into evidence what she wants to on

12 special damages.  But I think if it's defamation per se

13 she doesn't have a need to.  So, in fact, while she could

14 put in evidence --

15      THE COURT:  Let me stop you for a second because

16 my question is, what is it that you understand would be

17 part of the plaintiff's case that then would not be --

18 not come in?  It would not be admissible because of a

19 determination that it is, if anything, per se.

20      MR.  DEAN:  I think it dramatically impacts the

21 admissibility on relevance grounds of the YouTube

22 comments and any third party testimony.  There's some in

23 the depositions whether where they've attempted to use

24 third parties where they said they viewed our testimony.

25 Any of that testimony is inadmissible and --

```
 1        THE COURT:  Let's say for the fact that somebody
 2   else viewed the video that's relevant to publication
 3   that's an element that the plaintiff has to prove.  Why
 4   wouldn't it come in then?
 5        MR.  DEAN:  It may be cumulative.  I think it
 6   would be cumulative of publication.  And, again, when
 7   it's issues like the YouTube comments, you know, the risk
 8   of prejudice by those comments is so significant that the
 9   cumulative effect of showing that someone else saw the
10   video.
11        THE COURT:  Again, I'm sorry to keep interrupting
12   you --
13        MR.  DEAN:  That's all right.
14        THE COURT:  -- to try to get to the point.
15   Cumulativeness is cumulativeness regardless of the reason
16   why it's admissible.  Say, for instance, with the YouTube
17   comments.  If the plaintiff is offering the YouTube
18   comments to show them as having spurred her anxiety,
19   therefore it's relevant to damages something of that
20   nature.  Then, yeah, after two or three of them it
21   becomes very cumulative.
22        And if -- if they keep going with that you'll
23   object; I may sustain it.  If they keep going with it you
24   might object and I might overrule it, but then the jury
25   penalizes them for just belaboring the point.  That
```

1   doesn't get to the question of whether or not those

2   comments would come in.  And it seems like, at least on

3   that scenario -- I'm not previewing any rulings here.

4   But on that scenario at least some of them would come in,

5   wouldn't they?

6          MR. DEAN:  I don't think so.  Because it's a

7   weighing analysis under Rule 403 of marginal probative

8   value versus risk of cumulative waste of time.  And if

9   we're talking about defamation per se, the probative

10  value is, I think, nonexistent but, in any event, is far

11  less than the probative value that it's defamation per

12  quod depending what they're using the piece of evidence

13  for.  And I would say the other piece of evidence I

14  didn't use earlier is this whole side about her medical

15  expenses and neurofeedback therapy.  Certainly she could

16  present that if she wanted to on a per se claim, but she

17  would not be required to.

18         THE COURT:  As to this question:  Then why does

19  that make any difference?  If she can present it either

20  way she's going to make -- Mr. Sasser and his cohorts

21  here are going to make a determination as to whether it's

22  a beneficial part of their case.  It's not a question of

23  whether or not it's admissible.

24         MR. DEAN:  That's right, Your Honor.  I agree

25  with you, Your Honor.  I think the biggest reason is for

1   the party's clarity.  Frankly, the biggest reason for a
2   ruling on this issue is for the party's clarity and the
3   way they think about this case in the way they prepare
4   for the case in terms of what themes and what evidence
5   and those types of things.  It may not, at the end of the
6   day, make a huge difference in the presentation of the
7   evidence.  A ruling on defamation per se would take
8   elements off the table that Ms. Teter is otherwise
9   required to prove.
10          THE COURT:  Mr. Sasser, do you have anything else
11  you want to say on this point?
12          MR.  SASSER:  Your Honor, your questions for
13  Mr.  Dean make it very clear that I cannot possibly add
14  anything that would be of any more assistance to the
15  Court.  Your Honor understands the issues quite well.  If
16  we're going to put in her medical records, yes, we can do
17  it under both of those.  It might be more relevant under
18  one than it is under the others.  But I think Your Honor
19  understandings this issue.
20          THE COURT:  You guys are getting so agreeable with
21  each other it seems like you ought to be able to settle
22  the case.  I wasn't expecting this level of agreeability
23  between the -- I will take a look at that issue.  I think
24  under the law this is very different from what we were
25  talking about a minute ago because I think the

determination of per se versus per quod is something to
be made quote, unquote from the four corners of a
document.  I hesitate because it's hard for me to think
about a video as a document, but within defamation law it
is.  But it's something to be determined from the four
corners of the document, and the document is something
that is before the court.  It's the same document that's
going to be going to the Fourth Circuit when whichever
one of you is on the short end of this case takes it to
the Fourth Circuit.  So I can make that determination
before trial.

        And I will take a close look at that, but I'll
tell you where I am right now.  It seems to me that these
videos are, if anything, libel per se.  I have trouble
seeing how this fits into a libel per quod box.  I
haven't read all the cases yet so I reserve ruling on
that.  I'll let you know in some form as to what my
determination is, but that's where I am at this point,
and I will say, particularly in light of the manner in
which this was pleaded.  In other words, the pleadings in
this case point to the videos in particular and how these
two issues are presented to the public in these two
videos is either libelous on its face or it's not.  So
that's where I am on that point right now.

        Are there any other issues regarding the verdict

form, the manner in which the jury would be instructed --
not specific instructions.  I'll work on those between
now and the trial.  But all of these sort of broader
legal issues that we're dealing with before we get into
things like motions in limine, the depositions.

        Hearing none, let's move on from there.  The first
thing that I want to address, so that I don't forget it,
is there was this individual named Leslie Boyd, who is
apparently under subpoena, who sent a letter to the court
which then we filed, because the Court would treat that
as a Motion to Quash the subpoena.  There was some
indication that you-all have resolved the issue of how to
handle that.  So is that resolved?

        MR.  DEAN:  Very close, Your Honor.  We agreed
amongst the parties to four stipulations, I think, that
cover the bulk of Ms. Boyd's testimony.  There were about
maybe 20 or so lines of deposition testimony that the
defendants would offer that the plaintiffs don't
stipulate to and that they would like an opportunity to
be able to counter designate.  And if the Court is
agreeable to allowing us to designate those lines of
testimony which are included in the motion that we've
already filed with the Court they're already in the
record.  And for the plaintiff to be able to counter
designate those then we are happy to present Ms. Boyd by

1 the stipulations and by the limited deposition testimony.

2     THE COURT:  So am I understanding correctly that

3 even though Ms. Boyd may not be technically "unavailable"

4 within the meaning of Rule 32 you're willing to stipulate

5 that she is unavailable so that her deposition may be

6 used.

7     MR.  DEAN:  Yes, Your Honor, and we filed a motion

8 to that effect.

9     THE COURT:  Okay.  Mr. Sasser, I see you nodding.

10 Do you agree with that?

11     MR.  SASSER:  Your Honor, we would like the

12 opportunity to counter designate if that motion is

13 granted.  There's another issue that is relevant based on

14 our other discussions.  She is a witness solely on the

15 issue of public figure.  And if that issue is resolved

16 before trial she wouldn't be necessary at all, along with

17 several other witnesses.

18     THE COURT:  Well, regardless of whether you

19 stipulate that she's unavailable and make counter

20 designations, it doesn't mean that the defendant has to

21 offer that deposition.

22     MR.  SASSER:  Yes, sir.

23     THE COURT:  So, I mean, that's a determination

24 that can be made then.  And if it is something -- again,

25 my frame of mind still is if that's evidence that is

1    relevant to the question of whether or not Ms.  Teter is

2    a special purpose public figure, then if they want to

3    present that evidence, if it is in fact pertinent to it,

4    then I'll hear it.

5         MR.  DEAN:  Your Honor.

6         THE COURT:  Yes Mr.  Dean.

7         MR.  DEAN:  I apologize, Your Honor.  I think if

8    we could -- if we could get some clarity on the

9    designations in terms of the timing.  We designated, like

10   I said, I think 20 or so lines which we will treat as

11   direct testimony.  So I assume there's not going to be a

12   huge volume of counter designations.  But could we set a

13   deadline for when the counter designations are due so

14   that if there are any objections to the counter

15   designations we can make sure those are presented to you

16   in time to have a deposition ready to go?  This is one

17   that would not be presented by video, so there's no clips

18   to be cut.  It's just a matter of knowing what we're

19   going to be reading.

20        THE COURT:  Well, Mr. Sasser, how long do you need

21   to figure out your counter designations?

22        MR.  SASSER:  Tuesday should be fine, Your Honor.

23        THE COURT:  Can you do it more quickly than that?

24   I was -- I figured you'd tell me, you know, 9 o'clock

25   Monday morning.  How short is this deposition?

1        MR.  SASSER:  I'm not sure.

2        THE COURT:  I mean, Mr.  Dean said his part -- I

3   thought he said is 20 lines.

4        MR.  SASSER:  Maybe an hour long.  If Monday

5   morning is the time Your Honor would like then we could

6   do that.

7        THE COURT:  How about I give you until 5 o'clock

8   on Monday?  That gives you all day on Monday to get it

9   done.  It doesn't sound like you're going to need that

10  much time.

11       MR.  SASSER:  Thank you, Your Honor.  We will do

12  that.

13       THE COURT:  To this point, though, do I understand

14  correctly that there aren't any objections regarding the

15  Leslie Boyd deposition?  Is that right?

16       MR.  SASSER:   I'm not sure, Your Honor.  I would

17  like the same time to do the objections and counter

18  designations.

19       THE COURT:  Okay.  That's one of the reasons I

20  raised it.  Objections and counter designations by Monday

21  at 5:00.

22       Mr.  Dean, Mr.  Montecalvo, objections to counter

23  designations by Tuesday at 5:00?.

24       The next thing that I wanted to address were the

25  deposition designations because, I have to admit, I have

1  never been so overwhelmed with deposition testimony for a

2  trial.  But then again I have never had a trial actually

3  go to a jury in which the parties were proposing to

4  present seven witnesses by way of video deposition.

5      Just as an aside, the jury is going to hate you

6  just so that you know.  That is very counter to their

7  expectations of how a trial is done.  Be that as it may,

8  you try the case however you want to do it.  It puts an

9  awfully big burden on the Court to go through all these

10  because you-all filed those deposition designations -- I

11  think we finally got them in the ECF system yesterday,

12  and there was like 1,700 pages.

13      How much time do you need to edit the videos?

14  Because this is going to take time.  If I had any idea

15  that you-all were doing this -- and this isn't your

16  fault.  It's my fault.  If I had any idea you were doing

17  this I would have given you a deadline of three weeks

18  ago.

19      MR.  SASSER:  Your Honor, we have already started

20  trying to cut back on that.  I have sent the other side a

21  shorter version of James O'Keefe, and I plan to do that

22  with the other witnesses as well and try to cut them to

23  the bone.  Basically, these were, I think, at least from

24  our side and maybe from the other's, we just wanted to

25  make sure that everything we felt was relevant would be

1  in there in case we needed it.

2      Now, looking at it from the perspective of cutting

3  the video that somebody's going to have to look at for an

4  hour or so, we're being a lot more careful.  There's

5  going to be some duplication on those on a couple of

6  videos but I'm going to cut that out.  So that was my

7  goal was to get that done by the end of this week.  But I

8  plan to keep slugging away at that with the cooperation

9  of the other side.

10     THE COURT:  Well, in light of that, what is it

11 that you want me to do?  Do you want me to wait?

12     MR.  SASSER:  I think it would be a good idea for

13 Your Honor to give us a little more time to try to narrow

14 the universe of what Your Honor needs to consider,

15 because we would hate for you to have to consider

16 something that we've decided voluntarily to omit.  If I'm

17 speaking for both sides --

18     THE COURT:  Mr.  Dean, Mr.  Montecalvo, what say

19 the two of you as to the timetable for getting me what I

20 really need to be looking at on this.

21     MR.  DEAN:  I'd say it needs to be a pretty swift

22 turn around, Your Honor, only because, unfortunately, I

23 think there will be a good bit remaining for the Court.

24 You know, obviously, if you're at trial and a line of

25 questioning were begun and an objection were sustained,

1  it would end.  But in a deposition the questioning goes

2  on because it's a deposition and that's the format.  So

3  while I think there's probably only eight or ten

4  different types of issues the Court's going to see,

5  there's just many instances of those.

6        So I really think if we are trying to revise

7  what's been designated I don't want there to be a false

8  impression that that's going to leave the Court with very

9  little.  Unfortunately, I think there will still be a

10  little bit.  I don't think it would give the Court

11  sufficient time, given what you said about the week prior

12  to trial, if we don't get those to you still fairly early

13  next week.

14        THE COURT:  By what date do you need the answers

15  in order to edit these videos?

16        MR. SASSER:  I'd say a few days before trial,

17  Your Honor.  But I have another suggestion.  If the Court

18  gives us some guidance on the motions in limine I think

19  that will -- at least if Your Honor says none of this

20  stuff is coming in I'll cut that out of my designations,

21  and I would assume that the other side would as well.  Or

22  if Your Honor says that stuff is coming in under the

23  motion in limine, then I would expect their objections to

24  be withdrawn.

25        THE COURT:  Okay.  Well and we might make some

1  headway there.  Often though with motions in limine it

2  it's dependent on what foundation is presented in order

3  to make the evidence admissible.  So we might make some

4  headway; we might not.  But we'll get to the motions in

5  limine here shortly.  That's helpful.

6        I'll be candid with you.  One of my reservations

7  about the timetable is the week of the 13th is the

8  court's district conference.  So I'm completely bottled

9  up that week to where I will have very little opportunity

10 to do anything during that week.  So, for instance, if I

11 don't get the questions from you until Monday, the 13th,

12 I don't know how I'm going to get you an answer before

13 the day you're picking the jury.  So let's see how much

14 headway we make when we get to the motions in limine.

15       Just going through my list here.  Is there

16 anything else that any of you want to address before we

17 move on to the motions in limine?  Okay.

18       Let me get rearranged here so I can get everything

19 in front of me regarding the motions.  Well the very

20 first motion in limine is the one that we've already

21 spent some time on, and that has to do with the evidence

22 of the altercation.  To me, regardless of the issue of

23 limited purpose public person, public figure, that at

24 least has some 401 relevance as to whether the plaintiff

25 was one who provoked violence or had the intent to

```
1    provoke violence.  So it seems that there is 401
2    relevance.
3          Now there was some hint that this evidence might
4    become cumulative under 403.  But I -- I don't know
5    cumulative until I see it.  I don't know that there's a
6    lot more that I can say about that.  I think you-all know
7    what I'm talking about.  Obviously, if you talk about
8    some topic from a couple of different angles it's not
9    really cumulative yet because you're giving that flavor
10   of different perspectives.  However, there is a point
11   that you reach fairly quickly where the jury starts
12   rolling their eyes.  And when the jury starts rolling
13   their eyes I start sustaining objections as to cumulative
14   under 403.
15         Does that give you enough guidance to understand
16   where I stand regarding evidence of the altercation?
17         MR.  SASSER:  Yes, Your Honor.
18         THE COURT:  Mr.  Dean.
19         MR.  DEAN:  Certainly, Your Honor.  We would argue
20   that there are other factors as well.  Misleading the
21   jury as to what they are to decide and creating prejudice
22   by drawing a connection as if there's some link between
23   the defendants in this case and Mr.  Campbell.  But we
24   understand your ruling, and we'll raise appropriate
25   objections at the time of trial.  If I may.  I understand
```

1  that the witnesses on this issue will be live witnesses.

2         MR. SASSER:  That's correct.

3         MR. DEAN:  We can raise those issues.  We will e

4  raise any issues as appropriate when the witness is on

5  the stand.

6         THE COURT:  Is Mr. Campbell going to be

7  testifying?

8         MR. SASSER:  Not from us, Your Honor.

9         MR. DEAN:  We have Mr. Campbell's deposition

10 designated and Mrs. Campbell's deposition designated, and

11 we have some rebuttal witnesses who will testify live as

12 well.  Mr. Campbell lives in South Carolina, is older

13 and not in good health, and is unwilling and unable to

14 travel for trial.

15        THE COURT:  I see.

16        Okay.  The next motion in limine had to do with

17 special damages.  Here a lot of the argument had to do

18 the necessity of special damages and if there is a claim

19 under per quod, et cetera.  It seems to me that this

20 boils down to a fairly simple issue.  And that is Rule

21 9(g) says special damages have to be specifically

22 pleaded, and I don't see where they were pleaded.  Am I

23 missing something.

24        MS. RINI:  I briefed this, Your Honor.  I believe

25 you're correct.  We would argue that Ms. Teter's

1 complaint says that she will incur out-of-pocket expenses

2 and other damages because she continues to live in fear

3 for her safety and that --

4      THE COURT:  Yeah.  How does that qualify under

5 9(g)?  I mean that's -- that's not even in the ballpark,

6 is it?

7      MS.  RINI:  Well we would argue that even if there

8 is not -- even if it's an improbable factual allegation

9 at the time of the filing of the complaint, that during

10 discovery there might be items in evidence that come up

11 that could show an incurring of out-of-pocket expenses to

12 show that she lived in fear for her safety.  And there's

13 also allegations in the complaint that she suffered

14 emotional distress and that defendant's videos have

15 caused mental distress of a very serious nature.

16      THE COURT:  Well what I understood to be the focus

17 of this motion in limine was the evidence regarding the

18 neurofeedback therapy and any costs related to that.  I'm

19 having trouble seeing how you have given notice of any --

20 well and 9(g) is -- it's not a notice pleading.  It says

21 if any item of special damage is claimed it must be

22 specifically stated.  Explain to me how you think that

23 the neurofeedback therapy evidence and bills fall within

24 that provision.

25      MS.  RINI:  It would be a broad reading of the

1    three portions of the complaint that we've cited to.  The

2    three paragraphs of the complaint we've cited to -- and I

3    would remind Your Honor this is only to show defamation

4    per quod.  It doesn't show anything with regard to

5    defamation per se because there is no special damages for

6    need to show defamation for per se.

7         THE COURT:  If you're only going on a defamation

8    per se theory then you wouldn't be presenting any of

9    this.

10        MS.  RINI:  We would still be presenting it but we

11   would not have had to alleged special damages in our

12   complaint, because defamation per quod requires as an

13   element of defamation per quod that the plaintiff provide

14   -- that the plaintiff allege special damages in her

15   complaint.

16        THE COURT:  That's not how I read Rule 9(g).  Rule

17   9(g) says if an item of special damage is claimed.  It

18   doesn't say if claimed pursuant to libel per quod.

19        MS.  RINI:  Right, Your Honor.

20        THE COURT:  It says if it's claimed it must be

21   specifically stated.  So even if you're going on a libel

22   per se theory, in order to recover those special damages

23   you have to have pleaded them.  That's what 9(g) says,

24   isn't it?

25        MS.  RINI:  You're correct, Your Honor.  In order

1 to show cumulative damages or, I think, presumed damages,

2 we would still introduce evidence of neurotherapy

3 expenses and records but it wouldn't be for special

4 damages. So there would still be evidence of --

5 THE COURT: How are you going to get that in for

6 -- treat them separately; presume damages or punitives?

7 I mean isn't that just a back door way of saying, ladies

8 and gentlemen of the jury, we really want you to put this

9 in the blank?

10 MS. RINI: It would tend to show that Ms. Teter

11 had some serious anxiety as a result of these videos, and

12 that she sought out special help for that.

13 THE COURT: Well, Mr. Dean, what do you have to

14 say?

15 MR. DEAN: Well a couple of responses. As to

16 just the portion of the 9(g), we do think they have other

17 problems on this evidence. I agree with Your Honor that

18 medical expenses are pecuniary damages and they should be

19 specifically stated. I don't think that you can end

20 around the pleading rule by offering them for some other

21 purpose like showing emotional distress. Allegations of

22 emotional distress, as a matter of law, aren't sufficient

23 to show special damages. There's lots of cases we cited

24 to that effect so I won't belabor that.

25 I would also just point out to a bigger issue with

this type of evidence, Your Honor, which is a causation
issue.  I don't think Ms.  Teter may testify that she has
anxiety that was caused by something specific that
necessitated medical treatment, particularly in light of
her past history of anxiety and the many other anxiety
inducing conditions and stressors in her life that she
reported to her therapist --

THE COURT:  Let me stop you for a second because
that goes to the question of whether or not Ms.  Teter
lays an adequate foundation for the admissibility of
something that would otherwise be admissible.  Right now,
since this is in the form of a motion in limine, I want
to deal first with the issue of is it admissible?  Even
if she lays the foundation that you're talking about, is
she going to be able to get it in?

MR.  DEAN:  Is it admissible?  That's a little
different from our motion.  We have not argued that the
medical expenses -- our bases for our motion in limine,
Your Honor, are the failure to plead and then the fact
that this evidence was not provided during discovery.
Some of it wasn't provided until after summary judgment.
So these are really Rule 9(g) and then Rule 26 and Rule
37 motions.

Your Honor, the notion that this evidence was ever
disclosed to us is belied by the plaintiff's counsel's

1  correspondence with us.  When they produced documents to

2  us in late March, after the summary judgment argument,

3  they produced a set of Medicare records.  We wrote back

4  and said, on the face of these records it looks like they

5  were downloaded in October.  Why weren't they provided to

6  us?  And in, you know, a candid response, counsel wrote

7  back and said that they didn't appreciate the relevance

8  of Dina Rose, who was the neurofeedback therapist at the

9  time that the records were downloaded; and they didn't

10  appreciate their relevance, they said, until the last

11  week of discovery.

12      So if, Your Honor, they didn't even appreciate

13  that these neurofeedback records were relevant until the

14  last week of discovery, it is impossible that the

15  complaint -- the initial disclosures or the interrogatory

16  answer that they provided could have disclosed these

17  medical expenses to us.

18      So, you know, I'd say that even apart from 9(g), a

19  bigger problem that we have with this medical expense

20  theory is the only thing we received within the discovery

21  period -- it was only three or four days before the

22  discovery period closed were copies of the treatment

23  records themselves received, but no copies of anything

24  relating to expenses, and nothing that tied us to that

25  treatment.

1        And I'd point out, as we did at summary judgment,

2    Your Honor, those records that we received they didn't

3    put us on notice that Ms.  Teter was going to be seeking

4    medical expenses from these defendants, because the

5    medical records don't mention these defendants or

6    defendant's videos or YouTube comments.  So our bigger

7    problem with this evidence is that the actual

8    documentation of expenses, Medicare records, those

9    weren't produced until late March of this year, and we

10   never had any notice of those records beforehand.

11       As to medical expenses generally.  We asked

12   specifically from Ms.  Teter, what are your out-of-pocket

13   expenses?  That phrase she used in paragraph 61.  We

14   asked an interrogatory.  It was our first interrogatory

15   directly on that point.  The only thing that she

16   disclosed was the costs of buying a new cell phone.

17       And if you go back further to her initial

18   disclosures she claims that she is seeking medical

19   expenses in a specific amount of, like, $2,504.  And the

20   documentation that she provided is an emergency room bill

21   from the time -- from the date when she had an

22   altercation with Mr.  Campbell.  Of course that was a

23   consolidated disclosure.  So the only thing she gave

24   notice of was seeking medical expenses from her emergency

25   room visit from Mr.  Campbell.

1    So our problem with the medical expenses is we

2  never had any notice of a medical expense theory from the

3  time the complaint was filed.  The first time we ever

4  heard anything about neurofeedback -- and this treatment

5  was provided before she filed her complaint.  The first

6  time we heard about it was when we got some records that

7  don't refer to us, and we received those four days before

8  discovery closed.

9    The first time we received any evidence that

10  showed even Medicare was billed for those services was on

11  March 26th, which was a week after summary judgment

12  argument.  So we haven't been able to depose the

13  therapist who provided this treatment.  We haven't been

14  able to -- we didn't have any of the expense information

15  at our disposal when discovery was conducted when

16  Ms.  Teter was deposed, and it's a paradigm situation for

17  the application of Rule 37.  They had the information as

18  early as October, and they didn't disclose it to us.  It

19  is prejudicial to us to have to try to defend something

20  by gleaning what information we can outside of the

21  discovery period.  So I think that is the main reason why

22  we believe this evidence should not be admitted.

23    THE COURT:  Okay.  Any response?

24    MS.  RINI:  I would say, Your Honor, that we

25  disclosed -- there's a distinction between the different

records that were disclosed.  On one hand, there are the
neurotherapy records themselves which are the therapist's
notes for Ms.  Teter from the year of, you know, about
February 2017 through the end of 2017, And then there are
Medicare expense records and those are the billing
statements from Medicare.  And then --

     THE COURT:  But as to those two components.  The
first one is what you produced two days before the
discovery period ended, and the second group was what you
produced months after the discovery period ended.  Right?

     MS.  RINI:  That's correct.  And we produced the
neurotherapy records the day before Ms.  Teter's
deposition.  So the defendant did have an opportunity to
cross-examine her about it.  Mr.  Campbell's counsel did
cross-examine her about them for -- I mean there's at
least three pages in her deposition about the
neurotherapy records.  And because they were, you know,
tied to seven hours total to depose Ms.  Teter they sort
of divvied up the responsibilities.

     THE COURT:  Well but, still, even though it was
before the deposition, producing something in the nature
of damages, particularly anything related to healthcare
treatment two days before the discovery period ends, how
is an opposing party supposed to prepare anything, do any
followup discovery, other than simply asking the patient?

1     MS. RINI: Well they didn't ask her anything

2 about the neurotherapy records despite the fact that it's

3 axiomatic that if you go to therapy you're suffering from

4 some sort of anxiety related to something. And we've

5 alleged in our complaint and in all of our pleadings, or

6 in all of our documents during discovery to them, that

7 she suffered anxiety and feared going out into public as

8 a result of their videos. So that would be our argument.

9     THE COURT: Well, with regard to this, the fact

10 that the special damages were not pleaded, there was

11 nothing that even mentioned a connection between any of

12 the alleged defamation and any sort of neurofeedback

13 therapy or recovery related to neurofeedback therapy,

14 coupled with the fact that apparently plaintiff's counsel

15 didn't see any connection between the alleged defamation

16 and the neurofeedback therapy so that plaintiff's counsel

17 didn't see it as within the purview of anything that was

18 pleaded, added to the fact that a portion of this was

19 provided two days before the discovery period ended, and

20 the other portion was provided months after the discovery

21 period ended. I believe that just in the interest of

22 fairness, as well as to comply with Rule 9(g), the

23 evidence regarding the neurofeedback therapy, and

24 particularly regarding the bills regarding the

25 neurofeedback therapy, would not come in.

1          The next one has to do with the YouTube comments.
2     Here's the way I'm looking at the issue of the YouTube
3     comments.  The plaintiff is saying that the defamation
4     had this -- the alleged defamation had this impact on her
5     life making her fearful, et cetera.  And a portion of
6     that impact is by way of what she's seeing in some of
7     these comments.  First of all, that's not a hearsay use.
8     It's showing the comment for the purpose of its effect
9     not for the purpose of its truth.

10          But I see some real pitfalls to this under 403, in
11     particular.  Number one, because we've all looked at
12     comments on the Internet.  It doesn't matter what the
13     article is, it seems like by the end of the day there are
14     1,400 comments; 1,300 of which are completely idiotic.
15     It can become cumulative very quickly.  And when they're
16     cherry-picked they can become unduly prejudicial.

17          So my thought is so long as they are being offered
18     for the limited purpose of showing the impact on the
19     plaintiff that, to a very limited degree, they can come
20     in.  I'm not going to allow them, for instance, for the
21     purpose of publication.  Because in order to show that as
22     evidence of publication you are going to have to
23     authenticate from whom the comment came.  You have to
24     show that it's from a real third person.  Now if you have
25     that evidence maybe thick things are a little bit

1   different from what I understand here.  But if it's

2   anything like ordinary comments on the Internet I doubt

3   you have such information.  I've kind of told you what my

4   first blush reaction is.  Do either of you want to say

5   anything to try to move me off of that point?

6          MR.  DEAN:  I would, Your Honor, which is,

7   candidly, I don't know how to resolve this issue at this

8   moment.  But these comments, as you have noted, Your

9   Honor, have the potential to be extremely prejudicial

10  considering the language.  I assume Your Honor has

11  perused the complaint and seen some of the language

12  that's used.  My concern is that that prejudice can't be

13  fixed once a comment is read, and Ms.  Teter has not told

14  us which of these comments she actually read.

15         So Your Honor is admitting them for the limited

16  purpose of showing she read comments and felt

17  trepidation.  I think that that is the extent of the

18  information that should be admitted is that Ms.  Teter

19  saw comments and they were -- she interpreted them as

20  threatening to her, and that made her feel fearful.  Or

21  at the minimum, Your Honor, that before a specific

22  comment is read there must be some type of foundation

23  laid to prove that Ms.  Teter read that comment.

24         I haven't seen anything in this case that says

25  here are the specific comments that Ms.  Teter read.  We

asked her about this in her deposition, and I don't

believe that she was able to testify about any comment

with precision.  I know that -- I'm trying to peruse her

deposition outline at this second, and I can't do it fast

enough.  I know she testified in general about what some

of the comments said, but she certainly did not use, you

know, the language that is used in these comments.

And she certainly did not say that someone called

themselves "Mein Fuhrer" and put a swastika on the

comment.  So a significant concern for us is just that,

in terms of prejudice these comments that have been

presented in the complaint, they are not the comments --

I don't think they have ever been represented to be the

comments Ms.  Teter actually read.

THE COURT:  Let me stop you there for a second

because, obviously, for it to be -- for a comment to be

evidence of the impact upon the plaintiff she's going to

have to lay a foundation that she in fact read the

comment within the relevant time period.  Otherwise, it

cannot have an impact.  So I don't see what you're

arguing about as a potential problem.  Because if she

can't -- if she can't identify it as what she read then

it doesn't come in at all.

MR.  DEAN:  Right, Your Honor.  I guess I'm

questioning the procedure by how that happens.  For

example, if a document is placed in front of her that says, is this one of the comments you read?  Then that's one thing.  But if it's -- if plaintiff's counsel has to say the comment out loud and then say, did you read that?  Regardless of her answer, the jury's heard it.

THE COURT:  Well I certainly hope that plaintiff's counsel knows better than to try to present anything in that manner.  Obviously, I'm going on some assumptions here.  I assume that these comments are going to be in the form of some sort of exhibit, and that exhibit can be displayed to the witness, who presumably would be Ms.  Teter, without being displayed to the jury.

Counsel can ask Ms.  Teter, do you see that third comment there, or the third line, on Exhibit 65?  You know, yes, I do.  Have you seen that before?  Yes, I have.  Where did you see it?  I say it on the Internet when I viewed the video that was about me.  How did you see this?  Well it's one of the comments that I scrolled down to.  Then they offer, you know, can you read that comment to the jury?  I mean something along those lines.

Obviously, if counsel jumps out of the box and presents something to the jury that is of documentary form that is not yet in evidence, plaintiff's counsel might expect that I might get rather perturbed.  I don't expect plaintiff's counsel is going to do that, at least

```
1   I certainly hope not.
2        MR.  DEAN:  Your Honor, I just had one other
3   followup.  I also assume that there will be some type of
4   exhibit, but what is the exhibit and who is the witness
5   who can actually say that it is what it purports to be?
6   Because I think copying and pasting comments on to a
7   document is -- suffers from authenticity problems.
8   Unless there's a witness who can say is this -- who can
9   actually sponsor the document and say that these were
10  comments that existed at the time, I think Ms.  Teter
11  still has an authenticity problem.  And because these
12  comments don't exist as individual snippets, they exist
13  on the web side, it's hard for me to fathom comment
14  number one that Ms.  Teter, based on her testimony
15  reading these for a few minutes and stopping, that she
16  read comment one and comment 10,567.
17       So we don't have that context based on the cutting
18  and pasting that's been provided.  So I still think there
19  are significant authenticity concerns just to show that
20  these comments are the comments that actually appear on
21  YouTube.
22       THE COURT:  Well who at the plaintiff's table
23  wants to field this one?
24       MR.  SASSER:  Your Honor, I think there's an issue
25  beyond Ms.  Teter reading the comments.  Everybody read
```

1  these comments.  Lots of people read these comments, and

2  that also led to her damages.  People come up to her and

3  say things to her.  She has the feeling that everybody

4  hates her from the kind of things that she reads about

5  herself.  So it's not just --

6      THE COURT:  That's an evidentiary minefield if

7  there ever was one.  I quite purposefully steer away from

8  that particular theory of admissibility because the

9  foundation that you would be stuck having to lay for that

10  seems probably more of a burden than you'd be able to

11  surmount.  I would think --

12      MR.  SASSER:  Your Honor, the fact that these

13  actually flowed directly from the video -- they were

14  appended to their video on their YouTube.  They're not

15  put on a loop mix tape or Heidi Siegler's violin recital.

16  These things -- they were engendered by these people, and

17  the comments refer to Ms.  Teter.  I think there's a

18  pretty good inference that that's what they're looking

19  for.

20      THE COURT:  I'm looking for a response to the

21  point Mr.  Dean was making.  And that is, how are you

22  going to be able to show what evidence -- what

23  foundational evidence are you going to be able to present

24  that a particular comment that you want to have her read

25  to the jury was something that Ms.  Teter actually saw at

1  that time on that website that actually came from there

2  within the appropriate timeframe?  How do you propose to

3  present that?

4          MR.  SASSER:  We'll ask her.  Ms.  Teter, did you

5  see these comments?  Yes, I remember a couple of them.

6  One of them said I should be strangled with my oxygen

7  tube.  Does it look like the one there in Number 7?  Yes.

8          THE COURT:  Well but you have these in documentary

9  form; correct?

10         MR.  SASSER:  We do, yes.  There may be thousands

11 of them with regard to video one.  And they deal with all

12 kinds of stuff like Scott Foval and Bob Campbell.  Video

13 two is just about her.  It's 300 comments, and I'd say 98

14 percent of them are negative.  So there's no question

15 about them being representative.  And they're not that

16 long -- that hard to read through unless --

17         THE COURT:  You're planning to present all of

18 them?

19         MR.  SASSER:  No, Your Honor, just the ones that

20 she can identify if that's what we're limited to.

21         THE COURT:  Well I want to make sure you

22 understand what I already said.  And that is, you have a

23 serious 403 problem with regard to presenting a

24 cumulative amount of commentary because these are

25 purportedly comments from people who are unidentified.

1  You cannot authenticate them as statements of any

2  particular individual.  For that matter, you don't know

3  that they came from an individual.  You don't know that

4  they came -- you know, supposedly Ms.  Teter would be

5  able to testify that she didn't post them.  Other than

6  that, you have not eliminated the rest of the world as

7  being the source of these comments.

8          MR.  SASSER:  Yes, sir.

9          THE COURT:  Therefore, the only 401 relevance that

10  I see is with regard to the impact that it has on her.

11  Therefore, I would only allow in for her to say there

12  were some comments that made me fearful.  You know,

13  Ms.  Teter, I show you Exhibit 65, The third line.  Can

14  you read that silently?  You know, yes.  Is that one of

15  the comments that you saw that you're talking about?

16  Yes, it is.  When did you see it?  You know, the day

17  after the video was posted.  Can you read it to the jury?

18  And you do that for maybe three comments or so to give

19  the jury a flavor of what she encountered.  If you're

20  going to present 298 of these to the jury you're not

21  going to get anywhere near 298.

22          MR.  SASSER:  Yes, sir.

23          THE COURT:  Because that -- I mean, at that point

24  it is so 403 overboard on something that is -- I don't

25  want to say that it's collateral to the suit, but it's

1   one small slice of the suit.  And you don't want to spend

2   hours going through comment after comment.

3          MR.  SASSER:  Yes, sir.  I understand.

4          THE COURT:  Okay?  We've been at this about two

5   hours and 20 minutes.  We still have several motions in

6   limine to go through.  I guess we'll go ahead and take a

7   short break this morning, and then we'll come back and

8   wrap up, and we'll get out of here before lunch.

9          Marshal, ten minutes please.

10                    (Off the record at 11:13 a.m.)

11                    (On the record at 11:26 a.m.)

12          THE COURT:  The next motion in limine that I have

13  pertains to the transcript that was apparently prepared

14  regarding the raw video of Mr.  Foval.

15          Mr.  Dean, I'll turn to you because here is why I

16  don't understand your motion.  In criminal trials I deal

17  with this all the time.  I mean it's almost rote because

18  it is so common for the prosecution to be presenting a

19  wiretap, or even a video, of the defendant doing

20  something wrong.  But a lot of times the sound quality

21  isn't that good so the prosecution always wants to have

22  that transcript that is simultaneously shown to the jury

23  while they're watching the video or listening to the

24  wiretap.

25          I give this almost rote instruction of, ladies and

gentlemen of the jury, you are going to be presented with
this video by the prosecution. At the same time, you are
going to be presented with what purports to be a
transcript of what is being said by the parties that you
will see in the video. It is my instruction to you that
the transcript is not the evidence. The video is the
evidence. If you discern that there is any discrepancy
between the transcript and the video you shall disregard
the transcript, and the video shall govern. I mean that
may not be verbatim of what I've said, but I've probably
said that a hundred times.

Isn't that exactly what we do here? It's in an
unusual context, but isn't that exactly what we do here?

MR. DEAN: No, Your Honor, for a few reasons.
One, we're using the word "transcript." And I don't know
what Your Honor receives in the criminal on the text, but
this is not a certified by anyone type of document. This
is -- I don't know if they use a court reporting service
or what type of transcriptionist service was used to
prepare it, but this is just a document where one person
sat down and purported to listen to it and write down --

THE COURT: That's all I'm talking about in the
other context. It's some clerical employee at the U. S.
attorney's office that sat down and tried -- or more
often at the DEA office that sat down and tried to figure

1  out what the party said.

2      MR. DEAN:  In this context, Your Honor, both

3  sides agree that there are inaccuracies in the transcript

4  and phrases that can't be heard.  Looking at the

5  transcript on its face to a jury is going to be confusing

6  because it has no names, it says SP name, SP two, SP

7  three.  It doesn't stay Scott Foval or Hartsock or

8  Campbell.

9      And what we're talking about here is I think this,

10  from many criminal cases, the exact words are actually

11  the dispositive thing.  It's not about, you know, sort of

12  what other conduct was going on or the general import,

13  but exact words really matter in r this case, and the

14  audio was clear but the transcript isn't.  And in what I

15  think is --

16      THE COURT:  I don't understand what that means.

17  If the audio is clear and the transcript isn't, what's

18  the purpose of the transcript?

19      MR. DEAN:  Exactly, Your Honor.  I agree a

20  hundred percent.  The transcript is unnecessarily

21  confusing things for the jury when we can play the video

22  and they can hear it for themselves.  I think where this

23  really becomes an issue is we saw in depositions, and you

24  will see when you have to go through the deposition

25  designations, questions of this form.  Well did

Mr. Foval say X in the transcript? Did Mr. Foval say Y
in the transcript?

    THE COURT: Again, just like the cautionary
instruction that I referred to earlier, the transcript is
not evidence. Therefore, if a witness is asked, whether
it's on the stand or in canned testimony, what did
Mr. Foval say in the transcript, that's not admissible.

    MR. DEAN: Your Honor, I agree with you a hundred
percent. That's all I can say on that. I think that
that is the very use that we are concerned about. We are
concerned about a witness saying well I don't see
something in the transcript and the jury making
inference, well, then it wasn't said, when that's not a
supportable -- that's not a proper conclusion because the
recording itself is there.

    THE COURT: Can you give me a particular example
of where that happens? And it doesn't need to be exact,
but just give me an example of how this comes up in the
case.

    MR. DEAN: Right. Well Mr. Foval -- I don't
have the page and line in front of me; Mr. Montecalvo may
be able to show it to you. He was asked about what was
said. And he was looking at the -- you know, his
testimony was done exactly like this Your Honor. The
transcript was placed in front of him so he could follow

1  along, and he was shown video clips.  And he frequently

2  said well that's not what the transcript says here.  This

3  is wrong.  What I actually said is X, so that is wrong.

4       Or with Mr.  Hartsock they were -- you know,

5  questions were asked about whether certain words appear

6  in the transcript with reference only to the transcript.

7  With Mr. O'Keefe, questions were asked about whether

8  words appear in the transcript.  The same problem happens

9  because we have summaries, you know, basically smaller

10  transcripts which the journalists themselves prepare of

11  the meeting that are just sound bites, bullets.

12       And questions are asked, well, does this -- does

13  this summary say, you know, Ms.  Teter's name?  Does it

14  say X, Y, or Z?  And all of that testimony is misleading.

15  Because what is relevant is what is actually recorded,

16  and those two things don't align.  So we would say any

17  testimony that's based on what is said in the transcript

18  and any argument or inference to the jury that, you know,

19  go back to the jury room and look at his transcript and

20  see if you -- you look for this word is.

21       THE COURT:  Again, they're not going to have the

22  opportunity to go back to the jury room and look at the

23  transcript because it won't come into evidence.  It is

24  merely an aid for them to view the video.

25       And I'd like for you to go back for a moment about

1  this whole point of how the transcript does not match up
2  to the video.  What's the defect in the transcript?
3        MR.  DEAN:  Sure.  Can Mr. Montecalvo read a
4  portion of Mr.  Foval's testimony?
5        THE COURT:  Certainly.
6        MR.  MONTECALVO:  Your Honor, to answer your
7  question, with the defect, this is how the examination of
8  Scott Foval was done.  And this relates to the
9  designations and the objections to the designations so
10  this ruling would be helpful on this issue.
11        The way Mr.  Foval's deposition was done is he was
12  presented with the transcript, and at times he was given
13  snippets of the video.  And then it was confusing whether
14  he was referring to the transcripts at times, or whether
15  he was referring to the video.  In fact, at one point in
16  the deposition Mr.  Dean who was doing the examination
17  and said, are you looking at the transcript?  He said no
18  I wasn't, but the video will show his eyes down.
19        And then on page 96 of his transcript the question
20  would be -- and this is just one example -- did I read
21  his statement or the statement in the transcript
22  correctly?  And then he'd say yes, although I don't think
23  I actually said "yes" in that video.  In that
24  conversation I don't think I said yes in between when I
25  was acknowledging his previous question.  I think I was

1    nodding and Mm-hmm.  I don't think I actually said yes.

2         THE COURT:  But what does the video say.

3         MR.  MONTECALVO:  The video will actually

4    demonstrate what he said, whether he was nodding along,

5    when he was nodding along, whether he "Mm-hmm" which

6    court reporters deal with all the time, whether that was

7    a yes or whether that was, according to Mr.  Foval, just

8    a nervous tick that he gave.  The video is the best

9    demonstration of that.  And to have a transcript come in

10   where he's able to testify based on that and adopt it

11   when he wants to and then run from it when he doesn't

12   want to.  That's how the Foval deposition proceeded with

13   the transcript, and that's why it was confusing.  That's

14   why we filed this motion.

15        THE COURT:  Okay.  Who at plaintiff's table is

16   going to field this?  Mr. Sasser.

17        MR.  SASSER:  I will, Your Honor.  I assume in the

18   cases that Your Honor has given those instructions to the

19   jury that those transcripts are offered by the

20   prosecution who's also offering the videotape or the

21   wiretap.  Here they are trying to disavow their own

22   transcript.  They signed it in their deposition -- in

23   their summary judgment papers.  They quoted it at length

24   in their deposition -- summary judgment papers.  In

25   Mr. O'Keefe's deposition I asked him questions.  He kept

1   saying I can't answer that without looking at the

2   transcript.  Ten times that happened.  And at one point

3   --

4        THE COURT:  What relevance does that have?  What's

5   your point there?  Because here, just like I have in all

6   of those cases -- and it comes up so often.  If there is

7   a discrepancy between the video and the transcript, the

8   jury is specifically instructed the transcript isn't

9   evidence.  Period.  It's the video that's the evidence.

10  So if you have all of these questions about, well, what

11  does the transcript say?  I don't care who's asking the

12  question.  How does that come in.

13       MR.  SASSER:  Your Honor, the actual -- what

14  they're trying to prove here is what happened in the

15  meeting and not necessarily what's on the tape.

16       THE COURT:  I don't understand what that means.  I

17  thought the video is of the back and forth that has been

18  recorded on the video.

19       MR.  SASSER:  Right.  But anybody can testify as

20  to what happened in a meeting.  I was there and this

21  happened.  And then somebody can say, yeah, but look at

22  this tape.  This tape doesn't show that that's what

23  happened.  The actual memory of the people who were there

24  are the best evidence.  That's the -- we're not trying to

25  prove --

1      THE COURT:  You're saying this transcript isn't a

2 transcript at all; that it's somebody's recollection of

3 what took place?

4      MR.  SASSER:  No, sir.  I'm talking about just

5 witness testimony.

6      THE COURT:  Then I don't understand where you're

7 going.

8      MR.  SASSER:  You've got witness testimony, you've

9 got video, and then you've got a transcript.  The

10 transcript is of the video.  If you were trying to prove

11 the contents of the video then the best evidence rule

12 applies.  If you're trying to prove what happened in the

13 meeting you can still ask people about what happened in

14 the meeting without necessarily using the video.  But

15 they --

16      THE COURT:  That doesn't have anything to do with

17 the transcript.  I am not understanding your argument at

18 all.  Yes, there are circumstances in which the people,

19 the participants in the meeting can testify about what

20 happened at the meeting.  Now there might be hearsay

21 problems with what was said, et cetera.  But if the

22 question is what is on the video, and there's a

23 transcript, the video is evidence and the transcript is

24 not.

25      MR.  SASSER:  That's correct, Your Honor.  But the

1  transcript was also a statement by a party.  It's their

2  transcript.  They created it.  They relied on it in their

3  depositions for giving testimony.

4      THE COURT:  Transcript of the defendants as to

5  what?  As to the contents of the video?

6      MR.  SASSER:  As to what happened.  I would ask --

7      THE COURT:  Again, I'll ask you the same question

8  that I was asking Mr.  Dean a few minutes ago.  Give me

9  an example of where you have a situation where you have a

10 quote, unquote transcript about what happened that is

11 somehow not on the video that the transcript is

12 supposedly a transcript of?  That makes no sense to me.

13      MR.  SASSER:  I asked Mr.  Foval, was -- I'm

14 sorry.  I asked Mr. O'Keefe was Mr.  Foval talking about

15 Shirley Teter?  Yes, he was.  Well did he say her name?

16 I would have to see the transcript.  And then we'd trot

17 out the transcript.  He looked at it for 13 minutes,

18 without stopping, looking for Shirley Teter's name.  He

19 was relying on it.  And if he used it to rely on it, I

20 think it's evidence that comes in.  The witness was using

21 a particular document to bolster his testimony.  They

22 quoted it throughout the deposition in their summary

23 judgment papers, Your Honor.

24      THE COURT:  What does that have to do with the

25 evidentiary issue?

1       MR.  SASSER:  It's a statement by them.  It's an

2   admission by the party.  All admissions by parties are,

3   by definition, not hearsay.  So they should be -- it

4   should come in.

5       THE COURT:  Well I don't perceive, at least, that

6   the objection is being made based on it being hearsay.  I

7   understand that the objection is being made as to really

8   two grounds.  One is authenticity.  Because if it

9   purports to be a transcript it has to actually transcribe

10  what was said.  But, secondly, under the best evidence

11  rule.  The best evidence of what is shown on a video is

12  the video.  It's not seen the transcript.  I see both of

13  those as being very relevant points.

14      MR.  SASSER:  The videos aren't great, Your Honor.

15  I don't know if you've seen any of them, but they're --

16      THE COURT:  We're talking about the two videos

17  that are at issue, or we're talking about the stock

18  footage?

19      MR.  SASSER:  The stock footage.

20      THE COURT:  Okay.  I have not seen that.

21      MR.  SASSER:  So it's 2.5 hours.  They're using

22  hidden cameras shooting through buttonholes, and

23  sometimes the person who is talking is on the screen;

24  sometimes you're just looking at the ceiling.

25      THE COURT:  Just like the videos that the DEA

1   agents take.  That's the thing.  This is just what I see

2   all the time, and I never get any argument about this.

3   That's why I feel like there's must be something I'm

4   missing here to be hearing these arguments, because it

5   sounds like what at least the prosecutors in the criminal

6   defense bar think is just normal everyday stuff.  So

7   explain to me why it's not.

8        MR.  SASSER:  Because they're walking away from

9   their transcript.  I assume the prosecution puts in both.

10  Right?  I assume.  These guys want to get away from what

11  they use throughout discovery and now go --

12       THE COURT:  You keep talking about discovery.

13  We're talking about admissibility of evidence.  If the

14  video says today is Thursday, and their transcript says

15  today is Wednesday, is that an admission of a party

16  opponent that the video says today is Wednesday?  Is it?

17       MR.  SASSER:  It's an admission of what they said,

18  not of what the video said.

19       THE COURT:  But it's a transcript purportedly of

20  the video.  Why doesn't the best evidence rule keep that

21  out?

22       MR.  SASSER:  In that situation, if you're talking

23  about what's in the video, I think the best evidence rule

24  does apply.  I do have a case -- we cited a case here

25  that's consistent with what Your Honor was discussing in

the criminal context.  The *Breezy Point* case.  This says
nothing in Rule 1002 prevents introduction of a
transcript to aid a jury in following the recording if
the original recording is available for the Court's
inspection.  I don't know when they said it helps the
jury.  I don't know if that means admissible or they just
see it at the time.

THE COURT:  Right.  And that's exactly the way
it's always done.  It is allowed to be shown to the jury,
but the jury is specifically instructed the transcript
isn't evidence because of the best evidence rule.  It's
merely an aid to the jury in viewing the video.

MR.  SASSER:  Thank you, Your Honor.

MR.  STREZA:  Judge, if I could just answer or
respond to one thing that Mr. Montecalvo said.  I took
the deposition of Mr.  Foval, and that transcript was
used predominantly in the way that you have described it
to be used.  It was used to help him understand inaudible
testimony he was giving or statements he was giving as
well as the interviewers were giving in that situation.

THE COURT:  Give me an example of what you're
talking about.  In other words, the video is inaudible
and you can't hear what was said, but then when asked
about it Mr.  Foval said what?

MR.  STREZA:  The transcript reflects what I was

trying to say, Your Honor. Or he would say the transcript says what you cannot hear. So that would refresh his recollection as to what happened in the video. I can't give you an exact --

THE COURT: Is it in terms of the refreshed recollection?

MR. STREZA: Yes.

THE COURT: In other words, Mr. Foval you see this part of the video. Can you hear what was being said? No, I can't, it's inaudible.

MR. STREZA: Does the transcript help you in any way? And he would say yes it does.

THE COURT: Will it help you in any way, or did you ask does it refresh your recollection?

MR. STREZA: Yes, Your Honor.

THE COURT: What was said? Before you refresh his recollection there do you ask him, do you remember what was said?

MR. STREZA: I believe that's the case, Your Honor. I can't give you the line or the page at this time.

THE COURT: You either go through the paces or it doesn't come in. You know how this works.

MR. STREZA: Gotcha. I didn't want the Court to leave today thinking the use of the transcript at the

deposition was entirely inappropriate and it was not.

THE COURT: You know, apparently, I'm going to have to -- you're going to make me read this 1,700 pages, aren't you, to where I'm going to have to go through item by item. Basically speaking, that transcript is going to be a very limited use. I've told you the general limited use which is going to be allowed. But beyond that there is a significant foundation that has to be laid, and that's part of what Mr. Streza has been talking about here.

If there is a portion of the video that is inaudible, and then there is a transcript that is prepared by someone who was there that says well you can't hear it on the tape but what he said was X, then, you know, there is that narrow exception to where it may be substantive evidence there. But I mean that -- it's going to be hard to pass that camel through the eye of that needle.

Mr. Dean.

MR. DEAN: A couple questions. One, I would -- just to be clear, this transcript was not prepared by one of the journalists. It was prepared by a third party. So I'm not sure where it's an a situation where the video was ininaudible and the transcript is more complete that I think would be anomalous. So to understand what your

1   instruction is Your Honor.  I understand you to say that
2   the transcript itself does not get submitted as evidence
3   to the jury, and that if a witness is being asked
4   questions based on the transcript that that also is
5   inadmissible.  I think those were our fundamental
6   questions.
7           THE COURT:  Without any further foundation, that
8   is correct.
9           MR.  DEAN:  Thank you.
10          THE COURT:  The foundational exception would be
11  that very narrow exception that Mr. Streza was just
12  addressing.
13          MR.  SASSER:  Your Honor, I completely forgot to
14  address Rule 1007 which says that if it's a statement --
15  a written statement of party it may be used to show the
16  contents of the recording.
17          THE COURT:  It says what?
18          MR.  SASSER:  A proponent may prove the content of
19  a recording by the written statement of a party against
20  whom the evidence is offered.  We're offering it against
21  Veritas.  And I think this is a statement by Veritas
22  since it's -- they're the ones who had it prepared.
23          THE COURT:  Well and again this is going back to
24  the very narrow exception that Mr.  Streza was just
25  talking about, unless I'm misunderstanding your argument.

1    First of all, the best evidence rule says it's the
2    recording that is the evidence.  So if the recording says
3    Thursday, you can't refute that by some other evidence.

4         However, if the recording is inaudible and the
5    defendant's statement of what was said was Wednesday,
6    then you can use that so long as you've laid that
7    foundation.  That's 1007.  You can use it as substantive
8    evidence under those circumstances but you cannot use the
9    writing to in fact refute what is in the best evidence.

10        MR.  SASSER:  Your Honor, I think both parties
11   have addressed Rule 1007.  I would just urge the Court to
12   look at it and see to the extent to which it is an
13   exception to Rule 1002.  It seems to me that testimony or
14   statement by a party may be used against it, and it says
15   the original doesn't even need to be accounted for.

16        THE COURT:  Well you say doesn't need to be
17   accounted for.  That's different from the fact that it
18   contradicts it.  Under the best evidence rule you cannot
19   contradict the best evidence.  I mean the circumstance in
20   which that might come up more often is if there is, you
21   know, the document, the lease, or whatever, that is at
22   issue, and one of the parties has his notes as to what
23   the lease contains.  And you say well the lease may say
24   this it's for one year but the defendant's notes say that
25   it was for three years.  Does that change the terms of

the lease?  Of course not.  If you can't find the lease

and you're suing on the lease, and the defendant's notes

to the extent that they might otherwise be admissible say

it's a three year lease, that's then substantive evidence

usable against the defendant that it's a three year

lease.

       MR.  SASSER:  Okay.

       THE COURT:  I feel like I must be missing

something because, to me, it seems so simple, and you

seem very whetted to the idea that it's more usable than

I think it is.

       MR.  SASSER:  I was just looking at the actual

language of 1002 and 1007, and there's nothing in there

about contradict contradicting the other.  Your Honor,

the example Your Honor was giving kind of is a corporate

example.  When there is a -- when you come to a contract

all the other stuff is excluded and I keep trying to

think of the term.

       THE COURT:  Parole evidence rule.

       MR.  SASSER:  Parole evidence rule.  Yes, sir,

Your Honor.

       THE COURT:  Yeah.  If you don't have the document.

       MR.  SASSER:  There's another term that the

parties use when -- at the end of the contract with stuff

about using North Carolina law that -- there's a term

1    that everything that's in the contract itself is subsumed
2    from all of the negotiation.

3          THE COURT:  Well I think I've been clear as to
4    where I stand on this one.  It can be can be shown to the
5    jury in conjunction with the showing of the video.  If
6    there is any point at which the video is inaudible then
7    the transcript can be offered as substantive evidence
8    only as to the inaudible part against the defendant if
9    you lay a foundation that the defendant in fact prepared
10   it.

11         The next item I have here is with regard to the
12   Foval deposition.  It seems like there were various
13   things here including what we were just talking about a
14   moment ago.  Just looking at my notes, if I'm
15   understanding the question here correctly, it has to do
16   with where Mr.  Foval is shown a portion of the video and
17   then is asked, well what did you mean?  Is that a fair
18   rendition of what the question is at least?

19         MR.  MONTECALVO:  That's correct, Your Honor.
20   That takes what we were just arguing one step further is
21   that he was then asked not what's on the video.  He's
22   then asked, what did you mean?  What did you say?  And I
23   have various examples that I looked at from the
24   transcript.  The way the deposition flowed was that
25   Mr.  Foval was asked questions setting up the meeting

```
 1   that led to the video, all appropriate.  Who were you
 2   meeting with that day?  What were you wearing?  What was
 3   the other side wearing?  That's admissible.
 4        What the motion in limine relates to is where
 5   Mr.  Foval is getting into what he meant by those words.
 6   Sometimes what the people he was talking about that he
 7   was talking with, the journalists, meant when they were
 8   asked him the questions he was asked.  Once they set up
 9   the meeting in the deposition they started asking Mr.
10   Foval questions about what was said.
11        The questions are, what were you referring to?
12   And his answers at some points would be I was explaining.
13   Question, would be what did you state?  One question was,
14   what did Mr. O'Keefe state?  These are all relating to
15   the video.
16        THE COURT:  I'm not understanding the context
17   here.  Is he being asked what is shown on the video, or
18   is he being asked what is your recollection of what took
19   place in this meeting without reference to the video?
20        MR.  MONTECALVO:  No.  He would be shown the
21   actual clip of a video.  So Mr. Streza would show
22   Mr.  Foval a portion of the video and say, okay, we've
23   now listen today that video.  What did you say on that
24   video?  And at times it bleeds into the last argument:
25   What does it say on the transcript?
```

107 of 153

1          THE COURT:  Well I mean -- I need to understand

2     your -- the point that you're raising here.  Is it that

3     Mr.  Foval is now changing what he said?  In other words,

4     on the recording he says it's Thursday, and Mr.  Streza

5     asks him so what did you say on the recording?  And he

6     says well I said it was Wednesday.  Is that the sort of

7     thing that we're talking about?  That he's changing the

8     content of the video?

9          MR.  MONTECALVO:  That's precisely it.  There's

10    portions where he was changing what he said based on what

11    was on the video.  Many of our designations, and our

12    objections to the designation in the Foval transcript,

13    relate to that line of questioning where he's shown the

14    video and then he's asked then to interpret what it was

15    he said what it was he meant and, you know, did you say

16    that?  We think that that's the jury domain is that, as

17    Your Honor said early in this pretrial, you have the

18    video.  You have the video.  They have the video and we

19    presented the video.  There are -- it's a long video, but

20    that video is the best evidence of what's there.  And for

21    Mr.  Foval then to be able to contradict and state what

22    he real really intended to say as opposed to what he

23    actually said is not probative of any issue in the case.

24         THE COURT:  Well that gets into a totally

25    different issue, doesn't it?

1    MR. MONTECALVO: That was also the basis of our

2 motion in limine too. To the extent that there's some

3 benefit to Mr. Foval then having a catharsis of what he

4 wanted to say in that meeting, or what he really -- how

5 the other side should have interpreted it instead. He's

6 now allowed to just explain the video for the first time

7 what it was that he meant.

8    Questions would be asked: How did you respond?

9 What did he ask? Those are the types of questions that

10 the video is going to be very clearly showing what he --

11 how he responded and what he asked, and it would be

12 cumulative. It certainly would be a waste of time. And

13 in this case, for the Foval transcript, it would reduce

14 out a large portion of how that questioning went.

15    THE COURT: Do I understand correctly that the

16 Foval deposition that we're talking about was the de bene

17 esse deposition on video for the purposes of preserving

18 it for trial?

19    MR. MONTECALVO: That's correct, Your Honor.

20    THE COURT: So we have this juxtaposition of the

21 video clips, and then Mr. Foval either explaining what

22 he said or modifying what he said. Is that --

23    MR. MONTECALVO: That's correct. And that's why

24 these designations are particularly important.

25    THE COURT: Okay. Well let me hear from the

1  plaintiff's side.

2       MR.  SASSER:  Your Honor, their very defense to

3  this lawsuit is we thought he was talking about Shirley

4  Teter.  We understood he was talking about Shirley Teter.

5  I think Mr.  Foval is entitled to say whether or not he

6  was talking about Shirley.

7       THE COURT:  What relevancy does that have?

8       MR.  SASSER:  Whether he was talking about Shirley

9  Teter or not.

10      THE COURT:  What he meant not what he said.  What

11 he meant.  What relevance does it have?

12      MR.  SASSER:  Who he was talking about was

13 somebody other than Shirley Teter; I think that's

14 relevant.  If he says --

15      THE COURT:  I asked you what relevance does it

16 have, and your answer of "I think it's relevant" doesn't

17 really answer my question.

18      MR.  SASSER:  Who he was talking about is relevant

19 if it's not Shirley Teter.

20      THE COURT:  How?  What's the relevance of it?

21 What element of your case does that go to?  And let me

22 refine my question because I seemed not to be

23 communicating it very clearly here.  You have person A,

24 Foval, communicating to reporter and he says A, B and C.

25 Reporter says, wow, I've got a story.  He said A, B and

1  C.  And reporter then goes and writes a story based on A,

2  B and C.  Foval comes back later and said well I didn't

3  really mean A, B and C.  I meant X, Y and Z.  What

4  relevance does that have to what that reporter wrote?

5  The reporter wrote Foval said A, B and C.

6      MR.  SASSER:  Here the reporter took M, V and A

7  and put it in that order involving things that were not

8  even at that conversation.

9      THE COURT:  Okay.  And that may be part of what

10  your claim is based on.  But for Foval then to go and

11  say, by the way, all the things I didn't say are these.

12  How is that relevant to the claim of whether or not the

13  product that was provided, the final document, the video,

14  is in some way defamatory.

15      MR.  SASSER:  What Foval was going to be saying

16  is, okay, when I'm wearing the checked shirt I wasn't

17  even talking to Brittney Rivera.  That was several months

18  earlier.  I certainly could not have been talking about

19  Shirley Teter because nobody in the world knew who she

20  was until she got hit at the Trump rally.  He can say

21  these are three different videos and these got jumbled

22  together.  And he can also say what were the

23  circumstances under which he was asked the question

24  because they cut stuff.  He can say look --

25      THE COURT:  So there are pieces missing from the

video.

          MR.  SASSER:  From video one and video two, Your
Honor.

          THE COURT:  I'm talking about the video that's
being shown to Mr.  Foval in his deposition.

          MR.  SASSER:  I think some pieces of that may be
missing.  Mr.  Bernie testified that in his deposition
that video was disclosed to us half a month after
discovery closed.  Because what they had given us was of
such poor quality it came in 15-, 20-second snippets.
This was the one that I think thing nobody really got to
consider here during the discovery period itself.  That's
why we were relying on the transcript.  So Mr.  Foval can
say --

          THE COURT:  Again you have me confused.  I thought
the Foval de bene esse deposition was taken here just
within the last few weeks.

          MR.  SASSER:  Yes, it was, Your Honor.

          THE COURT:  So what does that have to do with what
you had months earlier or even after the close of
discovery?  I don't understand.  Your comment made no
sense to me.

          MR.  SASSER:  Okay.  What Mr.  Foval is talking
about is about -- he was also shown video one and video
two and was asked, what was going on there?  Were you

allowed to -- is this your entire sentence?  No.  And
then you go back to the video that they're talking about
that they produced in December, and he was able to say,
see, I was asked and this is my whole answer.  And over
here on video one they cut that part out.  I think that's
pretty important for the jury to be able to understand.

THE COURT:  Again, I feel like we're talking in
two different universes here.  For Mr.  Foval to be shown
a snippet of a video and then asked is that all of what
you said and he says no, they cut off the second half of
that sentence, and then a video is shown of the entire
sentence.  I think that's admissible.

I think it might be going around your elbow to get
to your nose, but it -- the ultimate point is that the
actual statement by Foval was truncated for whatever
reason.

MR.  SASSER:  Yes, sir.

THE COURT:  I can see how that might be relevant
to the issue of defamation.  But for Foval to say, yeah,
it says Thursday on the video but I really said
Wednesday, that -- that doesn't come in.

MR.  SASSER:  Let me make this clear.  I do not
want to do that.  I do not want him to contradict what he
said, and we're not offering it for that.  We're offering
him -- I would like to be able to ask -- explain the part

1  where he says, were you -- did you mention the words

2  "Shirley Teter?" And he says no. If I misunderstand the

3  defendants, they want to show the 2.5 hours of video so

4  that the jury can determine whether he said the words

5  "Shirley Teter" or not. I'd like to be able to just cut

6  to the chase on that and have him say I did not say

7  "Shirley Teter." We've probably got two or three clips

8  of him saying that in his deposition.

9         THE COURT: That falls into the category of not so

10  much the rules of evidence but sort of the manner in

11  which trials are ordinarily conducted.

12         MR. SASSER: Yes, sir.

13         THE COURT: If the defendants want to be utterly

14  obstreperous I can see where they might say, no, we're

15  going to have to play that whole 2.5 hours. But I don't

16  know too many lawyers who would make that objection

17  because it's just going to tick off the jury.

18         MR. SASSER: There's another issue not talking

19  about what he meant but why he said certain things. Why

20  did you say uh-huh when you were asked this? And he.

21         THE COURT: That's an explanation as well. That

22  goes outside of the scope of what he said on the video.

23  Again, it's outside of the scope of what he communicated

24  to the reporter. How is that relevant?

25         MR. SASSER: It's relevant in that he -- they did

1    not get the names out -- get from him what they were

2    trying to get him to accomplish.  They were trying to get

3    him to say words like "violence," and "Shirley Teter,"

4    and they succeeded on one but they did not succeed on the

5    other.  And it goes down to whether it's an issue of

6    truth.  Was it true that they were talking about Shirley

7    Teter?  If they're --

8        THE COURT:  Again, I understood that point.  But

9    where he said on the video -- said as part of the

10   discussion with the reporter A, B and C, and then he's

11   asked in the deposition well what did you mean?  And then

12   he testifies in substance I didn't tell the reporter X, Y

13   and Z but that's what I was thinking.  I don't see where

14   that has any relevance because that's something that was

15   not communicated to the reporter.  It cannot be part of

16   that reporter's formulation of a statement which you are

17   now claiming is defamatory.  It is outside of that box.

18       MR.  SASSER:  Well physical -- if the jury is

19   shown video one that makes it sound like he is talking

20   about Shirley Teter being one of his activists, and they

21   say we understood that and we're able to have Mr.  Foval

22   say no that was half of a sentence and, oh, by the way,

23   they did not put in the sentence where I said we never

24   paid anybody go get beaten up.  That goes to their

25   recklessness in taking certain of his things out of the

1 video when they created video one.

2     THE COURT: Again, that's a totally different

3 situation from what you were describing a moment ago

4 where he is saying I told them A, B and C, and they put

5 that in the video. I also told them D, and here it is on

6 the video clip. I mean that's part of what was

7 communicated to the reporter. Therefore it goes to the

8 issue of whether or not it goes to the defamatory

9 editing.

10     MR. SASSER: That's what it goes to the recorder.

11     THE COURT: Have I given you all enough guidance

12 to what I'm going to let in and what I won't?

13     MR. SASSER: As I understand it, you're not going

14 to let him say what he meant. You're going to let him

15 say what was said and what was not said what went in the

16 video one, and that was -- or what did not go into video

17 one that he had actually said, and what had got cut out.

18     THE COURT: I'm not going to let him say what he

19 meant, and I'm not going to let him say what is at

20 variance from what it shows on the video what he said.

21     MR. SASSER: Thank you, Your Honor.

22     MR. MONTECALVO: Your Honor, if I could be heard

23 on that point lastly? /

24     THE COURT: Just a second. You may.

25     MR. MONTECALVO: Thank you. Your Honor, I think

1    there might be some efficiency to discuss this issue just

2    a little bit further.  Part of the issue we have with the

3    way Mr.  Foval's deposition was conducted, with snippets

4    from the raw video, is I think going to be one of the

5    challenges that we also have at trial.  As Mr. Sasser

6    mentioned, we have two hours of that raw video.  The

7    defendants don't desire to play all two hours of that

8    video.

9          However, if the defendants are going to be accused

10   of selectively editing and defamatory editing, then there

11   does need to be significant context around the statements

12   when a witness is asked questions at trial, which is

13   essentially what the Foval deposition said, when the

14   witness is asked questions about it doesn't say anything

15   in there about this does it?  And there may be something

16   30 minutes before, 30 minutes after, that does -- I think

17   the completeness doctrine would allow us to put in

18   without trying to be obstreperous about that put in the

19   entire video.  We don't desire to do that.  And I think

20   that we can reach some type of reasonable accommodation

21   with the plaintiff so that --

22         THE COURT:  I mean that's all an issue of trial

23   tactics.  That's not an issue of evidentiary

24   admissibility.  Go ahead.

25         MR.  MONTECALVO:  I'm sorry.

1          THE COURT:  Go ahead.

2          MR.  MONTECALVO:  I think what we're going to see

3     in the designations from Foval is there may be some

4     designations being done by the plaintiff based on what I

5     understand Your Honor's ruling to be.  But where -- we

6     have issues with how they picked the snippets from the

7     raw video they picked.  So, in other words, the video is

8     two hours long.  They have picked a snippet to ask

9     Mr.  Foval about for a minute or two, and he's asked

10    questions about that.  That's not going to be appropriate

11    for trial to show the completeness and to show that

12    answer.  I think we would have an opportunity to present

13    the context around that video.  That's going to be very

14    difficult to do in trial if we make that objection, and

15    if Your Honor sustains it, that we're allowed to play

16    some of that at that time if we haven't worked --

17         THE COURT:  Why at that time?

18         MR.  MONTECALVO:  Well I think that's -- that's

19    what the -- that's my understanding of how that would

20    work is that if they're going to play a portion or read a

21    portion of a transcript, in the sake of completeness they

22    would need to read the rest of it at that time.

23         THE COURT:  Maybe I'm not understanding what you

24    have in mind.

25         MR.  MONTECALVO:  Well I think --

```
 1        THE COURT:  Here is kind of how I was envisioning
 2   where you were going with this.  That a 15-second clip of
 3   the video, the raw footage, is played to Mr. Foval, and
 4   then he's asked:  You didn't say anything about the time
 5   square bombing, did you?  He says, no, I didn't say
 6   anything at all.  But, in reality, 30 minutes later in
 7   the raw footage, he did talk about the time times square
 8   bombing.
 9        Are you saying that rather than presenting some
10   sort of rebuttal or defense evidence that says, you know,
11   that puts into evidence that portion of the raw footage
12   that completely undermines what Mr. Foval said, you want
13   to with be able to put it in as part of his testimony?
14        MR. MONTECALVO:  I believe at that time that
15   they're obligated to provide it at that time so it's not
16   a confusing answer and that the answer is complete at
17   that point.
18        THE COURT:  Why didn't you cross-examine him about
19   it?
20        MR. MONTECALVO:  We didn't have the snippets
21   ahead of time.  And we did cross-examine him about part
22   of it.  But it's not something you're able to do in a
23   deposition on the fly; and it's an objection that I think
24   we preserved.
25        THE COURT:  I mean how would you have done it at
```

1   trial to say right then we think -- you want to be able

2   to play a much broader snippet?

3          MR.  MONTECALVO:  I think if -- that's correct.

4          THE COURT:  Even if it's a snippet that's 30

5   minutes later in the video?

6          MR.  MONTECALVO:  I think that's correct, Your

7   Honor.  If it's 30 minutes later then we would be able to

8   play up until that point.  But this was a de bene esse

9   deposition and, as such, we would have had that advanced

10  knowledge of what was going to be played and we would

11  have been able to make that.  Because it was still in

12  deposition format we preserved that as an objection that,

13  you know, as to how he was asked questions on those

14  snippets.

15         THE COURT:  Well I'll take a look at those issues

16  in the transcript.  Generally speaking, where it's the

17  next sentence then, yes, the rule of completeness says

18  you need to show him a little bit more.  Where it's 30

19  minutes later you don't get to interrupt the flow of a

20  direct examination by saying, well, let's listen to the

21  next 30 minutes of this video to see if that's correct.

22  I've never seen anybody want to do that sort of thing

23  because, again, part of this is trial tactics.  But you

24  don't want to tick off the jury, and you sure don't want

25  to put them to sleep.

1        You save that for cross- examination, and on

2    cross-examination you say, now, Mr. Foval, on direct

3    examination you said that you didn't say anything about

4    the Times Square bombing. That's what you said, isn't

5    it? Oh. Yes, that's what I said. Well let me show you

6    part of this video right here. You play the video and

7    say, Mr. Foval, what you said before wasn't true, was

8    it? I mean that's how you do it; right?

9        MR. MONTECALVO: Except Mr. Foval is not going

10    to be at trial.

11        THE COURT: Well that's the problem with the de

12    bene esse deposition. When you've got it in the can,

13    you've got it in the can. You have other ways you can do

14    it. You can put it on through a different witness who

15    can explain something about what's in the raw footage.

16    There are other ways to do it. But you kind of have one

17    opportunity to do it, and you missed that opportunity.

18    That doesn't mean that you're out of luck.

19        MR. MONTECALVO: Thank you, Your Honor.

20        MR. SASSER: Your Honor, I just want to make sure

21    that this ruling applies to everybody in that

22    conversation. If they bring in their people to say what

23    they meant in the conversation or what they understood

24    they're still bound by the words of the transcript and

25    they can't come in and do anything that Mr. Foval.

```
 1        THE COURT:  I'm not understanding the context in
 2   which you're asking this question.
 3        MR.  SASSER:  There were three people in that
 4   conversation on September 15th 2016:  Mr.  Foval,
 5   Christian Hartsock, and Brittney Rivera, two of their
 6   employees, the people who take everything down.  I want
 7   to make sure Your Honor's ruling with regard to what
 8   Scott Foval said, or can be allowed to be played on his
 9   deposition, is going to be consistent with what they were
10   going to be allowed to say in front of the jury.
11        THE COURT:  Well, I mean, again, keep in mind, the
12   rules that you're wanting to apply here are also supposed
13   to be the same rules that apply to the New York Times and
14   CBS and MSNBC and Fox News.  So when you're talking about
15   the reporters here, when they are taking this raw
16   information, just like the reporter from the New York
17   Times interviewing some cabinet member and then taking
18   from that cabinet member and writing down what they
19   believe to be the reasonable inferences from what was
20   said.  That's relevant to whether or not what they write
21   is defamatory.
22        So there are two components here in the creation
23   of the product.  One is what is communicated.  Secondly
24   is what is the reasonable inference from that
25   communication.  The speaker's reasonable inference or
```

what the speaker believes the hearer should have drawn as
a reasonable inference is irrelevant to that process.
The reporter's inference that is drawn in the preparation
of the product could potentially be very relevant.

So, I mean, we're talking about two different ends
of that communication chain.  It seems to me like you're
saying well the same rule applies at both ends, doesn't
it?  Well, no, it doesn't.  It's two totally different
things at least in the context of an allegedly defamatory
product.  Does that make sense?  Have I said that in a
way that makes sense.

MR.  SASSER:  I understand what Your Honor says.
I'm just wondering to what extent Mr.  Hartsock is going
to be able to say.  You know, he said that and I thought
this and, you know, what is the relevance of what he
thought?

THE COURT:  Well with no more context than that, I
don't know that it has any relevance.

MR.  SASSER:  Thank you, your Honor.

THE COURT:  If he says I drew a reasonable
inference from the specifics of what Mr.  Foval said, and
that's what I put into the individual video, then it
might be very relevant.

THE COURT:  Do we need to do anything else with
regard to the Foval deposition?

1           MR.   MONTECALVO:   No, Your Honor.

2           THE COURT:   The next thing I had was with regard

3    to journalistic standards.   Here's the question I have.

4    I don't know who is fielding this question on the

5    plaintiff's side.   As I understand it, unless we get into

6    an actual malice standard it is a negligence standard.

7    This isn't like a medical malpractice case where you put

8    on evidence about the standard of care for an

9    orthopedist.   It is a reasonable man standard; the way

10   that an ordinary person would act under the

11   circumstances.   And if there is a breach of that ordinary

12   person standard then there is potential liability.

13          With that in mind, what is the relevance of some

14   exterior standard, some exterior source?   I mean I could

15   see where it is in a professional malpractice case but

16   this isn't a professional malpractice case.

17          MS.   RINI:   Your Honor, we would agree that this

18   is not a professional malpractice case.   However,

19   defendants have argued that they are journalists and they

20   act as though they abide by journalistic rules, and for

21   that reason it would be important to show that they do

22   not follow those rules.

23          THE COURT:   Well you say it would be important to

24   show that.   What is the relevance?   Tie it to one of the

25   elements of what you have to prove as to your case in

1   chief.

2        MS. RINI: To show negligence you have to show

3   that a reasonable person, in the same situation or

4   similarly situated to the defendants, would not have done

5   what they did. I think that it would be relevant to show

6   what a journalist or someone -- I'm not saying that we --

7   we do not agree that defendants are journalists but

8   persons --

9        THE COURT: Well but and I gathered that from what

10   you have written here, and that's the source of my

11   question. It seems to me from what you've written that

12   you want to have it both ways. That you want to say well

13   they're not journalists but they should be held to the

14   standard of journalists because they're negligent if

15   they're not held to the standard of what they're not.

16   Explain to me how that makes any sense.

17        MS. RINI: I guess if the Court were to determine

18   that they were journalists then evidence of journalistic

19   norms would be relevant. If the Court were to determine

20   that they were not journalists, journalistic norms would

21   inform the jury on what typically happens when you

22   publish news articles.

23        THE COURT: Well don't you have to present

24   evidence as a foundation for the presentation of this

25   evidence? In other words, don't you have to prove that

1  they are in fact journalists in order to get into

2  evidence journalistic standards?  And if you put on

3  evidence that they're not in fact journalists then how do

4  you get it in?

5      MS.  RINI:  I guess you're right, Your Honor.  I

6  don't think we'll be introducing evidence that they are

7  journalists.

8      THE COURT:  Okay.  So then what's going to happen

9  with this evidence about the standards?

10     MS.  RINI:  It's only in the event that they say

11 that they are journalists because they will be testifying

12 that they're journalists.

13     THE COURT:  I can see where this might be some

14 cross-examination material.

15     MS.  RINI:  In that case we would want to

16 introduce evidence of journalistic norms, and for that

17 reason it would be relevant.

18     THE COURT:  Well, again, you say introduce

19 evidence of.  I was saying cross-examination of them

20 which is not to split too fine a hair there.  But I can

21 see where if they hold themselves out as journalists that

22 you might want to impeach them as journalists.

23     MS.  RINI:  Correct, Your Honor.

24     THE COURT:  Mr.  Dean, Mr. Montecalvo, do you want

25 to respond to that at all?

1        MR.   MONTECALVO:   To that point, I think Your

2   Honor has that one.  It's just a matter of how this came

3   in and the way it came in and about whether the

4   defendants were journalists or not was on direct

5   examination asking the defendant representatives and the

6   defendants questions about whether they were journalists,

7   and how did they consider themselves journalists when

8   they do X.  And I think based on what Your Honor is

9   inclined that none of that is going to come in on that

10  direct testimony.

11       THE COURT:  Okay.

12       MR.   MONTECALVO:   Thank you.

13       THE COURT:  The next one that we have here is the

14  evidence of malice or recklessness.  Let me turn here to

15  Mr.  Dean or Mr. Montecalvo.  It seems that the

16  plaintiff's claim here is based in part on malice -- an

17  assertion of malice.  So why shouldn't that be relevant?

18  Or have I misunderstood your motion.

19       MR.   MONTECALVO:   Your Honor, you are correct that

20  the malice -- the analysis on malice is going to come in

21  to this case.  Whether it's per quod or whether it's per

22  se, it's not that we're trying to exclude evidence

23  relating to malice.  What we're trying to exclude with

24  this motion is specific types of evidence relating to the

25  way that we expect that the plaintiff is going to attempt

1  to prove malice, and those are set out in the bullets on

2  Page 18 and 19 of the motion.  Each one of these issues

3  comes from the Fourth Circuit decision stating, as such,

4  that profit motivating the ill-will towards Ms. Teter.

5  None of these things should come in in this way under the

6  guise that they're trying to prove malice.

7        For example, the first one is insensitivity to the

8  plaintiff's reputation or career.  The question was asked

9  of the defendants, was this fair to Ms. Teter?  And

10  based on that they're going to say that the defendants

11  didn't care that Ms. Teter was going to be potentially

12  defamed as a result of this, and they're using that as a

13  back door way to prove malice in much the same way.

14        THE COURT:  I'm not understanding what you mean by

15  a back door way of proving malice.  Because that sounds

16  like sort of a front door way of avenue.

17        MR. MONTECALVO:  That's a front door way.  That's

18  correct, Your Honor.

19        THE COURT:  Malice is an element of the claim

20  they're making, both with regard to liability and

21  potentially with regard to punitives.  So why wouldn't

22  that come in?

23        MR. MONTECALVO:  Well just that specific about

24  how it was fair to Ms. Teter and is something that was

25  covered in *Reuber*.  In that decision, there was

specifically that ill-will toward the plaintiff is not a relevant factor into the malice standard under the Fourth Circuit law.

THE COURT: Well but there -- and remind me if I'm getting this wrong. There wasn't it seeking to elicit testimony specifically about that? You know, isn't it true that you hated the plaintiff? That sort of questioning. Whereas, here the particular things you're talking about are, isn't it true that you hated Ms. Teter? It was questions about well, you know, isn't it true that you put this together in a way that you didn't care whether this hurt her or not? And why isn't that malice?

MR. MONTECALVO: Well I think that's -- it's the insensitivity. And that's what the *Reuber* case states is that nor can Cooper's alleged insensitivity to Reuber's career or reputation be the basis for recovery. And there's limits to the lengths to which news organizations can be expected to go to in protecting the sensibilities of one side in the public debate. So this relates to the malice standard and, I think, regardless of whether Ms. Teter is a public figure or a limited purpose public figure. It's that example.

The profit motive was another example of ways to prove malice that were viewable that's not authorized.

In this case the defendants were asked how much they made as a result of the videos.  The suggestion being that because -- that they chose to defame in order to have a profit motive, to have a story that was going to be interesting and that was going to be read.  And *Reuber* states precisely the opposite, and that if you can't -- it's very typical that news organizations are going to publish stories that are going to be profit-based and that that should not be a standard.

THE COURT:  Again, just like I was talking about with regard to one of the earlier matters.  You have to keep in mind that we're talking about the same body of law that applies to the New York Times, and CBS, and MSNBC, and Fox News.  Can you imagine a defamation claim against the New York Times where the representative of the New York Times is asked, well, do you make a profit by publishing your paper?  Well of course they -- well I don't know.  Maybe the New York Times -- it's a newspaper, and it probably doesn't make a profit anymore but they try to.

Their objective is to make a profit.  Does that show malice?  It's irrelevant to malice.  It is not the least bit probative of the question of malice.  And it seems to me as you go down this list -- it's been a while since I read *Reuber*, but it seems to me that on this list

1   there are some things that are just not probative at all.

2   But there are other things that might be probative of

3   malice, if taken with other evidence, that the cumulative

4   effect would be a showing of malice and, you know,

5   insensitivity to the plaintiff may be part of that.

6          You know, even with a special purpose public

7   figure -- I'm not saying that Ms. Teter is.  But even if

8   she is, as a purveyor of information, is simple

9   insensitivity to her reputation taken by itself enough to

10  prove malice?  I think anybody with common sense would

11  say no.  But when you take that element which has that

12  nugget of 401 relevance and you put it with a lot of

13  other things it might have a tendency to cumulatively

14  prove malice.  It's that -- it's the same old 401

15  standard.  If there is that nugget of probative value

16  then it comes in unless it gets kicked out under 403.

17  It's awfully hard for me to rule on a motion in limine

18  with regard to these because it has to do with the

19  context of the evidence as a whole.

20         MR. MONTECALVO:  Your Honor, I think you're

21  sensitive to the issues that are going to be raised at

22  trial, and that's precisely the purpose of that motion in

23  limine.  Thank you.

24         THE COURT:  Mr. Sasser, do you have anything you

25  want to say on that point?

```
 1        MR.  SASSER:  Yes, I do, Your Honor.  The Reuber
 2   case came out of the district of Maryland.  It did
 3   therefore not involve the North Carolina punitive damages
 4   statute which goes through and categorizes a whole bunch
 5   of things that are relevant to whether something
 6   constitutes punitive damages.  One of them is profit.
 7   The very --
 8        THE COURT:  That has nothing to do with malice.
 9        MR.  SASSER:  It has nothing to do with malice.
10        THE COURT:  That's what their motion in limine is
11   about is the question of whether or not profit motive is
12   probative of malice.  The answer is no.  Does that mean
13   that profit motive or actual profit realized might be an
14   element of a claim for punitive damages is a completely
15   different question which I do not understand has been
16   presented to me.
17        MR.  SASSER:  I believe there's a rule, but I
18   can't remember the number of it, that says if a evidence
19   is admissible for any purpose then it comes in and the
20   court does with it as is appropriate.  This evidence will
21   come in for punitive damages.  The very things they're
22   saying that are covered by the Reuber case that aren't
23   malice, they're punitive damages.  It's explicitly listed
24   by the North Carolina General Assembly in the punitive
25   damages statute the relation of the conduct and whether
```

1  there was likelihood of serious harm; the existence and
2  frequency of such conduct in the past; whether they
3  profited; their ability to pay punitive damages.  All
4  those things are elements of punitive damages.  It can't
5  come in for malice but it can come in for punitive
6  damages.  I'm not sure where they get with their motion.
7       THE COURT:  I don't know where they get it either.
8  They have posed a question to the Court about whether or
9  this can be excluded as evidence of malice.  And if you
10 are presenting it as evidence of malice, it's excluded.
11 If you're presenting it for some other purpose it might
12 be admissible.  You do raise a point -- and I don't want
13 to get caught off on a tangent here, but you do raise a
14 point as to whether as we often have with regard to
15 punitive damages claims.
16      Is there some evidence that is admissible only
17 with regard to punitives?  If so, are we going to need to
18 bifurcate the trial and wait for the jury to come back?
19 And only if the jury comes back in favor of the plaintiff
20 then move on to that evidence?  This was the -- I'm
21 surprised that it has taken us three and a half hours to
22 get here to the point that that issue has come up for the
23 first time, but at least it has as to this one issue.
24      Are there other issues like that to where we're
25 going to have to bifurcate the trial?

MR. DEAN: Your Honor, I think this *Reuber* type
evidence is the exact type of evidence because we have
two types of malice -- and that's what's confusing -- the
constitutional actual malice for defamation, and then
there's malice. And then there's the factors for
punitive damages. And what *Reuber* is addressing is what
the constitutional law is to be presented as relevant on
actual malice, and what the punitive damages statute
presents are the factors that our legislature thinks are
relevant to a punitive damages award.

So I do think we could bifurcate. And I don't
think it would be procedurally that difficult. One, all
this testimony is already "in the can," to borrow the
court's expression from earlier. I assume that most of
this would come in through direct examination of
Mr. O'Keefe, and so we know we can figure out exactly how
long that could take. It strikes me it's probably less
than a few hours of additional evidence.

On the flip side, the 403 concerns about this type
of evidence are, I think, substantial because we're not
just talking about profit motive and insensitivity to
Mrs. Teter. We're talking about what other types of
reports have you done in the past? Have you
misrepresented yourself to a North Carolinian in the
past? Have you ever been investigated by a state

1    attorney general?  All of this other type of evidence.

2    We still have to talk about some of those may be relevant

3    on punitive damages, but they're certainly not relevant

4    on malice.  And I think bifurcation is a reasonable,

5    practical solution that really shouldn't materially

6    lengthen this trial because the testimony is already in

7    the can.

8            THE COURT:  Mr. Sasser.

9            MR. SASSER:  Your Honor, some of those issues are

10   relevant to their recklessness; whether they have a

11   business model of reckless disregard for the truth.  I

12   have not seen a motion to bifurcate yet.  And I think as

13   it now stands if those things are relevant for any

14   purpose then they should come in in our case in chief.

15           THE COURT:  Well I'm asking you the question as to

16   whether there is evidence that you are proposing to

17   elicit that is of any substantial quantum that goes only

18   to the questions related to punitives.  Because if there

19   is then we have to bifurcate this trial.  I don't care

20   whether there's been a motion or not.  I'm not going to

21   allow you to pollute the jury with evidence that is not

22   relevant until they have reached a verdict in your favor.

23   That -- I mean that's normal.  That's every case when you

24   have that sort of thing coming up.  So my point is, are

25   we only talking about did you make a profit to this one

1    30-second blip of information?  It sounds to me like

2    you're saying there's a whole lot more than that.

3         MR.  SASSER:  There's more than that.  Did you

4    come to North Carolina and lie to elections officials

5    repeatedly?  Did you lie to the Secretary of State about

6    whether your CEO is a convicted criminal?  Those sorts of

7    things.  There's not that long of a period of time, but

8    there's several different elements.

9         THE COURT:  Well, I mean, I think you've told me

10   then that we probably need to bifurcate this trial, and

11   we -- any evidence that is relevant only to the questions

12   of punitives, including the availability of punitives --

13   in other words, the other type of malice will go after a

14   verdict if there's a verdict for the plaintiff.

15        MR.  SASSER:  Thank you, Your Honor.

16        THE COURT:  These last two pertain to the

17   plaintiff's other projects and other investigations.

18   Mr. Sasser, is that what you were referring to with

19   regard to some of this other evidence on punitives?

20        MR.  SASSER:  That's correct.  And also to prove

21   reckless recklessness and that they -- that they have a

22   business model of coming out and doing the same thing

23   over and over.  That they -- it makes it more likely they

24   were reckless if they had done this in the past.

25        THE COURT:  How does that come within 404(b),

1   prior bad acts?  They were bad before so therefore they

2   must be bad again?  It says it doesn't come in unless you

3   can use it to prove some other element.

4        MR.  SASSER:  As Your Honor knows from criminal

5   cases there's always some other element.

6        THE COURT:  Yeah, but you've got to be able to

7   articulate what it is.

8        MR.  SASSER:  Motive, intent, plan, modus

9   operandi.  They've said what their modus operandi was.

10  Mr. O'Keefe asked him if he did usually use hidden

11  cameras, and he goes yeah that's our modus operandi.  But

12  what they do their recklessness here is -- and lack of

13  accident --

14        THE COURT:  What are you proposing to ask them?

15  In other words, are you planning to ask the defendant, or

16  somebody on behalf of the defendant, you know, isn't it

17  true that you've used hidden cameras in projects before?

18        MR.  SASSER:  More than that, Your Honor.

19        THE COURT:  Well how much more than that?

20        MR.  SASSER:  I asked Mr. O'Keefe -- and this is

21  in the first ten minutes of his deposition.  If you look

22  at the few first few pages of the transcript:  Did you

23  come to North Carolina and lie to elections officials?

24  Not really.  Okay.  Is this you in a video saying your

25  name is somebody other than "James O'Keefe" to an

1  official at a polling place?  Well, yeah, that's me.  And

2  did you do this?  And did you tell people -- did you tell

3  the world that two people from North Carolina were lying

4  about being United States citizens when they were not?

5  He's just, yeah, trying to -- he had to apologize for

6  that.  He did that too.  Those kind of things.

7      And the stuff about the Secretary of State is very

8  short.  We haven't gotten into the issue about his

9  criminal conviction.  But those are the kind of things --

10 and I think the criminal conviction goes to his

11 credibility.  And there is -- I don't think there's a

12 motion in limine on that.

13     THE COURT:  Well, I mean, that -- that's something

14 very different from what I understood to be the motion in

15 limine.  Obviously, where you're directly attacking the

16 credibility of a defendant with regard to specific acts

17 -- I mean that's Rule 609.  How are you coming within

18 Rule 609?

19     THE COURT:  Particularly the way that you were

20 just describing how you apparently did it in the

21 deposition.  I don't know how you're going to do it at

22 trial, but extrinsic evidence is not admissible to prove

23 specific instances of a witness's conduct in order to

24 attack or support the witness's character for

25 truthfulness.  But the Court may, on cross-examination,

1 allow them to be inquired into if they are probative of

2 the character, et cetera.

3       MR. SASSER: It was cross-examination, Your

4 Honor.

5       THE COURT: Okay. But I thought you were talking

6 about playing a video to bring in extrinsic evidence.

7       MR. SASSER: The video of his deposition.

8       THE COURT: Okay. That's not what I thought you

9 were saying.

10       MR. SASSER: I'm sorry. There was another thing,

11 too. You're not confused. I was also talking about a

12 video of him accusing North Carolina citizens of being

13 not United States citizens inaccurately. That does sound

14 like a prior act.

15       THE COURT: Well.

16       MR. SASSER: I need to look at that.

17       THE COURT: I think even though it's not an issue,

18 with regard to these motions in limine on the issue that

19 you have raised, I think the majority of the answers to

20 your questions are in Rule 609 or in 404(b).

21       MR. SASSER: There may well be -- those issues

22 may well be in the deposition designations for,

23 unfortunately, Your Honor's consideration.

24       THE COURT: Okay. I thought we were talking about

25 Mr. O'Keefe. Is Mr. O'Keefe not going to be present for

1  the trial?

2      MR.  SASSER:  I don't know.  I was planning to use

3  his deposition as a statement of a party.

4      THE COURT:  Okay.  So using a party deposition

5  under Rule 32?

6      MR.  SASSER:  Yes, sir.

7      THE COURT:  Okay.

8      MR.  DEAN:  Your Honor, one question about that

9  based on the exchange that just occurred.  This is not

10 cross-examination.  These were Mr. Sasser's first

11 questions in his deposition.  So when we're looking at

12 this from a Rule 609 perspective, we haven't treated any

13 of this as cross-examination.  If they're putting in

14 Mr. O'Keefe as part of their examination, or as part of

15 their case in chief, and that's their direct, is Your

16 Honor saying that you believe it is cross-examination?

17     THE COURT:  I have no idea.  I haven't read the

18 deposition.

19     MR.  DEAN:  All right.  I wanted to make sure --

20 from that interaction I think the deposition speaks for

21 itself on that point.

22     THE COURT:  Okay.  All I was going on is

23 Mr. Sasser said it was on cross-examination.  I took that

24 at face value.

25     MR.  SASSER:  Your Honor, that's what I meant by

questions I asked him in his deposition.  I was referring
to that as cross-examination.  I was not offering
extrinsic evidence of any of those things.  For example,
the criminal conviction.  I asked him about it, and he
answered I'm not trying to bring anything in to show that
that happened since he admitted it.

THE COURT:  But here is where I'm confused.
Mr. Dean, if I'm understanding him correctly, is saying
this wasn't cross-examination.  This is right at the
beginning of your direct examination of Mr. O'Keefe when
you noticed up his deposition and took his deposition,
apparently for the purposes of preserving it for trial,
at least as a Rule 32 deposition.  Is that
cross-examination under 609?

MR. SASSER:  I think it is, Your Honor.

THE COURT:  Because you pulled that out of your
ear, or you have a case that says that?

MR. SASSER:  Because I'm not offering extrinsic
evidence.  It's questioning the witness.  It's not
questioning somebody that --

THE COURT:  There's a non sequitur there.  You're
saying it's not cross-examination because you're not
offering extrinsic evidence.

MR. SASSER:  I'm sorry.  It is cross-examination
under Rule 609 because I'm not offering extrinsic

1  evidence.

2      THE COURT:  Extrinsic evidence is not admissible.

3      MR.  SASSER:  Yes, sir.

4      THE COURT:  To challenge -- let me just read you

5  the rule, because you -- I think you've taken the rule

6  and turned it on its head.  Extrinsic evidence is not

7  admissible to prove specific incidents of a witness's

8  conduct in order to attack or support the witness's

9  character for truthfulness.  Period.  But the court may,

10  on cross-examination, allow them to be inquired into if

11  they are probative of the character for truthfulness, et

12  cetera.

13      So you can do it without extrinsic evidence on

14  cross-examination.  So was this on cross-examination?

15  Because if it's not on cross-examination you can't do it.

16      MR.  SASSER:  Your Honor, I consider it

17  cross-examination when I'm deposing somebody on the other

18  side not questioning my own witness.  That's my

19  understanding of what cross-examination means.

20      THE COURT:  Well you might want to find a case

21  that interprets Rule 609 that way because I don't know

22  what the answer is.  But it's an interesting question.

23      MR.  SASSER:  608, Your Honor.  Is it 608 or 609?

24      THE COURT:  609 is what I'm talking about.

25      MR.  DEAN:  Your Honor, I think 611 is the mode

1 and operation of testimony. Then it talks about the

2 scope of cross-examination should not go on beyond

3 subject matter direct examination. I mean I don't know a

4 person in the country -- a lawyer who says that you can

5 cross someone who hasn't been directed. And if that's

6 the case then you could call an adverse party and just

7 lead them all the way through your case in chief and go

8 on home.

9     I mean Mr. Sasser asked the first questions and,

10 in terms of the deposition, I was the one doing the cross

11 examining. But Mr. Sasser asked these questions right

12 out of the gate in his deposition of Mr. O'Keefe. That

13 was the direct examination. He wasn't crossing anything

14 because he wasn't asking Mr. O'Keefe about direct

15 examination testimony that Mr. O'Keefe had given.

16     THE COURT: Yeah. If you-all have some case law

17 on the interpretation of 609 on this point I'd be glad to

18 read it, but -- and you know you can call an adverse

19 witness, but that's not what we're talking about here.

20 Because as far as I know Mr. O'Keefe is a defendant and

21 he's going to be here.

22     We're talking about the use of this deposition as

23 a Rule 32 deposition. Therefore, you know, you look at

24 the face of the deposition. What is direct examination?

25 What is cross-examination? And if this is right in the

first five minutes of that deposition I have trouble

seeing it as cross-examination.  Now if Mr. O'Keefe shows

up and he testifies, or if you call him as an adverse

witness, it might be a different matter.

MR.  SASSER:  Your Honor, I'll read the rest of

Rule 611(b) that Mr.  Dean just mentioned.  Cross-

examination should not go beyond the subject matter of

the direct examination, a matter affecting the witness's

credibility.  So that's -- I was going to his credibility

on that.  But I will research that rule and we may, if

it's permissible, have the parties submit some -- at

least a case that will give you some guidance with regard

to the deposition designations.

THE COURT:  Please go ahead and submit anything

like that.  Please don't make it lengthy.  Just simply

giving a citation to a case or a paragraph quote from a

case with the citation so that we can look it up, and

I'll read that.  I have to say that -- I generally feel

like I know the Rules of Evidence, but that's an issue

that I don't remember ever coming up.  Maybe it should

have before.

I've come to the end of my notes on the motions in

limine.  Is there anything else that we need to talk

about?

MR.  SASSER:  Your Honor, is there a filing due on

```
1    Friday of next week, like the exhibits, perhaps?  I was

2    trying to --

3          THE COURT:  By the middle of the day on the Friday

4    before jury selection you have to file your witness

5    lists.  And I don't remember exactly what your case

6    management order says, but I want you to file your

7    exhibit lists as well.

8          MR.  SASSER:  So we can do that electronically.

9    There's not going to be anybody, I understand, in the

10   clerk's office, but we can do that electronically.

11         THE COURT:  Right.  You should be able to file

12   that in the ECF system.  That shouldn't be a problem.

13         MR.  SASSER:  And there may be things that could

14   not be filed electronically, such as a video or something

15   like that, and we would FedEx it and the clerk will get

16   it Monday morning I assume.

17         THE COURT:  Well like what?  Tell me what you have

18   in mind here because we're going to have to work around

19   this.

20         MR.  SASSER:  I have nothing in mind, Your Honor.

21   There have been situations in the case where we've had to

22   file things that could not be filed electronically.

23         THE COURT:  Yeah.  I can't think of any last

24   minute filings of that nature --

25         MR.  SASSER:  All right.
```

```
 1        THE COURT:  -- that you would have right before a
 2   trial.  Because it's not like a summary judgment motion
 3   or opposition to a summary judgment or something like
 4   that where you have video exhibits and all these things
 5   that are nonreproducible.  The main things you're doing
 6   at the last minute are going to be documentary in nature.
 7   It's going to be witness lists, it's going to be exhibit
 8   lists; it might be some additional exhibits sometimes.
 9   Please don't drop another 1,700 pages of depositions on
10   me.
11        Okay.  Any other issues or any other things that
12   we need to address?  Anything that we can do today that
13   will save us time on May the 20th?
14        MR.  SASSER:  Do you want us to continue to try to
15   modify deposition designations, taking into advice what
16   we've heard about motions in limine, and try to get you
17   something some time next week?
18        THE COURT:  The sooner the better.  Yeah.  And I
19   would hope -- even though I haven't had a chance to look
20   at your designations yet I would hope that the
21   discussions that we've had on the motions in limine will
22   be limiting your objections as well as your designations
23   considerably.  I have to admit, ordinarily for a trial
24   the designations and objections for depositions to be
25   used at trial is something that I can dispose of in half
```

1   an hour.  It usually is not very involved at all.  It's a

2   handful of questions.

3       I was utterly stunned when I got 1,700 pages of

4   transcript along with page after page after page of

5   designations and objections.  It just -- my initial

6   reaction was come on guys read the rules of evidence.

7   But, you know, maybe it's more complex than that.  Don't

8   take that as a criticism.  That was just my initial

9   reaction.

10       My law clerk is reminding me of sort of a

11   logistical problem that we have with regard to the 1,700

12   pages that you have submitted.  You've submitted them

13   only in electronic format which presents a real problem

14   for me because I need it on paper.  And I would need --

15   in fact, if you could do it before you leave town.  Do it

16   this afternoon.  Get us those 1,700 pages with the

17   designations, with the objections highlighted the way you

18   have done electronically.  Get them to us in hard copy

19   this afternoon and that would be a tremendous help.  And

20   then if you can limit it further next week that would be

21   great, but at least that sure helps.

22       MR.  SASSER:  Does Your Honor mind front and back

23   copy?  Because I've got it right there.

24       THE COURT:  That's fine.  So long as it's on

25   paper.  Are these on the condensed transcripts like the

1  little bitty pages?

2          MS. RINI: Two on one page.

3          MR. SASSER: Quasi-condensed.

4          THE COURT: Yeah. That's better than what I have

5  right now. I'll get out my magnifying glass. Thank you.

6          MR. MONTECALVO: Your Honor, can I take a shot at

7  limiting it a little bit further?

8          THE COURT: Say again.

9          MR. MONTECALVO: Can I take a shot at limiting

10 the designations a little bit further?

11         THE COURT: If it's going to save us time or help

12 us, I'm very open to that.

13         MR. MONTECALVO: We had a general objection on

14 the use of one of the transcripts in its entirety, and

15 that's the transcript of Ms. Comerford from November

16 2018. We took Ms. Comerford's deposition in 2018 within

17 the discovery period. And then last month -- last month

18 we took the de bene esse deposition of Ms. Comerford in a

19 much more condensed format that ended up being two hours.

20         By stipulation, we got an hour and the plaintiff

21 got an hour. We designated on that second transcript,

22 and we were surprised to get a designation on the first

23 transcript from the plaintiff which caused us, then, to

24 counter designate on the first transcript as well. We

25 don't -- under Rule 32, we think that only the second

transcript should be the one that is presented into trial because it was the de bene esse deposition transcript.

THE COURT:  Well I'm not understanding where you're getting that out of Rule 32.  What provision are you relying on?

MR.  MONTECALVO:  Well she actually was available at the trial through that deposition that we took last month.  And because we asked the questions and primarily very similar questions than what when he we had asked at the longer deposition in November, based on the unavailability -- based on the availability of her that we were presenting her through that deposition transcript, it didn't seem appropriate to go back to an earlier transcript and also designate that.

So what the jury is going to end up getting are two transcripts from Ms. Comerford that deal with, primarily, the same subject matter.  I can't point to a specific portion in the rule that relates to this specific instance.

THE COURT:  Is the de bene esse deposition done on video?

MR.  MONTECALVO:  It was.

THE COURT:  Was the earlier one done within on video?

MR.  MONTECALVO:  It was not.

1        THE COURT:  Okay.  Well what we'll have here, if I

2   understand what is being proposed, is there will be a

3   video deposition of Ms. Comerford played for the jury

4   that includes direct and cross-examination, and that will

5   be followed by a short addendum to that where you do it

6   the old-fashioned way and somebody sits in the chair and

7   asks the questions and somebody sits in the witness stand

8   and reads the answers from the earlier deposition.

9        MR.  MONTECALVO:  Okay.  Thank you, Your Honor.

10        THE COURT:  I mean if there's something in

11   particular that you want to point to in Rule 32 that says

12   once you take a de bene esse deposition the older

13   deposition no longer counts it's no longer within the

14   rule I'll look at it, but I've never heard that before.

15        MR.  MONTECALVO:  Well I don't think we've -- I've

16   seen that situation come up.  At the very least, it seems

17   like it would be cumulative under 403 to have a lot of

18   the same questions.

19        THE COURT:  Cumulative evidence is still not

20   admissible.  So, in other words, if it is the videotape

21   that has Ms. Comerford saying A, B and C, and then

22   reading from the witness stand Ms. Comerford again saying

23   A and B, that will probably be excluded.  It's got to be

24   new information.  To state the obvious:  When you have

25   depositions read to the jury from the witness stand the

1    old-fashioned way, jurors hate that because they don't

2    see the witness.  They don't have the opportunity to

3    determine the credibility of the witness.  You put them

4    to sleep.  All of the earmarks of poor presentation are

5    in that kind of a deposition.  So unless you have more

6    than just a few lines from it it's not prohibitive but it

7    sure is a bad idea.

8          MR.  SASSER:  Your Honor, with regard to one other

9    deposition.  We would like you to completely disregard

10   the one of Ruth Smith.  We designated it because she was

11   a party opponent at one point.  We're withdrawing that,

12   so you do not need to go through anything involving that.

13         THE COURT:  Okay.  You say she was a party

14   opponent.  She was --

15         MR.  SASSER:  She was deposed.  She was

16   representing her father Mr.  Campbell.

17         THE COURT:  Okay.  She wasn't a party opponent,

18   was she?

19         MR.  SASSER:  No, sir, she was a representative

20   for him.

21         THE COURT:  Okay.  Anything else?  Anything that

22   might save us some time or that will streamline things if

23   we address it now?

24         MR.  SASSER:  Any predictions on the ruling on the

25   per se/per quod issue?  Timing on that?

1     THE COURT:  As soon as I can get to it.

2     MR.  SASSER:  All right.  That sounds great.

3     THE COURT:  The more you load me up with

4  deposition designations the longer it will take.

5     MR.  SASSER:  Will it help if we were to limit it

6  to the depositions transcripts we were using for the case

7  in chief rather than punitives?  We've already designated

8  it both ways, and I'm sure Your Honor can flip through

9  and tell what's punitive and what's not.

10     THE COURT:  Well I tell you what would be helpful

11  for updating your designations and objections one

12  deposition at a time rather than waiting until you have

13  all of it done and unload it on us at one time.  When you

14  have one of them done, provide that information, you

15  know, by filing it.  But also email it to Ms. Ritter so

16  that we can take that up and take a look at that.

17     MR.  SASSER:  Yes, sir, we will do that.

18     THE COURT:  I fear we are going to be spending our

19  weekend on that.

20     MR.  SASSER:  I'm sorry.

21     THE COURT:  Even if you're sending it to us on a

22  Saturday afternoon that will probably be helpful.

23     MR.  SASSER:  Thank you, Your Honor.

24     THE COURT:  Okay.  Anything else?

25     MR.  DEAN:  Judge?  I'm sorry, Your Honor.

1          THE COURT:  Go ahead, Mr. Dean.

2          MR. DEAN:  Mr. Montecalvo and I didn't hear the

3     same thing.  You want us to submit depositions as they

4     are done in their entirety.  So Mr. O'Keefe's

5     designations from their side, our counter designations

6     and objections, their counter counter designations, and

7     then submit that one deposition.  Is that what you said,

8     Your Honor, you'd like us to do?

9          THE COURT:  It would be helpful for you to do

10    that.  And do that one after another as opposed to

11    waiting until you have all of them finished and then

12    unloading all of them on us on, say, Wednesday of next

13    week.  I'd rather get one this afternoon, one tomorrow

14    afternoon, one Sunday afternoon, and three on Monday,

15    than to get all of them on Wednesday.

16         MR. DEAN:  Understood.  Thank you.  That

17    clarifies it.  Thank you.

18         THE COURT:  Okay.  Anything else?  All right.

19    Well I appreciate all your hard work and all your

20    preparation in this, and I'm sure you're looking forward

21    to everything you're going to be doing for the next three

22    weeks which will be this case and nothing else.

23         With that, marshal, please recess us until further

24    call.

25                    (Off the record at 1:00 p.m.)

1

## **CERTIFICATE**

2    I, Tracy Rae Dunlap, RMR, CRR, an Official Court
Reporter for the United States District Court for the
3 Western District of North Carolina, do hereby certify
that I transcribed, by machine shorthand, the proceedings
4 had in the case of SHIRLEY TETER versus PROJECT VERITAS
ACTION FUND, et al, Civil Action Number 1:17-CV-256, on
5 May 3, 2019.

6    In witness whereof, I have hereto subscribed my
name, this 7th day of May 2019.

7

8             __/S/__Tracy Rae Dunlap__
             TRACY RAE DUNLAP, RMR, CRR
9             OFFICIAL COURT  REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25