```
 1                 UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF NORTH CAROLINA
 2                     (Asheville Division)

 3  ---------------------------x
    SHIRLEY TETER,             :
 4            Plaintiff,       :
                               :
 5                             :
    vs                         :Civil Action: 1:17-CV-256
 6                             :
                               :
 7  PROJECT VERITAS ACTION     :
    FUND, ET AL,               :
 8            Defendants.      :
    ---------------------------x
 9
                              Wednesday, May 22, 2019
10                            Asheville, North Carolina

11       The above-entitled action came on for a Jury Trial
    Proceeding before the HONORABLE MARTIN K. REIDINGER,
12  United States District Judge, in Courtroom 1, commencing
    at 8:58 a.m.

13

14       APPEARANCES:
         On behalf of the Plaintiff:
15       JONATHAN DREW SASSER, Esquire
         PREETHA SURESH RINI, Esquire
16       DIXIE WELLS, Esquire
         Ellis & Winters, LLP
17       Post Office Box 33550
         Raleigh, North Carolina  27636
18
         RALPH STREZA, Esquire
19       Critchfield, Critchfield & Johnston, Ltd
         4996 Foote Road
20       Medina, Ohio 44256

21       On behalf of the Defendants:
         JAMES A. DEAN, Esquire
22       MICHAEL MONTECALVO, Esquire
         Womble Bond Dickinson, LLP
23       One West Fourth Street
         Winston-Salem, North Carolina  27101
24
    Tracy Rae Dunlap, RMR, CRR              828.771.7217
25  Official Court Reporter
```

1              **I N D E X**

                                                          <u>Page</u>
25 Reporter's Certificate.......................20

# P R O C E E D I N G S

1      THE COURT:  Is there anything that we need to

2  address this morning before we resume where we left off

3  yesterday?

4      MR.  MONTECALVO:  Yes, Your Honor.  The plan for

5  the first two witnesses -- the first witness will be

6  Richard Campbell by video deposition -- by video

7  testimony.  There is one exhibit with Mr.  Campbell, and

8  it's Exhibit 27, that we would like to admit and to

9  publish before the jury when that point comes into his

10  deposition.  I don't believe there is an objection on

11  that from the plaintiff.  We would like to offer that

12  exhibit in to evidence at the -- prior to the start of

13  that testimony.

14      The next witness would be Ms. Boyd.  As allowed by

15  this court we would be reading the testimony that's been

16  designated.  There is one exhibit with Ms. Boyd.  That

17  exhibit has been identified, and I believe the foundation

18  has been established with Ms.  Teter.  That's Exhibit 8

19      THE COURT:  What was the number?

20      MR.  MONTECALVO:  Exhibit 8 is the one with

21  Ms. Boyd.  Our plan was to ask Your Honor to read the

22  stipulations that are specific to Ms. Boyd, and then we

23  would do the designation of the transcript, and then

24  introduce the exhibit.

1       THE COURT:  Is that Plaintiff's 8 or Defendant's

2  8?

3       MR.  MONTECALVO:  Plaintiff's 8.

4       MR.  DEAN:  Defendant's.

5       MR.  MONTECALVO:  Defendant's 8, Your Honor.

6       THE COURT:  Defendant's 8.

7       MR.  MONTECALVO:  I believe that one was is also

8  by stipulation of the parties.

9       And I believe before our next break there will be

10  an opportunity to show Ms. Comerford's deposition.  Her

11  deposition is approximately 50 minutes or a little bit

12  longer maybe -- about 50 minutes, Your Honor.  And there

13  are exhibits that are going to be referenced in her

14  testimony that we would like to introduce and publish to

15  the jury as well.  Those are Exhibits 301, 302, 303, 304,

16  305, 307, 308, and 309.  One of them is a video.  I don't

17  believe there was objections on 303 forward with the

18  exception of the plaintiff's objection that the jury

19  should not see "public figure" evidence, but I think

20  that's been ruled on already.

21       THE COURT:  I think if we're going that far into

22  the schedule we're getting a little bit ahead of

23  ourselves, because I'd rather do it like we did it

24  yesterday for the exhibits that pertain to the deposition

25  that we're going to go to.  So let's hold off on that for

1    now.

2           MR.  MONTECALVO:  Okay.  Thank you, Your Honor.

3           As far as the stipulations.  With Your Honor's

4    permission, we would like to have the stipulations read

5    as to specific witnesses prior to the time that they

6    testify, whether live or by video.  It's not all the

7    stipulations.  It's Mr. Campbell.  Prior to his

8    testimony, we would ask that stipulations 10 to 12 be

9    read.

10          For Ms. Boyd, prior to reading her designations,

11   that would be stipulations 25 through 28.  And we would

12   like to ask whether Your Honor would prefer that we

13   actually put someone in the witness box in order to read

14   the answers, or whether we should just do it at counsel

15   table.

16          THE COURT:  Oh.  For the reading of the

17   deposition?

18          MR.  MONTECALVO:  Correct.

19          THE COURT:  The only way I've ever seen a

20   deposition presented, other than on videotape, is that a

21   lawyer sits at table reading the questions, and some

22   person sits in the witness box reading the answers.

23          MR.  MONTECALVO:  Okay.  Thank you, Your Honor.

24          THE COURT:  The jury will be instructed in advance

25   of how that process works.

```
 1        MR.  MONTECALVO:  Thank you, Your Honor.  Nothing
 2  further.
 3        THE COURT:  Okay.  Anything else that we need to
 4  address before we proceed with where we left off
 5  yesterday?
 6        MR.  SASSER:  Your Honor, with regard to
 7  Ms. Comerford.  I believe you ruled on at the pretrial
 8  conference that there was a previous deposition that we
 9  wanted to have read in as part of completeness for that
10  deposition.  She was deposed --
11        THE COURT:  She was the one who was deposed twice?
12        MR.  SASSER:  Yes, Your Honor.  Exactly.
13        THE COURT:  Okay.
14        MR.  SASSER:  So what we would propose is that,
15  after her video is shown, we read in the portions of the
16  2018 deposition that we had designated.
17        THE COURT:  Okay.  We'll need to deal with that
18  issue when we get to it because I've never addressed the
19  rule of completeness before as extending to a different
20  deposition of the same witness.  We might have to discuss
21  that issue for a little bit but we'll see about that.
22  Anything else?
23        What I wanted to do next -- as I said, to pick up
24  where we left off yesterday.  Because where we left off
25  yesterday, after a very late evening, was with regard to
```

the motions pursuant to Rule 50.  And I wanted to let you
know kind of what I had in mind with regard to the
motions that were made on behalf of the defendants.

I will start with a point of admitting an extreme
bias on my part that I bring to the decision on this
particular point.  And, that is, the extreme bias that I
have is that I have enormous confidence in the jury
system and the juries that we impanel for the cases that
we try in this court.  I think it's the best system that
we have ever developed -- when I say "we," I think that
the human race has ever developed -- for settling
disputes.  And, of course, the Rule 50 standard is one
that relates to whether there is sufficient evidence for
a reasonable jury to find in favor of the party with the
burden of proof.

So the reasonableness of juries is an integral
part, and my default is to let a reasonable jury decide
any case.  And I will admit that part of that bias comes
from the fact that not only do I trust juries; not only
is it my experience that juries tend to act in very
reasonable ways; but we have involuntarily brought these
people here to decide a case that they didn't want to
decide.  We've asked them to listen carefully and
contemplate this case.  And if we, then, after a certain
period of time, just tell them, oh, never mind, I think

that we have in a way abused them.  But I also recognize,
and I think the arguments on both sides yesterday evening
really have focused on the fact that because of the First
Amendment implications in this case, the issue of a Rule
50 motion, really warrants close examination.

Where there are First Amendment implications there
are great societal implications.  And in addition to
that, because of the nature of the interplay between the
First Amendment and the common law on this topic, the
factual determinations that are placed with the court as
a matter of constitutional law, and the factual
determinations that would otherwise be placed with the
jury, are so intertwined that, of necessity, when
submitting a case to the jury it is -- well let's just
say that it is difficult not to end up with the jury
believing that they have been thrown some issues that are
not actually within their bailiwick.

I believe that the First Amendment implications
also extend to a greater degree in a case like this
because the court is being asked to walk a very fine
line.  On the one hand, the free exchange of ideas
requires a very broad latitude for the media, and for
private citizens alike, to be able to express their
opinions, to express their views, to say what they feel
needs to be said, particularly on issues of great public

1    importance.  And at the top of the list of issues of
2    great public importance would be an issue regarding who
3    should be elected as our president.  Therefore, if
4    citizens and the media are handcuffed by a fear of
5    liability, that's detrimental to political discourse, it
6    is detrimental to society as a whole, and it is
7    detrimental, really, to our fundamental freedom.

8          At the same time, however, the law needs to impose
9    upon the media a degree of responsibility that there
10   needs to be some standard of responsibility in the law,
11   and I believe that that's underscored all the more by the
12   fact that in our current situation, as we have it today,
13   the media is trusted by the public on par with used car
14   salesmen and congress.

15         And while the Internet has broadened the number
16   and the variety of available voices in the marketplace of
17   ideas, it has also served to undermine the public's
18   confidence in the veracity of those sources.  Therefore,
19   that fine line has to be walked.  And I think that
20   walking that fine line required this court to take a
21   close look at what issues are really for this court and
22   what issues are really for this jury.

23         I appreciate the arguments that were made
24   yesterday.  I kept you all here awfully late.  I
25   appreciate the fact that Mr.  Dean and Ms.  Wells

1  dutifully entertained my badgering questions.  But they

2  were -- the presentation of counsel on both sides was

3  very helpful to me in trying to navigate these issues,

4  and I appreciate your hard work.  I appreciate your

5  candor as attorneys in making those arguments.  I also

6  appreciate the briefs that were submitted by Mr.  Dean

7  yesterday and by Ms.  Wells this morning; and I have read

8  through those.  I've read through them very carefully.

9        The bottom line is, as both of you have briefed

10  very carefully, that the -- the way in which the law

11  requires this court to walk that fine line between media

12  responsibility and the free exchange of ideas is governed

13  by this actual malice standard that has been set forth

14  through case law by the Supreme Court, and particularly

15  for this circuit by the Fourth Circuit Court of Appeals.

16        And whether we agree with that standard or not it

17  is the fine line that we are all required to walk.  And

18  not only are we required to walk that fine line but the

19  law also imposes the standard, the burden of proof on the

20  plaintiff, to prove that particular element by clear and

21  convincing evidence because of the constitutional

22  implications.  And the *Liberty Lobby* case, I think, is

23  very clear that that is something that the court is

24  required to take into account in a Rule 50 motion.

25        So what I have done is I have gone through the

particular points of evidence that have been set forth on
behalf of the plaintiff as to the evidence of actual
malice so as to make a determination about whether there
is sufficient evidence of actual malice whereby a
reasonable jury could find by clear and convincing
evidence that actual malice is present in this case.
There were five points in particular that the plaintiff
has made, four of which were made by Ms. Wells in the
brief filed this morning; a fifth one made by Ms. Wells
in the arguments yesterday in addition to the four.
I want to go through each one of those.

The first of those was the argument that there was
evidence that the defendants had a pre-conceived story.
In other words, that there is -- where there is evidence
of a storyline that has been conceived in advance of an
investigation, and then the defendants consciously set
out to make the evidence conform to the preconceived
story, is evidence of actual malice.  The plaintiff
relies on Plaintiff's Exhibit 25 as the evidence for this
particular point, that being the so-called "draft number
three."  I think it's actually the response to draft
number 3 of the video.

The problem with that argument is that the
evidence shows that the events occurred in the opposite
order.  It wasn't that the storyline was preconceived and

1  then the defendants consciously set out to make the

2  evidence conform by a subsequent investigation.  The

3  provision that was -- the clips that were used by the

4  defendant, the most operative one coming from September

5  15th with Mr. Foval, and then this concept of adding this

6  in to the video is in this memo of October 14th, a month

7  later.  So this particular provision of the law does not

8  have any application to the evidence as presented by the

9  plaintiff.

10        The second point that was presented on behalf of

11  the plaintiff was that Mr.  Hartsock never asked

12  Mr. Foval the name of the woman to whom he was referring.

13  I find that argument to be unpersuasive because it is

14  setting a standard of interview for journalists.  For

15  instance, if an attorney doesn't ask that additional

16  question during a trial, or during a deposition, that's

17  not even a basis for a claim in negligence against an

18  attorney.  There is no First Amendment liability on the

19  part of an attorney.  I mean even under a *Strickland v*

20  *Washington* sort of analysis where an attorney is

21  questioning an attorney's method of interviewing or

22  deposing or examining a witness isn't held to that

23  standard.  And, therefore, to impose that standard with

24  regard to a particular question, I believe, is a great,

25  great stretch with regard to the issue of what

constitutes evidence of actual malice.

The third point that was made by or on behalf of the plaintiff was that Mr. Hartsock did not contact the plaintiff to ask her view. But, again, under the circumstances here, particularly with the nature of the information that was before the defendants, it is very questionable as to what that might yield. And the second part, or the companion part of that point made on behalf of the plaintiff, was that the defendants were on notice by the *New York Times* article in which the plaintiff's response was given. The problem with that argument is it came after the publication of the video that is really the one that is at question in this case. So, again, it is a great stretch to refer to that as being evidence of actual malice.

The fourth point that was made on behalf of the plaintiff was that Mr. Foval was inherently unreliable as a source and, therefore, Mr. Foval could not be believed in assembling the video -- the statement. However, Mr. Foval's statements were statements against interest. As reflected in our rules of evidence, particularly Rule 804(b)(3), statements of interest are considered to be of higher reliability, not lower reliability. So, once again, I find it difficult to see how this constitutes evidence of malice, particularly constitutional actual

1    malice, on the part of the defendants.

2        The fifth point that the plaintiff -- that was

3    made on behalf of the plaintiff was the excising from the

4    video the statement by Mr. Foval of, "we didn't know who

5    she was ahead of time," and that that should have led to

6    further investigation.  However, it is clear from looking

7    at the raw video that whoever Mr. Foval was talking

8    about, when he said we didn't know who she was ahead of

9    time, that he was talking about precisely the same person

10   as to whom he was referring when he said, "She's one of

11   ours."  Therefore, there is no contradiction as to there

12   being two different people being identified here and,

13   therefore, it does not give rise to an inference that the

14   defendants should have investigated further as to which

15   person Mr. Foval was talking about when it appeared that

16   he was talking about the elderly woman in North Carolina.

17       Any one of these points, if they are evidence at

18   all of actual malice, would constitute, really, the

19   thinnest of thin reeds.  I think that this would be a

20   difficult question if we were deciding this element on a

21   preponderance of the evidence standard but we're not.

22   The law requires, and the Supreme Court has made clear

23   under the *Liberty Lobby* case, that I not only have to

24   look at this from the standpoint of whether or not there

25   is the thinnest of thin reeds, that scintilla of

1  evidence, but rather whether a jury could find by clear

2  and convincing evidence that there was actual malice.

3  And these very thin reeds, which I believe as to several

4  of these are really no evidence of malice at all, are

5  insufficient to meet that standard.  Therefore, for that

6  reason, the defendant's motion -- defendant's motions

7  pursuant to Rule 50 will be granted.

8      Is there anything further that we need to address?

9      MS.  WELLS:  No, Your Honor.  Thank you very much.

10      THE COURT:  Anything else for the defendants?

11      MR.  DEAN:  No, Your Honor.  Thank you.

12      THE COURT:  Whenever I have something that is of

13  particular difficulty, such as this case, it is my

14  ordinary, knee-jerk reaction to tell the party that I've

15  ruled against that I urge you to have the court of

16  appeals go grade my paper.  To that end, I will say that

17  I will follow this up with a written order before I enter

18  a judgment in this matter that will further elucidate

19  what I'm talking about.

20      And I do have an inclination to say exactly that.

21  I think that if I got this wrong I'd certainly like for

22  somebody to tell me that I got it wrong.  I have a little

23  bit of hesitation in saying that this time.  Because if

24  I've gotten this wrong, and the Fourth Circuit says that

25  this is not what the law is, I hesitate to think where

1   the First Amendment is going in this country.

2          Unless we have something else that we need to

3   address, I will bring the jury in and I will let them

4   know the result and then discharge the jury.  So is there

5   anything else that needs to be discussed?  Okay.

6          Marshal, please bring us the jury.

7                    (Jury returns at 9:25 a.m.)

8          THE COURT:  Ladies and gentlemen of the jury,

9   thank you again for being here on time this morning so

10  that we may continue with our proceedings.  I thank you,

11  also, for your patience and for -- while you've been

12  waiting in the jury room for close to half an hour here,

13  since all of you have arrived, and I assure you it wasn't

14  because we were just fooling around in here.  In fact,

15  after you went home for the evening yesterday we were all

16  here dealing with issues that the law requires that I

17  conduct outside of your presence.  In fact, we were here

18  for a good hour and a half after you left yesterday

19  evening, and then we resumed again this morning with some

20  of those proceedings.  So quite a bit has gone on since

21  you were in this courtroom last.

22         The conclusion of all of those proceedings is

23  that, after having entertained all of the evidence that

24  has been presented by the plaintiff in this case,

25  pursuant to the legal standards that are set out in the

law and in our rules of procedure, I have dismissed the
plaintiff's case and this case is concluded. That means
that your service as members of this jury is likewise
concluded. I realize that that comes with some
frustration on your part for having sat through two days,
and then returned here for a third day, and listening as
attentively as you have to all of these proceedings only
to have everything essentially pulled away from you. I
recognize that that's frustrating, and I apologize for
the frustration but, of course, it's the requirement that
we follow the law as the law is.

    But I also assure you that your presence here has
not been in vain. Because it is as a result of your
being here, it is a result of our ability to impanel the
eight of you as the jury for this case, that has
facilitated this trial going forward, and our proceedings
and our process and our rules of procedure playing out
the way that the law dictates that they should. And it
is only because of that that we have come to the
conclusion that we have with regard to the dispute
between these parties. So, with that, I offer you my
great thanks for what you have done here in listening so
attentively and being here for two days and again here
today.

    Before I discharge you, I want to mention a few

1   things that I've mentioned before but I want to remind

2   you of.  First of all, all along I've been telling you

3   you can't talk to anybody about this case.  As soon as I

4   discharge you, you may talk to whomever you want to but

5   you're not required to talk to anybody.  That's entirely

6   your choice.  You can go home and talk to your family and

7   friends, of course, but the attorneys in this case may

8   contact you.  Members of the media may contact you.  You

9   can talk to them if you want to but you sure don't have

10  to, and that's entirely up to you.  That is your choice.

11         I mentioned to you about the notes that you have

12  taken.  Please leave those on the table in the jury room.

13  No one will read them.  Those notes will be shredded

14  without anybody ever looking at them.  So you don't have

15  to worry about anybody finding your notes or anything

16  that you may have written down or said regarding these

17  proceedings.

18         Please make sure that you leave your cell phone

19  badges with the clerk, who will be in the jury room for

20  that purpose.  Otherwise, the security officers will

21  tackle you on your way out of the building.

22                        (Laughter.)

23         Please also remember if you have a cell phone that

24  is in the little lockers that are in the jury room to

25  make sure that you get you're your cell phone.  Please

1    remember to leave the keys.  Because retrieving those

2    keys, if you leave accidentally with them, becomes very

3    difficult.

4         The last thing that I want to mention is that it

5    is my practice that after a trial is concluded that I

6    come back to the jury room to talk to any members of the

7    jury who wish to stay.  If they have any questions about

8    the court system or how the system works I'll be glad to

9    talk to you for a few minutes.  There's no obligation

10   that you stay.  That's entirely up to you as to whether

11   you want to or not.

12        Again, I thank you more than I can express

13   particularly under these circumstances where you no

14   longer get to make the decision that you were called here

15   to make.  Your presence here, your attentiveness here,

16   has been invaluable to us, and I thank you very much for

17   that.  I thank you for your service to this court.  I

18   thank you for your service to these parties.  I also

19   thank you for your service to your communities.

20        At this time, you're discharged from any further

21   service from this term of court.  Thank you very much.

22        Marshal, please take the jury to the jury room.

23              (Jury excused at 9:30 a.m.)

24        THE COURT:  Is there anything further that we need

25   to address before we recess court?  Anything for the

1  plaintiffs?

2       MR.  SASSER:  Nothing from the plaintiffs, Your

3  Honor.

4       THE COURT:  Anything for the defendants?

5       MR.  DEAN:  No, sir.

6       THE COURT:  Okay.  Once again, I appreciate all of

7  your hard work in this case; I appreciate the good

8  presentations that were made.  Obviously, it's a

9  difficult case for everybody involved and to that end the

10 lawyers made it easy.  In a way, I feel a little bit

11 badly about how much I badgered Ms.  Wells yesterday, but

12 I was trying to extricate, you know, what are all of

13 those points?  I assume it's obvious to you now that I

14 was very troubled about how to overcome the burdens of

15 the law.  With that, we will go ahead and recess court

16 until further call.

17            (Off the record at 9:32 a.m.)

18                    **<u>CERTIFICATE</u>**

19      I, Tracy Rae Dunlap, RMR, CRR, an Official Court
    Reporter for the United States District Court for the
20  Western District of North Carolina, do hereby certify
    that I transcribed, by machine shorthand, the proceedings
21  had in the case of SHIRLEY TETER versus PROJECT VERITAS
    ACTION FUND, et al, Civil Action Number 1:17-CV-256, on
22  May 22, 2019.
         In witness whereof, I have hereto subscribed my
23  name, this 22nd day of May, 2019.

24            __/S/__Tracy Rae Dunlap__
              TRACY RAE DUNLAP, RMR, CRR
25            OFFICIAL COURT  REPORTER